# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

## Greenbelt Division

| | |
|---|---|
| CASA de Maryland, Inc.<br>8151 15th Avenue<br>Hyattsville, MD 20783<br>Prince George's County | |
| | **Civil Action No.** |
| ANITA RAMIREZ and RAMIRO<br>LOPEZ<br>8125 14th Avenue<br>Apt. 2<br>Hyattsville, MD 20783<br>Prince George's County | |
| | **JURY TRIAL DEMANDED** |
| ERVIN OBDULIO RODAS<br>1412 Kanawha Street<br>Apt. 202<br>Hyattsville, MD 20783<br>Prince George's County | |
| JESUS GONZALEZ and MARIA<br>ARELY BONILLA<br>1405 Merrimac Street<br>Apt. 201<br>Hyattsville, MD 20783<br>Prince George's County | |
| MARIA LARA<br>1446 Kanawha Street<br>Apt. 201<br>Hyattsville, MD 20783<br>Prince George's County | |
| NORMA GUADALUPE BELTRAN,<br>1406 University Boulevard<br>Apt. 201<br>Hyattsville, MD 20783<br>Prince George's County | |

Plaintiffs,

v.

ARBOR REALTY TRUST, INC.
A Real Estate Investment Trust
incorporated in Maryland
333 Earle Ovington Boulevard
Suite 900
Uniondale, NY 11553
County of Nassau

       **Serve on:**
       CSC-LAWYERS
       INCORPORATING
       SERVICE COMPANY
       7 St. Paul Street
       Suite 820
       Baltimore, MD 21202

ARBOR REALTY LIMITED
PARTNERSHIP
A Delaware Limited Partnership
333 Earle Ovington Boulevard
Suite 900
Uniondale, NY 11553
County of Nassau

       **Serve on:**
       Corporation Service
       Company
       251 Little Falls Drive
       Wilmington, DE 19808
       County of New Castle

ARBOR MANAGEMENT
ACQUISITION COMPANY, LLC

A Delaware Limited Liability
Company
333 Earle Ovington Boulevard
Suite 900
Uniondale, NY 11553
County of Nassau

**Serve on:**
Corporation Service
Company
251 Little Falls Drive
Wilmington, DE 19808
County of New Castle

ARBOR REALTY SR, INC.
A Real Estate Investment Trust
incorporated in Maryland
20 S Charles Street
Baltimore, MD 21201
Baltimore City, Maryland

**Serve on:**
CSC-LAWYERS
INCORPORATING
SERVICE COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202
Baltimore City

BEDFORD UNITED, LLC
A Delaware Limited Liability
Company
2607 Nostrand Avenue
Brooklyn, NY 11210
Kings County

**Serve on:**
CSC-LAWYERS

INCORPORATING
SERVICE COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202
Baltimore City

VICTORIA UNITED, LLC
A Delaware Limited Liability
Company
2607 Nostrand Avenue
Brooklyn, NY 11210
Kings County

       **Serve on:**
       CSC-LAWYERS
       INCORPORATING
       SERVICE COMPANY
       7 St. Paul Street
       Suite 820
       Baltimore, MD 21202
       Baltimore City

HYATTSVILLE UNITED, LLC
2607 Nostrand Avenue
Brooklyn, NY 11210
Kings County

       **Serve on:**
       CSC-LAWYERS
       INCORPORATING
       SERVICE COMPANY
       7 St. Paul Street
       Suite 820
       Baltimore, MD 21202
       Baltimore City

REALTY MANAGEMENT
SERVICES, INC.
7910 Woodmont Avenue

Suite 350
Bethesda, MD 20814
Montgomery County

**Serve on:**
THE CORPORATION
TRUST,
INCORPORATED
2405 York Road
Suite 201
Lutherville Timonium,
MD 21093-2252

Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

## Table of Contents

I.  INTRODUCTION AND SUMMARY OF CLAIMS .......................................1

II.  JURISDICTION AND VENUE ...................................................35

III.  PARTIES ......................................................................36

  A. Named Plaintiffs..............................................................36

  B. Defendants ...................................................................39

IV.  FACTS.........................................................................41

  A. History and Background of the Real Estate Investment Trust ("REIT")....41

    1.  Housing as a Commodity ..........................................44

    2.  Historical Context of Arbor's Violations.................................46

    3.  Standard Types of Real Estate Investment Strategies and Knowledge of Prospective Investments .................................................49

    4.  The Arbor Family of Companies .............................................52

  B. Defendants Have Engaged in a Pattern and Practice of SystemIC and Intentional Race Discrimination in Communities of Color..............................55

    1.  The Bedford and Victoria Station Community Demographics, Statistical Disparity, and the Disintegration of the Properties .......................56

    2.  Arbor's Knowledge of and Willful Blindness to the Conditions at BVS 64

    3.  Arbor's Washington, DC Metropolitan Portfolio Is Targeted Against Low-Income Minority Communities of Color and the Company's Premeditated Neglect of its Maintenance Responsibilities is Not Limited to the BVS Community .....................................................66

    4.  Arbor's Actions in Other Housing Markets and Statements of its Leadership Demonstrate that Arbor Has Engaged in a Pattern and Practice of Systemic Racial Discrimination Through Targeting and Differential Treatment.................................................................72

  C. Arbor's Targeting, Acquisition, Failure to Maintain, and Outsourcing of the Compliance Obligations of their Properties Discriminates Against Communities of Color ........................................................81

    1.  Statistically Disparate Impact on Minorities in Arbor's Properties Located in the HUD DC Market ..................................................82

    2.   The Result of Arbor's Policies ................................................................94

  D.  Injuries Caused by Defendants' Behavior..................................................96

    1.   Injuries to CASA ..............................................................................96

    2.   Injuries Caused by Defendants' Conduct Continue ...............................99

    3.   Continuing Violation .......................................................................100

 V.  Class Allegations ......................................................................................101

 VI.   Plaintiffs' Claims....................................................................................106

JURY TRIAL DEMANDED ................................................................................123

PRAYER FOR RELIEF .....................................................................................123

Plaintiffs by and through counsel, P. Joseph Donahue and The Donahue Law Firm, LLC, and Jonathan Nace and Nidel & Nace, P.L.L.C., hereby sue the Defendants, and as grounds therefore state as follows:

**"There is a total disconnect between the person living in the home and the person owning the home.  Owning the house is only a means to making money."**

> Joseph Stiglitz, Professor of Economics, Columbia University and Nobel Prize Laureate,
> On the problem of the financialization of the residential housing market.

## I.     INTRODUCTION AND SUMMARY OF CLAIMS

1.     Bedford Station and Victoria Station (referred to collectively herein as "BVS") are two apartment complexes owned and managed by the Defendants in total disregard of federal law and contractual obligations. Tenants in the two complexes comprise one BVS community.  Basic maintenance and necessary repairs to both properties have been ignored and neglected to the point that the exclusively minority families living in them are forced to live in conditions that belie expected housing conditions in the region. The conditions at the BVS properties, deteriorating in real time around the families living in them, would shock the conscience of most Marylanders and others living only a short distance away.

2.     The BVS homes have been neglected as part of a systemic confluence of policies to commoditize and harvest profits in low-income neighborhoods while

delaying reasonable management or maintenance of properties until strategically and financially beneficial to shareholders, all to the detriment of the tenants.

3.      With these policies, BVS presents an unsafe, unsanitary environment where broken windows are routinely replaced with plywood, repurposed wooden doors, or other construction material,







holes in foundations and outside of the buildings, haphazardly plugged or left open,

allow rodents access to the living areas,





holes from collapsing ceilings related to failed plumbing are common,







toxic molds grow without any attempt at remediation,

















persistent, uncontrollable rodent infestations are permitted throughout the kitchens and living spaces leaving feces and bacteria,







insect infestations such as bed bugs have become so terrible that nests are found in

bedroom walls, and the nocturnal insects are so prevalent they can be seen in broad

daylight,









air conditioning units do not function, are often contaminated with mold, are not properly installed, and are refused to be repaired or replaced,





rusted bathroom radiators have been deteriorating for decades and present dangers

to children and adults alike,









peeling paint on fixtures such as bathroom sinks and doors is ubiquitous,







kitchen cupboards are long past their useful life and present havens for the

uncontrollable rodent populations,





electrical and appliance defects present serious, imminent threats of harm,

 

and trash is perpetually blocking parking lots and basement accesses as the

common areas are entirely ignored by management and ownership, leading to

further rat and rodent infestations.





4.     The Named Plaintiffs file this action to vindicate their rights and the rights of the putative class members under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and common law, for compensatory and injunctive relief arising out of Defendants' racially discriminatory conduct affecting their community.  The alleged violations are based on the fact that Defendants' business is to financialize, harvest, and decidedly refuse to invest in maintenance, management or renovation in the low-income and multifamily housing properties they own and manage in the State of Maryland and across the United States.  In other words, to further their business interests and increase shareholder profits, Arbor Realty Trust, Inc., and its subsidiaries have developed and implemented investment theses, policies, and procedures which treat the homes of thousands of tenants of low-income housing in Maryland and across the country as commodities to be bought and sold.

5.     The case arises from overwhelming evidence that Defendants discriminated against communities of color in the State of Maryland – and particularly in Prince George's and Montgomery County – through their targeted purchases of multifamily housing in low-income communities of color and premeditated their neglect of the properties in which Plaintiffs and those similarly situated live.

6.     The disparate effect of their targeted policies in Maryland have borne out most detrimentally on the communities of Bedford and Victoria Station in the small community of Langley Park.  BVS is comprised of 589 one- or two-bedroom apartments whose occupants are 0.0% White, 14.8% African American, and 85.2% Hispanic/Latino.

7.     Plaintiffs' claims are based on intentional discrimination through Defendants' targeting of low-income minority communities, including Defendants' intentionally discriminatory acts, Defendants' responsibility for the intentional acts of their agents, and the Defendants' deliberate indifference to the discriminatory effect of their and/or their agents' acts.  Plaintiffs' claims are also based on disparate impact, as Defendants' otherwise neutral policies and practices have a disparate impact on the protected class of foreign-born and African American tenants of BVS and those similarly situated living in Arbor Properties across the country.

8.     The Organizational Plaintiff, Casa De Maryland ("CASA"), is a private, non-profit community organization dedicated to assisting the minority Hispanic population in and around the DC Metropolitan area and along the eastern seaboard.  CASA advocates for justice alongside the immigrant, Latino, and working-class community in the United States.  They have a presence in 48 states and are the largest immigrant advocacy organization in the mid-Atlantic region, primarily serving the community in Maryland, Virginia, Pennsylvania, and the

District of Columbia.  They work with immigrants from over 140 countries around the world in all facets of advocacy to ensure these communities have an opportunity to thrive.

9.     At all times material to the allegations in this Complaint, Arbor Realty Trust, Inc. and its subsidiaries (referred to hereinafter collectively with the Arbor-owned or -affiliated co-defendants as "Arbor" or "the Company")[1] are able to take advantage of communities whose average median incomes are amongst the lowest in the country, but whose hard work and history of faithfully paying their rent at all costs to avoid homelessness has resulted in steady cash flows for Arbor and its shareholders.  In addition to their low incomes, however, these tenants are also exclusively minority.

10.    An investigation by CASA revealed a systematic and particularized pattern of differential treatment by Arbor in acquiring multifamily residential properties in low-income areas with rental populations that are majority minority Hispanic or African American.  These properties represent steady cash flows for Arbor's shareholders.  However, to ensure maximum return for the publicly traded Company's steadily increasing dividends and share value, Arbor's centralized

---

[1] Each reference to Arbor in this Complaint refers collectively to each of the co-defendants, and any other subsidiary or division of these entities that plays a role in owning or maintaining, buying or selling the multi-family residential properties of Arbor, with the exception of Defendant Realty Management Services, Inc., unless otherwise indicated.

leadership deliberately chooses not to make necessary capital improvements to the aging properties.

11. Alternatively, in areas where Arbor leadership deems a property to be located in a "desirable submarket" or if the neighborhood is "rapidly changing" in terms of demographics from majority minority to White, Arbor either (1) sells the property for a profit to developers or private equity firms who update, repair, and/or redevelop the property, or (2) alternatively, Arbor partners with a developer or firm to retain the properties and the renovations allow for increased rents – and increased dividends for its shareholders.

12. As a result of Defendants' discriminatory conduct and perpetuation of residential segregation, residents of BVS, including Individual Plaintiffs and those similarly situated, have been: (a) denied housing opportunities and had housing made unavailable, and (b) subjected to deteriorating, dilapidated, and dangerous living conditions in their neighborhood through Arbor's refusal to maintain and repair the properties, which has caused significant and permanent harm to the Plaintiffs and those similarly situated.

13. The differential treatment is the result of Arbor's targeting of these properties which the company is fully aware are inhabited overwhelmingly by Hispanic or African American working-class low-income communities with strong historical and familial ties to the community, as well as newly arrived immigrants.

Like reverse redlining, Arbor targets properties at the lowest level of real estate quality spectrum located in low-income communities – often communities of color – acquires their multifamily residences (as with BVS, often out of foreclosure), and systematically increases the rent year-over-year, without making the capital investments in the property that are required to make the property safe for human habitation, which results in increased dividends for Arbor shareholders.

14.   The policies leading to disparate impact are crushing the BVS Community through Arbor's retention of ownership of the properties which do not currently present a "value-add" opportunity for redevelopment, but which are instead held and "harvested" for annually increasing rents, while the much-needed capital improvements are delayed indefinitely or until the market conditions are right for Arbor to partner to redevelop or sell the property to developers for a profit.  In essence, Arbor's actions are that of a strip-mining firm, exhausting residential multifamily low-income properties in communities of color of their only remaining asset – the cash flows of its low-income minority tenants who, based on their position in American society, have little or no other option for housing.  Arbor's policies violate the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, 3604 (a) and (b), and HUD's implementing regulations, as well as Maryland contract and common law.

15.   In addition to the severe injuries to the Individual Plaintiffs and those similarly situated, Arbor's conduct has caused particularized and concrete injury to

Organizational Plaintiff CASA. Arbor's discriminatory practices of failing to basically maintain and/or update its properties that house low-income Hispanic members of CASA's organization, have interfered with the Organizational Plaintiff's activities and programs designed to promote compliance with fair housing laws, advance and uplift the immigrant community who comprise CASA's membership, and have frustrated CASA's mission by perpetuating the unlawful discrimination and segregation they use their limited resources to dismantle. CASA's purposes and interests fall squarely within the zone of interest protected by the Fair Housing Act. Arbor's discriminatory behavior has caused the Organizational Plaintiff to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendants' unlawful conduct and engaging in outreach and education efforts specifically to address Arbor's ongoing discrimination in the BVS Community. These efforts go above and beyond CASA's normal operational activities and expenses.

## II.     JURISDICTION AND VENUE

16.    This civil action arises under the laws of the United States of America. This Court has original jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. § 3613 (Fair Housing Act, private right of action for damages and injunctive relief).

17.   Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims brought under Maryland law because they are related to Plaintiffs' federal claims and arise out of a common nucleus of related facts.

18.   Further, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum or value of $5 million and the action is between multiple members of the class, who are not citizens of any U.S. State or commonwealth for purposes of diversity but of foreign sovereigns due to national origin on the one hand, and defendants who are citizens of the States of Maryland, Delaware, and New York on the other. Upon information and belief, less than two-thirds of the members of the proposed class in the aggregate are citizens of the States of any of Maryland, Delaware, or New York.  The number of members of all proposed plaintiff classes in the aggregate is more than 100.

19.   Venue herein is proper under 28 U.S.C. §§ 1391 (b)(1) and (2).  The Named Plaintiffs reside in Hyattsville, Maryland in Prince George's County, within the Southern Division in the United States District of Maryland and the events or omissions giving rise to the claims occurred in this district and division.

### III.   PARTIES

#### A.   NAMED PLAINTIFFS

20.   CASA de Maryland, Inc. is one of the largest immigrant rights membership organizations in the Mid-Atlantic region, with their headquarters in

Langley Park.  CASA works with immigrants' groups and communities inside and outside of Langley Park to promote human rights and fight discrimination.  They partner with local governments, private foundations, individuals, congregations, civic associations, and other organizations to provide a voice for tenants in Prince George's County, and provide resources to tenants, such as low- or no-cost legal services related to issues of housing and immigration matters.  They also assist with tenant organizing and offer educational resources and services regarding tenant rights.

21.   Named Plaintiff Anita Ramirez is an Hispanic woman with a national origin of Guatemala, and the spouse of Ramiro Lopez, an Hispanic man with a national origin of Guatemala.  They live at 8125 14th Avenue, Apt. 2, Hyattsville, MD, an apartment in Victoria Station.  Anita Ramirez is an existing member of Casa de Maryland.  Ms. Ramirez and her husband pay $1520 per month for their two-bedroom apartment where they live with three minor children.  Their apartment is contaminated with visible mold throughout.  The apartment is also infested with mice, roaches and other insects, and suffers electrical defects that cause supplied air conditioning and the stove to be defective.  Ms. Ramirez and Mr. Lopez currently are forced to utilize an extension cord to ensure that their electrical stove can receive electricity.  They have made numerous requests to fix these defects, but management

will either fail to answer the phone completely or will fail to remediate the defects as requested.

22.   Named Plaintiff Erwin Rodas is an Hispanic man with a national origin of Guatemala.  He lives at 1412 Kanawha Street, Apt. 202, Hyattsville, MD 20783, an apartment in Bedford Station.  Mr. Rodas is an existing member of Casa de Maryland.  He pays $1559 per month for a two-bedroom apartment where he lives by himself.  His apartment is contaminated with visible mold in the bathroom, kitchen and at least one bedroom.  He has previously had problems with insect infestation and electrical failures.  He has made numerous requests for management to remediate mold and other defects in his apartment, but his requests have been ignored.

23.   Named Plaintiff Jesus Gonzalez is an Hispanic man with a national origin of El Salvador and a member of Casa de Maryland.  Maria Bonilla is an Hispanic woman with a national origin of El Salvador and the wife of Jesus Gonzalez.  They live at 1405 Merrimac Drive, Apt. 201, Hyattsville, MD 20783, an apartment in Victoria Station.  They pay $1559 per month.  Their apartment suffers defects including water intrusion throughout the ceiling in the apartment, defective HVAC which was supplied by Defendants but does not work, electrical defects throughout, and insect infestation.  They have notified Defendants of these defects, but Defendants have not made attempts to remediate the defective conditions.

24.     Named Plaintiff Maria Lara is an Hispanic woman.  She lives at 1446 Kanawha Street, Apt. 201, Hyattsville, MD 20783, an apartment in Bedford Station with her minor daughter for which she pays $1613 per month.  She is a member of Casa de Maryland.  Her apartment is contaminated with mold, has defective HVAC, a defective stove, defective flooring and a defective bathroom.  Her apartment also has dangerous electrical defects, is infested with insects, and has a defective refrigerator and oven.  She has complained to Defendants of these defects, but Defendants have ignored her requests and refused to remediate the defects.

25.     Plaintiff Norma Beltran lives at 1406 University Blvd., Apt. 201, Hyattsville, MD 20783 an apartment in Bedford Station for which she pays $1552 per month.  She is a member of Casa de Maryland.  Her apartment is contaminated with mold, has water intrusion, mice, insects, as well as stove and refrigerator defects.  She has complained to Defendants and requested remediation, but her requests have been ignored or the repairs have otherwise failed to have been made.

## B.   DEFENDANTS

26.     Defendant Arbor Realty Trust, Inc. is a publicly traded (NYSE:ABR) real estate investment trust incorporated in Maryland.  Arbor Realty Trust, Inc. is the parent company and/or exerts controlling authority over the co-defendants and subsidiaries Arbor Realty Limited Partnership, Arbor Management Acquisition Company, LLC, Arbor Realty SR, Inc., Bedford United, LLC, Victoria United, LLC,

and Hyattsville United, LLC.  Arbor Realty Trust, Inc. is a specialized real estate finance company that invests in real estate-related bridge and mezzanine loans, preferred equity, discounted mortgage notes, and other real estate-related assets such as the properties of Bedford and Victoria Station.

27.     Defendant Arbor Realty Limited Partnership ("ARLP") is the operating partnership of Arbor Realty Trust, Inc. through which substantially all of Arbor Realty Trust, Inc.'s operations are conducted.  Arbor Realty Trust, Inc. is also the corporate parent of Arbor Realty GPOP, Inc., who is the General Partner of ARLP.

28.     Defendant Arbor Management Acquisition Company, LLC ("AMAC") is a subsidiary of Arbor Realty Trust, Inc. and a national commercial real estate investment firm founded in 2012, which owns and operates over 8,000 units and has acquired more than $1.75 billion of multifamily properties across the country.

29.     Defendant Arbor Realty SR, Inc. is a real estate investment trust incorporated in Maryland.  It is a subsidiary of Defendant Arbor Realty Trust, Inc.

30.     Defendant Bedford United, LLC is a single purpose Delaware limited liability company structured to be bankruptcy-remote, with one independent director in its organizational structure.  Bedford United, LLC owns the Bedford Station Apartments which are comprised of approximately 488 one- and two-bedroom units constructed in approximately 1947 and located in Langley Park.  Bedford United, LLC, is owned and controlled by Arbor Realty Trust, Inc. and its subsidiaries.

31.    Defendant Victoria United, LLC is a single purpose Delaware limited liability company structured to be bankruptcy-remote, with one independent director in its organizational structure.   Victoria United, LLC owns the Victoria Station Apartments which are comprised of approximately 101 one- and two-bedroom units constructed in approximately 1947 and located in Langley Park.  Victoria United, LLC, is owned and controlled by Arbor Realty Trust, Inc. and its subsidiaries.

32.    Defendant Hyattsville United, LLC is a single purpose single member Delaware limited liability company.   Hyattsville United, LLC, is owned and controlled by Arbor Realty Trust, Inc. and its subsidiaries.

33.    Defendant Realty Management Services, Inc. d/b/a Ross Management (collectively referred to hereinafter as "Ross") is a domestic corporation doing business in the State of Maryland via the registered trade name "Ross Management Services" and the management company of the relevant properties known as Bedford Station and Victoria Station.

## IV.    FACTS

### A.    HISTORY AND BACKGROUND OF THE REAL ESTATE INVESTMENT TRUST ("REIT")

34.    Congress first established REITs in 1960 with the passage of the Cigar Excise Tax Extension.   Contained in that Act was legislation which authorized REITs in the United States.  In approximately 1965, REITs first became publicly traded on the New York Stock Exchange ("NYSE").

35.    REITs provide a way for individual investors to earn a share of the income produced through real estate ownership without actually purchasing and managing the real estate themselves.

36.    Most REITs specialize in a single type of real estate such as retail, office space, healthcare, industrial space, or, as in this case, residential multifamily real estate – apartment buildings.

37.    A REIT is distinguished from other real estate companies in that a REIT must acquire and develop its real estate properties primarily to operate them as part of its own investment portfolio, as opposed to reselling the properties after they have been developed.

38.    To qualify as a REIT, a company must comply with certain provisions of the Internal Revenue Code ("IRC").  Pursuant to the IRC, a company that qualifies as a REIT is allowed to deduct from its corporate taxable income all of the dividends that it pays out to its shareholders.

39.    To qualify as a REIT under the IRC, a company must meet a number of requirements, but chief among them is that the company must pay a minimum of 90% of its taxable income in the form of shareholder dividends each year.  The income is derived almost exclusively from rents.  In other words, REITs avoid having to pay corporate tax if they distribute at least 90% of the rents from their tenants to their shareholders as dividends.

40.     Any decision to spend finances to maintain, manage, improve or renovate a property will result in lower dividends for shareholders, and potentially a concomitant lower stock price for publicly traded companies.

41.     In 1986, further legislation was passed which simplified the REIT industry.   One such simplification allowed REITs to be managed, like other companies, by their own internal management teams instead of by outside advisers. This process was simplified further in 2004 with the passage of the REIT Improvement Act under the Second Bush Administration, which allowed REITs to manage their day-to-day business operations more effectively for the benefit of their shareholders and stock values.

42.     In 2008, in the midst of the Great Recession, the REIT Investment and Diversification Act was passed which allowed REITs to buy and sell real estate assets more quickly and efficiently.

43.     There are three main types of REITs: (1) Equity REITs which own and operate income-producing real estate; (2) Mortgage REITs which lend money directly to real estate owners and operators through mortgages and loans or indirectly through acquisition of mortgage-backed securities; and (3) Hybrid REITs which are a combination of an Equity REIT and a Mortgage REIT.   Defendant Arbor is a Hybrid REIT.

44.    The primary sources of revenue for an Equity REIT come from rents received through the real property owned by the REIT, while the primary source of revenue for a Mortgage REIT is generated from the interest and fees related to mortgage loans.

45.    REITs are attractive investments because they are able to pay higher dividends due to this legal requirement to pay 90% of their taxable income to shareholders.   Because the taxable income doesn't include tax deductions like depreciation, this gives REITs the ability to keep cash on hand in order to stay liquid during difficult economic periods.

### 1.    HOUSING AS A COMMODITY

46.    A commodity is "[a]n article of trade or commerce.  The term embraces only tangible goods, such as products or merchandise, as distinguished from services."  COMMODITY, Black's Law Dictionary (11th ed. 2019).  Until the late twentieth century, housing was not commonly treated as a commodity.

47.    For most of American history housing has been governed by the market.  However, in recent decades, financial actors such as Arbor have become increasingly dominant on this market.  This trend has been referred to as the "commodification" or "financialization" of the housing market.  The REIT structure has provided a convenient vehicle to take advantage of this recent trend.

48.     Financialization of the housing market has had two major effects.  First, the mortgage market turned housing into a tradeable debt on financial markets in the form of mortgage-backed securities, the under-regulation of which was a significant contributing factor to the Great Recession.  Second, and importantly for present purpose, the financialization has greatly increased the significance of residential real estate as an asset of investment and wealth accumulation.

49.     The vast number of residential properties subject to foreclosures in the aftermath of the Great Recession created an opportunity for investors such as Arbor to cheaply purchase them.  Indeed, because of the financialization of housing, residential real estate is the biggest asset class in the world.  As a result of the financialization of the housing market, there is now a national and global market for residential real estate for purposes other than for simply providing housing for tenants to reside while making money, but further, **to buy and acquire housing as commodities with the intent that they provide *income* through rent while also passively increasing the owners' (or shareholders') *wealth* through expected commodity (the real estate) capital appreciation**.

50.     The purposes of these investments are to re-sell the properties with profit, sometimes after demolishing them to rebuild and individually sell luxury apartments.  Alternatively, homes are turned into rental apartments or are refurbished to profit from increased rents.  In other instances, these housing

investments are made for the purpose of using the property as office space or hotel accommodation.  In each instance, the real estate is treated as a commodity or mere asset, while the service or obligation of providing clean, safe, habitable homes is ancillary or non-existent.

51.   But the REIT model does not lend itself to buying and reselling properties.  Because the rents on the properties translate to dividends for investors, a REIT creates its returns by, *inter alia*, buying properties, holding the properties, and raising the rents annually.

52.   As discussed further *infra*, Arbor's unlawful policies fall outside of these otherwise legally reasonable approaches to residential real estate, and those polices are having a devasting impact on the protected class residents of BVS, and the similarly situated tenants of Arbor properties across the country.

## 2.   HISTORICAL CONTEXT OF ARBOR'S VIOLATIONS

53.   The failure by Arbor to ensure habitable conditions in the BVS community is a continuation of the well-documented history of residential discrimination against minorities and minority neighborhoods in this country by financial actors such as banks, mortgage origination and servicing companies, and other financial actors alike.

54.   It is now a well-established chapter of American history that Black and Brown individuals have been denied access to safe and habitable housing on the

same terms as their White counterparts.  In the twentieth century, mortgages were withheld from neighborhoods of color through redlining.  In the years leading up to the Great Recession, neighborhoods of color were targeted for expensive, predatory, and unfair mortgages.  Once those predatory mortgages reached their obvious conclusion, i.e., foreclosures and homelessness of their targets and the repossession of the houses by the banks, financial institutions took ownership of the homes, and in many instances across the country – and almost exclusively in the Black and Brown neighborhoods – ceased maintaining the vacant homes themselves.  Those numerous failures further contributed to the blight in these Black and Brown neighborhoods.

55.   The next chapter in the story is the financial industry's discrimination against these communities in residential multifamily rentals.   Following the foreclosure crisis and the Great Recession, companies such as Arbor focused their investing more heavily on what the industry termed the "multifamily asset class."

56.   Where other asset classes, such as travel and hotels, storage units, restaurants, or commercial office space, suffered during the Great Recession and during other downturns in the economy, the "multifamily asset class" consistently outperformed these other classes.  The reason for this is plain: when people lose their jobs due to a downturn in the economy, they stop spending money where it is not necessary.  They stop eating at restaurants, they cancel their plans to fly to a vacation

destination and stay in a hotel, or to take a cruise.  But they rarely stop paying their rent.

57.    While investors may have been aware of this fact prior to the Great Recession, that economic collapse inspired a new wave of multifamily investing by the financial industry.  Arbor's Founder, Chairman, and CEO, Ivan Kaufman made the following observation during the middle of the COVID Pandemic in 2020:

> Our core asset class is multi-family.  And that's not by accident. Going through several recessions and going through the Great Recession it was very clear to us that the multifamily asset class is extremely resilient.  Even if it goes down, it comes back very very quickly.   So, while we were only 30% in the past of multifamily assets as part of our balance sheet, we are now over 80%, and we made it a very very clear operational strategy to stick to multi-family, and that is why through this downturn, not only are we not negatively affected, **we are one of the winners**.

Josh King, *Arbor Realty Trust CEO Ivan Kaufman Builds an Empire from Multifamily Homes*, INSIDE THE ICE HOUSE (Aug. 24, 2020) https://www.theice.com/insights/conversations/inside-the-ice-house/arbor-realty-trust-ceo-ivan-kaufman-builds-an-empire-from-multifamily-homes    (emphasis added).

58.    Indeed, the reason for the resilience of the "multifamily asset class" can be explained very simply: people need a place to live, and when they are poor, they will pay almost everything they have for a home. To paraphrase an old line: when the paycheck comes in, the first thing paid is the housing.

59. However, the financialization of the housing industry, and the business model deployed by Arbor to increase dividends, relies not only on their tenants paying rents, but also on increasing annual rents year after year. In addition, when tenants are unable pay their rent, the model relies heavily on rapid evictions of delinquent tenants and replacement with new tenants, a necessary step in staying profitable and ensuring returns for shareholders.

### 3. STANDARD TYPES OF REAL ESTATE INVESTMENT STRATEGIES AND KNOWLEDGE OF PROSPECTIVE INVESTMENTS

60. Commercial real estate investment strategies generally fall into one of three different categories: (1) Core, (2) Value-Add, and (3) Opportunistic investments.

    a. "Core" investments are generally stabilized, fully leased, secure investments with established and predictable cash flows. These types of investments generally do not experience significant capital appreciation in value but provide stable and predictable cash flow with relatively low risk, an attractive attribute for shareholders. Notably, these core investments are usually characterized by (1) long term leases with (2) high credit tenants in (3) buildings that require little to no improvement on behalf of the new owners in (4) desirable locations (5), who are then able to hold the investments for long

periods of time.  Because of these characteristics, these investments are generally seen as low risk.

b. "<u>Value-Add</u>" investments are made in commercial properties that also share the established cash flows of core investments, but which require improvement or repositioning of the property to allow it to command higher rents.  "Value-Add" investments will typically generate higher returns than core investments because of the appreciation in value of the underlying property once the capital investments have been made. These investments are generally considered higher risk because in order to be successful, the acquisition, management, and improvement must be monitored, and the business plan implemented for the property.

c. "<u>Opportunistic</u>" investments are similar to "value-add" except the risk is even higher.  An opportunistic investment property tends to need significant or complete rehabilitation.  The property may be a vacant lot that requires completely new construction or, in many cases, may be an extremely old property that requires complete demolition and rebuilding.

61.  Arbor and other financial actors who specialize in residential multifamily investing have a wealth of information at their disposal when

determining whether or not to invest in a given property.   Among the various categories of data available to speculators such as Arbor are, at a minimum:

      a.  age of the property and when if ever it had been renovated;

      b.  rental rate history and trends;

      c.  overall occupancy history and trends;

      d.  demographics of the tenants to include race and nationality;

      e.  median incomes of the tenants;

      f.  median age of tenants;

      g.  employment status of the tenants;

      h.  population density;

      i.  operational costs and expense data on the property;

      j. median incomes of the residents of the surrounding community;

      k. location or existence of opportunity zones; and

      l. identical data for all comparable properties in the specific real estate market

62.   This information allows actors like Arbor to create an investment thesis or policy as it relates to a specific property based on specific characteristics of that property, and to make a business decision with regard to (1) which category the property falls (core, value-add, or opportunistic), (2) how the investment will create a financial return, and (3) what the exit strategy is for the investment in the specific property.   Given their knowledge, intricate understanding, and mastery of this

portion of the real estate market, Arbor's leadership is fully aware of each type of investment and what business decisions will create the largest return for their shareholders.

### 4.   THE ARBOR FAMILY OF COMPANIES

63.   Given the hybrid REIT model on which Arbor is based, the company has a number of sizeable and significant affiliates referred to by their CEO Ivan Kaufman as "lines of business," to include, *inter alia*, the following:

a.   Arbor Realty Trust, Inc.

b.   Arbor Realty SR, Inc.

c.   Arbor Realty Limited Partnership

d.   Arbor Realty GPOP, Inc.

e.   Arbor Management Acquisition Company, LLC

f.   Arbor Commercial Mortgage, LLC

g.   ArborCrowd management Holdings and ArborCrowd Holding Company, LLC and their affiliates (d.b.a. collectively as "ArborCrowd")

64.   These "lines of business" operate in such a manner that the shell companies which hold the underlying properties are mere instrumentalities.  These companies and their various but often related, leadership exhibit complete control over their sister and subsidiary companies such as Defendants Bedford United, LLC, Victoria United, LLC, and Hyattsville United, LLC.  Such control is used by Arbor

to implement the policies discussed herein and such control and breach of duty has proximately caused damages to Plaintiffs.

65.    Arbor and its subsidiaries were primarily founded and are now led in part by family members Ivan Kaufman and his two sons, Adam Kaufman and Maurice Kaufman.

66.    According to ArborCrowd's website, Ivan Kaufman is the Co-Founder and CEO of ArborCrowd and was the founder of a number of the Defendant entities over the course of the last four decades.  Regarding Ivan Kaufman, the company's website provides the following:

> a.  He is currently the Founder, Chairman, President and CEO of Defendant Arbor Realty Trust, Inc., a leading multifamily and commercial real estate lender and real estate investment trust that became publicly traded (NYSE:ABR) in April 2004.
>
> b.  He is the Founder and CEO of Arbor Commercial Mortgage, LLC, ("ACM") a multifamily finance company he established in 1995.
>
> c.  He is the Co-founder and Principal of Defendant Arbor Management Acquisition Company ("AMAC"), a national commercial real estate investor and operator that was formed in 2012.

67.    Ivan Kaufman himself refers to these entities as a single entity with mere formal distinction under the control of AMAC, which exceeds that which is typical between parent and subsidiary.  According to the 2021 Special Report issued by Ivan Kaufman as CEO of Arbor, "[AMAC] is an investment firm created in 2012, which owns and operates over 8,000 units and has acquired more than $1.75 billion of multifamily properties across the country."

68.    Arbor has numerous subsidiaries.  According to documents filed with the SEC, some of their "Significant Subsidiaries" are a number of tax shelter entities registered to do business in the Cayman Islands.

69.    An additional "Significant Subsidiary" is that of Defendant Arbor Realty SR, Inc. ("Arbor SR"), which is organized and operates as a REIT in the State of Maryland.   On December 22, 2005, Ivan Kaufman signed the Articles of Amendment and Restatement of the Articles of Incorporation of Arbor SR as the "President" of Arbor SR.

70.    According to SEC filings, Arbor SR "is a subsidiary of [Defendant] Arbor Realty Trust, Inc., a specialized real estate finance company that invests in real estate-related bridge and mezzanine loans, preferred equity, and in limited cases, discounted mortgage notes and other real estate-related assets."

71.    According to W-9s supplied by Arbor and Ross to tenants of BVS, Defendant Hyattsville United, LLC is the entity that collects rents on behalf of

Arbor.  Upon information and belief, these rents are then automatically directed to whichever entity Arbor has assigned them.

72.    Adam Kaufman is a co-founder and the COO of ArborCrowd, which, according to its website, is the first crowdfunding platform launched by a real estate institution.  Furthermore, "he oversees ArborCrowd's corporate growth strategies, including business development, digital technology, acquisitions, and marketing and sales initiatives."  According to its website, "[m]arrying technology and real estate, Adam developed ArborCrowd to make real estate investing more accessible to a wider group of investors."

73.    Maurice Kaufman is a founding Principal of Defendant AMAC, and according to the company's website, "oversees all facets of the company, including acquisitions, business development, asset management and investor relations."

74.    Each of the Defendants works in agreement amongst themselves and with property managers – in the case of BVS, the property manager is Ross – to conspire to implement policies that violate the FHA and cause the apartments to be uninhabitable as a further breach of contract and local ordinances.

### B.   DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN COMMUNITIES OF COLOR

75.    A "pattern or practice" of discrimination refers to systemic intentional discrimination  affecting  a  large  group  of  persons.    Statistical  evidence  of  a

sufficiently gross disparity over time between the affected population and the general population may establish an inference of intentional discrimination.

76.    To prove systemic discrimination, a plaintiff must show that the discrimination was the defendant's standard operating procedure, more than the mere occurrence of isolated or sporadic discriminatory acts.  A plaintiff can establish that discrimination was the defendant's standard operating procedure by, among other things, presenting statistical evidence of similarly situated persons not in the protected class who were treated better than those in the protected class.

    **1.    THE BEDFORD AND VICTORIA STATION COMMUNITY DEMOGRAPHICS, STATISTICAL DISPARITY, AND THE DISINTEGRATION OF THE PROPERTIES**

77.    Victoria and Bedford Station are located in the community of Langley Park, an inner-ring suburb of Washington, DC, located in Prince George's County ("PG County").  As with many inner-ring suburbs in the United States, Langley Park suffers from aging infrastructure and housing that have not seen investment in decades.

78.    PG County is approximately 61% African American.  Alternatively, the African American population of Maryland statewide is only 29.7%.  While the minority Hispanic population is rapidly growing throughout Maryland, that growth is centralized to the inner-ring suburbs inside the Capital Beltway in PG County, where the percentage of Hispanics at 19.5%, is nearly double the 10.6% population

of Hispanics in Maryland statewide.   Alternatively, the White population of Prince George's County is 12.1% as compared to the statewide White population of 49.8%.

79.    The majority of Hispanics in PG County live in the inner-ring suburbs inside the Capital Beltway, such as Langley Park, East Riverdale, Riverdale Park, Edmonston, and Brentwood.  The areas with the highest population densities and poverty levels are also largely located inside the Beltway.  Langley Park, East Riverdale, Bladensburg, Greater Landover, Seat Pleasant, and Suitland/Silver Hill all have large concentrations of low- to moderate-income households.

80.    PG County suffered disproportionately during the Great Recession, with the highest foreclosure rates in the region, and its economy has not recovered at the rate of its neighboring counties.  Furthermore, as of 2016, of the roughly 99,000 multifamily housing units in PG County, nearly a quarter (25,000) were built in 1959 or earlier.  In Langley Park specifically – the location of BVS and like BVS – 54% of the housing units are 55 years or older.

81.    The PG County Department of Permitting, Inspections, and Enforcement ("DPIE") maintains a list of "distressed properties."  A property is placed on the distressed property list when it displays at least one of the following conditions: improper management, inadequate maintenance, failure to comply in a timely manner with violation notices, failure or refusal to meet minimum code

standards, failure to satisfy tenant requests for repairs, or any such cause that provides an unsafe and/or unhealthy living environment.

82.     Bedford Station, **built in approximately 1947 and never significantly renovated**, is comprised of 488 one- and two-bedroom units spread out among several three-story buildings. The complex was placed on the distressed properties list in September 2012 prior to its acquisition by Arbor. The rental license for Bedford Station was renewed in January 2016, despite the fact that the property remained on the distressed properties list.

83.     Victoria Station, **built in approximately 1947 and never significantly renovated**, is comprised of 101 one- and two-bedroom units.  It was also placed on the distressed properties list in September 2012 prior to its acquisition by Arbor. The rental license for Victoria Station was renewed in April 2015, despite the fact that it also remained on the distressed properties list.

84.     Of the total multifamily housing units located in Langley Park, 71% of the units are located within the 13 apartment complexes represented in Figure 1:

| Complex | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|
| | Inspections | Violations | Inspections | Violations | Inspections | Violations | Inspections | Violations |
| Langley Gardens | 0 | 0 | 15 | 27 | 0 | 0 | 8 | 20 |
| Quebec Arms | 6 | 6 | 3 | 5 | 0 | 0 | 1 | 2 |
| University Landing | 0 | 0 | 6 | 8 | 0 | 0 | 0 | 0 |
| Campus Gardens | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hampshire Village | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Langley Terrace | 0 | 0 | 12 | 26 | 0 | 0 | 0 | 0 |
| Liberty Place | 10 | 16 | 1 | 2 | 14 | 37 | 0 | 0 |
| University Gardens | 1 | 3 | 3 | 12 | 0 | 0 | 1 | 1 |
| Victoria Crossing | 1 | 1 | 17 | 37 | 4 | 26 | 21 | 85 |
| Victoria Station | 81 | 282 | 58 | 219 | 19 | 54 | 16 | 38 |
| Villas at Langley | 29 | 179 | 26 | 114 | 21 | 61 | 10 | 62 |
| Bedford Station | 149 | 479 | 101 | 434 | 81 | 239 | 158 | 417 |
| University City | 10 | 10 | 6 | 27 | 13 | 83 | 3 | 8 |
| TOTAL | 288 | 978 | 249 | 912 | 152 | 500 | 218 | 633 |

**Figure 1. Number of Inspections and Violations by Year for Langley Park Apartment Complexes**

85.    Among the complexes, Bedford Station had the highest number of inspections and violations every year during the time period from 2014-2017, while the complex with the lowest number of inspections and violations varied each year.

86.    Between the two properties, there have been thousands of code violations discovered over the years.  Between 2014 and 2017 alone there were approximately 2,162 code violations.  As a result, over this time period, for every

inspection of a BVS unit that was undertaken by PG County, there were 3.3 code violations discovered.

87.    However, this number underestimates the direness of the situation.  In none of those years were all the apartments ever inspected.  Indeed, during this time period, the number of inspections conducted averaged only 28.25% of the total number of 589 BVS apartments.

88.    Code violations were placed into one of ten categories based on the type of violation.   The categories  with  the  highest  number  of  violations  relate  to maintenance issues, such as peeling paint and broken windows. The categories with lowest numbers of violations include those that pose serious health risks, such as unsanitary conditions and pests. Thus, even low levels of these violations should raise serious concern.  Figure 2 shows the distribution of code violations by category.



**Figure 2 – Violations Related to Household Health Hazards for Langley Park Apartment Complexes, 2014-2017**

89.     A description of the various types of code violations are reflected in Figure 3.

| Category | Description |
|---|---|
| Pests | This refers to any code violation related to insect/rodent infestation (i.e. roaches, bed bugs, and rats) |
| Trash / Unsanitary Condition | This refers to any code violation related to: 1) open storage; 2) an unsanitary accumulation of trash, litter, debris; or 3) unsanitary walls or ceilings. |
| Plumbing | This refers to any code violation related to: 1) walls and ceilings that have water leaks/stains; 2) leaking faucet or drain; or 3) commode and plumbing system are in disrepair and/or inoperable. |
| Heating | This refers to any code violation related to: 1) insufficient heating; 2) heating unit in disrepair; and 3) defective/inadequate water heating. |
| Paint / Caulking / Plaster | This refers to any code violation related to: 1) doors, walls and ceilings that have flaking, peeling paint and/or loose plaster; 2) loose/missing caulking; or 3) walls and ceilings that have cracks and holes. |
| Doors / Windows | This refers to any code violation related to: 1) doors and windows in a state of disrepair; 2) doors and windows that have broken/missing glass, damaged and/or missing hardware; or 3) doors and windows that are inoperable. |
| Lights / Electrical / Equipment | This refers to any code violation related to: 1) cooking equipment, electric fixtures, and electric outlets/covers that are in disrepair; 2) light fixture(s) and emergency lighting fixtures that are inoperative and/or missing; or 3) refrigerators and exhaust fans that are in disrepair. |
| Fire Safety / Egress / Floor | This refers to any code violation related to: 1) smoke detectors that are in disrepair, inoperative and/or missing; 2) stair treads and stair nose edges in disrepair; 3) floors and/or surface coverings in disrepair, buckled and deteriorated, and not structurally sound; 4) fire extinguishers that are discharged, missing and/or has expired service tag. |
| Building Exterior | This refers to any code violation related to: 1) exterior walls that have cracks, breaks, holes and/or rotted or rusted surfaces, including retaining walls; 2) roof shingles on building that are loose, buckled, missing and/or otherwise deteriorated; 3) gutter(s) and/or downspout(s) that is/are in disrepair and/or have obstructions; or 4) building foundations that have missing/deteriorated rodent screens. |
| Grounds / Landscape | This refers to any code violation related to: 1) exterior walkways, sidewalks, steps or porches/landings that are cracked, broken, deteriorated, and/or have sunken areas that creates a trip hazard; 2) exterior property areas that have holes and/or eroded/unprotected soil, dead trees; or 3) parking areas that have holes, cracks, is deteriorated and/or has a sunken surface, including broken and/or deteriorated concrete curbing. |

**Figure 3. Descriptions of Code Violation Categories**

90.    Since 2017 there have been no significant capital improvements to the BVS Properties.

91.    Langley Park is an immigrant community with 61.4% of residents foreign born.  Only 34% of Langley Park residents speak only English or English

"very well." This is significant because 88% of PG County residents and 93% of Maryland residents speak only English or English "very well." This fact alone creates significant issues for residents who face difficulty communicating with code enforcement inspectors due to language barriers, as most inspectors only speak English and, for a majority of residents, their primary language is Spanish.

92.    Furthermore, with such a large percentage of the population being foreign born, there is significant concern for family members and other tenants who may not be legally documented. This further characteristic of the tenants of the BVS properties impacts their community and significantly contributes to their hesitance when it comes to tenants seeking the assistance of county and government officials, as well as their unwillingness to engage legal counsel to assist them in their struggle to get their landlord to respond to their needs.

93.    In addition to the low levels of English proficiency, only 37% of the population age 25 and older has a high school level education or higher, whereas, the rates in PG County and the State of Maryland as a whole are 87% and 90%, respectively. Nevertheless, despite these low levels of language proficiency and education – and as Arbor is aware – the neighborhood has relatively low unemployment.

94.    Prior to the COVID-19 Pandemic, Langley Park's unemployment rate was nearly half of that of the county and the state. However, many of those who are

employed work in low-wage, intermittent jobs, often as day laborers.  Residents are primarily employed in construction, retail, housekeeping, healthcare and social assistance, accommodation and food services, and waste management.

95.    The median household income for Langley Park residents is $63,105.00, approximately $21,700 lower than that of the county or the state median income.

96.    Much like with employment figures, these census numbers likely inflate Langley Park's picture of economic well-being, as it fails to account for its large undocumented population.

## 2.    ARBOR'S KNOWLEDGE OF AND WILLFUL BLINDNESS TO THE CONDITIONS AT BVS

97.    Arbor is fully aware of the deplorable conditions at BVS.

98.    CASA has sent multiple correspondences to Arbor and Ross, explaining the conditions and seeking help on behalf of BVS tenants, as well as tenants of other Arbor Properties in Maryland.  Arbor has entirely ignored the correspondence and, consistent with its policies, has delegated all of its nondelegable and legal ownership duties to Ross.  Ross has utterly failed to respond appropriately.

99.    A number of articles and media pieces have detailed in both English and Spanish languages the grave conditions at the BVS properties.

100.  Exhibits A-F provide just a few examples of the many local and national stories that have been aired or published in the last year by the Washington Post, National Public Radio ("NPR"), and national and local news outlets.

101.  As reflected in the media coverage, the tenants of the Arbor Properties have had difficulty even identifying who exactly was the owner of the properties.

102.  Media outlets had more success in identifying Arbor and Ross, but their attempts to contact Defendants for comment were similarly ignored.

103.  One aspect of the Financialization Policy of Arbor, as further discussed *infra*, is the wall created by ownership between the tenants and the owners.  The use of LLCs as shell companies – such as Bedford United, LLC, Victoria United, LLC, and Hyattsville United, LLC – in addition to the buffer created by the delegation of management to a management company like Ross, makes it incredibly difficult for even sophisticated tenants to identify the owners of their properties.

104.  For BVS tenants, many of whom do not speak English and are not familiar with business organization law in the United States, identifying and then contacting the owner of the homes they live in is nearly impossible.

105.  The anonymity inherent in these complex corporate structures is exploited by Arbor as a part of its Financialization Policy.

3. **ARBOR'S WASHINGTON, DC METROPOLITAN PORTFOLIO IS TARGETED AGAINST LOW-INCOME MINORITY COMMUNITIES OF COLOR AND THE COMPANY'S PREMEDITATED NEGLECT OF ITS MAINTENANCE RESPONSIBILITIES IS NOT LIMITED TO THE BVS COMMUNITY**

106. According to the Department of Housing and Urban Development, the Washington DC housing market is defined as follows:

> DC-VA-MD HUD Metro FMR Area contains the following areas: District of Columbia, DC; Calvert County, MD; Charles County, MD; Frederick County, MD; Montgomery County, MD; Prince George's County, MD; Arlington County, VA; Clarke County, VA; Fairfax County, VA; Fauquier County, VA; Loudoun County, VA; Prince William County, VA; Spotsylvania County, VA; Stafford County, VA; Alexandria city, VA; Fairfax city, VA; Falls Church city, VA; Fredericksburg city, VA; Manassas city, VA; and Manassas Park city, VA.

*See* https://www.huduser.gov/portal/datasets/il/il2021/select_Geography.odn

107. Of these counties, Prince George's and Montgomery Counties are the only counties in Maryland that are also located in the DC-VA-MD Metro area where Arbor has purchased properties.

108. Arbor acquired its interests in Bedford and Victoria Station as part of a portfolio of five large Maryland multifamily properties in April 2013. Each of the properties is located in Prince George's County and, significantly, each of the properties is located in the inner-ring suburbs of Washington DC on the inside of the

Capital Beltway in areas facing the significantly difficult economic conditions discussed *supra*.

109.  The properties and holding companies listed in the following chart are all owned, operated, and controlled by Arbor:

| Property Name | Holding Company |
| --- | --- |
| Bedford Station | Bedford United, LLC |
| Victoria Station | Victoria United, LLC |
| Edmonton Station | Edmonton United, LLC |
| Finchley Square | Finchley United, LLC |
| Newbury Square | Newbury United, LLC |

110.  According to documentation filed with the SEC, these entities are single purpose Delaware limited liability companies with one independent director in their organizational structures.  In practice, these entities were nothing more than holding and passthrough companies for the underlying assets and are all owned and controlled by Arbor.

111.  On April 12, 2013, the same day each of the associated deeds was filed with the Maryland Land Records, Arbor also recorded alongside each deed, a nearly identical Assignment of Leases and Rents (the "Assignments").  According to these Assignments, each of the five properties had the identical principal place of business at 2607 Nostrand Avenue, Brooklyn, New York 11210.

112.  Each of the five properties assigned their leases and rents to the REIT entity, Defendant Arbor Realty SR, Inc.  In other words, the rents from tenants of

BVS are assigned directly from the Bedford United, LLC and Victoria United, LLC holding companies to the REIT subsidiary of Arbor Realty SR, Inc.

113.  BVS and the other properties purchased in April 2013 by Arbor are all located in majority minority communities.  However, these are not the only multi-unit multifamily properties owned and operated by Arbor in Prince George's County.  Since 2013, Arbor has purchased approximately twelve (12) multifamily housing developments in the Washington D.C. Suburban housing market defined *supra*.  Of the twelve multifamily properties purchased by Arbor:

    a.   All twelve (12) are located in majority minority communities,

    b.  Eleven (11) of the properties are located Prince George's County, and in the areas with the highest population densities and poverty levels as described *supra* – Langley Park, East Riverdale, Bladensburg, Greater Landover, Seat Pleasant, and Suitland/Silver Hill.

| Prince George's County | | | | |
|---|---|---|---|---|
| | % White (Non-Hispanic) | % Black | % Latino | % Other |
| **Apartment Name:** Bedford Station Apartments<br><br>**Holding Company:** Bedford United, LLC | 0.0% | 8.2% | 91.8% | 0.0% |
| **Apartment Name:** Victoria Station Apartments | 0.0% | 8.2% | 91.8% | 0.0% |

| | | | | |
|---|---|---|---|---|
| **Holding Company:** Victoria United, LLC | | | | |
| **Apartment Name:** The Woods at Hillcrest Apartments<br><br>**Holding Company:** Edmonton United, LLC | 3.7% | 44.6% | 47.4% | 4.3% |
| **Apartment Name:** Capital Square Apartments<br><br>**Holding Company:** Finchley United, LLC | 5.3% | 17.4% | 70.7% | 6.5% |
| **Apartment Name:** Newbury Square Apartments<br><br>**Holding Company:** Newbury United, LLC | 3.2% | 9.6% | 82.2% | 5.0% |
| **Apartment Name:** Oaks at Park South<br><br>**Holding Company:** AMAC II Oaks PS LLC | 0.0% | 54.8% | 43.9% | 1.4% |
| **Apartment Name:** Marlow Heights Apartments<br><br>**Holding Company:** Marlow Heights Apartments, LLC | 0.5% | 95.8% | 2.0% | 1.8% |
| **Apartment Name:** South Point Apartments<br><br>**Holding Company:** South Point Apartments, LP | 1.1% | 96.1% | 0.0% | 2.9% |
| **Apartment Name:** Admiral Place Apartments –<br><br>**Holding Company:** Forest Village United, LLC | 12.5% | 76.8% | 6.5% | 4.3% |
| **Apartment Name:** Park Greene Apartments<br><br>**Holding Company:** Shady Side United, LLC | 0.4% | 90.2% | 6.6% | 2.8% |

| Apartment Name: Cheverly Station Apartments | | | | |
|---|---|---|---|---|
| Holding Company: Cheverly Station Owner, LLC | 16.9% | 62.8% | 5.6% | 14.8% |
| | | | | |
| **Montgomery County** | | | | |
| Apartment Name: The Centre at Silver Spring Apartments | | | | |
| Holding Company: Knights Bridge I LLC | 4.6% | 77.3% | 6.0% | 12.2% |

114. Publicly available reviews related to just a few of these other Arbor properties in Maryland reveal a similar level of disrepair, neglect, and failed maintenance:

    a.  <u>Capital Square Apartments</u> – May 2021

I move into a really cute apartment mid November a few days after moving in I noticed serial things in my apartment weren't right. I was being bitten in my sleep by something. I informed management, included pictures of my bites and even found what appeared to be a bed bug(I also sent a picture of what I found). Management did send pest control out but they didn't even check my apartment thoroughly. I wish I could include pictures. I came home to a bed that was left just the way I left it. My sheets were still tucked in between my mattress and box spring. How could anyone possibly check your bed for bed bugs without moving anything? Both the sinks in my apartment didn't operate correctly. One had no cold water and the other was clogged. I also had 4 holes in my floor which were letting mice into my apartment. After 3 months of emailing the property manager I requested a consession be placed on my account. To my surprise I received an email from the property manager calling me a "mother f*****". I have even been in contact with the VP of the management company and she said no consession will be placed on my account because my issues were not health concerns. I'm warning you these ppl do not care about there tenants and you should stay far away.

    b.  <u>Marlow Heights Apartments</u>

    Review from 2019

I'm currently residing here and have been here 5 years now and from the moment I arrived there has been issue after issue, when it comes to the leasing office management is continuously changing so an issue you may have addressed before is then a new claim to new management. I've personally had plumbing issues since day one and no one knows how to fix the issue, no one is qualified to hold their position, i've had to deal with pests, mold, and poor plumbing however there really quick to tell you about rent how about fixing your units first save yourself the hassle DON'T MOVE HERE! Don't be persuaded by their promotions this place is hell

## Review from 2019

 Resident • 2017 - 2019

★★☆☆☆ ▼                                                                                            2/22/2019

Your better off living in a tent. Nothing works, nothing gets fixed. There is mold and all of the buildings are infested. I wish I knew before I signed a lease. The leasing office does not care about anything other then you giving them your money. Honestly go look somewhere else. If you have kids it's not sanitary place for them.



## c.   Cheverly Station Apartments

### Review from March 2021

Don't move into this community if you have another choice. It is infested with mice and other vermin and if you complain to Management they will go through motions of helping you but very little will be done and there will be no follow up...you will need to go back to them if the problem was not resolve the first time - From a verified resident on ApartmentRatings

### Review from April 2021

I have only been here for 1 month and already seeing mice. I've been reaching out to maintenance for the past 3 days to fix the pest problem they're coming out the walls and the stopper in my sink won't come out. I have a newborn baby and as soon as I find something else I am out of here. This is the worst apartment complex.
Don't move here !!!!

## d.   The Center at Silver Spring Apartments

### Review from February 2021

I am totally disappointed with the maintenance(again). The apartment is infested with mice requested pest control thrice this week itself.  Without completing the work the ticket status is getting changed to "Completed". This is the first property in my life which changes ticket status without the knowledge of the residents. I don't know how you could close a ticket without the resident's signature.

Review from June 2020

It wasn't this bad in 2017 but now there's mice and the property is dirty! The  building mailbox area in 3329 has a big hole and carpet covering it. This place has loss great value! I would just say that Anna is reliable and kind but the property is disgusting! There are mice and it's gross and traumatizing! Maintenance & Pest control states that they cleaning your home but it's absolutely disgusting. I rated this complex 1 star because Anna is the only decent entity representing this grotesque place! I can't wait till lease is over!

### 4. ARBOR'S ACTIONS IN OTHER HOUSING MARKETS AND STATEMENTS OF ITS LEADERSHIP DEMONSTRATE THAT ARBOR HAS ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC RACIAL DISCRIMINATION THROUGH TARGETING AND DIFFERENTIAL TREATMENT

115.  In addition to its Maryland properties, Arbor's real estate portfolio includes properties across the United States.  As identified by Arbor's CEO Ivan Kaufman, and discussed *supra*, as of 2021 Arbor owns "over 8,000 units and has acquired more than $1.75 billion of multifamily properties across the country."

116.  The precise location of all of its properties is not readily ascertainable from public records.  Nevertheless, publicly available documents and statements of Arbor's leadership point to a vast number of multifamily holdings that run the spectrum from luxury properties in Lower Manhattan to the slums of Langley Park.

117.  The common thread between all of Arbor's properties is the Company's full understanding of the communities in which the Company purchases properties,

72

and the fact that the policy with which Arbor seeks to acquire a property and turn the property into a profit for its shareholders, depends on the community characteristics.

118. Two distinct properties known individually as "10 Rutgers" and separately "The Quarry at Alamo Heights" demonstrate the disparate strategy employed by Arbor when it identifies a value-add property, as opposed to a harvest property, and chooses to renovate and maintain the property based substantially on the community demographics.

**10 Rutgers Street, New York City, NY 10002**

119. In January 2018, Arbor acquired an 83-unit apartment building located at 10 Rutgers Street in Manhattan's Chinatown in an area referred to as "Two Bridges" for its location between the Brooklyn and Manhattan Bridges. The building is located on the Lower East Side ("LES") approximately two blocks from One Manhattan Square, a recently completed luxury apartment building.

120. Chinatown is 58.8% Asian-American, 28.3% Hispanic, 7.3% African American, and only 4.7% White.



**Figure 4 – Arbor's 10 Rutgers Street in Manhattan's Chinatown with One Manhattan Square under construction two blocks away in the background.**

121. In recent years, there has been tremendous pushback from the predominantly Chinese and immigrant community who have for decades comprised the majority of residents in Chinatown.

122. The One Manhattan Square luxury apartment building is offering apartments for between $1 million and $4 million per unit. The median family income in the neighborhood is approximately $40,000. There are a number of additional large luxury apartments in various stages of planning, development, and building.

123.   Reporting on the efforts of the local community to maintain affordable housing has revealed significant facts about the impacts of financialization on the minorities in Chinatown:

    a.   "Already, 23 percent of households in Chinatown and the Lower East Side are classified as 'severely rent burdened,' meaning they spend 50 percent or more of their income on rent, according to data compiled by New York University's Furman Center for Real Estate and Urban Policy."

    b.   "Manni Lee, 46, [] lives one block east of One Manhattan Square…. She and her husband and two children live in a rent-regulated, two-bedroom unit in a building called Lands End One. She says their landlords are renovating their building by adding amenities, such as a rooftop garden, to attract young, wealthy tenants. But Lee says that they are not upgrading rent-regulated apartment units like hers, explaining that when she notified the building about leakage in her unit caused by the construction, they only offered to repaint the ceiling."

    c.   "Chinatown has been host to the highest population of Chinese people in the U.S ever since a mass influx of immigrants settled there in the late 19th century. Many Asian immigrants came to New

York City intent on working on the Central Pacific Railroad or eventually moving to California and striking it rich in the gold rush. After these industries began to dwindle and discriminatory legislation barred Chinese employment, immigrants stayed in New York City to work in sectors like textile production. Chinatown served as a unique place of refuge for the Chinese immigrant community to establish a cultural center and a political support network."

d. "Throughout the past decade, Chinatown has experienced rapidly shifting ethnic and racial demographics. A study conducted in 2013 revealed that the Asian population in Chinatown has been steadily declining **and the fastest growing demographic has been the White population**. As new racial groups move into Chinatown, the original residents find themselves displaced and forgotten." (Emphasis added).

124. Regarding the acquisition of 10 Rutgers Street in 2018, Maurice Kaufman made the following statement:

> This transaction presented an attractive opportunity to acquire a corner mixed-use property in a **rapidly-changing neighborhood** with fantastic subway access. **Value-add investments** in this submarket with this quality and scale are unique.

125.  Since 2018, 10 Rutgers has been redeveloped by AMAC and its partners.  Its website describes the "great change" in the neighborhood as follows:

> Two Bridges, at the foot of the Lower East Side, has historically been considered the little nook that Downtown forgot.  **In recent years, the tenement style landscape has undergone great change** and has wrought into fruition a landscape of new towers, culture, salons, bistros and nightlife.  Rich with history while vibrant and modern, **Two Bridges lends itself to a new kind of resident**.  Join us at 10 Rutgers as LES's forgotten nook turns a page in history **for a new generation of New Yorkers**.

*See* https://www.10rutgers.com/neighborhood

126.  As Arbor's "10 Rutgers" website states, "the tenement style landscape has undergone great change," and it is Arbor's intent is to attract "a new kind of resident," and "turn a page in history for a new generation of New Yorkers."  In other words, as the tenement style low-income housing of the minority Chinese and immigrant population is replaced by skyscrapers and condominiums, Arbor stands ready and willing to invest capital into the apartment building it owns in what was a formerly less desirable low-income community of color.

127.  In identifying 10 Rutgers as a value-add property due to its perceived changing demographics and gentrification, Arbor chose to redevelop the property and maintain it in a safe and habitable condition for its future tenants because Arbor perceived that such investment would create a larger return for its shareholders.

**The Quarry at Alamo Heights (Rebranded by Arbor from Crescent at Alamo Heights)**

128.  In 2017 Arbor purchased the Crescent at Alamo Heights, a 306-unit multifamily property in San Antonio.

129. Built in 1993, The Crescent is located in a community that has a majority White population.



**Figure 5 – Arbor's The Quarry at Alamo Heights**

130.   Regarding the acquisition of the Crescent in 2017 (four years after the purchase of BVS), Maurice Kaufman made the following statement:

> Crescent at Alamo Heights **enjoys a prime location** within one of the most **desirable submarkets** in San Antonio. **The property has not been renovated in over 10 years** and presents **a tremendous value-add opportunity** through unit upgrades and an operational overhaul.

131.   In a statement made by Arbor's partner in the project, EBEX Holdings Principal Evan Goldenberg added:

> We have only owned Crescent at Alamo Heights for a month, but we are already hearing from **tenants who are extremely excited about our rehabilitation plans, as the community has seen its share of deferred maintenance from previous owners**.

132.   Like 10 Rutgers, Arbor identified the Quarry as worthy of rehabilitation and maintenance because of changing demographics and a more "desirable" community, which Arbor perceived would result in financial gain to itself after redevelopment and efforts to maintain the property to achieve higher shareholder profits from increased market rent.

133.   Intentional discrimination occurs when a defendant acts, at least in part, because of the actual or perceived race or national origin of the alleged targets of discriminatory treatment.   Various factors are probative of intent to discriminate, including, but not limited to, statistics demonstrating a clear pattern unexplainable on grounds other than race, the historical background of a decision, the specific sequence of events leading up to the challenged decision, and the defendant's

departures from its normal procedures or substantive considerations.  Evidence of a consistent pattern of actions that have a much greater harm on persons of color than on white persons is highly probative.

134.  The disparities in maintenance and capital investment between Arbor's properties cannot be explained by non-racial factors.  Arbor's focus on investments in "rapidly changing" communities that are located in more "desirable submarkets," in addition to the statistical disparities in these communities bears more heavily on minorities than it does on the majority White communities.

135.  Arbor's acceptance of the notions of "core," "value-add," and "opportunistic" investment strategies in areas which are "within one of the most desirable submarkets" of a city or located in a "rapidly changing" neighborhood, viewed alongside its purchase and subsequent divestment of BVS and its other holdings in the Washington DC Housing Market – all located in low-income communities of color – are unexplainable on grounds other than race and represent clear departures from Arbor's regular course of action.

136.  The example of Arbor's actions related to the rehabilitation of a property in a predominantly White neighborhood that "has not been renovated in over 10 years and presents a tremendous value-add opportunity through unit upgrades and operation overhaul," as compared to Arbor's ownership and refusal to make any significant improvements to the BVS Properties, which have not been

renovated in nearly 70 years, is unexplainable on grounds other than race and plainly

departs from Arbor's regular course of action.

137.  Arbor's intentional targeting of these low-income communities of color

for purchase and divestment, as discussed in further detail *infra*, and the disparities

between that treatment and the Company strategies in majority White neighborhoods

(as well as neighborhoods trending in that direction) flow directly from Defendants'

discriminatory conduct.  The disparate treatment of these communities of color are

traceable to Defendants' discriminatory conduct and policies, and they are likely to

be redressed by a favorable judicial decision.  This behavior is also directly related

to the zone of interests protected by the Fair Housing Act.

### C.   ARBOR'S TARGETING, ACQUISITION, FAILURE TO MAINTAIN, AND OUTSOURCING OF THE COMPLIANCE OBLIGATIONS OF THEIR PROPERTIES DISCRIMINATES AGAINST COMMUNITIES OF COLOR

138.  Policies and Practices based on race-neutral factors may cause an

unjustified adverse impact on communities of color.   Despite the underlying

discriminatory intent outlined *supra*, even without that intent, Arbor's otherwise

facially neutral policies and practices regarding the targeted purchase and

subsequent refusal to maintain low-income properties have an unjustified and

adversely disparate impact on communities of color.

139.  Arbor has four (4) separately defined but related policies.  As a part of

its financial strategy, these policies are related to the fact that Arbor has been in part

targeting and purchasing multifamily residences in neighborhoods deemed to be "undervalued." In each case the pattern is similar. A multifamily building or several buildings are determined to be located in an undervalued area, which often means they house poor and low-income tenants who are predominantly members of protected classes.

### 1.   STATISTICALLY DISPARATE IMPACT ON MINORITIES IN ARBOR'S PROPERTIES LOCATED IN THE HUD DC MARKET

140. The racial composition of renters across the entire DC-VA-MD HUD Metro FMR Area (the "HUD DC Market") defined *supra* are as follows:

| White | Black | Hispanic/Latino | Other |
|-------|-------|-----------------|-------|
| 38.8% | 35.0% | 15.6% | 10.6% |

141. Arbor's policies stated *infra* are applied equally across all of its properties in the HUD DC Market.

142. Arbor's BVS properties are composed as follows:

| White | Black | Hispanic/Latino | Other |
|-------|-------|-----------------|-------|
| 0.0% | 14.8% | 85.2% | 0% |

143. Arbor multifamily properties across the entire HUD DC Market and located in Maryland are composed as follows:

| White | Black | Hispanic/Latino | Other |
|-------|-------|-----------------|-------|
| 1.5%  | 77.2% | 18.8%           | 4.6%  |

144. The proportion of Hispanic residents in Arbor's BVS properties where these policies are being enforced is 5.5 times greater than the proportion of Hispanic residents in the HUD DC Market as a whole.

145. The proportion of Hispanic residents in the Arbor properties within the HUD DC Market where these polices are being enforced is 1.2 times greater (20% greater) than the proportion of Hispanic residents in the HUD DC Market as a whole.

146. The proportion of Black residents in the Arbor properties within the HUD DC Market where these polices are being enforced is 2.2 times greater than the proportion of Black residents in the HUD DC Market as a whole.

**Policy No. 1 – The Exploitation of Cheap Properties and the Financialization of Housing – Arbor's "Financialization Policy"**

147. Arbor's Financialization Policy – the buying, holding, and selling of low-income multifamily housing as a commodity – increasingly implemented by Arbor in the years since the Great Recession on the multifamily housing market is having an ongoing and grave impact on protected class individuals of BVS and those living in similarly situated Arbor Properties across the country.

148.  Arbor's increased treatment of the BVS Properties and other similarly situated Arbor Properties across the country as commodities since the Great Recession is having a disparate impact on minorities.

149.  The **low-income** "multifamily asset class" plays a unique role in the American landscape, as these homes exist at the very bottom of the income and housing ladder in our society.

150.  Once families are forced out of these homes, they have few alternatives to homelessness.  This fact has an especially detrimental and disparate impact on Hispanic families whose immigration status may prevent them from qualifying for federally subsidized housing programs.

151.  Arbor's focus on these low-income multifamily complexes, and its policies of annual incremental rent increases that outpace the increase in median income increases has the deleterious effect of contributing to homelessness.

152.  On more than one occasion, Arbor evictions have caused the homelessness of BVS tenants.

153.  Arbor's failure to maintain the properties of these low income and protected class families creates a situation where the families may have a physical roof over their head, but the remainder of the property is deteriorating around the family or contaminated by mold or vermin in such a way that the family is made constructively homeless.

154.  The deterioration of the properties is the direct result of Arbor's decision to convert the rent driven profits into dividends for shareholders instead of reinvestments in the property.

155.  The high rate of evictions of Arbor tenants and those similarly situated is the direct result of the securitized model of real estate investment – or financialization – which requires Arbor to maintain a greater than 90% paying occupancy rate across its properties in order to satisfy its investors.

156.  While the financialization of multifamily housing is having a clearly disparate impact on the almost exclusively Hispanic population of BVS, this policy is also having a disparate impact on African American and other Hispanic families in Arbor's other properties in Maryland and across Arbor's nationwide portfolio.

157.  The Financialization Policy is a business model that is implemented at the discretion of Arbor's leadership.  Given the volume of multi-family housing properties owned by the REIT and made possible through the financialization of the housing, the policy can only be implemented with the assistance of third-party support of property management companies such as Ross.

158.  Management companies such as Ross are aware of and actively assist in the enforcement of the Financialization Policy which requires an effective and efficient internal eviction process to ensure vacancy of the subject property remains at the lowest level possible.

159.  Furthermore, by inserting a management company between itself and the tenants who pay rent, Arbor is able to create a fog of plausible deniability with regard to the status of the properties and the lives of their inhabitants that would not otherwise be present.

160. The anonymity inherent in these complex corporate structures is exploited by Arbor as a part of its Financialization Policy.  Using limited liability companies and third-party management, Arbor is often able to hide their ownership interest almost completely from the very individuals who pay rent to live in Arbor's properties.

161.  Arbor's "Financialization Policy" is having a disparate impact on (1) the BVS Community, (2) the low-income communities of color in Arbor's other Maryland holdings in Prince George's and Montgomery Counties, and (3) other Arbor Properties in low-income communities of color across the country.

### Policy No. 2 – Profits Over People – Arbor's "Opportunistic Target and Harvest Policy"

162. Inherent to the financialization of housing by a publicly traded company such as Arbor is the self-inflicted conflict of interest between (1) the company's duties to its shareholders and (2) its duties with regard to the warranty of habitability and the common law duties of a landlord to the tenants who live in the company's properties.

163.  The investment strategy of "rent harvesting" is related to the life cycle of products.  Typically, a harvesting strategy is employed at or near the end of a product's life cycle.  It is prevalent in the trade of commodities where ownership has determined that there would be a much better return-on-investment if the profits of the company were spent elsewhere within the company.  The strategy is based on the fact that further investment in the specific commodity cannot be justified given the likely future revenues from the product.

164.  The "harvesting" strategy is synonymous with the concept of "milking" an investment, because companies use the strategy when a product has reached the "cash cow" stage.  "Cash cow" refers to a product that makes a profit in a mature market and does not need heavy reinvestment.  As seen with Arbor's treatment of its properties in PG and Montgomery Counties, when it is unlikely that the rental incomes will increase even if the company invests further in the properties, Arbor instead directs the profits towards its shareholders and away from reinvestment.

165.  Given the location of BVS and the characteristics and demographics of the surrounding neighborhood – as well as the characteristics and demographics of other similarly situated Arbor properties in Maryland and across Arbor's portfolio – Arbor recognizes that updating the apartments in any significant way is not likely to increase the company's profits but would surely cost them given the tremendous capital required for updating or rebuilding these obsolete properties.

166.  As discussed *supra*, as a REIT, 90% of the net income received from Arbor's properties is distributed in the form of dividends to shareholders.  The relationship is roughly direct.

    a.  If a policy decision is made to decrease a tenant's rent, then the dividend is decreased.  If a policy decision is made to increase the tenant's rent, then the dividend is increased.

    b.  If the building requires maintenance, and a policy decision is made to spend money on the maintenance, then the dividend is decreased. If the building requires maintenance, and a policy decision is made not to spend money on maintenance, then the dividend is increased.

    c.  Many other factors affect the amount the Company may decide to pay in the form of a dividend to its shareholders, but the amount of the dividend to pay versus the amount of money to spend on the property or its expenses rests in the sound discretion of the Company and forms the company's policy as it pertains to any particular property profile.

167. The  notions  of  "core"  investment,  "value-add"  investment,  and "opportunistic" investment strategies defined *supra* are founded upon an inherently similar and related zero-sum relationship:

a. A "core" investment property often does not require significant capital investment, less money is required for maintenance, and the higher rents commanded by the property provide steady and predictable cash flows to the owner and, therefore, to the shareholders.  For this security owners pay more for the property and their risk is lower.

b. A "value-add" investment, has established cash flows which can be increased if appropriate capital investments by the shareholders are undertaken, but the overall investment will only be successful if the capital investments are executed properly so that the property is able to command the higher rent.  The owners pay less for the property, but the risk is greater due to the requirement to increase the rents which will only be possible if the investment strategy and capital improvements are executed successfully.

c. An "opportunistic" investment carries tremendous risk because though there may be some cash flow, the property is in need of significant rehabilitation, and the road to commanding the highest rents possible is wrought with the uncertainties inherent in new construction or demolition and rebuilding.

168.   However, Arbor has created a fourth investment strategy which the company deploys when the characteristics of the underlying property allow.  This "Opportunistic Target and Harvest Policy" (the "Targeting Policy") is not commonly accepted or recognized as reasonable, because it could not and should not result in a net positive investment.

169.   The Targeting Policy is one which incorporates only the positive aspects of "core" and "opportunistic" investments and is weaponized through the targeting of specific geographic areas with specific characteristics.  The attributes of the Targeting Policy are as follows:

    a.   Target properties with established, steady, and reliable cash flows;

    b.   Target properties which are beyond their useful life and in need of demolition or otherwise significant capital infusion because these properties are cheap;

    c.   Plan to make little or no capital improvement to the property;

    d.   Make predictable annual incremental increases in rent to ensure ever-increasing returns on investment for shareholders;

    e.   When a tenant cannot make the rent ensure management efficiently evicts and replaces the tenant swiftly to ensure maximum occupancy; and

    f.   Hold the properties for as long as people are willing to pay rent.

170.  In sum, The Targeting Policy causes Arbor to purchase properties it has deemed "opportunistic," but refrain from investing in the property as if they were "core" properties, because rent will be paid regardless by the tenants at the lowest rung of the economic ladder who are disparately members of at least one protected class and who have little or no alternatives to their current housing.

171. The Targeting Policy is deployed at the time of purchase and implemented and carried out for the remainder of the time the property is owned by Arbor, and the policy comprises a significant part of the investment thesis for the property.

172.  This Targeting Policy as an investment thesis would not work if it were deployed in more affluent communities, as the tenants would simply find new housing.   Indeed, Arbor's Targeting Policy only works in low-income urban communities – which are generally comprised of minorities – for the simple fact that there is nowhere else for these families to go.   Ultimately, the success of the Targeting Policy comes down to the fact that steady cash flows exist at all rungs of the multifamily residential real estate ladder, but as the quality of the housing descends, there are still cash flows available at the bottom rung for investors such as Arbor to redirect to its shareholders.

173. In practice, the Targeting Policy only works in the lowest income highest density urban markets such as those found in the inner-ring of PG County

inside of the Capital Beltway.  These densely populated locales contain almost exclusively low-income African Americans, and in the case of Plaintiffs, almost exclusively Hispanic, families, but decidedly non-White.

174. As stated *supra*, BVS is approximately 70 years old and has **never had any significant renovation**.  No reasonable investor operating within the requirements of the Fair Housing Act, would invest in such a property without accounting for the need for a significant amount of capital investment unless there was some alternate plan for turning a profit.  Arbor's Targeting Policy is that alternate plan.

175. Arbor's "Opportunistic Target and Harvest Policy" is having a disparate impact on (1) the BVS Community, (2) the low-income communities of color in Arbor's other Maryland holdings in Prince George's and Montgomery Counties, as well as (3) other Arbor Properties in low-income communities of color across the country.

### Policy No. 3 – Maintenance of Properties Based on the Age and/or Value of the Property – the "Divestment Policy"

176.  Consistent with their awareness of the drastically needed maintenance and rehabilitation of their properties prior to purchase, Arbor maintains a policy whereby maintenance of their properties is based **not** on the condition of the property but on **the age and/or value** of the residential property and the demographics of the property itself as well as the surrounding community.

92

177.  Policies and practices based on the age or value of residential property can result in adverse impact in communities of color, a fact that has been well documented by HUD and other federal financial regulatory agencies for decades. Arbor's maintenance practices and policies that are linked to one of their properties' age and/or value cause inferior maintenance to occur disproportionately in communities of color.

178.  BVS is a property in a condition that would call for maintenance and renovation on a large scale to make the properties safe and habitable.   However, Arbor's "Divestment Policy" ignores the needs of the properties and instructs that based upon the age and value of the properties, maintenance, renovation, and management should be as limited as possible.

179.  Arbor's "Divestment Policy" is having a disparate impact on (1) the BVS Community, (2) the low-income communities of color in Arbor's other Maryland holdings in Prince George's and Montgomery Counties, as well as (3) other Arbor Properties in low-income communities of color across the country.

### Policy No. 4 – Delegation of Legal Duties – the "Outsourcing Policy"

180.  Arbor has adopted a uniform policy of outsourcing to third parties, to include Defendant Ross as well as others, Arbor's duty to comply with statutory and common law obligations that are placed on owners of real property, without appropriate monitoring or review.

181.  For years, BVS Properties have been on the "distressed properties list" in PG County.

182.  Arbor is aware through its agents that the PG County DPIE is overburdened and incapable of fully and appropriately licensing and inspecting all of the multifamily rental properties in PG County.

183.  Arbor removes itself further from the BVS and other Arbor Properties by retaining agents who perform property management duties and ensure maximum occupancy of its rental properties.

184.  The Outsourcing Policy is a cogent and useful strategy for complying with Arbor's duties to its shareholders by increasing shareholder income due to the steady receipt of rent, but the Policy proliferates to the detriment of its tenants and in violation of Arbor's duties to its tenants to provide a clean, safe, and habitable living environment.

185.  Arbor's "Outsourcing Policy" is having a disparate impact on (1) the BVS Community, (2) the low-income communities of color in Arbor's other Maryland holdings in Prince George's and Montgomery Counties, as well as (3) other Arbor Properties in low-income communities of color across the country.

## 2.    THE RESULT OF ARBOR'S POLICIES

186.  During the Coronavirus Pandemic, the conditions of the Plaintiffs apartments – as well as those similarly situated – have continued their devastating

downward spiral.  The dangers to these tenants described *infra* are well known to both Arbor and Ross.  Nevertheless, in 2020, Arbor's policies positioned Arbor and its shareholders to remove themselves almost entirely from the realities of the harm caused directly by their intentionally discriminatory policies and the disparate impact of the same.

187.  While those polices wrought devastation in the lives of Arbor's tenants, the words of Arbor CEO Ivan Kaufman – the self-proclaimed largest shareholder of Arbor – provide a snapshot of just how far the Company's owners and leadership are removed from the realities of their tenants.  In a September 23, 2020, interview, CEO Ivan Kaufman provided the following:

> [W]e are having the best year ever.  It was a surprise to everybody but not to our staff and our management and people who followed us. We had the potential to increase our dividend, which we did. We have probably the lowest payout ratio between our dividend and our core earnings, and I think just as significant to that is the fact that that we increased our dividend 9 years in a row.  I mean, that's extraordinary.  And not once, but 9 times.  I think that in several years, we did two maybe three times our dividend increases.  So we have an extraordinary track record and we were very well prepared, and our business is just, in many ways, one of the winners in this recession.

Brad Thomas, *(ABR) Arbor Realty Trust Inc. with Ivan Kaufman*, LISTEN NOTES, (Sept. 23, 2020), https://www.listennotes.com/podcasts/the-ground-up/abr-arbor-realty-trust-inc-NjqYnQao-OX/.

188.  Arbor's business is a "winner" because its leadership refuses to spend money to maintain and repair many of its apartments which generate income for its shareholders, and instead transfers that money to shareholders in the form of dividends and stock profits.

### D.   INJURIES CAUSED BY DEFENDANTS' BEHAVIOR

189.  Based on the experience of the BVS tenants, CASA, consistent with their mission began to advocate and engage with the local government on behalf of their members.   This advocacy also involved attempts to work with Ross Management as well as with Arbor directly.  Ross' response has not been adequate, and Arbor's response was to simply ignore the BVS tenants.  Prior to pursuing relief through the courts, CASA spent significant resources in its efforts and as a result of Arbor and Ross' neglect, has incurred significant damages.

190.  However, the damages to the Individual Plaintiffs simply cannot be overstated.  The Individual Plaintiffs and the class of similarly situated individuals they seek to represent have endured life altering damages and neglect at the hands of Arbor, with the complicity of Ross.

### 1.   INJURIES TO CASA

191.  Plaintiff CASA de Maryland, Inc. is a nonprofit organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania. CASA's mission is to create a more just society by building power

and improving the quality of life in low-income immigrant communities, including for tenants living in substandard conditions.

192.  CASA is the largest membership-based immigrants' rights organization in the mid-Atlantic region, with more than 100,000 dues-paying members, including tenants living in privately owned housing complexes. CASA's members drive the organization's priorities and agenda, participate in campaigns and programs, and benefit from the social, health, job training, employment, and legal services offered by the organization. Some members of CASA have seats on the organization's board, participate in the organization's Leadership Council, and serve on other programming committees. In these roles, members provide ongoing input on, establish, and approve the organization's long-term strategic priorities and policies.

193.  Defendants' conduct has caused CASA grievous injury by diverting scarce resources away from CASA's usual activities including education, counseling, investigation and capacity-building activities and services, and instead towards tenant engagement at the Bedford & Victoria Station complexes. Such engagement includes educating tenants on their rights and responsibilities, representing tenants in legal matters or accompanying them to court, assisting tenants in applying for rental assistance, reporting housing code violations to the county, developing and distributing resources and materials, speaking with the media to give notice to the Defendants and other affected communities, organizing

actions designed to draw attention to the substandard living conditions and discrimination occurring at Bedford & Victoria Station complexes, and investigating and counteracting Defendants' unlawful conduct.

194.  Because of Defendants' ongoing illegal conduct, CASA was forced to delay, suspend or forego other existing programs and projects. In addition, CASA's mission of bringing power and dignity to our members, who are predominantly immigrant, Latino, and working-class, has been frustrated. Defendants' unlawful and discriminatory conduct creates obstacles for progress and erodes the dignity of our members who reside in the Bedford & Victoria Station complexes.

195. CASA's organizing campaign with the Bedford & Victoria Station complexes is one of the largest and longest continuous projects in CASA's 35-year history. Over the last several years, CASA has spent hundreds of hours of staff time to try and meet with the management company and ownership to remedy substandard living conditions and to stop their unlawful and discriminatory practices. To date, CASA has been met with opacity and intransigence.

196. CASA's resources have been severely diminished by Defendants' illegal conduct. Over the last year alone, CASA has held 35 meetings attended by hundreds of tenants and community members, with over 1,500 unique visits to such meetings. CASA has spent at least 200 hours of staff time organizing and recruiting tenants for the meetings, in addition to the time for the meetings themselves, which

have lasted 75 hours in total. CASA has designed, printed, and distributed to tenants 10,000 flyers on various topics, including tenants' rights, meeting information, legal help, and updates on renter protections related to the Covid-19 Pandemic. CASA has also spent 100 hours of staff time to bring attention about the deficient housing conditions to the Defendants by arranging press conferences and organizing rallies, to which Defendants did not respond. CASA has expended 30 hours of staff time to assist tenants in reporting 35 complaints to Prince George's County for housing code violations. Despite the Defendants' failure to abide by their legal responsibilities, they take severe action against tenants who have not paid full rent; in response to these legal actions, CASA has assisted 15 tenants with eviction proceedings brought by the Defendants and an additional 10 tenants in ancillary legal support, equating to 50 hours of staff time.

## 2.   INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUE

197.   Until remedied, Defendants' unlawful and discriminatory actions will continue to injure Plaintiffs and those similarly situated by, *inter alia*: (a) causing the Individual Plaintiffs and those similarly situated, emotional distress and mental anguish from the stress, fear, and anxiety of living in homes that are unsafe for themselves and their children; (b) causing physical harm to Individual Plaintiffs and those similarly situated through their living in the toxic and dangerous environments found at BVS and other similarly situated properties; (c) interfering with CASA's

efforts and programs intended to support and advocate for the Hispanic and immigrant community in the mid-Atlantic region; (d) requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendants' discriminatory conduct, thus diverting; (e) frustrating CASA's mission and purpose; and (f) perpetuating racial segregation in housing within the communities wherein Arbor owns its properties.

198.  All of these injuries flow directly from Defendants' conduct.  All of these injuries are fairly traceable to Defendants' discriminatory behavior in Plaintiffs' community and the communities of those similarly situated, and they are likely to be redressed by a favorable judicial decision.  The injuries suffered by Plaintiffs fall directly within the zone of interests protected by the Fair Housing Act.

### 3.   CONTINUING VIOLATION

199.  Defendants engaged in the conduct alleged herein on a continuing and ongoing basis from at least April 2013 to the present.  Defendants' policies are still ongoing and in effect.

200.  Plaintiffs each have continuing problems that are ongoing.

201.  Defendants are continuously in breach of contract.

202. Further, Defendants are continuously in violation of the Prince George's County Code, *infra*, which requires Defendants to maintain facilities and prevent substantial risk of serious harm to Plaintiffs and the class members.

203. Defendants refuse to maintain the property in compliance with their policies of Financialization and Targeting and this refusal is a continuing violation of the implied warranty of habitability.

## V.    CLASS ALLEGATIONS

204. This Class Action is being filed by the Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and others similarly situated.

205. Plaintiffs seek to certify the following classes defined as:

**ARBOR TENANTS CLASS (The "Arbor Class"):**

**All current tenants nationwide of any property owned by Arbor or any affiliate of Arbor.**

**BEDFORD AND VICTORIA CLASS (The "BVS Class"):**

**All current and prior tenants for the last three years of Victoria Station or Bedford Station apartment complexes.**

206. To the extent revealed by discovery and investigation, there may be additional appropriate classes and/or subclasses from the above class definition which is broader and/or narrower in time or scope, including but not limited to subclasses for current and prior Victoria Station lessees and separately current and prior Bedford Station lessees.

207. Excluded from the classes are Defendants' officers, directors, agents, employees and members of their immediate families; and the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

208.  Plaintiffs, and members of the Classes and/or their property have been exposed to and continue to be exposed to toxic and hazardous substances and conditions in their apartments and the common areas of BVS, have been disparately treated, and have been disparately impacted by Defendants' polices due to their race and/or national origin.

209.  This Court may maintain these claims as a Class Action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4).

210.  Numerosity – Fed. R. Civ. P. 23(a)(1): The members of each class are so numerous that joinder of all members is impractical.

211.  The number of properties and residents located within each class definition exceeds 1000 and, therefore, the number of members of the classes also exceeds 1000 people, in satisfaction of Fed. R. Civ. P. 23 (a)(1).

212.  Commonality – Fed. R. Civ. P. 23(a)(2): There are common questions of law and fact that affect the rights of every member of each respective class, and the types of relief sought are common to every member of each respective class. The same conduct by Defendants has injured or will injure every member of each Class.

213.  There are common questions of law and fact that affect the rights of every member of the respective Classes, and the types of relief sought are common to every member of the respective Classes.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in

satisfaction of Fed. R. Civ. P. 23(a)(2). The same conduct by Defendants has injured each respective Class Member.  Common questions of law and/or fact common to the respective Classes include, but are not limited to:

    a.  Whether Defendants, through their policies identified above disparately impacted the civil rights of Plaintiffs and the class members based upon their race and/or national origin;

    b.  Whether Defendants, through their policies identified above deliberately discriminated against the Plaintiffs and the class members because of their race and/or national origin;

    c.  Whether Defendants refuse to act in compliance with federal law;

    d.  Whether Defendants are in breach of contract for violating an implied warranty of habitability;

    e.  Whether Defendants are in breach of the implied warranty of habitability for violation of local codes and ordinances including, but not limited to, Sec. 13-153 of the Prince George's County Code of Ordinances;

    f.  Whether Defendants failed to perform adequate maintenance at BVS;

    g.  Other common questions of law and fact.

214. These questions of law and/or fact are common to the respective Classes and predominate over any questions affecting only individual class members.

215. Typicality – Fed. R. Civ. P. 23 (a)(3): The claims of Plaintiffs are typical of the claims of their respective Classes as required by Rule 23(a)(3), in that all claims are based upon the same factual and legal theories.  It is the same conduct by each Defendant that has injured each member of the Class.  The principal issue in this matter involves Defendants' conduct in failing to maintain BVS in an adequately safe and healthy condition.

216. Adequacy – Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the respective Classes, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in the prosecution of class actions, Fair Housing Act litigation, and environmental litigation. Plaintiffs and their counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor counsel has any interest adverse to those of the Classes.

217. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants and/or because adjudications

respecting individual members of the Class would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impeding their ability to prosecute their interests.

218.  Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all Members of the respective Classes, thereby making relief in the form of an injunction requiring Defendants to remediate BVS and maintain the properties and for the properties of Plaintiffs and the Members of the Classes appropriate, and to refrain from implementing policies of "harvesting," which disparately impact the class.

219.  Plaintiffs and members of the respective Classes have suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct.

220.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23 (b)(3). Absent a class action, most members of the Classes likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

221.   Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate one or more subclasses pursuant to Fed. R. Civ. P. 23(c)(4).

222.   Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy.   It would be impracticable and undesirable for each member of each putative class who has suffered harm to bring a separate action.   In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all putative class members.

223.   No unusual difficulties are likely to be encountered in the management of this action as a class action.

## VI.   PLAINTIFFS' CLAIMS

224.  Plaintiffs adopt and re-allege each of the preceding paragraphs of this Complaint as to each count set forth below.

225.  The Arbor properties are "dwelling[s]" within the meaning of 42 U.S.C. § 3602(b).

226.  The term "person" in the Fair Housing Act is defined to include "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint stock companies, trusts,

unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." 42 U.S.C. § 3602(d).

227.  Under the express provisions of the Fair Housing Act and applicable agency principles, banks, trustees, investors, servicers, and any other responsible contractors or vendors must maintain and market multifamily rental properties without regard to the race or national origin of the residents of a neighborhood. It is unlawful to treat a neighborhood or its residents differently because of the race or national origin of the residents.

### Count I – Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a)
### (All Plaintiffs and the BVS Class v. All Defendants)

228.  Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

229.  Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. § 3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a). Furthermore, HUD regulations provide that "[i]t shall be unlawful, because of race [or] national

107

origin, to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.  24 C.F.R. § 100.70(b).

230. The discriminatory targeting of communities of color by Arbor adversely affects their availability to be used as safe and habitable housing by making properties uninhabitable.

a.  Arbor's focus on investments in "rapidly changing" communities that are located in more "desirable submarkets," in addition to the statistical disparities in these communities plainly bears more heavily on minorities in these communities than it does on their White counterparts.

b.  Arbor's acceptance of the notions of "core," "value-add," and "opportunistic" investment strategies in areas which are "within one of the most desirable submarkets" of a city or located in a "rapidly changing" neighborhood, coupled with the aberration of Arbor's "Opportunistic Target and Harvest Policy," are unexplainable on grounds other than race and represent clear departures from Arbor's regular courses of action.

c.  Arbor's motivation to rehabilitate a property in a predominantly White neighborhood that "has not been renovated in over 10 years

and presents a tremendous value-add opportunity through unit upgrades and operation overhaul," as compared to Arbor's ownership and refusal to make any significant improvements to BVS, which has not been renovated in nearly 70 years is unexplainable on grounds other than race and plainly departs from Arbor's regular course of action.

231. Defendant Arbor's conduct constitutes intentional discrimination on the basis of race and national origin.

232. Defendants' policies and practices, including: (a) Arbor's "Financialization Policy" whereby Arbor targets properties in low-income predominantly minority communities that are "rapidly changing" in terms of demographics – or where that change is imminent – purchases the property, undertakes repairs or refurbishment, increases rent – often exorbitantly – driving existing tenants out, and replacing them with higher income tenants; (b) Arbor's "Opportunistic Target and Harvest Policy" of purchasing cheap low-income multifamily housing in predominantly poor and minority communities whereby Arbor purchases the undervalued property with the intent to make little or no investment whatsoever, and incrementally increases rents to inflate its profits and dividends for its shareholders; (c) Arbors "Divestment Policy," whereby maintenance of their properties is based not on the condition of the property but on

the age and/or value of the residential property and the demographics of the property itself and the surrounding community; and (d) Arbor's "Outsourcing Policy" whereby Arbor outsources their ownership responsibilities as real property owners to third parties such as Ross Management, coupled with Ross Management's acquiescence and complicity in the enforcement of evictions of tenants despite the property's underlying uninhabitable conditions at the properties where it manages Arbor assets, have had an unlawful and disproportionate impact on communities of color.

233.   Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin, in violation of 42 U.S.C. § 3604(a) and its implementing regulations, 24 C.F.R. § 100.70(a) and (b).

### Count II – Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b)<br>(All Plaintiffs and the BVS Class v. All Defendants)

234.   Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

235.  Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. § 3604(b).

236.  HUD's regulations implementing § 3604(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings because of race [or] national origin."  24 C.F.R. § 100.65.

237. Arbor has failed to maintain or repair its properties, and with the assistance of Ross, has then forced tenants into eviction despite the uninhabitability of their housing and the dangerous conditions which exist therein.

238. The discriminatory targeting of communities of color by Arbor adversely affects their availability to be used as safe and habitable housing by making properties uninhabitable.

      a. Arbor's focus on paying for maintenance and upgrades to existing facilities in "rapidly changing" communities that are located in more "desirable submarkets," in addition to the statistical disparities in these communities plainly bears more heavily on minorities in these communities than it does on their White counterparts.

      b. Arbor's acceptance of the notions of "core," "value-add," and "opportunistic" investment strategies in areas which are "within one of the most desirable submarkets" of a city or located in a "rapidly changing" neighborhood, coupled with the aberration of Arbor's "Opportunistic Target and Harvest Policy," are unexplainable on

grounds other than race and represent clear departures from Arbor's regular course of action when it comes to authorizing spending on maintenance.

c. Arbor's motivation to conduct maintenance or to completely rehabilitate a property in a predominantly White neighborhood that "has not been renovated in over 10 years and presents a tremendous value-add opportunity through unit upgrades and operation overhaul," as compared to Arbor's ownership and refusal to make any significant improvements to BVS which has not been renovated in nearly 70 years is unexplainable on grounds other than race and plainly departs from Arbor's regular course of action.

239. Defendant Arbor's conduct constitutes intentional discrimination on the basis of race and national origin.

240. Defendants' policies and practices, including: (a) Arbor's "Financialization Policy" whereby Arbor targets properties in low-income predominantly minority communities that are "rapidly changing" in terms of demographics – or where that change is imminent – purchases the property, undertakes repairs or refurbishment, increases rent – often exorbitantly – driving existing tenants out, and replacing them with higher income tenants; (b) Arbor's "Opportunistic Target and Harvest Policy" of purchasing cheap low-income

multifamily housing in predominantly poor and minority communities whereby Arbor purchases the undervalued property with the intent to make little or no investment whatsoever, and incrementally increases rents to inflate its profits and dividends for its shareholders; (c) Arbors "Divestment Policy," whereby maintenance of their properties is based not on the condition of the property but on the age and/or value of the residential property and the demographics of the property itself and the surrounding community; and (d) Arbor's "Outsourcing Policy" whereby Arbor outsources their ownership responsibilities as real property owners to third parties such as Ross Management, coupled with Ross Management's acquiescence and complicity in the enforcement of evictions of tenants despite the property's underlying uninhabitable conditions at the properties where it manages Arbor assets, have had an unlawful and disproportionate impact on communities of color.

241. Accordingly, Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. § 3604(b) and its implementing regulation, 24 C.F.R. § 100.65.

## Count III – Perpetuation of Segregation in Violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq.
## (All Plaintiffs and the BVS Class v. All Defendants)

242.  Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

243.  Discriminatory conduct that perpetuates or furthers segregation also violates the Fair Housing Act.

244.  HUD's regulations implementing the Fair Housing Act state that "[a] practice has a discriminatory effect where it…creates, increases, reinforces, or perpetuates segregated housing patterns because of race[.]" 24 C.F.R. § 100.500(a).

245.  Arbor's refusal to maintain its properties, and Ross' complicity and support of that action, as well as Arbor's targeting of low-income communities of color, act to perpetuate segregation through (a) destabilization of minority and immigrant communities; (b) alienation and expulsion of minorities and immigrants from historically minority communities to be replaced by White tenants who are more financially sound; (c) financial damage to minority and immigrant communities already existing in the lowest income categories who are forced to make modest repairs on their own to Arbor's properties to simply maintain their presence in the homes thereby furthering the wealth gap and the concomitant inability to purchase or rent homes in more affluent integrated neighborhoods.

246. The result of Arbor's policies is to freeze existing racial segregation patterns that exist in the low-income communities of color where it has targeted purchases of multifamily housing.

247. Accordingly, Defendants' conduct and practices perpetuate and encourage patterns of racial segregation that violate the Fair Housing Act, 42 U.S.C. § 3601, et seq., and its implementing regulation, 24 C.F.R. § 100.500(a).

### Count IV – Section 818 of the Fair Housing Act, 42 U.S.C. § 3617 (All Plaintiffs and the BVS Class v. All Defendants)

248. Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

249. Section 818 of the Fair Housing Act makes it unlawful, among other things, to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" other provisions of the Act. 42 U.S.C. § 3617.

250. Persons living in communities adversely affected by Defendants' practices and conduct have seen their enjoyment of their homes diminished. By poorly maintaining properties in predominantly minority communities, Defendants have interfered with the rights of neighboring residents (predominantly persons of color) to use and enjoy their homes and communities.

251. The health and safety risks caused by Defendants with respect to the properties in communities of color and the deleterious effects of those properties on

their surrounding neighborhoods create an unhealthy and hostile living environment for neighborhood residents.

252.  Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

253. Defendants' policies and practices have had an unlawful disproportionate impact on communities of color.

254.  Accordingly, Defendants have interfered with the exercise of rights granted or protected by the Fair Housing Act, in violation of 42 U.S.C. § 3617.

### Count V – Injunctive Relief
### (All Plaintiffs and all classes v. All Defendants)

255.  Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

256.  Plaintiffs and the classes seek remedies provided by 42 U.S.C. § 3613(c)(1) which grants declaratory and injunctive relief for violations of the FHA.

257.  The aforementioned violations of 42 U.S.C. §§ 3601, 3604, 3617 are ongoing violations to which Defendants refuse to conform.

258. 42 U.S.C. § 3613(c)(1) permits the entry of "any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)."

259. Plaintiffs seek an order permanently enjoining Defendants from 1) engaging in the financialization of residential property, 2) engaging in the targeting of low-income neighborhoods for rental property acquisition; and 3) engaging in the harvesting of rental income while delaying renovations and maintenance to property.

## Count VI – Breach of Contract
### (All Plaintiffs and the BVS Class v. All Defendants)

260. Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

261. Plaintiffs and the class each entered into a lease with Ross for a partially disclosed principal, which upon information and belief is Arbor.

262. Plaintiffs therefore bring this cause of action against all Defendants.

263. A material term of that contract was that the leased Unit be in clean, safe, and sanitary condition at all times and that Defendants maintain the common areas and each individual unit in a manner that is free from unhealthy indoor molds and water intrusion.

264. Defendants breached the contract by failing to provide clean, safe, and sanitary units that are free from unhealthy indoor molds, water intrusion, microbial contaminants, infestation and other unsanitary conditions and has failed to maintain the apartments by, *inter alia*, failing to provide heating and maintain air conditioning, failing to maintain electrical wiring, failing to maintain basic shelter such as windows and walls in adequately protective condition.

117

265. As a result of Defendants' breach, Plaintiffs have suffered economic losses including, but not limited to, money paid for rent, moving costs, and loss of personal property/contents of the units.

266. Further, Plaintiffs have suffered the cost of inspection of their respective units, and each tenant is similarly forced to bear the cost of environmental inspection despite Defendants' knowledge of chronic and consistent findings of elevated humidity, defective central air conditioning, water intrusion and unhealthy indoor molds.

267. Further, Defendants refuse to act in a manner consistent with the terms of the contract which they entered into by:

    a.    Failing to maintain a clean and healthy living environment;

    b.    When noticed of dangerous conditions, failing to inspect the units and common areas for unhealthy indoor molds and other environmental contaminants and infestations;

    c.    Failing to remediate the units and common areas for mold and other unhealthy environmental contaminants and infestations that have been or reasonably should have been discovered;

    d.    Failing to maintain electrical, HVAC, and structural aspects of the units, including windows and walls;

    e.    Otherwise refusing to act consistent with the terms of the lease.

268.  As stated, instead of complying with the terms of the lease agreement between tenants and Defendants, Defendants have refused to provide inspections or remediations and find new tenants who will not immediately complain of toxic mold or be able to move out and will continue to pay rent.

269.  These failures cause a serious and substantial threat to the life, health or safety of occupants, including Plaintiffs and the members of the class.

270.  Plaintiffs rely upon the doctrines of actual and apparent agency where necessary.

271.  Plaintiffs seek all damages allowed by law including compensatory damages and restitution damages.

### Count VII – Breach of the Implied Warranty
### of Habitability for Violation of Local Code
### (All Plaintiffs and the BVS Class vs. All Defendants)

272.  Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

273.  Each Plaintiff brings this cause of action against all Defendants.

274.  Prince George's County Local Code imposes upon Defendants a legal duty to "to maintain all facilities supplied with the leased dwelling unit and/or as enumerated in the lease."   The Prince George's County Local Code further incorporates all state legal obligations requiring that Defendants "comply with all applicable provisions of any Federal, State, County, or municipal statute, Code,

regulations, or ordinance governing the maintenance, construction, use, or appearance of the dwelling unit and the property of which it is a part."

275. Defendants have failed to maintain the facilities supplied within the leased dwelling units or enumerated in the lease by, *inter alia*:

> a. Failing to maintain a clean and healthy living environment;
>
> b. When noticed of dangerous conditions, failing to inspect the units and common areas for unhealthy indoor molds and other environmental contaminants and infestations;
>
> c. Failing to remediate the units and common areas for mold and other unhealthy environmental contaminants and infestations that have been or reasonably should be discovered;
>
> d. Failing to maintain electrical, HVAC, and structural aspects of the units, including windows and walls
>
> e. Otherwise refusing to act consistent with the terms of the lease.

276. Defendants thereby breached the implied warranty of habitability in that each knew or should have known of dangerous conditions upon the units which Plaintiffs leased, and local code expressly requires Defendants to maintain all supplied facilities as well as any facility enumerated in the lease.

277. These failures cause a serious and substantial threat to the life, health or safety of occupants, including Plaintiffs and the members of the class.

120

278.  Defendants continued to collect monthly rent from Plaintiffs and the class members though the defective conditions of each Unit rendered it unfit for habitation and in violation of state and/or local housing codes.

279.  Plaintiffs paid rent, and continue to pay rent, and have been subjected to physical eviction requests despite Defendants' knowledge of this breach of the implied warranty.

280.  Plaintiffs rely upon the doctrines of actual and apparent agency where necessary.

281.  Plaintiffs seek all damages allowed by law including compensatory damages and restitution damages.

### Count VIII – Breach of Contract – Third Party Intended Beneficiary
### (All Plaintiffs and the BVS Class v. Ross)

282.  Each of the preceding paragraphs is incorporated by reference herein.

283.  This Count is brought by each of the individual Plaintiffs and against Defendant Realty Management Services, Inc.

284.  The Arbor Defendants and Ross entered into a contract for the maintenance and management of the property.

285.  Plaintiffs were third-party intended beneficiaries of the contract.

286.  The contract provided that Ross would provide property management services to Plaintiffs, would maintain the tenants' properties in a habitable condition

for the benefit of the tenants, and would otherwise manage the property to the benefit of the tenants, including the Plaintiffs.

287.  A material term of each contract was that Ross keep all leased Units in clean, safe, and sanitary conditions at all times and that Ross maintain the common areas and each individual unit in a manner that is free from unhealthy indoor molds and water intrusion and environmental hazards.

288.  Ross breached the contract by failing to provide clean, safe, and sanitary units that are free from unhealthy indoor molds, water intrusion, microbial contaminants and other unsanitary conditions.

289.  As a result of Defendant's breach, Plaintiffs, which were third party intended beneficiaries of each contract, have suffered economic losses including, but not limited to, money paid for rent, moving costs, and loss of personal property/contents of the units.

290.  Plaintiffs rely upon the doctrines of actual and apparent agency where necessary.

291.  Plaintiffs demand all damages allowable by law on behalf of themselves individually and against Ross.

### Count IX – Civil Conspiracy
### (All Plaintiffs and the BVS Class vs. All Defendants)

292.  Each of the allegations in the preceding paragraphs is incorporated by reference as if fully set forth herein.

293.  A confederation of each of the named Defendants, including but not limited to Realty Management Services, Inc. have an agreement or understanding to engage in unlawful activity at the Bedford and Victoria Station apartments.

294.  Specifically, the Defendants conspired to refrain from performing maintenance or making repairs for known or reasonably knowable defects to further the policies identified above in violation of the FHA.

295.  This unlawful conspiracy has caused damage to Plaintiffs and the BVS Class including but not limited to:

      a.     Damages for past rent paid

      b.     Damages for violations of their civil rights

      c.     Other cognizable damages.

## JURY TRIAL DEMANDED

296.  Plaintiffs hereby demand a jury trial on all counts.

## PRAYER FOR RELIEF

297.  **WHEREFORE**, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor and against Defendants as follows:

      a.   Declare, pursuant to 28 U.S.C. § 2201, that the conduct of Defendants in the targeting and refusal to maintain the Bedford and Victoria Station Apartments and other properties in communities of color similarly targeted

by Arbor, as alleged herein, violates the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the applicable regulations;

b.   Enjoin, pursuant to 42 U.S.C. § 3613(c)(1), Defendants, their officers, directors, employees, agents, successors, assigns, and all other persons in active concert or participation with any of them, both temporarily during the pendency of this action and permanently, from violating the Fair Housing Act;

c.   Award such damages as would fully compensate the Individual Plaintiffs for their injuries caused by Defendants' unlawful conduct;

d.   Award such damages as would fully compensate CASA for their injuries caused by Defendants' unlawful conduct;

e.   Award punitive damages against Defendants as is proper under the law, pursuant to 42 U.S.C. § 3613(c)(1);

f.   Award Plaintiffs their costs and attorneys' fees incurred herein, pursuant to U.S.C. § 3613(c)(2); and

g.   Award Plaintiffs such other relief as the Court deems just and proper.

**The Donahue Law Firm, LLC**

*/s/ P. Joseph Donahue*
P. Joseph Donahue, Esquire
Bar Number: 06245
18 West Street
Annapolis, Maryland 21401
Telephone: 410-280-2023
pjd@thedonahuelawfirm.com

**Nidel & Nace, P.L.L.C.**

*/s/ Jonathan Nace*
Jonathan Nace, Esquire
Bar Number: 18246
One Church Street
Suite 802
Rockville, MD 20850
Telephone: (202) 780-5153
jon@nidellaw.com