**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MARYLAND**

| | | |
|---|---|---|
| CASA DE MARYLAND, INC., et al, Plaintiffs | * | |
| v. | * | Civil Action No. 8:21-cv-01778-DKC |
| ARBOR REALTY TRUST, INC., et al, Defendants. | * | |
| | * | |

**\*\*\*\*\*\***

**MEMORANDUM IN SUPPORT OF HYATTSVILLE DEFENDANTS'**
**<u>MOTION TO DISMISS COMPLAINT</u>**

**BUCKLEY LLP**

Benjamin B. Klubes (Bar Number 08085)
Amanda Lawrence (*pro hac vice*)
**BUCKLEY LLP**
2001 M Street NW, Suite 500
Washington, D.C.  20036
(202) 349-8000 (Telephone)
(202) 349-8080 (Facsimile)
bklubes@buckleyfirm.com
alawrence@buckleyfirm.com

Dated: December 20, 2021

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 4

    A.    Plaintiffs Group Seven Defendants Together and Call Them "Arbor." ....................... 4

    B.    The Complaint Fails to Allege Facts Supporting an FHA Claim and Ignores the Extensive Work and Funds Expended at BVS. ................................................................. 7

LEGAL STANDARD ....................................................................................................... 10

ARGUMENT .................................................................................................................... 11

I.     THE COMPLAINT'S COLLECTIVE REFERENCE TO ALL DEFENDANTS VIOLATES RULE 8 AND FAILS TO STATE A CLAIM. .................................................... 11

II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE FHA. ....................... 13

    A.    Plaintiffs Fail to Allege that the Hyattsville Defendants Own Any Properties Other than BVS. ........................................................................................................................ 14

    B.    Plaintiffs Do Not Plead a Prima Facie Case of Disparate Impact................................. 16

        1.    Plaintiffs Fail to Allege a Specific Policy that Creates Artificial, Arbitrary, and Unnecessary Barriers. ...................................................................................................... 16

        2.    Plaintiffs Fail to Satisfy the Causality Requirement................................................. 20

    C.    Plaintiffs Do Not Plead a Prima Facie Case of Discriminatory Intent. ....................... 24

    D.    Plaintiffs Fail to Allege the Statutory Elements Necessary to State a Claim Under Sections 3604(a), 3601, and 3617. .................................................................................. 27

    E.    Count V Must Be Dismissed Because There Is No Standalone Cause of Action for Injunctive Relief Under the FHA. .................................................................................... 29

    F.    Plaintiffs' Derivative Civil Conspiracy Claim Must Be Dismissed for Lack of a Predicate Violation. .......................................................................................................... 29

III.   PLAINTIFFS' BREACH OF CONTRACT CLAIMS MUST BE DISMISSED FOR LACK OF PRIVITY.......................................................................................................... 30

    A.    Plaintiffs Lack Contractual Relationships with Hyattsville United and AMAC. ......... 31

    B.    Ms. Ramirez and CASA Lack Contractual Relationships. ........................................... 32

IV.   CASA LACKS REPRESENTATIONAL AND ORGANIZATIONAL STANDING TO BRING CERTAIN CLAIMS.............................................................................................. 33

V.    PLAINTIFFS SEEK DAMAGES THAT ARE TIME BARRED. .................................. 35

CONCLUSION................................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*120 W. Fayette St., LLLP v. Mayor & City Council of Balt.*,
  43 A.3d 355 (Md. 2012) ...........................................................................................33

*Abdelhalim v. Lewis*,
  No. 1:19-cv-858, 2020 WL 3271378 (E.D. Va. June 17, 2020)..............................29

*Barry v. EMC Mortg.*,
  No. DKC 10-3120, 2011 WL 2669436 (D. Md. July 6, 2011) ...............................29

*Barry v. EMC Mortg.*,
  No. DKC 10-3120, 2011 WL 4352104 (D. Md. Sept. 15, 2011) ...........................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................10

*Bellezza v. Greater Havre de Grace Yacht Club, Inc.*,
  No. 0367, Sept. Term, 2014, 2015 WL 6394418 (Md. Ct. Spec. App. 2015).........29

*Binns v. City of Marietta Ga. (Hous. Choice Voucher Program)*,
  704 F. App'x 797 (11th Cir. 2017) ........................................................................21

*Bird Realty Ltd. P'ship v. Jiffy Lube Int'l, Inc.*,
  No. ELH-12-1104, 2012 WL 6562762 (D. Md. Dec. 14, 2012) ......................32, 33

*Bloch v. Frischholz*,
  587 F.3d 771 (7th Cir. 2009) .................................................................................27

*Boardley v. Household Fin. Corp. III*,
  39 F. Supp. 3d 689 (D. Md. 2014) ....................................................................16, 24

*Boykin v. Fenty*,
  650 F. App'x 42 (D.C. Cir. 2016)...........................................................................21

*City of Oakland v. Wells Fargo & Co.*,
  No. 19-15169, 2021 WL 4436205 (9th Cir. Sept. 28, 2021).................................28

*Cooper v. Bozutto & Assocs., Inc.*,
  No. DLB-19-3141, 2020 WL 2085462 (D. Md. Apr. 30, 2020) ...........................26

*Dave & Buster's, Inc. v. White Flint Mall, LLLP*,
  616 F. App'x 552 (4th Cir. 2015) ..........................................................................35

*Dixon v. Select Portfolio Servicing Co.*,
No. DKC 19-1710, 2020 WL 470314 (D. Md. Jan. 28, 2020) .............................................30

*Edwards v. Johnston Cty. Health Dep't*,
885 F.2d 1215 (4th Cir. 1989) ...................................................................................21, 22

*Ellis v. City of Minneapolis*,
860 F.3d 1106 (8th Cir. 2017) ...................................................................................19

*Ely v. Sci. Applications Int'l Corp.*,
716 F. Supp. 2d 403 (D. Md. 2010) ...........................................................................35

*Equal Rights Ctr. v. Abercrombie & Fitch Co.*,
767 F. Supp. 2d 510 (D. Md. 2010) ...........................................................................34

*Fare Deals, LTD. v. World Choice Travel.com, Inc.*,
180 F. Supp. 2d 678 (D. Md. 2001) ........................................................................9, 15

*Fenzel v. Group 2 Software, LLC*,
No. DKC 13-0379, 2016 WL 865363 (D. Md. Mar. 7, 2016) .........................................30, 31

*Fraidin v. Weitzman*,
611 A.2d 1046 (Md. Ct. Spec. App. 1992) ..................................................................30

*Francis v. Giacomelli*,
588 F.3d 186 (4th Cir. 2009) ...................................................................................10

*Glenn v. Wells Fargo Bank, N.A.*,
No. DKC 15-3058, 2016 WL 3570274 (D. Md. July 1, 2016) ..................................10, 14, 16

*Glenn v. Wells Fargo Bank, N.A.*,
No. PX 15-3058, 2017 WL 371956 (D. Md. Jan. 26, 2017), *aff'd*, 710 F. App'x
574 (4th Cir. 2017)...................................................................................................25, 26

*Hardaway v. Equity Residential Servs., LLC*,
No. DKC 13-0149, 2015 WL 858086 (D. Md. Feb. 26, 2015) ....................................... *passim*

*Hosack v. Utopian Wireless Corp.*,
No. DKC 22-0420, 2011 WL 1743297 (D. Md. May 6, 2011) ....................................9, 30, 31

*Inclusive Cmtys. Proj. Inc. v. Lincoln Prop. Co.*,
930 F.3d 660 (5th Cir. 2019) ...................................................................................17

*Jersey Heights Neighborhood Ass'n v. Glendening*,
174 F.3d 180 (4th Cir. 1999) ...................................................................................27

*Jien v. Perdue Farms, Inc.*,
No. 1:19-CV-2521-SAG, 2020 WL 5544183 (D. Md. Sept. 16, 2020)............................11, 13

*Montgomery Cty., Md. v. Bank of Am. Corp.*,
   421 F. Supp. 3d 170 (D. Md. 2019) ................................................................23

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund. v. Scales*,
   150 F. Supp. 2d 845 (D. Md. 2001) ................................................................34

*Nat'l Fair Hous. All. v. Bank of Am., N.A.*,
   401 F. Supp. 3d 619 (D. Md. 2019) ..............................................22, 24, 27, 28

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*,
   No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ..............................22

*Piotrowski v. Wells Fargo Bank, N.A.*,
   No. DKC 11-3758, 2013 WL 247549 (D. Md. Jan. 22, 2013) (Chasanow, J.) ........................9

*Prince George's Cty., Md. v. Wells Fargo & Co.*,
   397 F. Supp. 3d 752 (D. Md. 2019) ................................................................28

*Proctor v. Metro. Money Store Corp.*,
   579 F. Supp. 2d 724 (D. Md. 2008) ................................................................11

*Retail Indus. Leaders Ass'n v. Fielder*,
   475 F.3d 180 (4th Cir. 2007) ................................................................34

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
   903 F.3d 415 (4th Cir. 2018) ..............................................16, 17, 20, 24

*Roberson v. Graziano*,
   No. WDQ-09-3038, 2010 WL 2106466 (D. Md. May 21, 2010), *aff'd* 411 F.
   App'x 583 (4th Cir. 2011) ................................................................26

*Ruddy v. Equitable Life Assurance Soc'y of U.S.*,
   No. CIV. A. DKC 00-70, 2000 WL 964770 (D. Md. June 20, 2000) ....................................35

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ..............................................11, 12, 13

*Shield Our Const. Rights & Just. v. Tippett*,
   No. DKC 2009-0152, 2009 WL 2961428 (D. Md. Sept. 11, 2009) ........................................32

*Singer Co., Link Simulation Sys. Div. v. Balt. Gas & Elec. Co.*,
   558 A.2d 419 (Md. Ct. Spec. App. 1989) ................................................................35

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
   381 F. Supp. 3d 536 (D. Md. 2019) ..............................................12, 30

*Stevens v. Hous. Auth. of S. Bend, Ind.*,
   663 F.3d 300 (7th Cir. 2011) ................................................................32

iv

*Texas Dep't of Housing & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.*,
    576 U.S. 519 (2015) ................................................................................ *passim*

*U.S. v. Grahams Constr., Inc.*,
    585 F. App'x 173 (4th Cir. 2014) .............................................................. 33

*United States v. Akongmbom*,
    No. 17-po-5873, 2018 WL 461444 (D. Md. Jan. 18, 2018) ...................... 10

*United States v. Garcia*,
    855 F.3d 615 (4th Cir. 2017) ..................................................................... 10

*Walsh v. Bank of New York Mellon*,
    No. GJH-15-00934, 2017 WL 239367 (D. Md. Jan. 19, 2017) .................. 6

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................. 33, 34

*Young-Bey v. S. Mgmt. Corp., Inc.*,
    No. TDC-18-2331, 2019 WL 1992905 (D. Md. May 6, 2019) ................. 25

*Zos v. Wells Fargo Bank, N.A.*,
    No. GJH-16-00466, 2017 WL 221787 (D. Md. Jan. 18, 2017) .................. 6

**Statutes**

42 U.S.C. § 3601 ....................................................................... 1, 13, 27, 28

42 U.S.C. § 3604 ................................................................................... 13

42 U.S.C. § 3617 ....................................................................... 13, 27, 28, 29

Md. Code Ann., Cts. & Jud. Pro. § 5-101 ............................................. 35

**Other Authorities**

Fed. R. Civ. P. 8 ..................................................................................... 1, 11

Fed. R. Civ. P. 12 ............................................................................. *passim*

Prince George's County Open Data Portal,
    https://data.princegeorgescountymd.gov (last visited Dec. 13, 2021) ....... 10

United States Census Bureau,
    https://www.census.gov/quickfacts/fact/table/sanantoniocitytexas,US/PST045
    219 (last visited Dec. 13, 2021) ................................................................ 24

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants Victoria United, LLC ("Victoria United"), Bedford United, LLC ("Bedford United"), Hyattsville United, LLC ("Hyattsville United"), and Arbor Management Acquisition Company, LLC ("AMAC") (collectively, the "Hyattsville Defendants") respectfully move to dismiss the Complaint (ECF No. 1), because Plaintiffs Anita Ramirez ("Ms. Ramirez"), Ramiro Lopez ("Mr. Lopez"), Ervin Obdulio Rodas ("Mr. Rodas"), Jesus Gonzalez ("Mr. Gonzalez"), Maria Arely Bonilla ("Ms. Bonilla"), Maria Lara ("Ms. Lara"), Norma Guadalupe Beltran ("Ms. Beltran") (collectively, "Named Plaintiffs"), and CASA de Maryland, Inc. ("CASA") (collectively, "Plaintiffs"), fail to state a claim upon which relief can be granted and certain Plaintiffs lack standing to pursue certain claims.

## **INTRODUCTION**

CASA, an immigrant advocacy organization, and Named Plaintiffs, individual residents of Bedford Station and Victoria Station (collectively "BVS"), assert claims against eight Defendants, alleging that their actions violated: (i) various provisions of the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"); (ii) the express and implied terms of Named Plaintiffs' lease agreements; and (iii) Maryland's common law prohibition against civil conspiracy.  Compl. ¶¶ 228-295.

Plaintiffs attempt to transform an ordinary landlord-tenant dispute premised on the conditions of two multifamily apartment buildings in Prince George's County—BVS—into a nationwide housing discrimination case brought under the federal FHA.  Plaintiffs, however, fail to state a claim for two fundamental reasons.  First, Plaintiffs group together seven legally distinct entities and call them "Arbor" in almost all of their allegations, without alleging any facts to identify each of the different entities' involvement in the allegations or to justify such concerted treatment.  By doing so, Plaintiffs run afoul of the pleading standards required under Federal Rule of Civil Procedure 8.

1

Second, Plaintiffs' FHA claims do not—and cannot—plausibly allege that they suffered discrimination within the meaning of the FHA because they do not identify a policy of any particular defendant that plausibly supports an allegation of discriminatory impact, nor do they provide any plausible and cognizable statistical comparison between themselves as minorities who allegedly suffered a greater discriminatory affect and comparably situated White individuals, as required by Supreme Court precedent and the purpose of the FHA.  *See Texas Dep't of Housing & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.*, 576 U.S. 519, 543 (2015) ("Courts should avoid interpreting [FHA] liability to be so expansive as to inject racial considerations into every housing decision.").  Specifically, while Plaintiffs' Complaint spans 297 paragraphs over 124 pages, a close review of the Complaint shows that they fail to identify any policy actually used by a specific defendant or defendants, to say nothing of a policy that creates artificial, arbitrary, or unnecessary barriers as required to state a claim for disparate impact.  *Id.* at 540.  Further, Plaintiffs have not pled facts—and their allegations in the Complaint demonstrate that they cannot plead such facts as a matter of law—showing that the Hyattsville Defendants subject Latinos or members of other protected classes to different or worse treatment than similarly situated persons outside of the protected class due to their race or national origin.

Seeking to overcome their inability to demonstrate that Bedford United and Victoria United treat minorities differently, Plaintiffs attempt to link BVS to ten unrelated properties in the DC-VA-MD HUD Metro FMR Area (the "HUD DC Market") and two cherry picked properties (out of the over 8,000 units "Arbor" is alleged to own and operate nationwide) located in other parts of the country, all while failing to establish any meaningful connection between these properties, their owners, and BVS.  With respect to the ten HUD DC Market properties, the Complaint alleges that they are in the same alleged state of disrepair as BVS; thus, these 10 properties cannot support

any comparison showing that BVS treats minority residents differently.  And with respect to the "Arbor" properties located in New York and Texas, Plaintiffs fail to allege the racial or ethnic composition of the tenants in these properties.  This is fatal to Plaintiffs' disparate impact theory; simply comparing investments in two properties (BVS) to investments in two other properties in other parts of the country, without presenting any of the associated demographic information, fails to state a claim under the FHA.  As the Supreme Court stated,

> [A] plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.  It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units.

*Inclusive Cmtys.*, 576 U.S. at 543.

Plaintiffs also fail to provide any factual basis—much less a plausible one—establishing discriminatory intent based on race or national origin.  In fact, since their purchase of the properties, Bedford United and Victoria United have made substantial improvements to the properties, resulting in their removal from the Prince George's County's list of distressed properties.  Such conduct is hardly indicative of intentional discrimination against Hispanic or Latino tenants.

Plaintiffs' state law claims fare no better.  Critically, while Plaintiffs seek remedies for breach of the express and implied terms of the Named Plaintiffs' lease agreements in Counts VI and VII, Plaintiffs fail to show that each Plaintiff has a contractual relationship with each Defendant.  In fact, none of the Named Plaintiffs have contractual relationships with AMAC or Hyattsville United, and Ms. Ramirez and CASA lack contractual relationships with any of the Hyattsville Defendants.

In addition to the merits, CASA lacks standing to assert claims on behalf of its members for money damages and cannot bring breach of contract claims on its own behalf for money damages.  Further, while an alleged continuing violation may allow Plaintiffs to assert damages for breaches that allegedly occurred within the three-year limitations period for Counts VI and VII, Plaintiffs may not recover damages for breaches that purportedly occurred outside of the limitations period, as Plaintiffs attempt to do in the Complaint.

## FACTUAL BACKGROUND

Named Plaintiffs allege that they are Hispanic residents of Guatemalan and Salvadoran national origin[1] living at BVS, two multi-family apartment complexes located in Prince George's County, Maryland.  Compl. ¶¶ 21-26.  Plaintiffs allege that Bedford Station is owned by Bedford United (*id*. ¶ 30) and that Victoria Station is owned by Victoria United (*id.* ¶ 31).  Plaintiffs also allege that Realty Management Services, Inc. ("RMS") acts as the management company for these two properties.  *Id.* ¶ 33.  Plaintiffs assert that "basic maintenance and repairs to both properties have been ignored and neglected," resulting in uninhabitable conditions under federal law, the Named Plaintiffs' lease agreements, and the local housing code.  *Id.* ¶ 1.

### A.    Plaintiffs Group Seven Defendants Together and Call Them "Arbor."

In addition to asserting claims against Bedford United, Victoria United, and RMS based on their ownership and management of BVS, Plaintiffs also assert claims against a large number of unrelated corporate entities that have no cognizable connection to the facts alleged in the Complaint.  Trying in vain to draw a link between these unrelated Defendants and the facts that form the basis of their claims, Plaintiffs generally allege that Arbor Realty Trust, Inc. ("Arbor Realty Trust") and its alleged subsidiaries, including the Hyattsville Defendants, are part of a

---

[1] Ms. Lara does not plead her national origin (Compl. ¶ 24), and Ms. Beltran pleads neither her race nor national origin (*id.* ¶ 25).

4

single corporate "Arbor" family.  *Id.* ¶ 9.  Based on conjecture alone, Plaintiffs then lump together all of those Defendants into a single group and refer to them collectively as "Arbor" throughout the Complaint.  *Id.*[2]  Without differentiating which entity allegedly did what, Plaintiffs assert eight of the nine claims against "All Defendants."  *Id.* ¶¶ 227-28, 233-34, 241-42, 247-48, 254-55, 259-60, 271-72, 291-92.

But Plaintiffs provide no factual support for treating these separate and distinct legal entities as a single actor.  As to Bedford United, Victoria United, and Hyattsville United, Plaintiffs baselessly and erroneously assert that each is "owned and controlled by Arbor Realty Trust [] and its subsidiaries."  *Id.* ¶¶ 30-32.  Similarly, Plaintiffs state that AMAC is "a subsidiary of Arbor Realty Trust," (*id.*¶ 28) that Ivan Kaufman is the "Co-founder and Principal," (*id.* ¶ 66c) and that AMAC, along with seven other "lines of business"—including three entities that are not named as parties in this action—"exhibit[s] complete control over" Bedford United, Victoria United, and Hyattsville United (*id.* ¶ 64).  Plaintiffs conclude, without justification, that Arbor Realty Trust "is the parent company and/or exerts controlling authority over the co-defendants and subsidiaries," (*id.* ¶ 26) and that there is a single shared officer between AMAC and Arbor Realty Trust—Ivan Kaufman.  *Id.* ¶¶ 66a, 66c.  However, Plaintiffs fail to make any factual statements concerning how this "control" is exercised through their operations or, more specifically, in relation to the properties at issue in the Complaint.

The one fact that Plaintiffs do allege to attempt to show a connection between the BVS properties and "Arbor" relates to certain financing that one Defendant provided for seven months

---

[2] Confusingly, the definition of "Arbor" is circular and seemingly includes parties that have not been named to this action.  Compl. ¶ 9 n.1 ("Each reference to Arbor in this Complaint refers collectively to each of the co-defendants, and *any other subsidiary or division* of these entities that plays a role in owning or maintaining, buying or selling the multi-family residential properties of Arbor[.]") (emphasis added).

almost a decade ago.  Plaintiffs allege that in April 2013, Bedford United and Victoria United acquired BVS and took title of the properties by deed, as recorded in the Maryland land records. *Id.* ¶ 108.  As partial financing for the purchase of these properties, Bedford United and Victoria United each entered into mortgage loans with Arbor Realty SR, Inc. ("Arbor Realty SR") and secured the loans with an assignment of leases and rents, among other collateral.  *Id.* ¶¶ 111-12 (asserting that the "rents from tenants of BVS are assigned directly from the Bedford United, LLC and Victoria United, LLC holding companies . . . to . . . Arbor Realty SR").  But Plaintiffs conspicuously fail to mention that the same set of Maryland land records confirm that those assignments were satisfied within months of the initial assignment.  *See* Ex. A.[3]  Indeed, Bedford United and Victoria United subsequently assigned leases and rents from BVS to unrelated entities that are not named as defendants.[4]  Plaintiffs' allegations simply show that for a short period of months—more than eight years prior to the filing of the Complaint—Bedford United and Victoria United temporarily assigned the leases and rents of BVS as security for financing obtained from Arbor Realty SR.  Compl. ¶¶ 111-12.  They have no other specific factual assertions reflecting

---

[3] The Court may properly consider these land records as they are subject to judicial notice as land records publicly maintained by the Maryland state government, and because Plaintiffs' Complaint incorporates the records by expressly referring to the assignments and various "Maryland land records" (Compl. ¶ 111).  *See Zos v. Wells Fargo Bank, N.A.*, No. GJH-16-00466, 2017 WL 221787, at *1 n.2 (D. Md. Jan. 18, 2017) (taking judicial notice of land records as "integral" to breach of contract, civil conspiracy, and FHA claims) (citing *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *Walsh v. Bank of New York Mellon*, No. GJH-15-00934, 2017 WL 239367, at *1 (D. Md. Jan. 19, 2017) (taking judicial notice of Prince George's County land records and loan assignments to show current owner of property).

[4] Bedford United and Victoria United entered into three other assignments of leases and rents in connection with BVS with third party lenders, not named in this action (and which Plaintiffs do not allege have any ownership over BVS).  *See* Arbor Defs' Mem. Supp. Mot. Dismiss at 6-7 (describing Maryland land records that show assignments of leases and rents in 2013, 2018, and 2020 to German American Capital Corp. and to KeyBank, who further assigned its interest in the loan to the Federal National Mortgage Association).

control or otherwise justifying their blanket treatment of seven distinct legal entities as a sole "defendant" entity in their Complaint.

**B.**   **The Complaint Fails to Allege Facts Supporting an FHA Claim and Ignores the Extensive Work and Funds Expended at BVS.**

While Plaintiffs dedicate twenty-six full pages of their Complaint solely to photographs of their units in BVS (*id.* ¶¶ 2-29), they devote only six paragraphs to demonstrating a "statistically disparate impact on minorities," which is the crux of their FHA claims. *Id.* ¶¶ 140-46. In doing so, Plaintiffs point to ten properties allegedly owned by "Arbor" within the HUD DC Market, which includes Prince George's County. *Id.* ¶¶ 106, 113. Plaintiffs assert that these ten properties are "located in majority minority communities" (*id.* ¶ 113a) and are subjected to a "similar level of disrepair, neglect, and failed maintenance" as purportedly exists at BVS. *Id.* ¶ 114.

Plaintiffs contend that four "policies" are causing a disparate impact on the Named Plaintiffs as residents of BVS, the tenants of the ten properties identified in the HUD DC Market (*id.* ¶ 113), and on "communities of color" nationwide (*id.* ¶ 161), including: (1) the "business model" of "buying, holding, and selling of low-income multifamily housing as a commodity . . . on the multifamily housing market" (*id.* ¶¶ 147, 57); (2) the "investment strategy" or "investment thesis" whereby real estate investment trusts ("REITs") invest in properties in "low-income urban communities" and determine maintenance and rents based upon the REIT shareholder dividend (*id.* ¶¶ 162-74); (3) basing maintenance practices upon the age and/or value of residential property (*id.* ¶¶ 176-78); and, (4) "retaining agents who perform property management duties and ensure maximum occupancy of its rental properties" (*id.* ¶ 183). The Complaint does not plead any facts showing that these policies actually exist in any form or that they are used by the Hyattsville Defendants in their operations.

To demonstrate the "disparate strategy employed by Arbor when it identifies a value-add property" in a "majority White" community (*id.* ¶¶ 118, 137), Plaintiffs cherry pick two properties allegedly owned by "Arbor" in New York and Texas for comparison.   Despite alleging that "Arbor" holds a portfolio with a "*vast* number of multifamily holdings" spanning "across the United States" that totals "over 8,000 units," Plaintiffs identify only these two properties to demonstrate a nationwide "policy."   *Id.* ¶ 115-16 (emphasis added).   Moreover, only the Texas property is alleged to be located within a "majority White" community (*id.* ¶ 129); Plaintiffs themselves admit that the New York property is in a community that is 94.4% non-white. (*Id.* ¶ 120).   Plaintiffs further undermine their theory by alleging that "Arbor" made renovations and improvements at the New York property, which, is located in a majority non-white community. *Id.* ¶ 125.   Compounding these errors, Plaintiffs present no factual information regarding the racial composition of the Texas and New York properties, providing only the racial composition of the surrounding community for the New York property and not even this information for the Texas property.   *See id.* ¶¶ 119-137.   Similarly, Plaintiffs do not identify which Defendant purchased or owned these properties and simply assert that "Arbor" acquired the properties in 2017 and 2018. *Id.*   ¶¶ 119, 128.   However, publicly available records indicate that these properties are not owned by any Defendant in this action.

These significant factual gaps in the Complaint are contrasted by the lengthy descriptions regarding the individual Named Plaintiffs' units in BVS.   *See id.* ¶¶1-29, 36-39.   However, the Complaint conspicuously fails to mention any of the improvements Bedford United and Victoria United made to BVS since taking ownership of the properties.    For example, as Plaintiffs allege, the BVS properties were in distress prior to their acquisition by Bedford United and Victoria United and had been foreclosed upon by its lender during prior ownership.   *See id.* ¶¶ 82-83.   While

Plaintiffs point out that the BVS properties were placed on Prince George's County Department of Permitting, Inspection, and Enforcement's ("PG DPIE") list of distressed properties in "September 2012 ***prior to its acquisition by Arbor***," (*id.* ¶¶ 81-83) (emphasis added), the Complaint entirely ignores that the properties were removed from that list in September 2018 (Victoria Station) and February 2019 (Bedford Station), as a result of "the reduced number of violations and tenant calls for service, and the overall responsiveness of the management company." *See* Ex. B.[5]  These findings led to the conclusion that each property "was in compliance with the Prince George's County Housing code." *Id*.  Plaintiffs' conclusory allegation that "there have been no significant capital improvements to the BVS Properties" since 2017 (Compl. ¶ 90) is clearly belied by PG DPIE, which commended Bedford Station for its "***substantial*** investment in capital improvements on the property."   Ex. B, Tab 2 (emphasis added).[6]

Further, Plaintiffs provided detailed figures regarding the number of inspection violations reported by PG DPIE between 2014 and 2017.  *See* Compl. ¶¶ 84-90.  But they failed to provide those same figures for 2018 through 2021—despite the fact that this particular time period is the

---

[5] The Court may consider the February 8, 2019, and September 7, 2018, letters from PG DPIE as incorporated by reference into the Complaint, due to Plaintiffs' extensive references to the listing of BVS on the PG DPIE List of Distressed Properties as "central" to their Complaint.  *See* Compl. ¶¶ 81-83, 181, 182; *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC 11-3758, 2013 WL 247549, at *1 n.1 (D. Md. Jan. 22, 2013) (Chasanow, J.) (considering letter that was "expressly relied on in the complaint" as integral to the complaint).

[6] *See also Hosack v. Utopian Wireless Corp.*, No. DKC 22-0420, 2011 WL 1743297, at *3 (D. Md. May 6, 2011) (Chasanow, J.) ("'[If] the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail.'") (quoting *Fare Deals, LTD. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 683 (D. Md. 2001)).

most relevant for purposes of statutes of limitation.  During this period, PG DPIE reported sixty-two violations in 2018 on behalf of both properties and ***zero violations from 2019 to the present***.[7]

| Total Housing Violations for BVS | |
|---|---|
| **Year** | **Housing Inspection Violations** |
| 2018 | 62 |
| 2019 | 0 |
| 2020 | 0 |
| 2021 | 0 |

**Fig. 1. Number of Inspection Violations by Year for BVS.**

<u>**LEGAL STANDARD**</u>

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "'[N]aked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).  "Legal conclusions couched as factual allegations are insufficient, as are conclusory factual allegations without any reference to actual events." *Glenn v. Wells Fargo Bank, N.A.,* No. DKC 15-3058, 2016 WL 3570274, at *4 (D. Md. July 1, 2016) (Chasanow, J.).

---

[7] The Court may consider Figure 1 because it contains publicly available information maintained by the Prince George's County government available on the government's website, and is therefore, both subject to judicial notice and incorporated into the Complaint. *See* Prince George's County Open Data Portal, https://data.princegeorgescountymd.gov (last visited Dec. 13, 2021); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites."); *United States v. Akongmbom*, No. 17-po-5873, 2018 WL 461444, at *3 (D. Md. Jan. 18, 2018) (taking judicial notice of facts contained on Prince George's County website).

## ARGUMENT

I.  **THE COMPLAINT'S COLLECTIVE REFERENCE TO ALL DEFENDANTS VIOLATES RULE 8 AND FAILS TO STATE A CLAIM.**

Plaintiffs' Complaint fails to satisfy Rule 8's notice pleading requirement.  The Complaint impermissibly lumps together distinct corporate entities without alleging any facts specific to each defendant and thereby fails to put the individual Defendants on notice of the claims against them. *See Barry v. EMC Mortg.*, No. DKC 10-3120, 2011 WL 4352104, at *4 (D. Md. Sept. 15, 2011) (Chasanow, J.) ("All pleading requirements exist to ensure that the opposing party receives fair notice of the nature of a claim or defense.").  The Fourth Circuit is clear that a complaint "cannot rely on 'indeterminate assertions against all defendants,' a fact that holds true even when some of those defendants are corporate subsidiaries or affiliates of one another." *Jien v. Perdue Farms, Inc.,* No. 1:19-CV-2521-SAG, 2020 WL 5544183, at *4 (D. Md. Sept. 16, 2020) (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015)); *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 744 (D. Md. 2008) (finding allegations that "simply list[ed] everyone that *could have been* involved for every specific act that allegedly occurred" as conclusory "speculation [] which is deficient under *Twombly*") (emphasis in original).

Here, Plaintiffs have pled "precisely the type of corporate entity group pleading *SD3* forbids" by "using largely generic language" and conclusory statements when describing the purported corporate affiliations between the Arbor Defendants and Hyattsville Defendants and by referring collectively to these seven distinct legal entities simply as "Arbor" throughout the Complaint. *See Jien*, 2020 WL 5544183, at *4 (finding complaint violated Rule 8 where plaintiffs grouped corporate defendants together under a single "group label" and provided no explanation for such group treatment beyond "baldly alleging a corporate relationship") (citing *SD3*, 801 F.3d at 423).  Plaintiffs conclude without factual support that Bedford United, Victoria United, and

Hyattsville United are "owned and controlled by Arbor Realty Trust," (Compl. ¶¶ 30-32) and that AMAC "is a subsidiary of Arbor Realty Trust" (*id.* ¶ 28).  But these are nothing more than legal conclusions lacking factual support and, therefore, are not entitled to deference on a motion to dismiss.

Plaintiffs also assert that AMAC, along with seven other "lines of business"—including three entities that are not named in this action—operate to "exhibit complete control over" Bedford United, Victoria United, and Hyattsville United.  *Id.* ¶ 64 (concluding that the "shell companies which hold the underlying properties are mere instrumentalities").  Yet again, Plaintiffs provide no ***factual*** allegations showing any affiliation or exercise of control between the Hyattsville Defendants and Arbor Defendants.[8]  Indeed, the only ***fact*** Plaintiffs plead in their Complaint evincing any sort of relationship between the Hyattsville Defendants and Arbor Defendants is that Bedford United and Victoria United assigned the leases and rents of the properties to Arbor Realty SR in April 2013 as ***security*** for the loans made by Arbor Realty SR.[9]  *Id.* ¶¶ 111-12.  Moreover, Plaintiffs deliberately ignore that the assignments identified in the Complaint were satisfied in full and terminated months after they were made, thereby extinguishing ***any*** interest that ***any*** Arbor Defendant may have had in BVS.  *See* Ex. A.

The Complaint provides absolutely no factual basis to justify treating the entities "as a unified whole" based solely on the fact that they engaged in a financing transaction together nearly

---

[8] As indicated by the Disclosures of Corporate Interests filed concurrently with this Motion, none of the Hyattsville Defendants are affiliates or subsidiaries of the Arbor Defendants.  *See State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 572 (D. Md. 2019) (taking judicial notice of defendants' corporate disclosure statements as a judicial record for purposes of establishing corporate affiliation on Rule 12(b)(6)).

[9] While Plaintiffs assert that both AMAC and Arbor Realty SR share a common officer—Ivan Kaufman—they do not allege any ***facts*** showing that the sharing of a single officer accompanied or fostered the requisite control to plausibly show the "unity of interests" necessary to permit such indeterminate pleading.  *SD3*, 801 F.3d at 423.

a decade ago.  *Jien*, 2020 WL 5544183, at *4.  Not only were the nearly decade-old assignments terminated within a matter of months, but the assignments themselves—which were made as security for the financing of mortgage loans, along with other collateral—do not plausibly show that Arbor Realty SR had any ownership interest in the BVS properties.  Neither does this plausibly establish that Arbor Realty SR could or did impose the alleged policies and practices onto Bedford United and Victoria United's residential operations.  The allegations merely show, at best, that Arbor Realty SR had a temporary security interest in the properties.  Indeed, Bedford United and Victoria United subsequently assigned leases and rents of BVS to other non-"Arbor" lenders— whom Plaintiffs do not contend are similarly liable for discrimination.  These subsequent assignments cut against any notion that the temporary security interest Arbor Realty SR held in BVS could singularly justify the indeterminate group pleading employed in the Complaint.  *SD3*, 801 F.3d at 423.  Because the Complaint is devoid of facts that justify the group pleading, it violates established Fourth Circuit precedent and must be dismissed for failure to state a claim.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE FHA.

Plaintiffs assert five counts under the FHA, claiming that the Hyattsville Defendants violated: Section 3604(a) of the FHA, which prohibits discrimination in making housing unavailable (Count I); Section 3604(b) of the FHA, which prohibits discrimination against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therein (Count II); Section 3601 of the FHA, which prohibits the perpetuation of segregation (Count III); Section 3617 of the FHA, which prohibits interference with any person in the exercise or enjoyment of a right protected by the FHA (Count IV); and Section 3613(c)(1), which provides for injunctive relief (Count V).  In addition, Plaintiffs assert that the Hyattsville Defendants conspired to violate the FHA, in violation of Maryland's common law prohibition

against civil conspiracy (Count IX).  Plaintiffs bring their FHA claims under both the disparate

impact and discriminatory intent theories of discrimination.  Compl. ¶¶ 137-38.

### A. **Plaintiffs Fail to Allege that the Hyattsville Defendants Own Any Properties Other than BVS.**

Plaintiffs cannot establish either disparate impact or intentional discrimination against the

Hyattsville Defendants because Plaintiffs do not allege that the Hyattsville Defendants own any

properties other than BVS.  This Court has made clear that FHA claims may not be maintained

against corporate affiliates without ownership interests in the at-issue properties because such

affiliates lack "any relationship to the allegations in the [] complaint" and are therefore not "proper

parties" for an FHA discrimination action.  *See Hardaway v. Equity Res. Servs., LLC*, No. DKC

13-0149, 2015 WL 858086, at *4 (D. Md. Feb. 26, 2015) (Chasanow, J.) (dismissing subsidiaries

without ownership interests in the at-issue property that fell within the corporate umbrella of parent

entity that actually owned the relevant property in FHA action).  Because disparate impact and

discriminatory intent claims require comparative allegations, Plaintiffs cannot plausibly allege a

prima facie case of either without alleging that the Hyattsville Defendants are individually liable

for each property referenced in the Complaint.  *See Glenn*, 2016 WL 3570274, at *6.

Here, Plaintiffs have entirely failed to plead that the Hyattsville Defendants own any

properties, other than Bedford United's sole ownership of Bedford Station and Victoria United's

sole ownership of Victoria Station.[10]  Compl. ¶¶ 30-31.  Plaintiffs first point to ten properties

allegedly "purchased" by "Arbor" in the HUD DC Market—the community to which Plaintiffs

---

[10] Bedford United and Victoria United's ownership of BVS is also confirmed by the records maintained by the Maryland Department of Assessments and Taxation ("MDAT"), which show Bedford United and Victoria United as the sole and respective owners for the limitations period. *See* Ex. D.  These records are subject to judicial notice.  *Hardaway*, 2015 WL 858086, at *4 (considering documentation maintained by MDAT and the SEC on Rule 12(b)(6) motion for purposes of establishing ownership of apartment building).

14

allege the "policies are applied" for purposes of disparate impact.  *Id*. ¶¶ 113, 141.  However, Plaintiffs then allege that these ten properties are owned by entities *other than* the Hyattsville Defendants.  *See id.* ¶ 113 (listing the holding companies of the ten properties as non-defendant LLCs).  Further, publicly available land records for these ten properties indisputably show that the Hyattsville Defendants do not own any of these ten properties.  *See* Ex. C (records maintained by MDAT).[11]

Next, Plaintiffs point to a property located at 10 Rutgers Street in Manhattan, New York, and allege that "Arbor" acquired the property in January 2018.  Compl. ¶ 119.  However, the land records associated with the property indicate that it was purchased by a non-Defendant entity, AH 10 Rutgers, LLC.  *See* Ex. E.  Similarly, Plaintiffs then point to a property located in San Antonio, Texas and allege that "Arbor" acquired the property in 2017.  Compl. ¶ 128.  However, the land records associated with the property indicate that the property was purchased by a non-Defendant entity, Arbor Commercial Mortgage, LLC, during that time period.  *See* Ex. F.[12]  The land records for both of these properties indicate that none of the Hyattsville Defendants have been involved in the chain of title at any point in time.  *See* Ex. E, Tabs 1-2; Ex. F, Tabs 1-2; *Fare Deals*, 180 F. Supp. 2d at 683 ("When the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail.").  Because none of the Hyattsville Defendants have any sort of ownership interest in these other properties identified by Plaintiffs in the Complaint, the Hyattsville Defendants are neither responsible nor liable for the policies or practices employed in such properties.  Accordingly,

---

[11] The Court may consider these documents as public records maintained by the Maryland state government.  *Hardaway*, 2015 WL 858086, at *4.

[12] The Court may consider Exhibits E and F as public records maintained by the New York City municipal government and the Bexar County government of Texas.  *Hardaway*, 2015 WL 858086, at *4.

Plaintiffs cannot maintain any comparison between these properties and cannot state an FHA claim. *See Hardaway*, 2015 WL 858086, at *4 (dismissing corporate affiliates as improper parties in FHA action based on ownership of relevant property); *Glenn*, 2016 WL 3570274, at *6.  Therefore, this Court should dismiss the FHA claims.

**B.**        **Plaintiffs Do Not Plead a Prima Facie Case of Disparate Impact.**

To establish a prima facie case of disparate impact discrimination under the FHA, the "plaintiffs must show that a specific policy caused a significant disparate effect on a protected group." *Boardley v. Household Fin. Corp. III*, 39 F. Supp. 3d 689, 712 (D. Md. 2014); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018) ("[T]he plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class.") (citing *Inclusive Cmtys.*, 576 U.S. at 543).  Here, Plaintiffs have failed to state a claim of disparate impact because they have neither (1) alleged a sufficiently specific policy, nor (2) met the demanding causality requirement in showing a significant adverse impact.

1.        Plaintiffs Fail to Allege a Specific Policy that Creates Artificial, Arbitrary, and Unnecessary Barriers.

While Plaintiffs assert challenges to four policies that allegedly cause a disparate impact on Latino residents, Plaintiffs' policies are nothing more than generalized economic theories and one-off business decisions, disconnected from the individual properties and the Hyattsville Defendants, and, therefore, fail to support liability for disparate impact.  Notably, the Supreme Court has severely limited the scope of disparate impact liability by "command[ing]" that "private policies are not contrary to the disparate-impact requirements unless they are artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 576 U.S. at 543; *see also Reyes*, 903 F.3d at 424-25 ("[C]ourts should only use disparate-impact claims to remove artificial, arbitrary, and unnecessary

16

barriers, rather than displace valid []private priorities.").  Additionally, the Supreme Court further

limited a "policy" to exclude a "one-time decision."  *Inclusive Cmtys.*, 576 U.S. at 543; *see also*

*Reyes,* 903 F.3d at 426 (recognizing the difference between challenges to "a one-time decision

rather than a *policy"*) (emphasis in original); *Inclusive Cmtys. Proj. Inc. v. Lincoln Prop. Co.*, 930

F.3d 660, 663 (5th Cir. 2019) ("[A] decision between two developments likely would not be

considered a policy, and therefore would not constitute a prima facie case of disparate impact[.]").

Here, Plaintiffs assert that four policies are causing a disparate impact on Named Plaintiffs,

tenants of the ten properties identified in the HUD DC Market (Compl. ¶ 113), and "communities

of color" (*id.* ¶ 161), including: (1) the "business model" of "buying, holding, and selling of low-

income multifamily housing as a commodity . . . on the multifamily housing market" (*id.* ¶¶ 147,

57); (2) the "investment strategy" or "investment thesis" whereby REITs invest in properties and

determine maintenance and rents based upon the REIT shareholder dividend (*id.* ¶¶ 162-74); (3)

basing maintenance practices upon the age and/or value of residential property (*id.* ¶¶ 176-78); and

(4) the policy of "retaining agents who perform property management duties and ensure maximum

occupancy of its rental properties" (*id.* ¶ 183).

But they fail to allege any factual statements showing that any of the Hyattsville

Defendants employ these practices or are even legally capable of doing so.  For example, the first

policy—the "Financialization Policy"—is alleged to be a "business model" that involves the

"buying, holding, and selling of low-income multifamily housing as a commodity."  *Id.* ¶¶ 147,

57.  But Plaintiffs do not allege that Bedford United or Victoria United have bought or sold any

properties, other than the singular ownership of BVS—or even that Hyattsville United owns any

of the properties identified in this action.  *Id.* ¶¶ 30-31.  Moreover, while Plaintiffs challenge the

second policy, the "investment strategy" regarding REIT shareholder dividends, none of the

Hyattsville Defendants are alleged to be REITs (nor are they) and, therefore, cannot hold such a policy as a matter of law. *Compare* Compl. ¶¶ 26, 29 (alleging that Arbor Realty Trust and Arbor Realty SR are incorporated as REITs)*, with* Compl. ¶¶ 28, 30-31, 32 (alleging that AMAC is an investment firm and the other entities are limited liability companies).

Similarly, Plaintiffs challenge the third "policy" of maintaining BVS based on the age and value of the properties, but Plaintiffs have not alleged that either Hyattsville United or AMAC owns BVS, or that they have any decision-making authority concerning the maintenance of these properties. Compl. ¶¶ 176-78. Moreover, Bedford United and Victoria United do not own any properties other than BVS, which undermines any allegation that they have any type of "Divestment Policy." *Id.* ¶ 179. Finally, Plaintiffs challenge the fourth policy of "outsourcing to third parties . . . Arbor's duty to comply with statutory and common law obligations" for the basis of "complying with Arbor's duties to its shareholders by increasing shareholder income due to the steady receipt of rent[.]" *Id.* ¶¶ 180, 183, 184. To the contrary, Bedford United, Victoria United, and Hyattsville United lack shareholders as limited liability companies, and therefore owe no "duties" to such shareholders, (*cf.* Compl. ¶ 30), and therefore cannot hold this alleged "policy" as a matter of law. Further, because AMAC does not own BVS or any of the properties identified in the Complaint in the HUD DC Market, New York, or Texas, it cannot maintain any "uniform policy" at these properties. *Id.* ¶ 180.

Even if such policies could be ascribed to the Hyattsville Defendants, Plaintiffs have not offered any factual allegations demonstrating that the policies create "artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 576 U.S. at 543. Indeed, as Plaintiffs themselves point out, many of these "policies" amount to little other than general economic principles, investment strategies, and business models, all of which are generally applicable to actors within the housing

market.   Compl. ¶¶ 147-85.   These generally applicable economic principles fail to meet the requirements under Supreme Court precedent.   *Inclusive Cmtys.*, 576 U.S. at 543; *see also Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) (affirming dismissal of disparate impact claim under the FHA where the plaintiff "have not pleaded sufficient facts to plausibly support the existence of [] a policy").

By pointing to only a handful of properties that are allegedly subject to the "policies" and merely concluding that "Arbor" employs these policies, Plaintiffs improperly attempt to "bootstrap" a series of individualized, one-time decisions particularized to individual properties "together in order to allege the existence of a [uniform] *policy*." *Id.* at 1113 (emphasis added).   But Plaintiffs' own allegations undercut the notion that there is any "uniform" policy (Compl. ¶ 180); they allege that each "business decision" concerning "whether or not to invest in a given property" taken by the Defendants involves careful consideration of a "wealth of information" based on the "specific property" and its "specific characteristics." *Id.* ¶¶ 61-62.   These allegations establish that the acquisition, maintenance, and operations decisions are particularized to the properties themselves, which are held by different owners, in different and varied locations across the country ranging from the metropolis to the suburbs.[13]   Accordingly, Plaintiffs have shown nothing else than a handful of one-off business decisions, rather than a uniform policy.   Without establishing a "policy" within the meaning of the FHA, Plaintiffs cannot allege a prima facie case of disparate impact.

---

[13] *Inclusive Cmtys.,* 576 U.S. at 543 ("[A] plaintiff challenging the decision of a private developer to construct a new building on one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or ***renovate*** housing units.") (emphasis added).

2.      Plaintiffs Fail to Satisfy the Causality Requirement.

In addition to failing to identify any policies held by the Hyattsville Defendants, Plaintiffs fail to plausibly allege the "robust causality requirement" required to state a claim for disparate impact. To establish causation, the plaintiff "must demonstrate that the disparity they complain of is the result of one of the [] practices that they are attacking . . . specifically showing that each challenged practice has a *significantly* disparate impact on the protected class." *Inclusive Cmtys.*, 576 U.S. at 543 (emphasis added). The Fourth Circuit has cautioned that it is insufficient to demonstrate a "bare statistical discrepancy"; instead, "statistical disparities must be sufficiently *substantial* that they raise such an inference of causation." *Reyes*, 903 F.3d at 425 (emphasis added).

Critically, to survive a Rule 12(b)(6) motion, the Fourth Circuit requires plaintiffs to assert statistical evidence showing a disproportionate effect on members of the protected class "*compared to the number of non-Latinos* who faced [adverse effects] based on the policy." *Id.* at 428 (emphasis added). To satisfy this requirement, Plaintiffs must "compare whether Latinos that are subject to the [p]olicy—i.e., Latino tenants at the [properties subjected to the policy]—are disproportionately impacted by the [p]olicy as compared to non-Latinos that are subject to the policy—i.e., non-Latino tenants at the [properties subjected to the policy]." *Id.* at 429 n.8.

In their Complaint, Plaintiffs state that the "policies" have a disparate impact on: (1) the tenants of BVS and the ten other "Arbor"-purchased properties in the HUD DC Market; and, (2) generally on "communities of color across the country." Compl. ¶¶ 161, 175, 179, 185. However, Plaintiffs have failed to provide any statistical analysis demonstrating that Latinos at properties owned by the Hyattsville Defendants suffer a "greater adverse impact" under the policies as compared against similarly situated non-Latino tenants of other properties owned by the Hyattsville Defendants.

20

First, Plaintiffs attempt to show that the policies had a statistically "disparate impact on minorities in Arbor's properties located in the HUD DC Market," including BVS.  *Id.* ¶¶ 139-40. Plaintiffs allege that these ten other properties in the HUD DC Market, none of which are owned by a named Defendant, are "located in majority minority communities" and are subject to a "similar level of disrepair, neglect, and failed maintenance" as BVS.  *Id.* ¶¶ 113-114.  In doing so, Plaintiffs assert that "Arbor's policies . . . are *applied equally* across all of its properties in the HUD DC Market."  *Id.* ¶ 141 (emphasis added).

Plaintiffs' statistical analysis is plainly insufficient to demonstrate a "substantial" adverse effect as it amounts to little more than a showing that there are slightly higher rates of Latino residents at BVS and these ten properties than there are in the greater HUD DC Market population generally.  This general, market-wide imbalance is insufficient to state a claim for disparate impact because "merely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another."  *Edwards v. Johnston Cty. Health Dep't*, 885 F.2d 1215, 1223 (4th Cir. 1989); *Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) (affirming dismissal of disparate impact claim on 12(b)(6) where "complaint failed to allege facts suggesting that the closure affected a greater proportion of disabled individuals than non-disabled").  Here, Plaintiffs have not shown—or even attempted to show—that Latino residents of BVS and the ten properties in the HUD DC Market would be disproportionately affected *compared to* non-Latino residents.  *See Binns v. City of Marietta Ga., (Hous. Choice Voucher Program)*, 704 F. App'x 797, 802 (11th Cir. 2017) (finding disparate impact claim deficient where plaintiff "provided no *comparative* data" to show that class members disproportionately affected).

Nor could Plaintiffs make such a showing, as they allege that "Arbor's policies . . . are applied equally across all of its properties in the HUD DC Market," (Compl. ¶ 141) including

among the Latino residents and non-Latino residents.  Nowhere in their Complaint do Plaintiffs allege that within these properties, Latino residents are treated differently than non-Latino residents with respect to maintenance requests, apartment conditions, or anything else. Accordingly, the Complaint actually alleges that the Latino residents and non-Latino residents of BVS and the ten properties in the HUD DC Market allegedly "suffered the same *degree* of harm because they shared the same substandard housing."  *Edwards*, 885 F.2d at 1223 (affirming dismissal of disparate impact claim on 12(b)(6) where "nowhere in the [c]omplaint do appellants contend that the appellees' actions affected non-white migrant farmworkers to a greater *degree* than white farmworkers") (emphasis in original).  This is not sufficient.  *Id.*  Allowing an imposition of liability under these circumstances, "based solely on a showing of a statistical disparity," would flaunt Supreme Court precedent and invoke "serious constitutional questions." *Inclusive Cmtys.*, 576 U.S. at 540.

Additionally, Plaintiffs have failed to plausibly allege that the policies had a "disproportionate impact on communities of color" outside of the HUD DC Market.  Compl. ¶ 161. Plaintiffs seek to make this showing by pointing to two "Arbor" properties out of what they claim is a nationwide portfolio that allegedly includes at least 8,000 units and "more than $1.75 billion of multifamily properties across the country."  *Id.* ¶ 28.  Plaintiffs ask this Court to infer that there is a statistically "substantial" disproportionate effect based on a "uniform policy" on communities throughout the country by pointing to just two examples. [14]  The sheer paucity of Plaintiffs' factual

---

[14] *See, e.g., Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 624 (D. Md. 2019) (finding statistical analysis sufficient to state disparate impact claim premised on the condition of the property where plaintiff reviewed 1,677 properties in 37 cities and conducted regression analysis and dissimilarity indices); *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839, 2019 WL 5963633, at *1 (N.D. Ill. Nov. 13, 2019) (same where plaintiff reviewed 1,411 properties in 31 cities and conducted regression analysis and dissimilarity indices); *Montgomery*

pleadings concerning a population of only two properties out of an allegedly vast nationwide portfolio highlights the infirmities of Plaintiffs' claims. This is insufficient under statistical standards of probability and the law.

Further, even if these two properties could be deemed sufficient to support a claim of a nationwide policy—and they are not—Plaintiffs fail to adequately allege facts concerning the racial composition of these properties, which is necessary to make comparisons between the properties and establish a disproportionate adverse effect. While Plaintiffs first point to the 10 Rutgers Street property in New York as evidence of a disparate impact, they do not provide any information concerning the racial composition of the apartment building. Plaintiffs simply assert that the community surrounding the building is a "community of color," a majority-minority neighborhood, but say nothing of the tenants of the 10 Rutgers Street property. Compl. ¶ 120 (alleging that the neighborhood is 94.4% non-White). Moreover, even though the point of Plaintiffs' allegations related to BVS is that the owners do not invest or renovate properties with minority tenants, they assert that this building in a majority-minority neighborhood *was* recently renovated. *Id.* ¶ 125. Thus, this property in New York cannot serve as a basis for comparison showing that minority tenants are subject to "underinvestment" and in fact undermines Plaintiffs' discrimination claims.

Next, Plaintiffs point to the San Antonio, Texas property to illustrate that properties in communities of color are disproportionately affected. *Id.* ¶¶ 128-37. However, Plaintiffs again fail to allege the racial composition of the apartment building or even the community itself.

---

*Cty., Md. v. Bank of Am. Corp.,* 421 F. Supp. 3d 170, 184 (D. Md. 2019) (same where plaintiff reviewed 2,300 properties in 38 cities and 49,000 photographs and conducted regression analysis and dissimilarity indices); Complaint, *Montgomery Cty., Md. v. Bank of Am. Corp.*, No. 1:18-CV-03575, (D. Md. Nov. 20, 2018), ECF No. 1.

Plaintiffs merely conclude that it is located in a community "that has a majority White population," but do not provide any census information or even a description of the "community."[15] *Id.* ¶ 129. Such allegations are woefully deficient and therefore fail to provide evidence of a racial imbalance, let alone a "substantial" comparative statistical disparity.

By failing to plausibly show a greater adverse effect through sufficient statistical comparative analysis, Plaintiffs have failed to "raise an inference of causation." *Reyes*, 903 F.3d at 425. Further, Plaintiffs do not provide any facts showing how their analysis controlled for independent variables that could impact the integrity of their data results, and instead merely conclude that the disparities "cannot be explained by non-racial factors." *Compare* Compl. ¶ 134, *with Bank of Am.*, 401 F. Supp. 3d at 624 ("Their regression analyses controlled for myriad factors . . . and concluded that the disparities uncovered by the [o]rganizational [p]laintiffs' testing *cannot be explained by non-racial factors.*") (emphasis added). Plaintiffs' FHA claims boil down to little else than a bare, unsupported statistical disparity and conclusory allegations that the policies had a disproportionate effect. *See Boardley*, 39 F. Supp. 3d at 712 (dismissing disparate impact claim because merely "stating that the policy had a significant and pervasive adverse impact on black homeowners is not tantamount to *showing* that the policy caused a significant disparate effect on a protected group") (emphasis added). Plaintiffs cannot state a claim for disparate impact.

**C.    Plaintiffs Do Not Plead a Prima Facie Case of Discriminatory Intent.**

Plaintiffs have failed to state a claim for discriminatory intent because they provide no facts showing that similarly situated non-minority residents of other properties owned by the Hyattsville Defendants were treated differently or better than Plaintiffs. Because Plaintiffs present no direct

---

[15] Perhaps that is because the U.S. Census confirms that San Antonio, Texas in fact is 64.2% Hispanic or Latino, and is not a "majority White" community. United States Census Bureau, https://www.census.gov/quickfacts/fact/table/sanantoniocitytexas,US/PST045219 (last visited Dec. 13, 2021).

evidence of discriminatory intent, they must state establish that "discriminatory animus was . . . a motivating factor" in the housing decision. *Glenn v. Wells Fargo Bank, N.A*., No. PX 15-3058, 2017 WL 371956, at \*13 (D. Md. Jan. 26, 2017), *aff'd*, 710 F. App'x 574 (4th Cir. 2017).  To do so, Plaintiffs must "allege facts to show that tenants of a different race or [national origin] were treated differently under similar circumstances," i.e., that there were similarly-situated comparators outside of the protected class that were treated better or differently.  *Young-Bey v. S. Mgmt. Corp., Inc*., No. TDC-18-2331, 2019 WL 1992905, at \*3 (D. Md. May 6, 2019).  In their Complaint, Plaintiffs point to the same ten properties in the HUD DC Market, the New York property, and the Texas property for purposes of showing discriminatory intent.  Compl. ¶¶ 113, 118, 128.  However, none of these properties are owned by any of the Hyattsville Defendants and therefore, cannot serve as comparators to state an FHA claim.  *See supra* Section II.A.  But even assuming such properties could be attributable to the Hyattsville Defendants, the allegations still fail to show any differential treatment.

First, the ten properties located in the HUD DC Market cannot serve as similarly situated comparators from outside of the protected class because Plaintiffs' allegations make clear that these properties are located in the same community as BVS, are subjected to the levels of alleged "disrepair" pursuant to the policies as BVS, and have tenancies of similar racial compositions. Any comparison to these properties cannot show that the Hyattsville Defendants "treated other similarly situated tenants differently."  *Young-Bey*, 2019 WL 1992905, at \*3; *see supra* Section II(B)(2).

Second, the New York and Texas properties cannot sustain a discriminatory intent claim, either.  The Complaint is bereft of any facts showing that such properties can be considered similarly-situated comparators outside of the protected classes, or that such properties were treated

25

differently than BVS.  Here, because Plaintiffs have failed to provide any factual allegations regarding the racial composition of the surrounding community of the Texas property—other than concluding that it is in a "majority White" community (Compl. ¶ 129)—there is no basis for Plaintiffs to compare the residents of the Texas property to BVS.  Without such comparisons, the allegations regarding the Texas property do not plausibly show that discrimination was a "motivating factor."  *Glenn*, 2017 WL 371956, at *14 (dismissing discriminatory intent for alleging only conclusory statements concerning comparative treatment); *Cooper v. Bozutto & Assocs., Inc.*, No. DLB-19-3141, 2020 WL 2085462, at *4 (D. Md. Apr. 30, 2020) (same).

Similarly, the New York property cannot serve as a comparator to show that "Arbor" treats properties located in majority White neighborhoods better in terms of maintenance and repairs because Plaintiffs allege both that this property is located in a neighborhood that is 94.4% non-White (Compl. ¶ 120) *and*, notwithstanding the racial make-up of the community, "Arbor chose to redevelop the property."  *Id.* ¶ 127.  These allegations undercut any plausible argument that the tenants at BVS—which properties have similarly undergone "substantial capital improvements" according to PG DPIE (Ex. B)—are treated differently than other tenants due to their race or national origin.  *Glenn*, 2017 WL 371956, at *14; *Roberson v. Graziano*, No. WDQ-09-3038, 2010 WL 2106466, at *3 (D. Md. May 21, 2010), *aff'd* 411 F. App'x 583 (4th Cir. 2011) (dismissing discriminatory intent FHA claim where plaintiff "failed to state a claim because he has not explained how he was treated differently than the other tenants" outside the protected classes).

Because Plaintiffs have failed to plausibly state a prima facie claim for disparate impact or discriminatory intent, Plaintiffs cannot state a claim under the FHA and this Court should dismiss Counts I through V for failure to state a claim of housing discrimination.

**D.**      **Plaintiffs Fail to Allege the Statutory Elements Necessary to State a Claim Under Sections 3604(a), 3601, and 3617.**

In addition to failing to plausibly establish they suffered discrimination, Plaintiffs similarly failed to establish the additional requirements necessary to state a claim under Sections 3604(a), 3601, and 3617 of the FHA.  The Fourth Circuit mandates that housing is not made "unavailable" under Section 3604(a) unless there is a showing of actual or constructive eviction.  *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999) (finding that construction of highway did not render housing "unavailable" where plaintiff did not allege that "anyone has for discriminatory reasons been evicted from his home or denied the right to purchase or rent housing").  Named Plaintiffs' allegations of continuous residency do not amount to either actual or constructive eviction, and therefore fail to plausibly establish that that their apartments at BVS were made "unavailable" to them.  *Id.* (explaining that Section 3604(a) "is designed to ensure that no one is denied the right to live *where they choose* for discriminatory reasons" but that it "does not reach every event that might conceivably affect the availability of housing") (emphasis added); *see also Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) ("Availability, not simply habitability, is the right that § 3604 protects.")*.*

Plaintiffs' perpetuation of segregation claim—which, in the Fourth Circuit, functions as an alternate method of pleading disparate impact that focuses on the disparate impact on the entire community involved, as opposed to the individual plaintiffs—fails for the same reasons that Plaintiffs failed to plausibly allege that the Hyattsville Defendants' policies have a disparate impact on "communities of color," as described above.  *See supra* Section II.B.2; *compare Bank of Am.*, 401 F. Supp. 3d at 641 (allowing perpetuation claim to proceed where statistical analysis surveilled 1,677 properties owned by the defendant in 37 census tracks and provided "detailed dissimilarity indices" to show comparative disproportionate effect), *with* Compl. ¶¶ 140-46 (statistical analysis

provided on 12 properties in a single census tract, without comparative statistical analysis, regression analysis, or dissimilarity indices).  Plaintiffs have failed to provide statistical analysis showing a disproportionate impact, let alone "detailed dissimilarity indices," regression analyses, or an evaluation of a significant amount of sample properties from a significant number of census tracts upon which to form such conclusions from the data.  *Bank of America*, 401 F. Supp. 3d at 641.  Instead, Plaintiffs have simply alleged that there is a slightly higher rate of Latinos living in the "Arbor Properties" in the HUD DC Market, not that the Defendant's policies plausibly have any segregative effect.  Moreover, the bald, conclusory allegations of injuries stemming from the alleged segregative effects of the Hyattsville Defendant's conduct are simply "too far removed from the alleged discriminatory conduct to be plausibly proximately caused by such actions" and thus cannot state a claim under Section 3601.  *Prince George's Cty., Md. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 764 (D. Md. 2019) (describing plaintiff's attempt to recover for the injuries of being "damaged by the segregative effects of . . . neighborhood blight[] and urban decay" as "a bridge too far" to establish causality under the FHA); *City of Oakland v. Wells Fargo & Co.*, No. 19-15169, 2021 WL 4436205, at *9 (9th Cir. Sept. 28, 2021) (reversing denial of motion to dismiss for lack of causality where plaintiff's regression analyses "do not purport to show that [the alleged discrimination] *automatically* result[s]" in the harm) (emphasis in original).

Finally, Plaintiffs' claim for interference under Section 3617 requires them to make a showing that the Hyattsville Defendants were motivated by an intent to discriminate.[16] *Hardaway*,

---

[16] To the extent that Plaintiffs seek to extend their interference claim not only to allege a hostile living environment on behalf of residents living within the properties subjected to these "policies," but also on behalf of all other persons that reside within the same census tract as these properties—these "neighboring residents" (Compl. ¶¶ 250-251), none of whom are parties to this action—such request must be denied as an impermissible attempt to stretch FHA liability beyond its reasonable bounds.  *Oakland*, 2021 WL 4436205 at *8 (holding that the FHA's stringent causality requirement

2016 WL 3957648, at *7 (dismissing Section 3617 claim on basis that there "simply are no facts alleged that suggest a discriminatory intent by [d]efendant to retaliate against [p]laintiffs"); *Abdelhalim v. Lewis*, No. 1:19-cv-858, 2020 WL 3271378, at *5 (E.D. Va. June 17, 2020) (same). Because Plaintiffs fail to show any discriminatory intent on behalf of the Hyattsville Defendants, they cannot state an interference claim under Section 3617.  *See supra* Section II.B; *Hardaway*, 2016 WL 3957648, at *7; *Abdelhalim*, 2020 WL 3271378, at *5.

### E.    Count V Must Be Dismissed Because There Is No Standalone Cause of Action for Injunctive Relief Under the FHA.

Count V asserts a standalone claim seeking injunctive relief under the FHA.  Compl. ¶¶ 255-59.  "An injunction is a remedy, though, and not an independent cause of action, and should not be stated as a separate count in the complaint."  *Barry v. EMC Mortg.*, No. DKC 10-3120, 2011 WL 2669436, at *10 (D. Md. July 6, 2011) (Chasanow, J.) (dismissing standalone claim for injunctive relief on 12(b)(6)).  Accordingly, this Court should dismiss Count V.

### F.    Plaintiffs' Derivative Civil Conspiracy Claim Must Be Dismissed for Lack of a Predicate Violation.

In Count IX, Plaintiffs purport to bring a claim under Maryland common law, alleging that the Hyattsville Defendants conspired to violate the FHA.  Compl. ¶ 294.  For the reasons explained above, Plaintiffs have not plausibly stated a claim under the FHA.  Because their civil conspiracy claim is derivative of their FHA claims and these FHA claims are deficient, the claim for civil conspiracy must also be dismissed for lack of an underlying FHA violation.  *Bellezza v. Greater Havre de Grace Yacht Club, Inc.*, No. 0367, Sept. Term, 2014, 2015 WL 6394418, at *10 (Md. Ct.

---

allows only parties that allege harm that "flow[s] so automatically" from the purported discriminatory conduct to state a claim for causality under the FHA's "1:1" requirement).

Spec. App. 2015) (affirming dismissal of civil conspiracy claim for lack of predicate violation where predicate tort violations were dismissed).[17]

## III.   PLAINTIFFS' BREACH OF CONTRACT CLAIMS MUST BE DISMISSED FOR LACK OF PRIVITY.

In Counts VI and VII, Plaintiffs assert claims for breach of the express and implied terms of Named Plaintiffs' lease agreements.  Compl. ¶¶ 261, 276.  While "[e]ach Plaintiff" brings both claims against "all Defendants" (*id.* ¶¶ 262, 273), Plaintiffs have not alleged that each Plaintiff is in contractual privity with each of the Hyattsville Defendants.  As this Court has previously held, "a person cannot be held liable under a contract to which he was not a party."  *Fenzel v. Group 2 Software, LLC*, No. DKC 13-0379, 2016 WL 865363, at *11 (D. Md. Mar. 7, 2016) (Chasanow, J.).  "While not requiring a heightened pleading standard per se, it is well-established in Maryland that a complaint alleging a breach of contract must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff[.]" *Dixon v. Select Portfolio Servicing Co.*, No. DKC 19-1710, 2020 WL 470314, at *4 (D. Md. Jan. 28, 2020) (Chasanow, J.).   Here, both the lease agreements [18] and Plaintiffs' allegations unambiguously establish that certain Plaintiffs entered into contractual relationships with RMS as

---

[17] Moreover, to the extent that Plaintiffs contend that all of the Arbor and Hyattsville Defendants are a single corporate family operating as affiliates and subsidiaries of Arbor Realty Trust, such allegations doom their civil conspiracy claim since corporate affiliates are legally incapable of conspiring with each other.  *See Slade Healthcare*, 381 F. Supp. 3d at 572 (applying the intracorporate immunity doctrine to dismiss MD common law civil conspiracy claim alleged against parent and wholly-owned subsidiary); *Fraidin v. Weitzman*, 611 A.2d 1046, 1079 (Md. Ct. Spec. App. 1992) (stating that "[i]t is established law that there can be no conspiracy between a principal and an agent where the agent acts within the scope of his or her employment" where plaintiff alleged conspiracy between attorney and client).
[18] The Court can consider these lease agreements, attached as Exhibit G, because they are both expressly referenced in the Complaint and because they form the basis of Plaintiffs' contract claims.  Compl. ¶¶ 261, 267-68, 275; *Hosack*, 2011 WL 1743297, at *4 ("Although the complaint might suggest that all [d]efendants were parties to the [] agreement, the agreement itself—which [d]efendants attached to their motion to dismiss—says otherwise.").

agent for the owner of the properties—Bedford United and Victoria United.  Compl. ¶¶ 30, 31, 261; *see also* Ex. G.  Thus, such breach claims must be dismissed against Hyattsville United and AMAC.  Further, neither Ms. Ramirez nor CASA have contractual agreements with Bedford United or Victoria United; nor do they allege any facts necessary to support a plausible finding that they were intended third-party beneficiaries.  Accordingly, dismissal of their claims is warranted.

A.      **Plaintiffs Lack Contractual Relationships with Hyattsville United and AMAC.**

Plaintiffs have failed to allege that they are in privity with Hyattsville United or AMAC or that such corporate entities should be liable based solely on their alleged corporate affiliations with Bedford United and Victoria United.  *See supra* Section I.  Plaintiffs allege—and their lease agreements confirm—that certain Plaintiffs entered into lease agreements with RMS as "agent for owner" of BVS.  *See* Compl. ¶ 261; Ex. G, Part 1, Tabs 1-7, 13-15, 22-23.  Plaintiffs assert in their Complaint that "Bedford United, LLC owns the Bedford Station Apartments" (*id.* ¶ 30), and that "Victoria United, LLC owns the Victoria Station Apartments" (*id.* ¶ 31).  It is clear from the allegations of the Complaint itself, as well as the plain terms of the Plaintiffs' lease agreements, that Plaintiffs do not allege that they have a contractual relationship with any entity other than RMS as agent for Bedford United and Victoria United.  Accordingly, Plaintiffs cannot maintain contract claims against Hyattsville United[19] or AMAC.  *See Fenzel*, 2016 WL 865363, at *11 (dismissing breach of contract claim against individual member of an LLC where plaintiff's contract was entered into with the LLC entity); *Hosack*, 2011 WL 1743297, at *4 (dismissing

---

[19] While Plaintiffs allege that "[a]ccording to W-9s supplied by Arbor and Ross," Hyattsville United "is the entity that collects rents on behalf of Arbor" and that these "rents are then automatically directed to whichever entity Arbor has assigned them" (Compl. ¶ 71), such allegations fall short of asserting that Hyattsville United owns BVS, or that such rent collection and subsequent automatic redistribution of the rents constitutes a direct contractual relationship.

breach of contract claim against non-contracting defendants where the agreement showed that plaintiff entered into contract with single DE LLC, as opposed to all named defendants).

    **B.**    **<u>Ms. Ramirez and CASA Lack Contractual Relationships.</u>**

The lease agreements contemplate two different scenarios where residents may benefit from the lease—either as signatories entering into the contractual relationship or as non-signatory occupants who will reside in the apartment.  *See* Ex. G.  However, Ms. Ramirez is not included on the lease agreements for her unit as either and, therefore, she lacks a direct contractual relationship with Victoria United (or any other Hyattsville Defendant), as well as any entitlement as an intended third-party beneficiary.[20]  *See* Ex. G, Pt. I, Tabs 1-2 (listing Mr. Lopez as the sole resident and listing no additional occupants on the lease, despite lease terms that dictate that the "only" persons permitted to live in the unit are those enumerated in the lease); *Shield Our Const. Rights & Just. v. Tippett*, No. DKC 2009-0152, 2009 WL 2961428, at *5 (D. Md. Sept. 11, 2009) (dismissing breach of contract claims on 12(b)(6) with prejudice where "there is no allegation that [plaintiff] entered a contractual relationship with [d]efendant" in FHA discrimination action).

Ms. Ramirez's allegations are devoid of any facts to support the showing that the contract was "expressly" made for her benefit or that she was "intended to be the *primary* beneficiary" of the lease agreement, much less a "clear[] showing" as required for a party lacking privity to enforce a contract as an intended third-party beneficiary under Maryland law.  *Bird Realty Ltd. P'ship v. Jiffy Lube Int'l, Inc.*, No. ELH-12-1104, 2012 WL 6562762, at *6 (D. Md. Dec. 14, 2012).  The lease's failure to identify or reference Ms. Ramirez as a resident in any manner strongly cuts

---

[20] The fact that Ms. Ramirez's spouse, Mr. Lopez, is a contracting party under the lease agreement does not otherwise alter the impact of the plain terms of the leases, which clearly indicate that the *only* permitted tenants are those enumerated in the lease.  *See, e.g., Stevens v. Hous. Auth. of S. Bend, Ind.*, 663 F.3d 300, 307 (7th Cir. 2011) (finding that plaintiff had "violated her lease when she allowed her husband to stay at her home for two to three weeks without obtaining prior written approval" from her landlord pursuant to the terms of her lease, regardless of marital status).

against any third-party beneficiary liability.  *U.S. v. Grahams Constr., Inc.*, 585 F. App'x 173, 174

(4th Cir. 2014) (upholding dismissal of breach claim where there was "no evidence that [the

contracting parties] intended" to benefit third-party where it did not reference or identify the third-

party).  Further, the terms of the leases—which clearly state that the unit "will be occupied *only*

by" the persons listed on the lease and that "no one else may occupy the" unit—forecloses the

notion that these agreements contemplate any potential benefits for Ms. Ramirez, thereby negating

any third-party liability.  *See* Ex. G, Pt. I, Tab 1 ¶ 2; *id.* Tab 2 ¶ 2 (emphasis added); *see 120 W.

Fayette St., LLLP v. Mayor & City Council of Balt.*, 43 A.3d 355, 368 (Md. 2012) (rejecting third-

party beneficiary where the "promises and benefits" are "directed solely" to the named parties).

     As to the organizational plaintiff CASA, it does not allege anywhere in the Complaint that

it entered into a lease agreement with any of the Defendants or facts to support that it is an intended

third-party beneficiary of named Plaintiffs' residential lease agreements, and thus cannot maintain

claims for breach of contracts.  *See generally* Compl. ¶ 20; *Bird Realty*, 2012 WL 6562762, at *7.

Accordingly, Counts VI and VII should be dismissed as to Ms. Ramirez and CASA for failure to

state a claim.

## IV.  CASA LACKS REPRESENTATIONAL AND ORGANIZATIONAL STANDING TO BRING CERTAIN CLAIMS.

     CASA asserts that it has standing to bring each claim in the Complaint to recover money

damages and injunctive relief on its own behalf, as well as on behalf of its members, but such an

overly broad entitlement to standing contravenes established standing principles.  First, CASA

lacks representational standing to bring claims on behalf of its members for money damages

because such damages analysis necessarily involves "individualized proof" concerning the "fact

and extent" of each member's unique injury, vitiating representational standing.  *See Warth v.

Seldin*, 422 U.S. 490, 515-16 (1975) (rejecting organization's representational standing for

damages because "whatever injury may have been suffered is peculiar to the individual member concerned"); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007) (stating a "suit for money damages, [] would require examination of each member's unique injury").

Second, CASA lacks organizational standing to pursue money damages on its own behalf for the state law contract claims, Counts VI and VII.  Prudential standing requirements prohibit a party from "rest[ing] [its] claim to relief on the legal rights or interests of third parties," *Warth*, 422 U.S. at 499, unless the third-party demonstrates "(1) that the litigant has a 'close' relationship with the third party; and (2) that the third party faces some obstacle to asserting her own right." *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 523 (D. Md. 2010).  CASA fails under both prongs.

As to the first requirement, CASA has not alleged—and cannot allege—that it has a "special" relationship with its members close enough to justify organizational standing for these claims, and instead the "persons best suited to challenge the practices . . . are the direct victims of the alleged illegal practices."  *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund. v. Scales*, 150 F. Supp. 2d 845, 851 (D. Md. 2001) (holding that the mere fact that an organization is an advocacy group devoted to assisting its members does not "evidence[] a special relationship with those whose rights it seeks to assert").  As to the second requirement, the individual residents at BVS are clearly capable of asserting their own claims for breach, as shown by the seven Named Plaintiffs who are asserting their individual rights in this action.  *Abercrombie*, 767 F. Supp. 2d at 523 (finding it "obvious[] [that] the third party individuals face no impediment to bringing their own suit, as [their] status as co-plaintiff demonstrates").  As a result, the Court should dismiss CASA's requests for money damages: (i) on behalf of its members as to all counts; and, (ii) on its own behalf as to Counts VI and VII for lack of standing.

## V.     PLAINTIFFS SEEK DAMAGES THAT ARE TIME BARRED.

Plaintiffs seek damages that are time barred with respect to Counts VI and VII.  The Complaint seeks damages for breaches dating back to April 2013, well outside the three-year limitations period for breach of contract and which are disallowed on the basis of the continuing breach theory.  Compl. ¶¶ 201, 203; Md. Code Ann., Cts. & Jud. Pro. § 5-101 (three-year statute of limitations on breach of contract); *Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 556 (4th Cir. 2015) (providing that the continuous breach theory "bar[s] recovery of damages incurred more than three years prior to suit").[21]  This Court should dismiss the claims for damages outside of the three-year limitations period, because the continuing breach theory may only operate to allow claims for breaches and damages which occurred "*within* three years of the filing of the suit."  *Singer Co., Link Simulation Sys. Div. v. Balt. Gas & Elec. Co.*, 558 A.2d 419, 426 (Md. Ct. Spec. App. 1989) (emphasis added); *Ely v. Sci. Applications Int'l Corp.*, 716 F. Supp. 2d 403, 407-08 (D. Md. 2010) (dismissing damages from breaches prior to three-year limitations period on a 12(b)(6) under continuing breach theory).

## <u>CONCLUSION</u>

For the foregoing reasons, the Hyattsville Defendants respectfully request that the Court dismiss the Complaint.

---

[21] As is the case with Plaintiffs' Complaint, it is appropriate to consider the statute of limitations on a "Rule 12(b)(6) motion when the face of the complaint reveals that the cause of action has not been brought within the applicable limitations period."  *Ruddy v. Equitable Life Assurance Soc'y of U.S.*, No. CIV. A. DKC 00-70, 2000 WL 964770, at *2 (D. Md. June 20, 2000) (Chasanow, J.).

Dated: December 20, 2021          Respectfully submitted,

                                  /s/ Benjamin B. Klubes
                                  Benjamin B. Klubes (Bar Number 08085)
                                  Amanda Lawrence (*pro hac vice*)
                                  **BUCKLEY LLP**
                                  2001 M Street NW, Suite 500
                                  Washington, D.C.  20036
                                  (202) 349-8000 (Telephone)
                                  (202) 349-8080 (Facsimile)
                                  bklubes@buckleyfirm.com
                                  alawrence@buckleyfirm.com

                                  *Counsel for Defendants,*
                                  *Bedford United, LLC*
                                  *Victoria United, LLC*
                                  *Hyattsville United, LLC*
                                  *Arbor Management Acquisition Company, LLC*