**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MARYLAND**

CASA DE MARYLAND, INC., et al,
      Plaintiffs                  \*

             v.                \*

                             Civil Action No. 8:21-cv-01778-DKC

ARBOR REALTY TRUST, INC., et al,
      Defendants.           \*

                          \*

**\*\*\*\*\*\***

**MEMORANDUM IN SUPPORT OF HYATTSVILLE DEFENDANTS'**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**BUCKLEY LLP**

Benjamin B. Klubes (Bar Number 08085)
Amanda R. Lawrence (*pro hac vice*)
**BUCKLEY LLP**
2001 M Street NW, Suite 500
Washington, D.C.  20036
(202) 349-8000 (Telephone)
(202) 349-8080 (Facsimile)
bklubes@buckleyfirm.com
alawrence@buckleyfirm.com

Dated: February 18, 2022

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 4

    A.   Plaintiffs Group Seven Defendants Together and Call Them "Arbor Related Defendants." ...................................................................................................... 5

    B.   The FAC Fails to Allege Facts Supporting an FHA Claim and Ignores the Extensive Work and Funds Expended at BVS. ..................................................................... 7

LEGAL STANDARD .............................................................................................. 11

ARGUMENT ........................................................................................................... 11

    I.    PLAINTIFFS CONTINUE TO VIOLATE RULE 8'S NOTICE PLEADING REQUIREMENT. ................................................................................................. 11

    II.   PLAINTIFFS FAIL TO ALLEGE A COGNIZABLE VEIL PIERCING THEORY. ....... 13

    III.  THE FAC FAILS TO STATE A CLAIM UNDER THE FHA. ......................................... 17

    A.   Plaintiffs Still Fail to Allege that the Hyattsville Defendants Own Any Properties Other than BVS. ..................................................................................................... 17

    B.   Plaintiffs Do Not Plead a Prima Facie Case of Disparate Impact. ................................ 19

        1.   Plaintiffs Still Fail to Allege any Specific Policy Implemented by the Hyattsville Defendants. ...................................................................................................... 19

        2.   Plaintiffs Fail to Satisfy the Causality Requirement. ................................................. 22

    C.   Plaintiffs Do Not Plead a Prima Facie Case of Discriminatory Intent. ........................ 26

    D.   Plaintiffs Fail to Allege the Statutory Elements Necessary to State a Claim Under Sections 3601 and 3617. ..................................................................................... 28

    E.   Plaintiffs' Derivative Civil Conspiracy Claim Must Be Dismissed for Lack of a Predicate Violation. ............................................................................................ 29

    IV.  PLAINTIFFS' BREACH OF CONTRACT CLAIMS MUST BE DISMISSED FOR LACK OF PRIVITY. ................................................................................................ 30

    A.   Plaintiffs Lack Contractual Relationships with Hyattsville United and AMAC. ......... 31

    B.   Ms. Ramirez and CASA Lack Contractual Relationships. ........................................ 32

V.  CASA LACKS REPRESENTATIONAL AND ORGANIZATIONAL STANDING TO
BRING CERTAIN CLAIMS. ................................................................................................. 33

VI.  PLAINTIFFS SEEK DAMAGES THAT ARE TIME BARRED. ................................... 34

CONCLUSION ............................................................................................................................ 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*120 W. Fayette St., LLLP v. Mayor & City Council of Balt.*,
    43 A.3d 355 (Md. 2012) ...........................................................................33

*Abdelhalim v. Lewis*,
    No. 1:19-cv-858, 2020 WL 3271378 (E.D. Va. June 17, 2020)..............................29

*Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*,
    929 F. Supp. 2d 502 (D. Md. 2013) ......................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................24

*Barry v. EMC Mortg.*,
    No. DKC 10-3120, 2011 WL 4352104 (D. Md. Sept. 15, 2011) ...........................11

*Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*,
    340 A.2d 225 (Md. 1975) .......................................................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................11, 24

*Bellezza v. Greater Havre de Grace Yacht Club, Inc.*,
    No. 0367, Sept. Term, 2014, 2015 WL 6394418 (Md. Ct. Spec. App. 2015)........30

*Betsey v. Turtle Creek Assocs.*,
    736 F.2d 983 (4th Cir. 1984) .................................................................................23

*Binns v. City of Marietta Ga.*,
    704 F. App'x 797 (11th Cir. 2017) ........................................................................24

*Bird Realty Ltd. P'ship v. Jiffy Lube Int'l, Inc.*,
    No. ELH-12-1104, 2012 WL 6562762 (D. Md. Dec. 14, 2012) ......................32, 33

*Boardley v. Household Fin. Corp. III*,
    39 F. Supp. 3d 689 (D. Md. 2014).....................................................................19, 26

*City of Oakland v. Wells Fargo & Co.*,
    14 F.4th 1030 (9th Cir. 2021) ............................................................................28, 29

*Dave & Buster's, Inc. v. White Flint Mall, LLLP*,
    616 F. App'x 552 (4th Cir. 2015) ..........................................................................34

*Dixon v. Select Portfolio Servicing Co.*,
   No. DKC 19-1710, 2020 WL 470314 (D. Md. Jan. 28, 2020) ...............................................30

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
   No. 3184-VCP, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008) .................................................14

*Edwards v. Johnston Cnty. Health Dep't*,
   885 F.2d 1215 (4th Cir. 1989) ...................................................................................................23

*Ellis v. City of Minneapolis*,
   860 F.3d 1106 (8th Cir. 2017) ...................................................................................................21

*Ely v. Sci. Applications Int'l Corp.*,
   716 F. Supp. 2d 403 (D. Md. 2010)...........................................................................................35

*Equal Rights Ctr. v. Abercrombie & Fitch Co.*,
   767 F. Supp. 2d 510 (D. Md. 2010)...........................................................................................34

*Fare Deals, LTD. v. World Choice Travel.com, Inc.*,
   180 F. Supp. 2d 678 (D. Md. 2001) ....................................................................................10, 18

*Fenzel v. Group 2 Software, LLC*,
   No. DKC 13-0379, 2016 WL 865363 (D. Md. Mar. 7, 2016) .................................................30

*Fid. & Guar. Life Ins. Co. v. United Advisory Grp., Inc.*,
   No. WDQ-13-0040, 2014 WL 346630 (D. Md. Jan. 29, 2014).........................................14, 15

*Fraidin v. Weitzman*,
   611 A.2d 1046 (Md. Ct. Spec. App. 1992) ..............................................................................30

*Francis v. Giacomelli*,
   588 F.3d 186 (4th Cir. 2009) .....................................................................................................11

*Gerber v. A&L Plastics Corp.*,
   No. 19-12717 (ES) (CLW), 2021 WL 3616179 (D.N.J. Aug. 16, 2021) ................................12

*Glenn v. Wells Fargo Bank, N.A.*,
   No. DKC 15-3058, 2016 WL 3570274 (D. Md. July 1, 2016) .........................................11, 18

*Glenn v. Wells Fargo Bank, N.A.*,
   No. PX 15-3058, 2017 WL 371956 (D. Md. Jan. 26, 2017), *aff'd*, 710 F.
   App'x 574 (4th Cir. 2017) .........................................................................................................27

*Gore Enter. Holdings, Inc. v. Comptroller of Treasury*,
   87 A.3d 1263 (Md. 2014) ..........................................................................................................16

*Hardaway v. Equity Res. Servs., LLC*,
   No. DKC 13-0149, 2015 WL 858086 (D. Md. Feb. 26, 2015).........................................17, 18

*Hardaway v. Equity Residential Mgmt., LLC*,
  No. DKC 13-0149, 2016 WL 3957648 (D. Md. July 22, 2016)..............................................29

*Hosack v. Utopian Wireless Corp.*,
  No. DKC 22-0420, 2011 WL 1743297 (D. Md. May 6, 2011) ............................10, 13, 30, 31

*Iceland Telecom, Ltd. v. Info. Sys. & Networks Corp.*,
  268 F. Supp. 2d 585 (D. Md. 2003)....................................................................................16

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
  930 F.3d 660 (5th Cir. 2019) ............................................................................................19

*Jien v. Perdue Farms, Inc.*,
  No. 1:19-CV-2521-SAG, 2020 WL 5544183 (D. Md. Sept. 16, 2020)...................................12

*Liberty Prop. Tr. v. Republic Props. Corp.*,
  577 F.3d 335 (D.C. Cir. 2009) ..........................................................................................21

*Liverpool v. Caesars Balt. Mgmt. Co.*,
  No. JKB-21-0510, 2021 WL 3116106 (D. Md. July 22, 2021), *amended*, 2021
  WL 5909718 (D. Md. Dec. 14, 2021)..................................................................................13

*Mason v. Network of Wilmington, Inc.*,
  No. Civ.A. 19434-NC, 2005 WL 1653954 (Del. Ch. Mar. 29, 2005) .....................................15

*Meacham v. Knolls Atomic Power Lab'y*,
  554 U.S. 84 (2008)...........................................................................................................19

*In re Mid-Atlantic Toyota Antitrust Litig.*,
  525 F. Supp. 1265 (D. Md. 1981) ......................................................................................17

*Montgomery Cnty., Md. v. Bank of Am. Corp.*,
  421 F. Supp. 3d 170 (D. Md. 2019) ...................................................................................26

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund. v. Scales*,
  150 F. Supp. 2d 845 (D. Md. 2001) ...................................................................................34

*Nat'l Fair Hous. All. v. Bank of Am.*,
  401 F. Supp. 3d 619 (D. Md. 2019)...............................................................................26, 28

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*,
  No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019)...............................................26

*Piotrowski v. Wells Fargo Bank, N.A.*,
  No. DKC 11-3758, 2013 WL 247549 (D. Md. Jan. 22, 2013) ...............................................10

*Prince George's Cnty., Md. v. Wells Fargo & Co.*,
  397 F. Supp. 3d 752 (D. Md. 2019) ...................................................................................28

*Prince George's Cnty. v. Wells Fargo & Co.*,
   520 F. Supp. 3d 747 (D. Md. 2021) .........................................................................24

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
   903 F.3d 415 (4th Cir. 2018) ......................................................................... *passim*

*Roberson v. Graziano*,
   No. WDQ-09-3038, 2010 WL 2106466 (D. Md. May 21, 2010), *aff'd* 411 F.
   App'x 583 (4th Cir. 2011) .......................................................................................27

*Ruddy v. Equitable Life Assurance Soc'y of U.S.*,
   No. CIV. A. DKC 00-70, 2000 WL 964770 (D. Md. June 20, 2000) ...................34

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
   801 F.3d 412 (4th Cir. 2015) ..................................................................................14

*Shield Our Const. Rights & Just. v. Tippett*,
   No. DKC 2009-0152, 2009 WL 2961428 (D. Md. Sept. 11, 2009) .......................32

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
   381 F. Supp. 3d 536 (D. Md. 2019) ........................................................................30

*Stevens v. Hous. Auth. of S. Bend, Ind.*,
   663 F.3d 300 (7th Cir. 2011) ..................................................................................32

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) ....................................................................................... *passim*

*Thompson v. United States Dep't of Hous. & Urban Dev.*,
   348 F. Supp. 2d 398 (D. Md. 2005) ........................................................................24

*Travel Comm., Inc. v. Pan Am. World Airways, Inc.*,
   603 A.2d 1301 (Md. Ct. Spec. App. 1992) .............................................................15

*Treece v. Perrier Condo. Owners Assoc., Inc.*,
   No. 17-10153, 2020 WL 759567 (E.D. La. 2020) ..................................................23

*Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
   332 F.3d 188 (3d Cir. 2003) ...................................................................................14

*U.S. v. Grahams Constr., Inc.*,
   585 F. App'x 173 (4th Cir. 2014) ...........................................................................33

*United States v. Garcia*,
   855 F.3d 615 (4th Cir. 2017) ..................................................................................10

*Vitol, S.A. v. Primerose Shipping Co.*,
   708 F.3d 527 (4th Cir. 2013) .............................................................................13, 15

vi

*Wal-Mart, Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................................21

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................33

*Wilshire Credit Corp. v. Karlin*,
  988 F. Supp. 570 (D. Md. 1997) .....................................................................16

*Young-Bey v. S. Mgmt. Corp., Inc.*,
  No. TDC-18-2331, 2019 WL 1992905 (D. Md. May 6, 2019) ........................27

*Zos v. Wells Fargo Bank, N.A.*,
  No. GJH-16-00466, 2017 WL 221787 (D. Md. Jan. 18, 2017) .........................7

**Statutes**

42 U.S.C. § 3601 ........................................................................................ *passim*

42 U.S.C. § 3604 ...............................................................................................17

42 U.S.C. § 3617 ...............................................................................17, 28, 29

Md. Code Ann., Cts. & Jud. Pro. § 5-101 ........................................................34

**Other Authorities**

Fed. R. Civ. P. 8 ....................................................................................1, 11, 12

Fed. R. Civ. P. 12 .........................................................................1, 11, 18, 35

Prince George's County Open Data Portal,
  https://data.princegeorgescountymd.gov (data last updated Aug. 23, 2021; last
  visited Feb. 16, 2022) .....................................................................................10

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants Victoria United, LLC ("Victoria United"), Bedford United, LLC ("Bedford United"), Hyattsville United, LLC ("Hyattsville United"), and Arbor Management Acquisition Company, LLC ("AMAC") (collectively, the "Hyattsville Defendants") respectfully move to dismiss the First Amended Complaint (ECF No. 43) (the "FAC"), because Plaintiffs Anita Ramirez ("Ms. Ramirez"), Ramiro Lopez ("Mr. Lopez"), Ervin Obdulio Rodas ("Mr. Rodas"), Jesus Gonzalez ("Mr. Gonzalez"), Maria Arely Bonilla ("Ms. Bonilla"), Maria Lara ("Ms. Lara"), Norma Guadalupe Beltran ("Ms. Beltran") (together, the "Named Plaintiffs"), and CASA de Maryland, Inc. ("CASA") (collectively, "Plaintiffs"), fail to state a claim upon which relief can be granted, and CASA lacks standing to pursue certain claims.

## INTRODUCTION

Plaintiffs' second bite at the apple fares no better than their first.  The FAC is now longer—spanning 332 paragraphs over 159 pages—and its pleading defects run deeper.  Plaintiffs attempt to transform an ordinary landlord-tenant dispute, premised on the conditions of two multifamily apartment buildings in Prince George's County, into a nationwide housing discrimination case brought under the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq*.  They challenge routine business decisions made in the multifamily housing industry, essentially arguing that whenever an entity purchases, finances, or maintains properties with minority tenants, such ordinary business practices become *per se* discriminatory.  Plaintiffs are wrong.

First, Plaintiffs continue to violate the notice pleading requirement in Federal Rule of Civil Procedure 8 by lumping together seven legally distinct entities and calling them "Arbor Related Defendants" or "Arbor Family" throughout the FAC, without identifying each entity's involvement or justifying such concerted treatment.  Second, this indeterminate group pleading

1

falls woefully short of meeting the demanding requirements for the Court to disregard the corporate distinctions between these separate entities and pierce the corporate veil of any Defendant.  Third, Plaintiffs' FHA claims fail because they do not identify any specific policy implemented by the Hyattsville Defendants, or any other Defendant, which plausibly supports an allegation of discriminatory impact; nor do Plaintiffs provide a cognizable statistical comparison to evaluate disparate impact, or establish that the Hyattsville Defendants subject Latinos or other protected class members to different or worse treatment than similarly situated non-class members due to their race or national origin, as required by the FHA and Supreme Court precedent.

Seeking to overcome their inability to demonstrate that Bedford United and Victoria United treat minorities differently, Plaintiffs attempt to link them to seven unrelated properties in the DC-VA-MD HUD Metro FMR Area (the "HUD DC Market") and three cherry-picked properties out of the over 17,000 units the "Arbor Family" is alleged to own and operate nationwide, all while failing to establish any meaningful connection between these properties, their owners, and the Hyattsville Defendants.  As to the seven HUD DC Market properties, the FAC alleges that they are in the same alleged state of disrepair as Bedford and Victoria Station (collectively, "BVS"); thus, these seven properties cannot support any comparison showing that BVS treats minority residents differently.

And rather than provide any meaningful statistical analysis, Plaintiffs simply compare the racial demographics and investments in BVS to investments in three other properties in other parts of the country, which is fatal to their FHA claims.  As the Supreme Court stated,

> [A] plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.  It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units.

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 543 (2015). Moreover, the Supreme Court was concerned that bare allegations untethered to any robust causal connection like those here would have a chilling effect on affordable and lower income housing: "[i]f the specter of disparate-impact litigation causes private developers to no longer construct or renovate housing units for low-income individuals, then the FHA would have undermined its own purpose as well as the free-market system." *Id.* Plaintiffs' FAC is predicated on a legally unsupportable expansion of the FHA that will have precisely this effect warned of by the Supreme Court to undermine, rather than advance, the legislative purpose of the FHA.

Plaintiffs also fail to provide any factual basis—much less a plausible one—establishing discriminatory intent based on race or national origin. Since their purchase of the properties, Bedford United and Victoria United have made substantial improvements to BVS, resulting in their removal from the Prince George's County's list of distressed properties. Such conduct hardly indicates intentional discrimination against Hispanic or Latino tenants.

Plaintiffs' state law claims similarly fail. Critically, while Plaintiffs seek remedies for breach of the express and implied terms of the Named Plaintiffs' lease agreements in Counts V and VI, Plaintiffs fail to show that each Plaintiff has a contractual relationship with each Defendant. In fact, none of the Named Plaintiffs have contractual relationships with AMAC or Hyattsville United, and Ms. Ramirez and CASA lack contractual relationships with any of the Hyattsville Defendants. In addition to the merits, CASA lacks standing to assert claims on behalf of its members for money damages and cannot bring breach of contract claims on its own behalf for money damages. Further, while an alleged continuing violation may allow Plaintiffs to assert damages for breaches that allegedly occurred within the three-year limitations period for Counts

3

V and VI, Plaintiffs may not recover damages for breaches that purportedly occurred outside of the limitations period, as Plaintiffs attempt to do in the FAC.

Plaintiffs now have been given multiple chances to plead their case properly and have been unable to do so even after being given a roadmap by Defendants of their deficiencies.  They should not be given yet another opportunity to do what they have already failed to do.  The FAC should be dismissed with prejudice.[1]

## FACTUAL BACKGROUND

CASA and the Named Plaintiffs assert claims against eight Defendants, alleging that their actions violated: (i) various provisions of the FHA; (ii) the express and implied terms of the Named Plaintiffs' lease agreements; and (iii) Maryland's common law prohibition against civil conspiracy.  *See* FAC ¶¶ 267–326.  The Named Plaintiffs allege that they are Hispanic residents of Guatemalan and Salvadoran national origin living at BVS, two multi-family apartment complexes located in Prince George's County, Maryland.  *Id.* ¶¶ 21–26.  Plaintiffs allege that Bedford Station is owned by Bedford United (*id.* ¶ 31) and that Victoria Station is owned by Victoria United (*id.* ¶ 32).  Plaintiffs also allege that RMS acts as the management company for these two properties.  *Id.* ¶ 34.  Plaintiffs assert that "[b]asic maintenance and necessary repairs to both properties have been ignored and neglected," resulting in uninhabitable conditions under federal law, the Named Plaintiffs' lease agreements, and the local housing code.  *Id.* ¶ 1.

---

[1] The Hyattsville Defendants respectfully refer the Court to and incorporate the motions to dismiss and memoranda of law filed by (i) Defendants Arbor Realty Trust, Inc. ("Arbor Realty Trust"), Arbor Realty Limited Partnership ("Arbor Realty Limited"), and Arbor Realty SR, Inc. ("Arbor Realty SR") (collectively the "Arbor Defendants" and hereinafter the "Arbor Defs' Br."); and (ii) Defendant Realty Management Services, Inc. ("RMS").

A.    **Plaintiffs Group Seven Defendants Together and Call Them "Arbor Related Defendants."**

In addition to asserting claims against Bedford United, Victoria United, and RMS based on their ownership and management of BVS, Plaintiffs also assert claims against a large number of unrelated corporate entities that have no cognizable connection to the facts alleged in the FAC. Defendants previously identified substantial pleading deficiencies in Plaintiffs' original complaint, but the problems persist—and are even more glaring.  Trying in vain to draw a link between these unrelated Defendants and the facts that form the basis of their claims, Plaintiffs generally allege that the Hyattsville Defendants, along with other Defendants, are "owned and controlled" by and are a "mere instrumentality [of]" Arbor Realty Trust.  *Id.* ¶¶ 27 n.3, 35.  Plaintiffs then lump together all Defendants—apart from Arbor Realty Trust and RMS—into a single grouping and refer to them collectively as "Arbor Related Defendants" throughout the FAC.  *Id.*[2]  Without differentiating which entity allegedly did what, Plaintiffs assert seven of the eight claims against "All Defendants."  *Id.* ¶¶ 267–316, 327–30.

After Defendants pointed out these flaws, Plaintiffs revised their complaint to add numerous legal conclusions and reinforce existing ones—none of which supports Plaintiffs' claim that all Defendants should be treated as one.  For example, Plaintiffs baldly allege that the Hyattsville Defendants are "undercapitalized or insolvent," without providing factual statements in support.  *Id*. ¶ 36(a).  Plaintiffs allege that Arbor Realty Trust "siphon[s] funds from the other Arbor Related Defendants," that Defendants "routinely" deal with one another "without consideration to a good faith arm's length transaction," and that they operate "solely for the benefit of Arbor Realty Trust," (*id*. ¶¶ 36(b), (g), (h)), but Plaintiffs allege no fraudulent or even plausibly

---

[2] Plaintiffs also define another sub-group of Defendants as the "Arbor Family Defendants," which includes three of the same entities as the "Arbor Related Defendants."  FAC ¶ 10 n.2.

improper activity: merely that the Hyattsville Defendants borrowed money to acquire BVS, and that BVS rents were "redirected to other investments within the larger web of Arbor's subsidiaries." *Id.* ¶ 36(b). Plaintiffs separately point to Arbor Realty Trust's alleged forgiveness of a $35 million debt of an unnamed non-party "to the benefit of AMAC without any consideration in return" (*id.* ¶ 36(h)), yet do not even identify the "underlying properties" involved, much less explain the relevance of this entirely unrelated transaction to Plaintiffs' action.

Plaintiffs also allege that the "holding company co-defendants do not have officers," that Ivan Kaufman is the "dominant stockholder" of each Arbor Related Defendant, and that the Arbor Related Defendants "all share common office space . . . at the same address"—even though they separately allege that the Hyattsville Defendants maintain a different address. *Id.* ¶¶ 36(d), 36(f), 135. Here, too, Plaintiffs allege no plausible misuse of the corporate form, nor offer any factual support to substantiate that "traditional factors of fairness demand that the Court disregard the corporate forms." *Id.* ¶ 36(i).

In an attempt to show a connection between BVS and the Arbor Defendants, Plaintiffs describe various financing transactions from nearly a decade ago. Plaintiffs then allege that in April 2013, Bedford United and Victoria United acquired BVS and took title of the properties by deed, as recorded in the Maryland land records. *Id.* ¶¶ 110–12. As partial financing for the purchase of these properties, Bedford United and Victoria United each entered into mortgage loans with Arbor Realty SR and, as is typical in mortgage lending for multifamily properties, secured the loans with an assignment of leases and rents, among other collateral. *Id.* ¶¶ 111–12.[3] But Plaintiffs conspicuously fail to mention that the same set of Maryland land records confirm that

---

[3] The FAC includes allegations that Arbor Realty SR assigned the leases and rents to a collateralized loan obligation ("CLO"). FAC ¶¶ 113–15.

those assignments were wholly satisfied within months of the initial assignment.  *See* Ex. A.[4]  Indeed, Bedford United and Victoria United subsequently assigned leases and rents from BVS to unrelated entities that are not named as defendants.[5]  Plaintiffs claim that the Arbor Family "oversaw" these subsequent refinancings to third parties but provide no factual statements showing how such oversight was exercised.  FAC ¶¶ 117, 119.  Plaintiffs' allegations simply show that for a short period of months Bedford United and Victoria United temporarily assigned the leases and rents of BVS as security for financing obtained from Arbor Realty SR.  *Id.* ¶¶ 111–12.  Further, those assignments were satisfied in full and terminated more than eight years prior to the filing of the FAC.  Ex. A.

   **B.    The FAC Fails to Allege Facts Supporting an FHA Claim and Ignores the Extensive Work and Funds Expended at BVS.**

   While Plaintiffs dedicate twenty-six pages of the FAC to photographs of their units in BVS (FAC ¶¶ 2–29), they devote only three pages to demonstrating a "statistically disparate impact on minorities," which is the crux of their FHA claims.  *Id.* ¶¶ 182–96.  Indeed, Plaintiffs simply point to the alleged racial makeup of the various properties, compare that racial makeup to the population of a particular area as a whole, and fabricate "policies" to establish their FHA claims.

   Plaintiffs contend that four "policies" are causing a disparate impact on the Named Plaintiffs as residents of BVS, the tenants of the seven properties identified in the HUD DC Market,

---

[4] The Court may take judicial notice of these land records as they are records publicly maintained by the Maryland state government and because Plaintiffs' FAC incorporates the records by expressly referring to the assignments and various "Maryland land records" (FAC ¶ 112).  *See Zos v. Wells Fargo Bank, N.A.*, No. GJH-16-00466, 2017 WL 221787, at *1 n.2 (D. Md. Jan. 18, 2017) (taking judicial notice of land records as "integral" to breach of contract, civil conspiracy, and FHA claims).

[5] Bedford United and Victoria United entered into three other assignments of leases and rents in connection with BVS with third party lenders (which Plaintiffs do not allege have any ownership in BVS).  *See* Arbor Defs' Br. at 7–8 (describing Maryland land records that show assignments of leases and rents in 2013, 2018, and 2020 to German American Capital Corp. and to KeyBank, who further assigned its interest in the loan to the Federal National Mortgage Association).

and on "other Arbor Properties in low-income communities of color" nationwide: (1) Financialization Policy; (2) Harvesting Policy; (3) Divestment Policy; and (4) Outsourcing Policy. *Id.* ¶¶ 197–218.  The FAC pleads no facts showing that these policies actually exist in any form or that they are used by the Hyattsville Defendants in their operations.

To demonstrate the "disparate strategy employed by Arbor Family Defendants when they identify a value-add property" in a "majority White" community (*id.* ¶¶ 156, 176), Plaintiffs cherry pick two properties allegedly owned by "Arbor" or the "Arbor Family Defendants" in New York (the "Chinatown Property") and Texas (the "San Antonio Property") for comparison, and mention a third in Florida (the "Miami Property").[6]  Despite alleging that "Arbor" holds a portfolio with a "***vast*** number of multifamily holdings" spanning "across the United States" that totals "more than 17,000 individual multifamily units," Plaintiffs identify only these three properties to demonstrate a nationwide "policy."  *Id.* ¶¶ 153–54 (emphasis added).  The San Antonio Property is alleged to be located within a "majority Hispanic" community while the property itself is alleged to be "predominantly White."  *Id.* ¶ 168.  Plaintiffs admit that the Chinatown Property is in a community that is 94.4% non-White (*id.* ¶ 158), and further undermine their theory by alleging that the "Arbor Family Defendants" made renovations and improvements at the Chinatown Property.  *Id.* ¶ 166.  Compounding these errors, Plaintiffs present no factual information regarding the racial composition of the Chinatown Property, providing only the racial composition of the surrounding community.  *See id.* ¶¶ 157–66.  Similarly, Plaintiffs do not identify which Defendant purchased or owned these properties and simply assert that either "Arbor" or the "Arbor Family Defendants"

---

[6] As to the Miami Property, Plaintiffs allege ***only*** that AMAC and a non-party "acquired a vacant lot which the Arbor Family developed into the luxury condos dubbed 112 Biscayne Bay in Miami, Florida," as an "opportunistic" investment, and that the Arbor Family "pre-fund[ed]" its investment in the Miami Property.  FAC ¶ 206(c) & n.14.

acquired the properties in 2017 and 2018.  *Id.*  ¶¶ 157, 167.  However, publicly available records indicate that these properties are not owned by any Defendant in this action.

Plaintiffs also allege that these policies are applied at "139 multifamily residential developments in at least twelve (12) states, including the BVS properties" but do not identify these properties or their geographical location.  *Id.* ¶ 10.  Instead, Plaintiffs simply state that these 139 properties are located in states ranging from New York to Texas (*id.* ¶ 124) and speculate that the racial demographics of all 139 properties combined are as follows: 51% White, 48.4% non-White.[7]  *Id.* ¶ 130.  Plaintiffs then allege that "on the whole, in the twelve states" where the 139 properties are located, the racial demographics of the entirety of the 12 states are 60.6% White, and 39.4% non-White.  *Id.* ¶ 131.  The FAC fails to provide any statistical analysis, let alone one showing a robust causal connection between these statistics and any policy, but simply recites figures.

The FAC also conspicuously fails to mention any of the improvements Bedford United and Victoria United made to BVS since taking ownership of the properties.  For example, as Plaintiffs allege, the BVS properties were in distress prior to their acquisition by Bedford United and Victoria United and had been foreclosed upon by its lender during prior ownership.  *See id.* ¶¶ 88–89.  While Plaintiffs point out that the BVS properties were placed on Prince George's County Department of Permitting, Inspection, and Enforcement's ("PG DPIE") list of distressed properties in "September 2012 ***prior to its acquisition by Arbor***" (*id.* ¶¶ 88–89) (emphasis added), the FAC entirely ignores that the properties were removed from that list in September 2018 (Victoria Station) and February 2019 (Bedford Station), due to "the reduced number of violations and tenant

---

[7] These and Plaintiffs' other figures are pure speculation.  Plaintiffs do not cite a single source and federal law prohibits landlords from keeping records of the race or ethnicity of tenants, so Plaintiffs' statistics are unentitled to deference.  Even crediting them as true, however, they undermine Plaintiffs' own case, as discussed *infra* III, and do not warrant Plaintiffs conducting a fishing expedition in discovery on a nationwide scale.

calls for service, and the overall responsiveness of the management company." *See* Ex. B, Tab 2 (concluding that each property "was in compliance with the Prince George's County Housing code.").[8]  Plaintiffs' conclusory allegation that "there have been no significant capital improvements to the BVS Properties" since 2017 (FAC ¶ 96) is clearly belied by PG DPIE, which commended Bedford Station for its "***substantial*** investment in capital improvements on the property." Ex. B, Tab 2 (emphasis added).[9]

Further, Plaintiffs provide detailed figures regarding the number of inspection violations reported by PG DPIE between 2014 and 2017.  *See* FAC ¶¶ 90–96.  But they fail to provide those same figures for 2018 through 2022—the most relevant time period for purposes of statutes of limitation.  During this period, PG DPIE reported sixty-two violations in 2018 on behalf of both properties and only ***one violation from 2019 to the present***.[10]

---

[8] The Court may consider the letters from PG DPIE as incorporated by reference due to Plaintiffs' extensive reliance on the fact that BVS was listed on the PG DPIE list of distressed properties. *See* FAC ¶¶ 87–89; *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC 11-3758, 2013 WL 247549, at *1 n.1 (D. Md. Jan. 22, 2013) (Chasanow, J.) (considering letter that was "expressly relied on in the complaint" as integral to the complaint).

[9] *See also Hosack v. Utopian Wireless Corp.*, No. DKC 22-0420, 2011 WL 1743297, at *3 (D. Md. May 6, 2011) (Chasanow, J.) ("'[If] the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail.'") (quoting *Fare Deals, LTD. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 683 (D. Md. 2001)).

[10] The Court may also take judicial notice of the information in Figure 1 because it contains publicly available information maintained by the Prince George's County government. *See* Prince George's County Open Data Portal, https://data.princegeorgescountymd.gov (data last updated Aug. 23, 2021; last visited Feb. 16, 2022); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").  While there was one violation for Bedford Station in 2021, that single instance was the result of a zoning code violation where unrelated third persons were operating a food truck on the public sidewalk outside of Bedford Station without the proper permits.  Bedford Station worked with county authorities in addressing the issue since the unrelated third persons were not BVS residents and were not vending on BVS property.

| Total Housing Violations for BVS | |
| --- | --- |
| Year | Housing Inspection Violations |
| 2018 | 62 |
| 2019 | 0 |
| 2020 | 0 |
| 2021 | 1* |
| 2022 | 0 |

**Fig. 1. Number of Inspection Violations by Year for BVS.**

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'[N]aked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557). "Legal conclusions couched as factual allegations are insufficient, as are conclusory factual allegations without any reference to actual events." *Glenn v. Wells Fargo Bank, N.A.*, No. DKC 15-3058, 2016 WL 3570274, at *4 (D. Md. July 1, 2016) (Chasanow, J.).

## ARGUMENT

### I.  PLAINTIFFS CONTINUE TO VIOLATE RULE 8'S NOTICE PLEADING REQUIREMENT.

Although the FAC adds numerous allegations in an attempt to overcome its pleading deficiencies, the FAC remains an archetypal group pleading in violation of Rule 8's notice pleading requirement, which "exist[s] to ensure that the opposing party receives fair notice of the nature of a claim or defense." *See Barry v. EMC Mortg.*, No. DKC 10-3120, 2011 WL 4352104, at *4 (D. Md. Sept. 15, 2011) (Chasanow, J.); Arbor Defs' Br. at 24–30.

Even after being put on notice that the initial complaint violated Rule 8, the FAC still impermissibly lumps together distinct corporate entities, asserting seven of their eight claims

against *every* Defendant.  FAC ¶¶ 267–72 (Count I); 273–80 (Count II); 281–86 (Count III); 287–94 (Count IV); 295–306 (Count V); 307–16 (Count VI); 327–330 (Count VIII).  Plaintiffs purport to distinguish between the "Arbor Family Defendants" and the "Arbor Related Defendants," but define the latter to include *every* Defendant except Arbor Realty Trust and RMS.  *Id.* ¶¶ 10 n.2, 27 n.3.[11]  Adding to the confusion, Plaintiffs refer throughout to the "Arbor Family" (*e.g.*, *id.* ¶ 80) and merely "Arbor" (*e.g.*, *id.* ¶¶ 157, 171).  *See Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2020 WL 5544183, at *4 (D. Md. Sept. 16, 2020) (finding complaint violated Rule 8 where plaintiffs provided no explanation for group treatment beyond "baldly alleging a corporate relationship").[12]  Accordingly, it is "difficult to even begin to assess [Plaintiffs'] theories of liability" against each Defendant in particular.  *Gerber v. A&L Plastics Corp.*, No. 19-12717 (ES) (CLW), 2021 WL 3616179, at *5 (D.N.J. Aug. 16, 2021).  For example, Plaintiffs state that they rely on the doctrines of veil piercing, actual and apparent agency, *respondeat superior*, and *res ipsa loquitur* "*where appropriate*" (FAC ¶¶ 265–66), but never allege where it is appropriate.  By failing to identify how they seek to pierce the corporate veil of which entity, this glaring imprecision leaves the Court and the parties in the dark about who Plaintiffs seeks to hold liable and under what purported relationship such liability may be appropriate.

[11] Plaintiffs aver that the "Arbor Related Defendants" are "owned and controlled" by Arbor Realty Trust, whereas the "Arbor Family Defendants" are the "operating and controlling entities" within Arbor Realty Trust.  FAC ¶¶ 27 n.3.  Therefore, according to Plaintiffs, three of four Arbor Family Defendants are both controlled (by Arbor Realty Trust) and controlling entities (of other unnamed entities).

[12] In an attempt to justify their impermissible group pleading, Plaintiffs also rely on alleged financing transactions among the various entities from years ago—but these provide absolutely no basis to treat Defendants "as a unified whole." *Jien*, 2020 WL 5544183, at *4.  Not only were the nearly decade-old assignments terminated within months, but the assignments themselves—which were made as security for the financing of mortgage loans, along with other collateral—do not plausibly show that Arbor Realty SR had any ownership interest in the BVS properties, but only that it had a temporary security interest.  *See* Arbor Defs' Br. at 13–16.

Finally, the FAC is riddled with contradictions and illogic.  "[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim."  *Hosack*, 2011 WL 1743297, at *5.  For instance, Plaintiffs assert that "*[e]ach of the Defendants* other than [RMS] is a mere instrumentality or *alter ego* of parent company *Arbor Realty Trust*."  FAC ¶ 35 (emphasis added).  Simultaneously, Plaintiffs assert that these entities are a "single entity with mere formal distinction under the control of *AMAC*," relying on a purported statement by Ivan Kaufman that says no such thing.  *Id.* ¶ 71 (emphasis added).  Plaintiffs similarly claim that the "Arbor *Family* Defendants" conspired with RMS, but elsewhere that RMS had an "unlawful . . . agreement with the Arbor *Related* Defendants."  *Compare id.* ¶ 80*, with id.* ¶ 150 (emphasis added).  Plaintiffs' slipshod allegations, combined with the deeper pleading defects described below, cannot be remediated by a new pleading.  Therefore, the FAC should be dismissed with prejudice.

## II.  PLAINTIFFS FAIL TO ALLEGE A COGNIZABLE VEIL PIERCING THEORY.

"[A] corporate entity is liable for the acts of a separate, related entity only under *extraordinary circumstances*."  *Vitol, S.A. v. Primerose Shipping Co*., 708 F.3d 527, 543 (4th Cir. 2013) (emphasis added); *Liverpool v. Caesars Balt. Mgmt. Co*., No. JKB-21-0510, 2021 WL 3116106, at *4 (D. Md. July 22, 2021), *amended*, 2021 WL 5909718 (D. Md. Dec. 14, 2021) ("Maryland courts decline to pierce the corporate veil except where it is necessary to prevent fraud or [to] enforce a paramount equity, even where evidence suggests that a corporate entity was established for the sole purpose of dodging legal obligations.").[13]  Here, there are no extraordinary circumstances to pierce any Defendant's corporate veil.

---

[13] *See* Arbor Defs' Br. at 17–24, 17 n.3 (whether the Court applies federal law, Maryland law, or Delaware law in deciding to pierce the corporate veil, the result here is the same).

Plaintiffs continue to formulaically recite factors and buzzwords—but do not allege ***facts*** "suggesting the kind of unity of interests that [the Fourth Circuit] usually require[s] a party to plead before permitting them to advance an alter ego theory." *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 423 (4th Cir. 2015).  Rather, the FAC is littered with "unadorned conclusory allegations" that are "akin to no allegations at all." *Id.*

*First*, Plaintiffs claim that "[e]ach of the entities are grossly undercapitalized or insolvent." FAC ¶ 36(a).  But they provide no factual support for this conclusory assertion.  Nor do they show that the Hyattsville Defendants or any other Defendant was "grossly undercapitalized ***for purposes of its corporate undertaking***." *Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 196–98 (3d Cir. 2003) ("[C]ourts generally look to initial capitalization, asking whether a company was adequately capitalized at the time of its organization.") (emphasis added).  As a result, Plaintiffs' bare conclusion of "undercapitalization" warrants no deference.  *Id.*; *Fid. & Guar. Life Ins. Co. v. United Advisory Grp., Inc.*, No. WDQ-13-0040, 2014 WL 346630, at *10 (D. Md. Jan. 29, 2014) (declining to pierce corporate veil and denying leave to amend where entity was "allegedly undercapitalized"); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008) (refusing to pierce corporate veil where complaint made "wholly conclusory [statements] and [was] otherwise unsupported by any specific facts" and where plaintiff did not show the capitalization "was so minimal as to prove that it was a sham entity").[14]

---

[14] Plaintiffs also do not plausibly allege insolvency, as they allege no facts demonstrating that the Hyattsville Defendants have any outstanding payment obligations. *See Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225, 305 (Md. 1975) (refusing to pierce corporate veil in absence of fraud where company's assets were depleted to evade its legal obligations and used until company was "all but insolvent"); *EBG Holdings*, 2008 WL 4057745, at *13 ("Insolvency, in and of itself, does not justify piercing the corporate veil.").

14

*Second*, Plaintiffs baldly allege that "Arbor Realty Trust has a history of siphoning funds" from the other Arbor Related Defendants but these allegations also are conclusory and not entitled to deference.  FAC ¶ 36(b).  Even if true, however, such allegations still would not be sufficient to pierce the corporate veil.  *See Vitol*, 708 F.3d at 548 (holding that loans made between related entities, which were largely repaid "fall[] short of establishing alter ego");  *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 603 A.2d 1301, 1318–19 (Md. Ct. Spec. App. 1992) (refusing to pierce corporate veil despite evidence that the stockholder actually siphoned funds in absence of fraud).

*Third*, Plaintiffs allege that Bedford United and Victoria United "do not have officers" (FAC ¶ 36(c)), that "Ivan Kaufman maintains the largest shareholder ownership in all of the Arbor Related Defendants" (*id.* ¶¶ 36(d–e)), that the "Arbor Related Defendants all share common office space" (*id.* ¶ 36(f)), and that the entities are "operate[d] solely for the benefit of Arbor Realty Trust" (*id.* ¶ 36(g)).  Even crediting Plaintiffs' bare allegations (which the Court should not) of overlapping ownership, shared office space and employees, and operations for the benefit of Arbor Realty Trust, they do not suffice to pierce the corporate veil.  *Vitol*, 708 F.3d at 546  (allegations of shared office space, and the "extension of a line of credit from one corporate entity to another" to acquire assets "does not create a reasonable belief of alter ego");  *Mason v. Network of Wilmington, Inc.,* No. Civ.A. 19434-NC, 2005 WL 1653954, at *4 (Del. Ch. Mar. 29, 2005) (finding that "[b]eing the sole shareholder of two different legal entities, housed in the same office building and possessing the same phone number" does not justify piercing the corporate veil); *Fid. & Guar. Life Ins.*, 2014 WL 346630, at *10 (alleged reliance on shared office, "employees, policies and resources" where entity relied on start-up funding from parent and "had no mind of its own" insufficient to pierce corporate veil).

15

*Fourth*, Plaintiffs allege that the Arbor Related Defendants "have routinely dealt with each other without consideration to a good faith arm's length transaction," offering as an example Arbor Realty Trust's alleged forgiveness of an unnamed non-party borrower's debt, to the benefit of AMAC, without consideration.  FAC ¶ 36(h).  Plaintiffs' allegations suggest there was, in fact, consideration: the borrower's debt to AMAC was forgiven in return for relinquishing any claim to the underlying collateral.  *Id.*; Arbor Defs' Br. at 23–24.  Nowhere do Plaintiffs plausibly allege that Defendants dealt with one another without consideration or outside of a "good faith arm's length transaction" with respect to BVS.

*Finally*, Plaintiffs baselessly conclude that "[o]ther traditional factors of fairness demand that the Court disregard the corporate forms of the Arbor Related Defendants[.]"  FAC ¶ 36(i). Fatal to their veil-piercing theory, however, is the absence of ***any*** facts demonstrating fraud or a "paramount [in]equity" with respect to Defendants' uses of the corporate form.  *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 517 (D. Md. 2013) ("When a plaintiff seeks to pierce the corporate veil, the complaint must offer more than general and conclusory allegations of fraud, undue control exercised by a parent over its subsidiary, or paramount equity."); *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 87 A.3d 1263, 1281 (Md. 2014) ("In practice, [] the courts simply have not found an equitable interest more important than the state's interest in limited shareholder liability.").  Plaintiffs nowhere allege in the FAC that Defendants engaged in any sort of fraud.  Therefore, there is no reason to pierce the corporate veil.  *See id.*; *Iceland Telecom, Ltd. v. Info. Sys. & Networks Corp.*, 268 F. Supp. 2d 585 (D. Md. 2003) (declining to "become the first federal court sitting in diversity in Maryland to pierce the corporate veil upon a theory of the need to enforce a paramount equity"); *Wilshire Credit Corp. v. Karlin*, 988 F. Supp. 570, 575–76 (D. Md. 1997) ("[U]nder Maryland law, the evasion of legal

obligations does not warrant the invocation of the 'alter ego' doctrine."). Decades of precedent in corporate law establish that "the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *In re Mid-Atlantic Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1275 (D. Md. 1981). As no such circumstances exist, the Court should refuse Plaintiffs' invitation to disregard Defendants' corporate forms.

**III.    THE FAC FAILS TO STATE A CLAIM UNDER THE FHA.**

Plaintiffs assert four counts under the FHA, claiming that the Hyattsville Defendants violated: Section 3604(a) of the FHA, which prohibits discrimination in making housing unavailable (Count I); Section 3604(b) of the FHA, which prohibits discrimination against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therein (Count II); Section 3601 of the FHA, which prohibits the perpetuation of segregation (Count III); and Section 3617 of the FHA, which prohibits interference with any person in the exercise or enjoyment of a right protected by the FHA (Count IV). Plaintiffs bring their FHA claims under both the disparate impact and discriminatory intent theories of discrimination. *See* FAC ¶¶ 270–71. These claims fail for numerous reasons.

**A.    Plaintiffs Still Fail to Allege that the Hyattsville Defendants Own Any Properties Other than BVS.**

Plaintiffs do not allege that the Hyattsville Defendants own any properties other than Bedford United's sole ownership of Bedford Station and Victoria United's sole ownership of Victoria Station.[15] FAC ¶¶ 31–32. As such, they cannot plausibly allege a prima facie FHA claim

---

[15] Bedford United and Victoria United's ownership of BVS is confirmed by the records maintained by the Maryland Department of Assessments and Taxation ("MDAT"), subject to judicial notice, which show Bedford United and Victoria United as the sole and respective owners for the limitations period. *See* Ex. D. *Hardaway v. Equity Res. Servs., LLC*, No. DKC 13-0149, 2015 WL 858086, at *4 (D. Md. Feb. 26, 2015) (Chasanow, J.) (considering documentation maintained by MDAT on Rule 12(b)(6) motion for purposes of establishing ownership of property).

of either disparate impact or discriminatory intent related to the Hyattsville Defendants as there are no other Hyattsville owned properties to compare to BVS. *See Glenn*, 2016 WL 3570274, at *6; *Hardaway*, 2015 WL 858086, at *4 (dismissing FHA claims against corporate affiliates without ownership interests in the at-issue properties because affiliates lack "any relationship to the allegations in the [] complaint" and are therefore not "proper parties" for FHA claim).

In order to get around these uncontroverted facts, Plaintiffs identify seven properties that "were all at one time owned" or are "currently owned by Arbor Family" in the HUD DC Market, four of which they expressly allege are owned by non-defendant entities (FAC ¶¶ 142–44), and none of which are actually owned by the Hyattsville Defendants, as confirmed by the publicly available land records. *See* Ex. C (records maintained by MDAT). Next, Plaintiffs point to the Chinatown Property and allege that "Arbor" acquired it in January 2018. FAC ¶ 157. However, the land records associated with the property indicate that it was purchased by a non-Defendant entity, AH 10 Rutgers, LLC. *See* Ex. E.[16] Plaintiffs similarly point to the San Antonio Property and allege that the "Arbor Family Defendants" acquired the property in 2017. FAC ¶ 167. However, the land records associated with the property indicate that the property was purchased by a non-Defendant entity, Arbor Commercial Mortgage, LLC, during that time period. *See* Ex. F. The land records for both of these properties indicate that no Hyattsville Defendant has ever been involved in the chain of title. *See* Ex. E, Tabs 1–2; Ex. F, Tabs 1–2; *Fare Deals*, 180 F. Supp. 2d at 683 (crediting judicially noticeable facts over contradictory complaint allegations).

Because none of the Hyattsville Defendants have any ownership interest in these other properties, the Hyattsville Defendants are neither responsible nor liable for the policies or practices

---

[16] The Court may take judicial notice of attached public records (Exhibits C, E, & F) maintained by the Maryland state government, New York City municipal government, and the government of Bexar County, Texas, respectively. *See Hardaway*, 2015 WL 858086, at *4.

employed in such properties.  Accordingly, Plaintiffs cannot maintain any comparison between these properties, and this Court should dismiss the FHA claims with prejudice.

**B.**     **Plaintiffs Do Not Plead a Prima Facie Case of Disparate Impact.**

Plaintiffs still fail to plead disparate impact under the FHA because they do not "show that a specific policy caused a significant disparate effect on a protected group."  *Boardley v. Household Fin. Corp. III*, 39 F. Supp. 3d 689, 712 (D. Md. 2014); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018) ("[T]he plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class.").  Plaintiffs remain unable to (1) allege a sufficiently specific policy or (2) meet the demanding causality requirement in showing a significant adverse impact.

1.     Plaintiffs Still Fail to Allege any Specific Policy Implemented by the Hyattsville Defendants.

Plaintiffs identify four "policies" that are no more than abstract economic theories and one-off business decisions disconnected from the individual properties and the Hyattsville Defendants. Plaintiffs may not point to a "generalized policy," but instead are "obliged to do more: to isolate and identify the ***specific*** . . . practices that are allegedly responsible for any observed statistical disparities."  *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100 (2008) (emphasis in original).  This requirement aims "to avoid the result of [parties] being potentially liable for the myriad of innocent causes that may lead to statistical imbalances."  *Id.*  Further, a "one-time decision" does not constitute a "policy" under binding precedent.  *Reyes*, 903. F.3d at 426 (citing *Inclusive Cmtys.*, 576 U.S. at 543); *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 930 F.3d 660, 663 (5th Cir. 2019) ("[A] decision between two developments likely would not be considered a policy, and therefore would not constitute a prima facie case of disparate impact[.]").

Here, Plaintiffs allege that four "policies" create a disparate impact: (1) a hodgepodge of vague operational and investment practices called the "Financialization Strategy" that is based on the "Arbor Family's use of multifamily housing as financial instruments" over a "nationwide portfolio contain[ing] properties at every level of the quality spectrum" by securitizing and cross-collateralizing properties (FAC ¶¶ 198(a–e)); (2) the "Harvesting Policy," whereby REITs invest in properties and make personalized "investment strategies" based upon "the characteristics of a potential investment property" for the purpose of maximizing return of investment (*id.* ¶ 201); (3) the "Divestment Policy" of basing maintenance practices upon the age and/or value of residential property (*id.* ¶ 209); and (4) the "Outsourcing Policy" of outsourcing property management to "third party management companies" (*id.* ¶ 215).

Plaintiffs do not even attempt to show that the Hyattsville Defendants employ these policies or are even legally capable of doing so.  Plaintiffs allege the policies are "***applied equally across Arbor's approximately 139 properties nationwide***" (*id.* ¶¶ 198, 201, 209, 215), but they have not shown—and cannot show—that the Hyattsville Defendants own or are otherwise responsible for these unidentified 139 properties, and therefore employed such policies.  *Id.* ¶¶ 120, 123 (alleging that Bedford United and Victoria United are mere "single purpose" holding companies and that Hyattsville United is a "single purpose LLC" that allegedly collects rents from BVS).  For example, the "Divestment Policy" and "Financialization Policy," which depend on holding a "nationwide portfolio [of] [] properties at every level of the quality spectrum" (*id.* ¶ 198(a)), cannot apply to the Hyattsville Defendants, since it is not alleged that Bedford United or Victoria United own any properties other than BVS—or even that Hyattsville United owns any of the properties identified in this action.  While Plaintiffs challenge the "Harvesting Policy" as an "investment strategy" regarding REIT shareholder dividends, none of the Hyattsville Defendants are alleged to

20

be REITs (nor are they) and, therefore, cannot hold such a policy as a matter of law.   *Id.* ¶ 201. Plaintiffs challenge the "policies" of maintaining BVS based on the age and value of the properties and outsourcing its management to a third-party property management company, but Plaintiffs do not allege that either Hyattsville United or AMAC owns BVS, or that they have any decision-making authority concerning the maintenance of these properties.   *Id.* ¶¶ 208–10; *see also Wal-Mart, Stores, Inc. v. Dukes,* 564 U.S. 338, 357 (2011) ("bare existence of delegated discretion" not a "specific [] practice").

Even if such policies could be ascribed to the Hyattsville Defendants, Plaintiffs improperly attempt to "bootstrap" a series of individualized, one-time decisions particularized to individual properties "together in order to allege the existence of a [uniform] policy." *See Ellis v. City of Minneapolis*, 860 F.3d 1106, 1113 (8th Cir. 2017).  But Plaintiffs themselves undercut that notion by alleging that each "business decision" concerning "whether or not to invest in a given property" involves careful consideration of a "wealth of information" based on the "specific property" and its "specific characteristics."  FAC ¶¶ 65–66, 203(c) (alleging that "*[m]any other factors* affect" the decision of whether "to pay in the form of a dividend . . . or to reinvest in the underlying property") (emphasis added).  These allegations establish that the acquisition, maintenance, and operations decisions are particularized to the properties themselves, which are held by different owners, in different and varied locations across the country ranging from the metropolis to the suburbs.  *See Inclusive Cmtys.*, 576 U.S. at 541–42 ("Entrepreneurs must be given latitude to consider market factors.").[17]  In short, the Supreme Court intended to cabin claims precisely like

---

[17] That these challenged practices are economic principles generally applicable to the majority of actors within the multifamily housing market further militates against qualifying as a "policy" under the FHA.  *See Liberty Prop. Tr. v. Republic Props. Corp.*, 577 F.3d 335, 337 (D.C. Cir. 2009) ("REITs with affiliated limited partnerships are a common device for tax planning[.]");

Plaintiffs', which seek to second-guess discretionary business judgments on where and how to build and renovate individualized housing units. As Plaintiffs fail to allege any "policy" within the meaning of the FHA, they cannot make a prima facie disparate impact claim.

### 2.   Plaintiffs Fail to Satisfy the Causality Requirement.

Plaintiffs fail to plausibly allege the "robust causality requirement" required to state a claim for disparate impact. To establish causation, the plaintiff "must [] demonstrate that the disparity they complain of is the result of one of the [] practices that they are attacking . . . specifically showing that each challenged practice has a ***significantly*** disparate impact on the protected class." *Reyes*, 903 F.3d at 425 (emphasis added) (quotation omitted). The Fourth Circuit has cautioned that it is insufficient to demonstrate a "bare statistical discrepancy"; instead, "statistical disparities must be sufficiently ***substantial*** that they raise such an inference of causation." *Id.* (emphasis added). In the FAC, Plaintiffs assert that the "policies" have a disparate impact on: (1) the tenants of BVS; (2) the "low-income communities of color" in the seven properties "owned" by "Arbor" in the HUD DC Market; and (3) "other Arbor Family Properties in low-income communities of color across the country." FAC ¶¶ 199, 207, 213, 218. However, Plaintiffs' allegations do not as a matter of law establish any disparate impact on any protected class.

First, Plaintiffs attempt to show that the policies had a statistically disparate impact on minorities in the properties located in the HUD DC Market, including BVS. Plaintiffs identify seven properties in the HUD DC Market allegedly owned or once-owned by the "Arbor Family" (none of which is owned by a named Defendant) and assert that these properties—all allegedly subjected to similar funding and maintenance conditions as BVS (*id.* ¶¶ 135–36, 142–44)—have slightly higher concentrations of Black and Latino tenants "than the proportion of Hispanic/Black

---

*Inclusive Cmtys.*, 576 U.S. at 543 ("command[ing]" that "private policies are not contrary to the disparate-impact requirements unless they are artificial, arbitrary, and unnecessary barriers").

residents in the HUD DC Market as a whole." *Id.* ¶¶ 187–88.  Similarly, Plaintiffs allege that the "proportion of Hispanic residents" in BVS is "greater than the proportion of Hispanic residents in the HUD DC Market as a whole." *Id.* ¶ 186.

These are plainly improper comparison populations for measuring disparate impact. Where, as here, Plaintiffs challenge "policies" that are applied across "properties nationwide" (*id.* ¶ 182), Fourth Circuit law requires statistical evidence based on comparison groups that include, but do not extend beyond, the "total group ***to which the policy was applied***." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984) (emphasis added).  As to the BVS community, Plaintiffs must assert statistical evidence showing a disproportionate effect on members of the protected class "compared to the number of non-Latinos who faced [adverse effects] based on the [p]olicy." *Reyes*, 903 F.3d at 428.  Specifically, Plaintiffs must "compare whether Latinos that are subject to the [p]olicy—*i.e.*, Latino tenants at the [properties subjected to the policy]—are disproportionately impacted by the [p]olicy as compared to non-Latinos that are subject to the [p]olicy—*i.e.*, non-Latino tenants at the [properties subjected to the policy]." *Id.* at 429 n.8.

Plaintiffs fail to satisfy this requirement.  At best, Plaintiffs' allegations amount to a showing of a slight racial imbalance at seven properties out of purportedly 139 properties nationwide where the "policies" are "applied equally," of which only two are owned by the Hyattsville Defendants.  But "merely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another." *Edwards v. Johnston Cnty. Health Dep't*, 885 F.2d 1215, 1223 (4th Cir. 1989); *Treece v. Perrier Condo. Owners Assoc., Inc.*, No. 17-10153, 2020 WL 759567, at *13 (E.D. La. 2020) (holding that absolute numbers showing a statistical imbalance do not reveal whether policies "ha[d] a proportional or disparate impact" on protected class members "compared to the total population

of renters").  Here, Plaintiffs still have not plausibly alleged—or even attempted to plausibly allege—that Latino residents of BVS and the seven properties in the HUD DC Market would be disproportionately affected *compared to* non-Latino residents.  *See Binns v. City of Marietta Ga.*, 704 F. App'x 797, 802 (11th Cir. 2017) (finding disparate impact claim deficient where plaintiff "provided no comparative data" to show that class members disproportionately affected).

Plaintiffs also fail to plausibly allege that any policies had a "disproportionate impact on communities of color" outside of the HUD DC Market.  FAC ¶¶ 271, 279, 293.  In their original complaint, Plaintiffs asked this Court to infer a statistically substantial disproportionate effect on nationwide communities of color by identifying just *two* other examples out of an allegedly vast nationwide portfolio.  Now, Plaintiffs introduce naked and speculative statistics that purport to show higher rates of non-White tenants at the 139 properties overall (48.4%) than the rates of non-White persons "***on the whole, in the twelve states***" (39.4%).  *Id.* ¶¶ 130–31 (emphasis added).  By identifying and averaging the racial demographics of 12 entire states—as opposed to the distinct census tracts or cities where each property is located—Plaintiffs cannot plausibly allege a disparate impact on each community, particularly since Plaintiffs do not even identify the "communities" in which each of these 139 properties are located.  *Cf. Prince George's Cnty. v. Wells Fargo & Co.*, 520 F. Supp. 3d 747, 753 (D. Md. 2021) (considering "city-wide injuries"); *Thompson v. United States Dep't of Hous. & Urban Dev.*, 348 F. Supp. 2d 398, 428 (D. Md. 2005) (noting property's location in a particular "census tract").  This is a fishing expedition, based purely on speculation, intended to improperly expand this action from focusing on the tenants of two properties (BVS) to conducting nationwide discovery, which is exactly the scenario that *Twombly* and *Iqbal* were meant to prevent.  *See Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

24

Further, Plaintiffs' allegations as to the San Antonio, Chinatown, and Miami Properties still do not show a disparate impact.  Plaintiffs attempt to use these "distinct properties" and their surrounding communities as comparators for "Arbor Family" strategies in "higher-end rentals" and in "majority White neighborhoods."  FAC ¶¶ 156, 179, 198(a).  The FAC clarifies, however, that **neither** the surrounding San Antonio or Chinatown communities is majority White, and the FAC makes **no** allegations concerning the racial makeup of either the Miami Property or its surrounding community.[18]  Even though the point of Plaintiffs' allegations related to BVS is that the owners do not invest or renovate properties with minority tenants, they assert that the Chinatown Property (in a majority-minority neighborhood) **was** recently renovated.  *Id.* ¶ 166.  Thus, the Chinatown Property cannot serve as a basis for comparison showing that minority tenants are subject to "underinvestment" and in fact undermines Plaintiffs' discrimination claims.[19]

Plaintiffs similarly point to the San Antonio Property to illustrate Defendants' supposed commitment to serving White communities but not others.  *Id.* ¶¶ 167–79.  But again, Plaintiffs' purported statistics work against them.  They allege that 54.3% of the renters across the San Antonio Metropolitan Area are Latino and that Arbor renovated a property whose tenants were 36.5% Latino.  *Id.* ¶¶ 190–91.  Finally, Plaintiffs note that the Miami Property was developed into "luxury condos" but provide no information on the demographics of these condos, nor the community.  *Id.* ¶¶ 206(c) & n.14.  These allegations are woefully deficient and fail to provide

---

[18] Whereas the original complaint alleged that the San Antonio Property was located in a "majority White" community, the FAC now alleges that the area is "majority Hispanic."  *See* ECF No. 43-1 ¶ 168.  And Plaintiffs originally alleged, and continue to allege, that the Chinatown Property is 94.4% non-White.  *Id.* ¶ 163.

[19] Further, Plaintiffs fail to allege any facts concerning the racial composition of the Chinatown Property itself.

evidence of a racial imbalance, let alone a "substantial" legally significant comparative statistical disparity. *Reyes*, 903 F.3d at 425.

By failing to plausibly show a greater adverse effect through sufficient statistical comparative analysis, Plaintiffs have failed to "raise such an inference of causation." *Id.* Further, Plaintiffs do not provide any facts showing how their analysis controls for independent variables that could impact the integrity of their data results, and instead merely conclude that the disparities "cannot be explained by non-racial factors." *Compare* FAC ¶ 176*, with Nat'l Fair Hous. All. v. Bank of Am.*, 401 F. Supp. 3d 619, 624 (D. Md. 2019) ("Their regression analyses controlled for myriad factors . . . and concluded that the disparities uncovered by the [o]rganizational [p]laintiffs' testing ***cannot be explained by non-racial factors***.") (emphasis added). [20] Plaintiffs' FHA claims boil down to a bare, unsupported statistical disparity and conclusory allegations that the policies had a disproportionate effect. *See Boardley*, 39 F. Supp. 3d at 712 (dismissing disparate impact claim because merely "stating that the policy had a significant and pervasive adverse impact on [B]lack homeowners is not tantamount to ***showing*** that the policy caused a significant disparate effect") (emphasis added). Plaintiffs cannot state a claim for disparate impact.

## C.   Plaintiffs Do Not Plead a Prima Facie Case of Discriminatory Intent.

Plaintiffs fail to state a claim for discriminatory intent because they provide no facts showing that the Hyattsville Defendants treated similarly-situated residents at any other properties

---

[20] *Cf. e.g.*, *Bank of Am.*, 401 F. Supp. 3d at 624 (finding statistical analysis sufficient to state disparate impact claim premised on the condition of the property where plaintiff reviewed 1,677 properties in 37 cities and conducted regression analysis and dissimilarity indices); *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839, 2019 WL 5963633, at *1 (N.D. Ill. Nov. 13, 2019) (same where plaintiff reviewed 1,411 properties in 31 cities and conducted regression analysis and dissimilarity indices); *Montgomery Cnty., Md. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 184 (D. Md. 2019) (same where plaintiff reviewed 2,300 properties in 38 cities and 49,000 photographs and conducted regression analysis and dissimilarity indices); Complaint, *Montgomery Cnty., Md. v. Bank of Am. Corp.*, No. 1:18-CV-03575, (D. Md. Nov. 20, 2018), ECF No. 1.

differently or better than Plaintiffs.  Because Plaintiffs present no direct evidence of discriminatory intent, they must establish that "discriminatory animus was . . . a motivating factor" in the housing decision.  *Glenn v. Wells Fargo Bank, N.A.*, No. PX 15-3058, 2017 WL 371956, at *13 (D. Md. Jan. 26, 2017), *aff'd*, 710 F. App'x 574 (4th Cir. 2017).  To do so, Plaintiffs must "allege facts to show that tenants of a different race or [national origin] were treated differently under similar circumstances," *i.e.,* that similarly-situated comparators outside of the protected class were treated better or differently.  *Young-Bey v. S. Mgmt. Corp., Inc.*, No. TDC-18-2331, 2019 WL 1992905, at *3 (D. Md. May 6, 2019).  None of the properties described by Plaintiffs in the FAC is owned by any Hyattsville Defendant (other than BVS) and therefore, cannot serve as comparators to state an FHA claim.  *See supra* II.A.  But even assuming such properties are attributable to the Hyattsville Defendants, Plaintiffs still fail to show any differential treatment.

There is no plausible allegation that discrimination was a "motivating factor" across Arbor properties.  *Glenn*, 2017 WL 371956, at *14 (dismissing discriminatory intent for alleging only conclusory statements concerning comparative treatment).  For example, the Chinatown Property cannot serve as a comparator to show that "Arbor" treats properties located in majority White neighborhoods better in terms of maintenance and repairs because Plaintiffs allege both that this property is located in a neighborhood that is 94.4% non-White (FAC ¶ 158) **and**, notwithstanding the racial make-up of the community, "Arbor chose to redevelop the property." *Id.* ¶ 166.  These allegations undercut any plausible argument that the tenants at BVS—which properties have similarly undergone "substantial capital improvements" according to PG DPIE (Ex. B)—are treated differently than other tenants due to their race or national origin.  *Glenn*, 2017 WL 371956, at *14; *Roberson v. Graziano*, No. WDQ-09-3038, 2010 WL 2106466, at *3 (D. Md. May 21, 2010), *aff'd* 411 F. App'x 583 (4th Cir. 2011) (dismissing discriminatory intent FHA claim where

plaintiff "has not explained how he was treated differently than the other tenants" outside the protected classes).  Because Plaintiffs have failed to plausibly state a prima facie claim for disparate impact or discriminatory intent, Plaintiffs cannot state a claim under the FHA and this Court should dismiss Counts I through IV for failure to state a claim of housing discrimination.

### D.   **Plaintiffs Fail to Allege the Statutory Elements Necessary to State a Claim Under Sections 3601 and 3617.**

In addition to failing to plausibly establish they suffered discrimination, Plaintiffs similarly failed to establish the additional requirements necessary to state a claim under Sections 3601 and 3617 of the FHA.  Plaintiffs' perpetuation of segregation claim fails for the same reasons that Plaintiffs failed to plausibly allege that the Hyattsville Defendants' policies have a disparate impact on "communities of color," as described above.  *See supra* II.B.2; *compare Bank of Am.*, 401 F. Supp. 3d at 641 (allowing perpetuation claim to proceed where statistical analysis surveilled 1,677 properties owned by the defendant in 37 census tracks and provided "detailed dissimilarity indices" to show comparative disproportionate effect)*, with* FAC ¶¶ 182–94 (supposed statistics provided on ten properties without comparative statistical analysis, regression analysis, or dissimilarity indices).

Moreover, the bald, conclusory allegations of injuries stemming from the alleged segregative effects of the Hyattsville Defendant's conduct are simply "too far removed from the alleged discriminatory conduct to be plausibly proximately caused by such actions" and thus cannot state a claim under Section 3601.  *Prince George's Cnty., Md. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 764 (D. Md. 2019) (describing plaintiff's attempt to recover for the injuries of being "damaged by the segregative effects of . . . neighborhood blight[] and urban decay" as "a bridge too far" to establish causality under the FHA); *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1040 (9th Cir. 2021) (reversing denial of motion to dismiss for lack of causality where

plaintiff's regression analyses "do not purport to show that [the alleged discrimination] *automatically* result[s]" in the harm) (emphasis in original).

Finally, Plaintiffs' claim for interference under Section 3617 requires them to make a showing that the Hyattsville Defendants were motivated by an intent to discriminate. *Hardaway v. Equity Residential Mgmt., LLC*, No. DKC 13-0149, 2016 WL 3957648, at *7 (D. Md. July 22, 2016) (dismissing Section 3617 claim on basis that there "simply are no facts alleged that suggest a discriminatory intent by [d]efendant to retaliate against [p]laintiffs"); *Abdelhalim v. Lewis*, No. 1:19-cv-858, 2020 WL 3271378, at *5 (E.D. Va. June 17, 2020) (same).[21]   While CASA alleges that "[it] is interfered with in its ability to provide recommendations or guidance on the location of convenient, affordable, and safe housing within the Langley Park area" (FAC ¶ 230), these conclusory allegations (even if true) would not suffice to state a claim for interference under Section 3617 because no plausible facts suggest a "discriminatory intent," as is required to state a prima facie claim. *See supra* II.C; *Hardaway*, 2016 WL 3957648, at *7; *Abdelhalim*, 2020 WL 3271378, at *5.

### E.    **Plaintiffs' Derivative Civil Conspiracy Claim Must Be Dismissed for Lack of a Predicate Violation.**

In Count VIII, Plaintiffs purport to bring a claim under Maryland common law, alleging that the Hyattsville Defendants conspired to violate the FHA.  FAC ¶¶ 327–30.  For the reasons explained above, Plaintiffs have not plausibly stated a claim under the FHA.  Because their civil conspiracy claim is derivative of their FHA claims and these FHA claims are deficient, the claim

---

[21] To the extent that Plaintiffs seek to extend their interference claim to allege a hostile living environment on behalf of all other persons that reside within the same census tract as these properties (FAC ¶¶ 289–90), such request must be denied as an impermissible attempt to stretch FHA liability beyond its reasonable bounds.  *Oakland*, 2021 WL 4436205 at *8 (holding that the FHA's stringent causality requirement allows only parties that allege harm that "flow[s] so automatically" from the purported discriminatory conduct to state a claim for causality under the FHA's "1:1" requirement).

for civil conspiracy also must be dismissed for lack of an underlying FHA violation.  *Bellezza v. Greater Havre de Grace Yacht Club, Inc.*, No. 0367, Sept. Term, 2014, 2015 WL 6394418, at \*10 (Md. Ct. Spec. App. 2015) (affirming dismissal of civil conspiracy claim for lack of underlying violation where predicate tort violations were dismissed).[22]

## IV.   PLAINTIFFS' BREACH OF CONTRACT CLAIMS MUST BE DISMISSED FOR LACK OF PRIVITY.

Counts V and VI, where Plaintiffs assert claims for breach of the express and implied terms of the Named Plaintiffs' lease agreements, fail because while "[e]ach Plaintiff" brings both claims against "all Defendants," Plaintiffs have not alleged that each Plaintiff is in contractual privity with each of the Hyattsville Defendants.  FAC ¶¶ 295–316.  "[A] person cannot be held liable under a contract to which he was not a party."  *Fenzel v. Group 2 Software, LLC*, No. DKC 13-0379, 2016 WL 865363, at \*11 (D. Md. Mar. 7, 2016) (Chasanow, J.); *Dixon v. Select Portfolio Servicing Co.*, No. DKC 19-1710, 2020 WL 470314, at \*4 (D. Md. Jan. 28, 2020) (Chasanow, J.) (requiring plaintiff to "allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff").  Here, both the lease agreements[23] and Plaintiffs' allegations unambiguously establish that (1) Plaintiffs' contractual relationships are with RMS as agent for the owner of the properties—Bedford United and Victoria United, and therefore no claims may be

---

[22] To the extent that Plaintiffs contend that all of the Arbor and Hyattsville Defendants are a single corporate family operating as affiliates and subsidiaries of Arbor Realty Trust, such allegations doom their civil conspiracy claim since corporate affiliates are legally incapable of conspiring with each other.  *See State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 572 (D. Md. 2019) (dismissing common law conspiracy claim alleged against parent and wholly-owned subsidiary under the intracorporate immunity doctrine); *Fraidin v. Weitzman*, 611 A.2d 1046, 1079 (Md. Ct. Spec. App. 1992) (describing the "established law that there can be no conspiracy between a principal and an agent where the agent acts within the scope of his or her employment").

[23] The Court can consider these lease agreements, attached as Exhibit G, as expressly referenced in the FAC.  FAC ¶¶ 296, 298, 311; *Hosack*, 2011 WL 1743297, at \*4 ("Although the complaint might suggest that all [d]efendants were parties to the [] agreement, the agreement itself—which [d]efendants attached to their motion to dismiss—says otherwise.").

maintained against Hyattsville United or AMAC; and (2) neither Ms. Ramirez nor CASA have contractual agreements with Bedford United or Victoria United and there are no facts to support a plausible finding that they were intended third-party beneficiaries, such that they cannot maintain claims against any Defendant.

A.   **Plaintiffs Lack Contractual Relationships with Hyattsville United and AMAC.**

Plaintiffs have failed to allege that they are in privity with Hyattsville United or AMAC or that such corporate entities should be liable based solely on their alleged corporate affiliations with Bedford United and Victoria United. *See supra* I–II. Plaintiffs allege—and their lease agreements confirm—that certain Plaintiffs entered into lease agreements with RMS as "agent for owner" of BVS. *See* FAC ¶ 296; Ex. G, Part 1, Tabs 1–7, 13–15, 22–23. Plaintiffs assert in the FAC that "Bedford United, LLC is the holding shell company for the Bedford Station Apartments" (FAC ¶ 31), and that "Victoria United, LLC is the holding shell company for the Victoria Station Apartments" (*id.* ¶ 32). It is clear from the allegations of the FAC itself, as well as the plain terms of Plaintiffs' lease agreements, that Plaintiffs do not have a contractual relationship with any entity other than RMS as agent for Bedford United and Victoria United. Accordingly, Plaintiffs cannot maintain contract claims against Hyattsville United[24] or AMAC. *See Hosack*, 2011 WL 1743297, at *4 (dismissing breach of contract claim against non-contracting defendants where the agreement showed that plaintiff entered into contract with single LLC, as opposed to all named defendants).

---

[24] While Plaintiffs allege that "[a]ccording to W-9s supplied by Arbor Family and Ross," Hyattsville United "is the entity that collects rents on behalf of Arbor" and that these "rents are then automatically directed to whichever entity Arbor has assigned them" (FAC ¶ 75), such allegations fall short of asserting that Hyattsville United owns BVS, or that such rent collection and subsequent automatic redistribution of the rents constitutes a direct contractual relationship.

B.      **Ms. Ramirez and CASA Lack Contractual Relationships.**

The lease agreements contemplate two different scenarios where residents may benefit from the lease—either as signatories entering into the contractual relationship or as non-signatory occupants who will reside in the apartment.  *See* Ex. G.  However, Ms. Ramirez is not included on the lease agreements for her unit as either and, therefore, she lacks a direct contractual relationship with any Defendant, as well as any entitlement as an intended third-party beneficiary.[25]  *See* Ex. G, Pt. I, Tabs 1–2 (listing Mr. Lopez as the sole resident and listing no additional occupants on the lease, despite lease terms that dictate that the "only" persons permitted to live in the unit are those enumerated in the lease); *Shield Our Const. Rights & Just. v. Tippett*, No. DKC 2009-0152, 2009 WL 2961428, at *5 (D. Md. Sept. 11, 2009) (dismissing breach of contract claims on 12(b)(6) with prejudice where "there is no allegation that [plaintiff] entered a contractual relationship with [d]efendant" in FHA discrimination action).

Ms. Ramirez's allegations are devoid of any facts to show that the contract was "expressly" made for her benefit or that she was "***intended to be*** the ***primary b*eneficiary**" of the lease agreement, much less a "clear[] showing" as required for a party lacking privity to enforce a contract as an intended third-party beneficiary under Maryland law.  *Bird Realty Ltd. P'ship v. Jiffy Lube Int'l, Inc.*, No. ELH-12-1104, 2012 WL 6562762, at *6 (D. Md. Dec. 14, 2012) (emphasis in original).  The lease's failure to identify or reference Ms. Ramirez as a resident in any manner, as well as the terms of the lease which clearly indicate that the unit will "be occupied ***only*** by" the persons on the lease and that "no one else may occupy the unit" shows that there is

---

[25] The fact that Ms. Ramirez's spouse, Mr. Lopez, is a contracting party under the lease agreement does not otherwise alter the impact of the plain terms of the leases, which clearly indicate that the ***only*** permitted tenants are those enumerated in the lease.  *See, e.g.*, *Stevens v. Hous. Auth. of S. Bend, Ind.*, 663 F.3d 300, 307 (7th Cir. 2011) (finding that plaintiff had "violated her lease when she allowed her husband to stay at her home for two to three weeks without obtaining prior written approval" from her landlord pursuant to the terms of her lease, regardless of marital status).

no intended third-party beneficiary liability for Ms. Ramirez.  *See* Ex. G, Pt. I, Tab 1 ¶ 2, Tab 2 ¶ 2 (emphasis added); *U.S. v. Grahams Constr., Inc.*, 585 F. App'x 173, 174 (4th Cir. 2014) (upholding dismissal where there was "no evidence that [the contracting parties] intended" to benefit third-party where it did not reference or identify third-party); *see 120 W. Fayette St., LLLP v. Mayor & City Council of Balt.*, 43 A.3d 355, 368 (Md. 2012) (rejecting third-party beneficiary where the "promises and benefits" are "directed solely" to the named parties).

CASA does not allege anywhere in the FAC that it entered into a lease agreement with any Defendant or facts to support that it is an intended third-party beneficiary of the Named Plaintiffs' residential lease agreements, and thus cannot maintain claims for breach of contract.  *See generally* FAC ¶ 21; *Bird Realty*, 2012 WL 6562762, at *7.  Accordingly, Counts V and VI should be dismissed as to Ms. Ramirez and CASA with prejudice for lack of privity.

## V.   CASA LACKS REPRESENTATIONAL AND ORGANIZATIONAL STANDING TO BRING CERTAIN CLAIMS.

CASA seeks to recover money damages as to all counts, on its own behalf and its members' behalf, but plainly lacks standing to do so.  First, CASA lacks representational standing to bring claims on its members' behalf for money damages because such damages analysis involves "individualized proof" concerning the "fact and extent" of each member's unique injury, vitiating representational standing.  *See Warth v. Seldin*, 422 U.S. 490, 515–16 (1975) (rejecting organization's representational standing for damages because "whatever injury may have been suffered is peculiar to the individual member concerned").

Second, CASA lacks organizational standing to pursue money damages on its own behalf for the state law contract claims, Counts V and VI.  A party may not "rest [its] claim to relief on the legal rights or interests of third parties," *Warth*, 422 U.S. at 499, unless the third-party demonstrates "(1) that the litigant has a close relationship with the third party; and (2) that the third

party faces some obstacle to asserting her own right." *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 523 (D. Md. 2010).  CASA fails under both prongs.  As to the first requirement, CASA has no close or "special" relationship with its members because the "persons best suited to challenge the practices . . . are the direct victims of the alleged illegal practices." *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund. v. Scales*, 150 F. Supp. 2d 845, 851 (D. Md. 2001) (holding that advocacy group devoted to assisting its members does not "evidence[] a special relationship").  As to the second requirement, the tenants at BVS are capable of asserting their own claims for breach, as shown by the seven Named Plaintiffs.  *Abercrombie*, 767 F. Supp. 2d at 523 (finding it "obvious[] [that] the third party individuals face no impediment to bringing their own suit, as [their] status as co-plaintiff demonstrates").  Thus, the Court should dismiss CASA's requests for money damages: (i) on behalf of its members as to all counts; and (ii) on its own behalf as to Counts V and VI.

## VI.   PLAINTIFFS SEEK DAMAGES THAT ARE TIME BARRED.

Plaintiffs seek damages that are time barred with respect to Counts V and VI.  The FAC seeks damages for breaches dating back to April 2013, well outside the three-year limitations period for breach of contract and which are disallowed on the basis of the continuing breach theory. FAC ¶ 236; Md. Code Ann., Cts. & Jud. Pro. § 5-101 (three-year statute of limitations on breach of contract); *Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 556 (4th Cir. 2015) (continuous breach theory "bar[s] recovery of damages incurred more than three years prior to suit").[26]  This Court should dismiss the claims for damages outside of the three-year limitations period, because the continuing breach theory may only operate to allow claims for breaches and

---

[26] As is the case with the FAC, it is appropriate to consider the statute of limitations on a "Rule 12(b)(6) motion when the face of the complaint reveals that the cause of action has not been brought within the applicable limitations period."  *Ruddy v. Equitable Life Assurance Soc'y of U.S.*, No. CIV. A. DKC 00-70, 2000 WL 964770, at *2 (D. Md. June 20, 2000) (Chasanow, J.).

damages "that occurred within the limitations period and not for the entire claim." *Ely v. Sci. Applications Int'l Corp.*, 716 F. Supp. 2d 403, 407–08 (D. Md. 2010) (barring damages from breaches prior to three-year limitations period under continuing breach theory).

## **CONCLUSION**

For the foregoing reasons, the Hyattsville Defendants respectfully request that the Court dismiss the FAC.  Because Plaintiffs already have been afforded a chance to amend their allegations and have been unable to sufficiently do so, the FAC should be dismissed with prejudice.


Dated: February 18, 2022                  Respectfully submitted,

                                          */s/ Benjamin B. Klubes*
                                          Benjamin B. Klubes (Bar Number 08085)
                                          Amanda R. Lawrence (*pro hac vice*)
                                          **BUCKLEY LLP**
                                          2001 M Street NW, Suite 500
                                          Washington, D.C.  20036
                                          (202) 349-8000 (Telephone)
                                          (202) 349-8080 (Facsimile)
                                          bklubes@buckleyfirm.com
                                          alawrence@buckleyfirm.com

                                          *Counsel for Defendants,*
                                          *Bedford United, LLC*
                                          *Victoria United, LLC*
                                          *Hyattsville United, LLC*
                                          *Arbor Management Acquisition Company, LLC*