# Exhibit 1

Use these links to rapidly review the document
 INDEX
 TABLE OF CONTENTS 2

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-32136**

## Arbor Realty Trust, Inc.
(Exact name of registrant as specified in its charter)

| Maryland | 20-0057959 |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |

| 333 Earle Ovington Boulevard, Suite 900, Uniondale, NY | 11553 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(Registrant's telephone number, including area code): **(516) 506-4200**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbols | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | ABR | New York Stock Exchange |
| Preferred Stock, 8.25% Series A Cumulative Redeemable, par value $0.01 per share | ABR-PA | New York Stock Exchange |
| Preferred Stock, 7.75% Series B Cumulative Redeemable, par value $0.01 per share | ABR-PB | New York Stock Exchange |
| Preferred Stock, 8.50% Series C Cumulative Redeemable, par value $0.01 per share | ABR-PC | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
|---|---|---|---|
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

The aggregate market value of the registrant's common stock, all of which is voting, held by non-affiliates of the registrant as of June 30, 2019 (computed based on the closing price on such date as reported on the NYSE) was $1.06 billion. As of February 7, 2020, the registrant had 111,246,371 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive proxy statement for the registrant's 2020 Annual Meeting of Stockholders (the "2020 Proxy Statement"), to be filed within 120 days after the end of the registrant's fiscal year ended December 31, 2019 are incorporated by reference into Part III of this Annual Report on Form 10-K.

## INDEX

|  |  | PAGE |
|---|---|---|
|  | **PART I** |  |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 37 |
| Item 2. | Properties | 37 |
| Item 3. | Legal Proceedings | 38 |
|  | **PART II** |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 39 |
| Item 6. | Selected Financial Data | 41 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 58 |
| Item 8. | Financial Statements and Supplementary Data | 61 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 147 |
| Item 9A. | Controls and Procedures | 147 |
| Item 9B. | Other Information | 150 |
|  | **PART III** |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 150 |
| Item 11. | Executive Compensation | 150 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 150 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 150 |
| Item 14. | Principal Accounting Fees and Services | 150 |
|  | **PART IV** |  |
| Item 15. | Exhibits, Financial Statement Schedules | 151 |
|  | Signatures | 155 |

**Forward-Looking Statements**

    This report contains certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements relate to, among other things, the operating performance of our investments and financing needs. We use words such as "anticipate," "expect," "believe," "intend," "should," "could," "will," "may" and similar expressions to identify forward-looking statements, although not all forward-looking statements include these words. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain projections of results of operations or of financial condition or state other forward-looking information. Our ability to predict results or the actual effect of future plans or strategies is inherently uncertain. These forward-looking statements involve risks, uncertainties and other factors that may cause our actual results in future periods to differ materially from forecasted results. Factors that could have a material adverse effect on our operations and future prospects include, but are not limited to, changes in economic conditions generally and the real estate market specifically; adverse changes in our status with government-sponsored enterprises affecting our ability to originate loans through such programs; changes in interest rates; the quality and size of the investment pipeline and the rate at which we can invest our cash; impairments in the value of the collateral underlying our loans and investments; changes in federal and state laws and regulations, including changes in tax laws; the availability and cost of capital for future investments; and competition. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect management's views as of the date of this report. The factors noted above could cause our actual results to differ significantly from those contained in any forward-looking statement. For a discussion of our critical accounting policies, see "Management's Discussion and Analysis of Financial Condition and Results of Operations of Arbor Realty Trust, Inc. and Subsidiaries—Significant Accounting Estimates and Critical Accounting Policies" under Item 7 of this report.

    Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. We are under no duty to update any of the forward-looking statements after the date of this report to conform these statements to actual results.

# PART I

### Item 1.   Business

In this Annual Report on Form 10-K we refer to Arbor Realty Trust, Inc. and subsidiaries as "Arbor," "we," "us," "our," or the "Company" unless we specifically state otherwise or the context indicates otherwise.

**Overview**

Arbor is a Maryland corporation formed in 2003. We operate through two business segments: our Structured Loan Origination and Investment Business, or "Structured Business," and our Agency Loan Origination and Servicing Business, or "Agency Business."

Through our Structured Business, we invest in a diversified portfolio of structured finance assets in the multifamily, single-family rental and commercial real estate markets, primarily consisting of bridge and mezzanine loans, including junior participating interests in first mortgages, preferred and direct equity. We may also directly acquire real property and invest in real estate-related notes and certain mortgage-related securities.

Through our Agency Business, we originate, sell and service a range of multifamily finance products through the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the government-sponsored enterprises, or "GSEs"), the Government National Mortgage Association ("Ginnie Mae"), Federal Housing Authority ("FHA") and the U.S. Department of Housing and Urban Development (together with Ginnie Mae and FHA, "HUD"). We retain the servicing rights and asset management responsibilities on substantially all loans we originate and sell under the GSE and HUD programs. We are an approved Fannie Mae Delegated Underwriting and Servicing ("DUS") lender nationally, a Freddie Mac Multifamily Conventional Loan lender, seller/servicer, in New York, New Jersey and Connecticut, a Freddie Mac affordable, manufactured housing, senior housing and small balance loan ("SBL") lender, seller/servicer, nationally and a HUD MAP and LEAN senior housing/healthcare lender nationally. We also originate and sell finance products through conduit/commercial mortgage-backed securities ("CMBS") programs and during the second half of 2019, we began to originate and service permanent financing loans underwritten using the guidelines of our existing agency loans sold to the GSEs, which we refer to as "Private Label" loans. We intend to pool and securitize the Private Label loans and sell certain securities in the securitizations to third-party investors, while retaining the highest risk bottom tranche bond referred to as the "B Piece."

Substantially all of our operations are conducted through our operating partnership, Arbor Realty Limited Partnership ("ARLP"), for which we serve as the general partner, and ARLP's subsidiaries. We are organized to qualify as a real estate investment trust ("REIT") for U.S. federal income tax purposes. A REIT is generally not subject to federal income tax on that portion of its REIT-taxable income that is distributed to its stockholders, provided that at least 90% of taxable income is distributed and provided that certain other requirements are met. Certain of our assets that produce non-qualifying REIT income, primarily within the Agency Business, are operated through taxable REIT subsidiaries ("TRS"), which is part of our TRS consolidated group (the "TRS Consolidated Group") and is subject to U.S. federal, state and local income taxes. In general, our TRS entities may hold assets that the REIT cannot hold directly and may engage in real estate or non-real estate-related business.

**Business Objectives and Strategy**

Our principal business objectives are to maximize the difference between the yield on our investments and the cost of financing these investments, to grow the stable earnings associated with the servicing portfolio of our agency platform, to generate cash available for distribution and facilitate

capital appreciation. We believe we can achieve these objectives and maximize the total return to our stockholders through the following investment strategies.

*Investment Strategy*

The financing of multifamily, single-family rental and commercial real estate offers opportunities that demand customized financing solutions. We believe that providing both structured products and agency loans through direct originations and in-house underwriting capabilities throughout our national network of sales offices and lending solutions through various GSE and HUD programs provides us with a competitive advantage, since this allows us to meet the multiple needs of our borrowers through fully integrated, comprehensive product offerings. We employ the following investment strategies:

*Provide Customized Financing.*   We provide customized financing to meet the needs of our borrowers. We target borrowers whose options may be limited by conventional bank financing, have demonstrated a history of enhancing the value of the properties they operate and who may benefit from the customized financing solutions we offer.

*Execute Transactions Rapidly.*   We act quickly and decisively on proposals, provide commitments and close transactions within a few weeks and sometimes days, if required. We believe that our rapid execution attracts opportunities from both borrowers and other lenders that would not otherwise be available. We believe our ability to structure flexible terms and close loans quickly gives us a competitive advantage.

*Manage Credit Quality.*   A critical component of our strategy is our ability to manage the real estate risks associated with our investment portfolio. We actively manage the credit quality of our portfolio by using the expertise of our asset management group, which has a proven track record of structuring and repositioning investments to improve credit quality and yield.

*Use Our Relationships with Existing Borrowers.*   We have solid relationships with a large nationwide borrower base and maintain a strong reputation in the commercial real estate finance industry. Through the expertise of our originators, we offer a wide range of customized financing solutions and benefit from our existing customer base by using existing business to create potential refinancing opportunities.

*Long-Established Relationships with GSEs.*   Our Agency Business benefits from our long-established relationships with Fannie Mae, Freddie Mac and HUD enabling us to offer a broad range of loan products and services which maximizes our ability to meet our borrowers' needs.

*Leverage the Experience of Executive Officers and Our Employees.*   Our executive officers and employees have extensive experience originating and managing structured commercial real estate investments. Our senior management team has, on average, over 30 years of experience in the financial services industry.

*Our Primary Targeted Investments*

We pursue short-term and long-term lending and investment opportunities and primarily target transactions where we believe we have competitive advantages, particularly our lower cost structure and in-house underwriting capabilities.

Through our Structured Business, we focus primarily on the following investment types:

*Bridge Financing.*   We offer bridge financing products to borrowers who are typically seeking short-term capital to use in an acquisition of property. The borrower has usually identified an undervalued asset that has been under managed and/or is located in a recovering market. From the borrower's perspective, shorter term bridge financing is advantageous because it allows for time to

Table of Contents

improve the property value without encumbering it with restrictive, long-term debt that may not reflect optimal leverage for a non-stabilized property.

Our bridge loans are predominantly secured by first mortgage liens on the properties. Additional yield enhancements may include origination fees, deferred interest, yield look-backs, and participating interests, which are equity interests in the borrower that share in a percentage of the underlying cash flows of the property. Borrowers typically use the proceeds of a conventional mortgage to repay a bridge loan.

*Preferred Equity Investments.*  We provide financing by making preferred equity investments in entities that directly or indirectly own real property. In cases where the terms of a first mortgage prohibit additional liens on the ownership entity, investments structured as preferred equity in the entity owning the property serve as viable financing substitutes. With preferred equity investments, we typically become a member in the ownership entity. Similar to our bridge loans, the yield on these investments may be enhanced by prepaid and deferred interest payments, yield look-backs and participating interests.

*Mezzanine Financing.*  We offer mezzanine financing in the form of loans that are subordinate to a conventional first mortgage loan and senior to the borrower's equity in a transaction. Mezzanine financing may take the form of loans secured by pledges of ownership interests in entities that directly or indirectly control the real property or subordinated loans secured by second mortgage liens on the property. We may also require additional security such as personal guarantees, letters of credit and/or additional collateral unrelated to the property. Similar to our bridge loans, the yield on these investments may be enhanced by prepaid and deferred interest payments, yield look-backs and participating interests. We hold a majority of our mezzanine loans through subsidiaries of our operating partnership that are pass-through entities for tax purposes.

*Junior Participation Financing.*  We offer junior participation financing in the form of a junior participating interest in the senior debt. Junior participation financings have the same obligations, collateral and borrower as the senior debt. The junior participation interest is subordinated to the senior debt by virtue of a contractual agreement between the senior debt lender and the junior participating interest lender. Similar to our bridge loans, the yield on these investments may be enhanced by prepaid and deferred interest payments, yield look-backs and participating interests.

*Structured Transactions.*  We also periodically invest in structured transactions, which are primarily comprised of joint ventures formed to acquire, develop and/or sell real estate related assets. These joint ventures are generally not majority owned or controlled by us and are primarily accounted for under the equity method of accounting.

Through our Agency Business, we focus primarily on the following investment types:

*GSE and HUD Agency Lending.*  We are one of 25 approved lenders that participate in Fannie Mae's DUS program and one of 23 lenders approved as a Freddie Mac Multifamily Conventional Loan lender for multifamily, manufactured, student, affordable and certain seniors housing properties, one of 12 participants in the Freddie Mac SBL program and an approved HUD MAP and LEAN lender providing construction permanent loans to developers and owners of multifamily housing, affordable housing, seniors housing and healthcare facilities. Our Agency Business underwrites, originates, sells and services multifamily mortgage loans across the U.S. through these programs and also originates and sells loans through the conduit markets. Our focus is primarily on small balance loans.

*Private Label.*  Through our Agency Business, we underwrite, originate and service permanent financing loans underwritten using the guidelines of our existing agency loans sold to the GSEs. We intend to pool and securitize the Private Label loans and sell certain securities in the securitizations to third-party investors, while retaining the highest risk bottom tranche bond referred to as the "B Piece."

We retain the servicing rights and asset management responsibilities on substantially all Agency Business loans.

*Other Investment Opportunities*

   *Real Property.*   We have, and may in the future, obtain real estate by foreclosure, through partial or full settlement of mortgage debt related to our loans. We may identify such assets and initiate an asset-specific plan to maximize the value of the investment, which may include appointing a third party property manager, renovating the property, leasing or increasing occupancy, or selling the asset. As such, these transactions may require the use of additional capital prior to completion of the specific plan.

   *Freddie Mac SBL Program Securities.*   We have, and may in the future, invest in bond securities issued by Freddie Mac SBL securitizations from loans originated under the Freddie Mac SBL program. These securities are carried at cost and are usually purchased at a discount to their face value which is accreted into interest income, if deemed to be collectable, over the expected remaining life of the related security as a yield adjustment.

**Structured Business Portfolio Overview**

   Product type and asset class information about our loan and investment portfolio as of December 31, 2019 is as follows ($ in thousands):

| Type | Asset Class | Number | Unpaid Principal | Wtd. Avg. Pay Rate(1) | Wtd. Avg. Remaining Months to Maturity |
|---|---|---|---|---|---|
| Bridge Loans | Multifamily | 173 | $ 3,112,957 | 5.76% | 19.1 |
| | Healthcare | 10 | 203,694 | 7.54% | 19.8 |
| | Land | 9 | 172,657 | 2.22% | 1.5 |
| | Hotel | 4 | 142,300 | 6.41% | 21.8 |
| | Office | 5 | 122,127 | 6.64% | 6.2 |
| | Retail | 3 | 39,500 | 7.89% | 21.0 |
| | Other | 13 | 43,597 | 6.57% | 14.9 |
| | | 217 | 3,836,832 | 5.77% | 18.0 |
| Mezzanine Loans | Multifamily | 15 | 109,272 | 8.84% | 55.7 |
| | Land | 3 | 48,832 | 11.14% | 0.4 |
| | Self Storage | 1 | 12,713 | 11.00% | 2.0 |
| | Other | 5 | 20,758 | 10.04% | 43.5 |
| | | 24 | 191,575 | 9.70% | 36.7 |
| Preferred Equity | Multifamily | 8 | 178,478 | 7.65% | 69.5 |
| | Other | 2 | 2,580 | 5.12% | 18.1 |
| | | 10 | 181,058 | 7.62% | 68.8 |
| Other | Single-Family Rental | 12 | 41,575 | 4.86% | 97.5 |
| | Multifamily | 9 | 28,571 | 0.00% | 66.4 |
| | | 21 | 70,146 | 2.88% | 84.8 |
| Total | | 272 | $ 4,279,611 | 5.98% | 22.1 |

(1)   "Weighted Average Pay Rate" is a weighted average, based on each loan's unpaid principal balances ("UPB"), of our interest rate required to be paid monthly as stated in the individual loan agreements. Certain loans and investments that require an additional rate of interest "Accrual Rate" to be paid at maturity are not included in the weighted average pay rate as shown in the table.

Asset class and geographic concentration information for our loan and investment portfolio as of December 31, 2019 is as follows ($ in thousands):

| Asset Class | UPB | Percentage | Geographic Concentrations | UPB | Percentage |
|---|---|---|---|---|---|
| Multifamily | $ 3,429,278 | 80% | New York | $ 749,859 | 18% |
| Land | 221,489 | 5% | Texas | 519,549 | 12% |
| Healthcare | 203,694 | 5% | Georgia | 389,814 | 9% |
| Hotel | 142,300 | 3% | North Carolina | 265,917 | 6% |
| Office | 134,007 | 3% | California | 234,354 | 5% |
| Single-Family Rental | 71,592 | 2% | Alabama | 227,139 | 5% |
| Retail | 49,258 | 1% | Illinois | 197,069 | 5% |
| Self Storage | 26,293 | 1% | Pennsylvania | 179,816 | 4% |
| Other | 1,700 | <1% | Other(1) | 1,516,094 | 36% |
| Total | $ 4,279,611 | 100% | Total | $ 4,279,611 | 100% |

(1) No other individual state represented 4% or more of the total.

The overall yield on our loan and investment portfolio in 2019 was 7.04% on average assets of $4.11 billion, which was computed by dividing the interest income earned during 2019 by the average assets during 2019. Our cost of funds in 2019 was 4.99% on average borrowings of $3.40 billion, which was computed by dividing the interest expense incurred during 2019 by the average borrowings during 2019. As of December 31, 2019, our loan and investment portfolio was comprised of 88% floating rate loans and 12% fixed rate loans.

We also own unconsolidated investments in equity affiliates totaling $41.8 million, which consists primarily of a joint venture formed to invest in a residential mortgage banking business and an investment in a multifamily-focused commercial real estate investment fund.

**Agency Business Lending and Servicing Overview**

One of the Agency Business's primary sources of revenue are the gains and fees recognized from the origination and sale of mortgage loans under GSE and HUD programs. Loans originated under GSE and HUD programs are generally sold within 60 days from the loan origination date. Our loan activity in 2019 was comprised of originations totaling $4.81 billion and sales totaling $4.40 billion. Our gains and fees as a percentage of our loan sales volume ("sales margin,") was 149 basis points for 2019.

We also retain the mortgage servicing rights ("MSRs") on substantially all of the loans we originate, and record as revenue the fair value of the expected net future cash flows associated with the servicing of these loans. Servicing revenue is generated from the fees we receive for servicing the loans and on escrow deposits held on behalf of borrowers, net of amortization on the MSR assets.

5

Product and geographic concentration information about our Agency Business servicing portfolio as of December 31, 2019 is as follows ($ in thousands):

| | Product Concentrations | | | | | Geographic Concentrations | |
|---|---|---|---|---|---|---|---|
| Product | Loan Count | UPB(1) | Percent of Total | Wtd. Avg. Servicing Fee Rate (basis points) | Wtd. Avg. Life of Servicing Portfolio (years) | State | UPB |
| Fannie Mae | 2,349 | $ 14,832,844 | 74% | 49.3 | 7.8 | Texas | 19% |
| Freddie Mac | 1,475 | 4,534,714 | 23% | 30.0 | 10.6 | North Carolina | 9% |
| FHA | 92 | 691,519 | 3% | 15.4 | 18.7 | New York | 9% |
| Total | 3,916 | $ 20,059,077 | 100% | 43.8 | 8.8 | California | 9% |
| | | | | | | Florida | 6% |
| | | | | | | Georgia | 6% |
| | | | | | | Other(2) | 42% |
| | | | | | | Total | 100% |

(1) Excludes loans which we are not collecting a servicing fee.

(2) No other individual state represented 4% or more of the total.

**Management Agreement**

In connection with the acquisition of the agency platform of Arbor Commercial Mortgage, LLC ("ACM" or our "Former Manager") in the third quarter of 2016 (the "Acquisition,") we had the option to fully internalize our management team and terminate the management agreement we had with ACM. Effective May 31, 2017, we exercised our option to fully internalize our management team and terminate the existing management agreement for $25.0 million. In addition, we also entered into a shared services agreement with ACM where we provide limited support services to ACM and it reimburses us for the costs of performing such services.

**Operations**

The following describes our lending and investment process for both our Structured and Agency Businesses.

*Origination.* We have a network of sales offices in California, Florida, Georgia, Idaho, Indiana, Massachusetts, New Jersey, New York and Oklahoma that staff approximately 27 loan originators who solicit property owners, developers and mortgage loan brokers. In some instances, the originators accept loan applications which meet our underwriting criteria from a select group of mortgage loan brokers. Once potential borrowers have been identified, we determine which of our financing products best meet the borrower's needs. Loan originators in every sales office are able to offer borrowers the full array of finance products for both the Structured and Agency businesses. After identifying a suitable product, we work with the borrower to prepare a loan application. Upon completion by the borrower, the application is forwarded to our underwriters for due diligence.

***Underwriting and Risk Management.***   Our underwriters perform due diligence on all proposed transactions prior to approval and commitment using several tools to manage and mitigate potential loan losses and risk sharing exposure. The underwriters analyze each loan application in accordance with the guidelines below to determine the loan's conformity with the guidelines. Key factors considered in credit decisions include, but are not limited to, debt service coverage, loan to value ratios and property financial and operating performance. In general, our underwriting guidelines require evaluation of the following:

- The borrower and each person directing a borrowing entity's activities (a "key principal"), including a review of their experience, credit, operating, bankruptcy and foreclosure history;

- Historic and current property revenues and expenses;

- Potential for near-term revenue growth and opportunity for expense reduction and increased operating efficiencies;

- The property's location, its attributes and competitive position within its market;

- Proposed ownership structure, financial strength and real estate experience of the borrower and property management;

- Third party appraisal, environmental review, flood certification, zoning and engineering studies;

- Market assessment, including property inspection, review of tenant lease files, surveys of comparable properties and an analysis of area economic and demographic trends;

- Review of an acceptable mortgagee's title policy and an "as built" survey;

- Construction quality of the property to determine future maintenance and capital expenditure requirements;

- The requirements for any reserves, including those for immediate repairs or rehabilitation, replacement reserves, tenant improvement and leasing commission costs, real estate taxes and property casualty and liability insurance; and

- For any application for one of our Agency products, we will underwrite the loan to the relevant agency or Company guidelines.

With respect to our Fannie Mae loans, we maintain concentration limits to further mitigate risk. Geographic concentrations of such loans are limited, based on regional employment concentration and trends, and we limit the aggregate amount of such loans subject to full risk-sharing for any one borrower and elect to use modified risk-sharing for such loans of more than $50.0 million, in accordance with Fannie Mae requirements. We also rely heavily on loan surveillance and credit risk management. We have a dedicated group of employees whose sole function is to monitor and analyze loan performance from closing to payoff, with the primary goal of managing and mitigating risk within the Fannie Mae portfolio.

We continuously refine our underwriting criteria based upon actual loan portfolio experience and as market conditions and investor requirements evolve.

***Investment Approval Process.***   We apply an established investment approval process to all loans and other investments proposed for our Structured Business portfolio before submitting each proposal for final approval. A written report is generated for every loan or other investment that is submitted to our credit committee for approval, which consists of our chief executive officer, chief credit officer and executive vice president of structured finance. The report includes a description of the prospective borrower and any guarantors, the collateral and the proposed use of investment proceeds, as well as borrower and property financial statements and analysis. The report also includes an analysis of borrower liquidity, net worth, cash investment, income, credit history and operating experience. All transactions require the approval of a majority of the members of our credit committee. Following the

approval of a transaction, our underwriting and servicing departments, together with our asset management group, assure that all loan approval terms have been satisfied and conform to lending requirements established for that particular transaction.

Our loan approval process for the Agency Business requires the submission of a detailed loan package in accordance with our underwriting checklist to our agency loan committee for approval. Our agency loan committee consists of multiple members of our senior and executive management teams, including our chief underwriter for the Agency Business and its chief operating officer. All transactions require the approval of up to four members, depending on the size of the loan. In addition, we are required to submit a completed loan underwriting package to Freddie Mac and HUD for approval prior to origination.

*Servicing.*   We service all loans and investments through our internal loan servicing department in Depew, New York. Our loan servicing operations are designed to provide prompt customer service and accurate and timely information for account follow up, financial reporting and management review. Following the funding of an approved loan, all pertinent loan data is entered into our data processing system, which provides monthly billing statements, tracks payment performance and processes contractual interest rate adjustments on variable rate loans. The servicing group works closely with our asset management group to ensure the appropriate level of customer service and monitoring of loans.

For most loans serviced under the Fannie Mae DUS program, we are required to advance, in the event of a borrower failing to pay, the principal and interest payments and tax and insurance escrow amounts associated with a loan for four months. We are reimbursed by Fannie Mae for these advances, which may be used to offset any losses incurred under our risk-sharing obligations once the loan and the related loss share is settled.

Under the HUD program, we are obligated to advance tax and insurance escrow amounts and principal and interest payments on the Ginnie Mae securities until the Ginnie Mae security is fully paid. In the event of a default on a HUD-insured loan, we can elect to assign the loan to HUD and file a mortgage insurance claim. HUD will reimburse approximately 99% of any losses of principal and interest on the loan and Ginnie Mae will reimburse substantially all of the remaining losses.

*Asset Management.*   Effective asset and portfolio management is essential to maximize the performance and value of a real estate investment. The asset management group customizes a plan with the loan originators and underwriters to track each investment from origination through disposition. This group monitors each investment's operating history, local economic trends and rental and occupancy rates and evaluates the underlying property's competitiveness within its market. This group assesses ongoing and potential operational and financial performance of each investment in order to evaluate and ultimately improve its operations and financial viability. The asset management group performs frequent onsite inspections, conducts meetings with borrowers and evaluates and participates in the budgeting process, financial and operational review and renovation plans of each underlying property. This group also focuses on increasing the productivity of onsite property managers and leasing brokers. This group communicates the status of each transaction against its established asset management plan to senior management, in order to enhance and preserve capital, as well as to avoid litigation and potential exposure.

Timely and accurate identification of an investment's operational and financial issues and each borrower's objectives is essential to implementing an executable loan workout and restructuring process, if required. Since the existing property management may not have the requisite expertise to manage the workout process effectively, our asset management group determines the current operating and financial status of an asset or portfolio and performs a liquidity analysis of the property and ownership entity and then, if appropriate, identifies and evaluates alternatives to maximize the value of an investment.

**Operating Policies and Strategies**

*Investment Guidelines.* Our Board of Directors has adopted general guidelines for our investments and borrowings to the effect that: (1) no investment will be made that would cause us to fail to qualify as a REIT; (2) no investment will be made that would cause us to be regulated as an investment company under the Investment Company Act; (3) no more than 25% of our equity (including junior subordinated notes as equity), determined as of the date of such investment, will be invested in any single asset; (4) no single mezzanine loan or preferred equity investment will exceed $75 million; (5) our Structured Business leverage (including junior subordinated notes as equity) will generally not exceed 80% of the UPB of our assets, in the aggregate; (6) we will not co-invest with our Former Manager or any of its affiliates unless such co-investment is otherwise in accordance with these guidelines and its terms are at least as favorable to us as to our Former Manager or the affiliate making such co-investment; and (7) no more than 15% of our gross assets may consist of mortgage-related securities. Any exceptions to the above general guidelines require the approval of our Board of Directors.

*Financing Policies.* We finance our structured finance investments primarily by borrowing against, or "leveraging," our existing portfolio and using the proceeds to acquire additional mortgage assets. We expect to incur debt such that we will maintain an equity-to-assets ratio no less than 20% (including junior subordinated notes as equity), although the actual ratio may be lower from time to time depending on market conditions and other factors deemed relevant. Our charter and bylaws do not limit the amount of indebtedness we can incur, and the Board of Directors has discretion to deviate from or change our indebtedness policy at any time, provided that we are in compliance with our bank covenants. However, we intend to maintain an adequate capital base to protect against various business environments in which our financing and hedging costs might exceed the interest income from our investments.

Our structured finance investments are financed primarily by collateralized loan obligations ("CLOs"), credit facilities and repurchase agreements with institutional lenders, and senior and convertible debt instruments. Although we expect that these will be the principal means of leveraging these investments, we may issue common stock, preferred stock or senior, unsecured or convertible notes of any maturity if it appears advantageous to do so.

Our Agency Business finances loan originations with several committed and uncommitted warehouse credit facilities on a short-term basis, as these loans are generally transferred or sold within 60 days from the loan origination date. We also meet our restricted liquidity requirements and purchase and loss obligations with Fannie Mae and Freddie Mac through letters of credit issued by a financial institution.

*Credit Risk Management Policy.* We are exposed to various levels of credit risk depending on the nature of our underlying assets and the nature and level of credit enhancements supporting our assets. We, including our chief credit officer and our asset management group, review and monitor credit risk and other risks of loss associated with each investment. In addition, we seek to diversify our portfolio of assets to avoid undue geographic, issuer, industry and certain other types of concentrations. Our Board of Directors monitors the overall portfolio risk and reviews levels of provision for loss.

*Interest Rate Risk Management Policy.* To the extent that it is consistent with our election to qualify as a REIT, we generally follow an interest rate risk management policy intended to mitigate the negative effects of major interest rate changes. We minimize our interest rate risk from borrowings by attempting to structure the key terms of our borrowings to generally correspond to the interest rate terms of our assets.

We may enter into hedging transactions to protect our investment portfolio from interest rate fluctuations and other changes in market conditions. These transactions may include interest rate swaps, the purchase or sale of interest rate collars, caps or floors, options, mortgage derivatives and

other hedging instruments. These instruments may be used to hedge as much of the interest rate risk we determine is in the best interest of our stockholders, given the cost of such hedges and the need to maintain our status as a REIT. In general, income from hedging transactions does not constitute qualifying income for purposes of the REIT gross income requirements. To the extent, however, that a hedging contract reduces interest rate risk on indebtedness incurred to acquire or carry real estate assets, any income that is derived from the hedging contract would not give rise to non-qualifying income for purposes of the 75% or 95% gross income tests. We may elect to bear a level of interest rate risk that could otherwise be hedged when we believe, based on all relevant facts, that bearing such risk is worthwhile.

*Disposition Policies.*   We evaluate the asset portfolio in our Structured Business on a regular basis to determine if it continues to satisfy our investment criteria. Subject to certain restrictions applicable to REITs, we may sell our investments opportunistically and use the proceeds for debt reduction, additional originations, or working capital purposes.

*Equity Capital Policies.*   Subject to applicable law, our Board of Directors has the authority, without further stockholder approval, to issue additional authorized common stock and preferred stock or otherwise raise capital, including through the issuance of senior securities and convertible debt instruments, in any manner and on the terms and for the consideration it deems appropriate, including in exchange for property. We may in the future issue common stock in connection with acquisitions. We also may issue units of partnership interest in our operating partnership in connection with acquisitions. We may, under certain circumstances, repurchase our common stock in private transactions with our stockholders, if those purchases are approved by our Board of Directors.

*Conflicts of Interest Policies.*   We, our executive officers, and ACM face conflicts of interests because of our relationships with each other. ACM has approximately 15% of the voting interest in our stock as of December 31, 2019. Our chairman and chief executive officer is also the chief executive officer of ACM and beneficially owns approximately 31% of the outstanding membership interests of ACM. One of our directors is the chief operating officer of Arbor Management, LLC (the managing member of ACM) and a trustee of two trusts that own noncontrolling membership interests in ACM. Our general counsel is also the general counsel to ACM. Our chief financial officer is the chief financial officer of ACM. Our treasurer is the treasurer of ACM. Our chief executive officer, one of our directors, general counsel, chief financial officer and treasurer, as well as our executive vice president of structured finance, executive vice president of structured securitization and chief credit officer, are members of ACM's executive committee and, excluding our chief executive officer, own minority membership interests in ACM.

We have implemented several policies, through board action and through the terms of our charter and our agreements with ACM, to help address these conflicts of interest, including the following:

- Our charter requires that a majority of our Board of Directors be independent directors and that only our independent directors make any determination on our behalf with respect to the relationships or transactions that present a conflict of interest for our directors or officers; and

- Decisions concerning our participation in any transaction with ACM, or its affiliates, including our ability to purchase securities and mortgages or other assets from ACM, or our ability to sell securities and assets to ACM, must be reviewed and approved by a majority of our independent directors.

Our Board of Directors has approved the operating policies and the strategies set forth above. Our Board of Directors has the power to modify or waive these policies and strategies without the consent of our stockholders to the extent that the Board of Directors determines that such modification or waiver is in the best interest of our stockholders. Among other factors, developments in the market that either affects the policies and strategies mentioned herein, or that change our assessment of the market, may cause our Board of Directors to revise its policies and strategies. However, if such

modification or waiver involves the relationship of, or a transaction between us, and ACM, the approval of a majority of our independent directors is also required. We may not, however, amend our charter to change the requirement that a majority of our board consists of independent directors or the requirement that our independent directors approve related party transactions without the approval of two thirds of the votes entitled to be cast by our stockholders.

**Federal and State Regulation of Commercial Real Estate Lending Activities**

Our multifamily and commercial real estate lending, servicing and asset management businesses are subject, in certain instances, to supervision and regulation by federal and state governmental authorities in the U.S. In addition, these businesses may be subject to various laws and judicial and administrative decisions imposing various requirements and restrictions, which, among other things, regulate lending activities and conduct with borrowers, establish maximum interest rates, finance charges and other charges require disclosures to borrowers and prohibit illegal discrimination. Although many states do not regulate commercial finance, certain states impose limitations on interest rates, as well as other charges on certain collection practices and creditor remedies. Some states also require licensing of lenders, loan brokers and loan servicers and adequate disclosure of certain contract terms. We are required to comply with certain provisions of, among other statutes and regulations, the USA PATRIOT Act, regulations promulgated by the U.S. Department of the Treasury's Office of Foreign Asset Control and other federal and state securities laws and regulations. These legal and regulatory requirements that apply to us are subject to change from time to time and may become more restrictive, making compliance with applicable requirements more difficult, expensive or otherwise restrict our ability to conduct our business in the manner that it is now conducted.

**Compliance with Federal, State and Local Environmental Laws**

Properties that we may acquire directly or indirectly through partnerships, and the properties underlying our structured finance investments and mortgage-related securities, are subject to various federal, state and local environmental laws, ordinances and regulations. Under these laws, ordinances and regulations, a current or previous owner of real estate (including, in certain circumstances, a secured lender that acquires ownership or control of a property) may become liable for the costs of removal or remediation of certain hazardous or toxic substances or petroleum product releases at, on, under or in its property. These laws typically impose cleanup responsibility and liability without regard to whether the owner or control party knew of or was responsible for the release or presence of the hazardous or toxic substances. The costs of investigation, remediation or removal of these substances may be substantial and could exceed the value of the property. An owner or control party of a site may be subject to common law claims by third parties based on damages and costs resulting from environmental contamination emanating from a site. Certain environmental laws also impose liability in connection with the handling of or exposure to materials containing asbestos. These laws allow third parties to seek recovery from owners of real properties for personal injuries associated with materials containing asbestos. Our operating costs and the values of these assets may be adversely affected by the obligation to pay for the cost of complying with existing environmental laws, ordinances and regulations, as well as the cost of complying with future legislation, and our income and ability to make distributions to our stockholders could be affected adversely by the existence of an environmental liability with respect to properties we may acquire. We endeavor to ensure these properties are in compliance in all material respects with all federal, state and local laws, ordinances and regulations regarding hazardous or toxic substances or petroleum products.

**Requirements of the GSEs and HUD**

To maintain our status as an approved lender for Fannie Mae and Freddie Mac and as a HUD-approved mortgagee and issuer of Ginnie Mae securities, we are required to meet and maintain various eligibility criteria established by these entities, such as minimum net worth, operational liquidity

11

and collateral requirements and compliance with reporting requirements. We are required to originate loans and perform our loan servicing functions in accordance with the applicable program requirements and guidelines established by these agencies. If we fail to comply with the requirements of any of these programs, the agencies may terminate or withdraw our licenses and approvals to participate in the GSE or HUD programs. In addition, the agencies have the authority under their guidelines to terminate a lender's authority to sell loans to it and service their loans. The loss of one or more of these approvals would have a material adverse impact on our operations and could result in further disqualification with other counterparties.

**Competition**

We face significant competition across our business, including, but not limited to, other mortgage REITs, specialty finance companies, savings and loan associations, banks, mortgage bankers, insurance companies, mutual funds, institutional investors, investment banking firms, other lenders, governmental bodies and other entities, some of which may have greater name recognition, financial resources and lower costs of capital available to them. In addition, there are numerous institutions with asset acquisition objectives similar to ours, and others may be organized in the future which may increase competition. Competitive variables include market presence and visibility, size of loans offered and underwriting standards. To the extent that a competitor is willing to risk larger amounts of capital in a particular transaction or to employ more liberal underwriting standards when evaluating potential loans, our origination volume and profit margins for our investment portfolio could be impacted. Our competitors may also be willing to accept lower returns on their investments and may succeed in originating the loans that we have targeted.

We compete on the basis of quality of service, relationships, loan structure, terms, pricing and industry experience, including the knowledge of local and national commercial real estate market conditions, loan product expertise and the ability to analyze and manage credit risk. Our competitors also seek to compete aggressively on the basis of these factors and our success depends on our ability to offer attractive loan products, provide superior service, demonstrate our industry knowledge and experience, maintain and capitalize on relationships with investors, borrowers and key loan correspondents and remain competitive in pricing. In addition, future changes in laws, regulations and GSE/HUD program requirements, and consolidation in the commercial real estate finance market could lead to the entry of more competitors, or enhance the competitive strength of our existing competitors.

Although we believe we are well positioned to continue to compete effectively in each facet of our business, there can be no assurance that we will do so or that we will not encounter increased competition in the future that could limit our ability to compete effectively.

**Employees**

At December 31, 2019, we employed 532 individuals, none of which are represented by a union or subject to a collective bargaining agreement.

**Corporate Governance and Internet Address**

Our internet address is www.arbor.com. All of our filings with the Securities and Exchange Commission ("SEC") are made available free of charge through our website, including this report, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to such reports, if any, as filed with the SEC as soon as reasonably practicable after such filing. Our website also contains our code of business conduct and ethics, code of ethics for chief executive and senior financial officers, corporate governance guidelines, stockholder communications with the Board of Directors, and the charters of the committees of our Board of Directors. No information contained in or linked to our website is incorporated by reference in this report.