**17.08   Time.**   Time is of the essence with respect to Manager's obligations under this Agreement.

**17.09   Severability.**   If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**17.10   Authority Limited.**   Manager's authority shall be derived wholly from this Agreement, and Manager has no authority to act for or represent Owner except as herein expressly specified.

**17.11   Exclusiveness of Compensation.**   The payments to be made to Manager hereunder shall be in lieu of all other and further compensation or commissions of any nature whatsoever for the services described herein and this Agreement shall be considered as a special agreement between the parties hereto covering the appointment and compensation of Manager to the exclusion of any other method of compensation unless otherwise agreed to in writing.   Without limiting the foregoing and except for the compensation expressly set forth in this Agreement, Manager shall not be entitled to any commission, fee or other compensation upon the sale or other disposition of the Property by Owner.

**17.12   Counterparts.**   Any number of counterparts of this Agreement may be executed and delivered and each shall be considered an original and together they shall constitute one agreement.

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement effective as of the Commencement Date.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

**OWNER:**

BEDFORD UNITED LLC, a Delaware limited
liability company

By: _____

    Name: Maurice Kaufman
    Title: Authorized Signatory

**MANAGER:**

REALTY MANAGEMENT SERVICES, INC.,
a Maryland corporation

By: _____
Name: DAVID J. MISKOVICH
Title: COO.

29

## EXHIBIT A-1

Manager, unless otherwise instructed by Owner at Owner's expense, shall procure the insurance coverages hereinafter set forth and ensure that they are in full force and effect on the Commencement Date and that they remain in full force and effect throughout the Term of this Agreement. All cost(s) and expense(s) incurred by Manager in procuring the following insurance coverages shall be Operating Costs and shall be paid from the Bank Account(s):

**Coverages:**                                                  **Amounts Of Insurance:**


Workers' Compensation                                          Statutory
Employer's Liability                                           $1,000,000
Fidelity (Employee Dishonesty)                                As required (EXHIBIT B)
Money and Securities                                          As required

Automobile Liability                                          $1,000,000

    Owned Vehicles (Statutory)
    Non-Owned Vehicles
    Uninsured motorist where required by statute

Automobile Physical Damage (Optional)

Comprehensive                                                 (To value if insured)
Collision


The following insurance coverages shall be procured by Owner unless Owner instructs Manager to procure coverage. If coverage is procured by the Manager, cost(s) and expense(s) incurred by the Manager in procuring such shall be Operating Cost(s) paid from the Bank Account(s).

Comprehensive General Liability                              $2,000,000   (general  aggregate)
    Including:
    Products/Completed Operations               $1,000,000
    Contractual
    Personal Injury                             $1,000,000

Umbrella or Excess Liability                                 $5,000,000 or as directed
    Underlying auto, general liability and employer liability must be scheduled as required
    so that excess limits will apply.

Builders Risk                                                Completed value of property

A-1

All risk for term of the initial and any subsequent Property construction and renovation

<u>Real and Personal Property</u>
>   Blanket Coverage where available and required(except for perils of floods and earthquakes)

<u>Earthquake/Flood</u>

Any coverage required in writing from Owner to Manager.

| | |
|---|---|
| <u>Business Interruption</u> | Calculated yearly based on estimated Property revenues |

Blanket Coverage for the perils insured against under Real and Personal Property in this Exhibit A-1. This coverage shall specifically cover manager's loss of Management Fees. The business interruption insurance shall be for a twelve (12) month indemnity period

All insurance coverages provided for under this Exhibit A-1 shall be effected by policies issued by insurance companies (i) that are authorized to do business in the state in which the Property is located; and (ii) that are of good reputation and of sound and adequate financial responsibility, having a Best Rating A or better, or a comparable rating if Best ceases to publish its ratings or materially changes its rating standards or procedures unless otherwise specified by owner.

Owner hereby authorizes Manager to utilize the services of and/or place the insurance set forth in this Exhibit A-1 with a third party insurance carrier, in each case meeting the specifications set forth above.

Manager shall deliver to Owner duly executed certificates, and, if requested by Owner and if available, duplicate copies of all policies of insurance to be procured hereunder, including existing, additional and renewal policies.

Each policy or insurance maintained in accordance with this Exhibit A-1 to the extent obtainable, shall specify that such policies shall not be canceled or materially changed without at least 30 days' prior written notice to Manager.

Except as otherwise provided in the Agreement, Manager and Owner each waives, releases and discharges the other, but only to the extent of collectible insurance proceeds, from all claims or demands which each may have or acquire against the other or the other's subsidiaries, affiliates, directors, officers, agents, employees, independent contractors or partners, with respect to any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by either of them on account of injury to persons or damage to

property or business arising out of the ownership, management, operation and maintenance of the Property, regardless whether any such claim or demand may arise because of the fault or gross negligence of the other party or its subsidiaries, affiliates, officers, employees, directors, agents or independent contractors. Each policy of insurance maintained in accordance with this Exhibit A-1 shall contain a specific waiver of subrogation reflecting the above.

All policies of insurance provided for under this Exhibit A-1 shall be carried in the name of Owner, Manager and Mortgagee (as applicable), and losses thereunder shall be payable to the parties as their respective interests may appear. All liability policies shall name the Owner and Manager, and in each case any of their affiliated or subsidiary companies, which they may specify, and their respective directors, officers, agents, employees and partners as additional named insureds.

All such policies of insurance shall be written on an "occurrence" basis to the extent obtainable.

A-3

## EXHIBIT A-2

a.      Property insurance in an amount equal to the sum of 100% of the replacement cost value of all personal property belonging to Manager.  Said coverage to be written under an ISO Special Causes of Loss or equivalent policy form.

b.      General liability insurance with minimum limits of █████████████ ████████████████████████████████ in the aggregate. If general liability coverage is provided under a policy that covers multiple locations, said policy must be endorsed to state that the above coverage limits apply separately to each covered location.

c.      Automobile liability insurance covering all owned, non-owned and hired automobiles belonging to Manager or its employees.

d.      Workers compensation insurance complying with all  statutory requirements of the state where the Property is located.  Said policy to include coverage for employer's liability with minimum limits as follows:

1)      ████████████████████ for bodily injury by accident

2)      ████████████████████ for bodily injury by disease – each employee; and

3)      ████████████████████ for bodily injury by disease policy limit.

e.      Employee Benefits Liability with minimum limits of ███████████ █████████ milli██████████████ annual aggregate.

f.      Umbrella or excess liability insurance with minimum limits of ten million dollars ($10,000,000) per occurrence and in the aggregate.  If umbrella or excess liability coverage is provided under a policy that covers multiple locations, said policy must be endorsed to state that the above coverage limits apply separately to each covered location.  Said umbrella or excess liability policy shall provide coverage limits in excess of those specified above for general liability, automobile liability, employers liability and employee benefits liability.

g.      Fidelity bond or employee dishonesty coverage, including a client loss extension, in an amount of not less than two (2) months' potential Gross Revenues of the Property.  It is agreed that the cost of said fidelity bond shall be borne by the Owner and paid from by the Property Account.

h.      Professional liability or errors & omissions insurance covering the professional actions of Manager and/or Manager's employee s with minimum limits of one million dollars ($1,000,000) per occurrence and one million dollars ($1,000,000) annual aggregate.

i.      Manager agrees to procure all of the above referenced insurance coverages from insurance carriers that are rated A 8 or higher according to the most recent ratings issued by A.M. Best.

j.      Upon written request from Owner, Manager shall provide Owner with a certificate of insurance confirming Manager's compliance with all of the above requirements.

# EXHIBIT B

## Special Stipulations

A.  <u>Independent Contractor.</u>  Owner and Manager intend, acknowledge and agree that the relationship between Owner and Manager pursuant to this Agreement is that of a principal and an independent contractor and that all employees and personnel necessary for the operation of the Property shall in every instance be the employees or independent contractors of Manager and not of Owner or Servicer. At the expense of Manager, which shall be a Centralized Service Expense, executive personnel of Manager will oversee the performance of Manager's obligations under this Agreement and the general supervision, direction and control of Manager's employees and personnel in accordance with normal and prudent practices in the Property management industry.  Manager shall exercise due care in hiring employees and selecting persons and entities to provide labor, services, products and materials required for Manager to perform its obligations under this Agreement.  Nothing contained herein shall be deemed to constitute Owner and Manager as partners or joint venturers.  Manager hereby covenants that it will refrain from any activity that could create, or be deemed to create, a conflict of interest with Owner in the discharge of Manager's obligations under this Agreement.

B.  <u>General Operations.</u>  Manager shall operate the Property and all its facilities in a manner in accordance with the highest standards achievable consistent with the Initial Approved Budget and the applicable Approved Budget in a good, orderly, safe, clean, sanitary, and sightly condition, and so as to maximize the earnings of the Property and its underlying value and to provide such services at the Property as are normally provided by operators of Properties of comparable class and size, subject, however to the Initial Approved Budget or the applicable Approved Budget.

C.  <u>Notices of Claim of Injury or Damage.</u>  Manager shall notify the Owner (and any insurer of Owner or the Property) of any personal injury or property damage occurring to or claimed by any employee, contractor, guest, customer, lessee or other third party on or with respect to the Property promptly upon obtaining knowledge thereof and shall promptly forward to the Owner within two (2) business days after Manager's receipt thereof, any summons, subpoena, or legal document served upon the Manager relating to actual or alleged potential liability of the Owner, the Manager or the Property.

D.  <u>Assistance with Proposed Sale, Financing, Refinancing.</u>  Manager shall cooperate with and assist Owner from time to time in any attempt(s) by Owner to sell, finance or refinance the Property.  Such cooperation shall not entitle Manager to any additional compensation and Manager shall not be deemed to be acting as a broker unless Owner and Manager enter into a separate written agreement engaging Manager as broker with respect to the Property.  Such cooperation shall include, without limitation, answering prospective purchasers' or lenders' questions about the Property or its operations.

E.  <u>Hazardous Materials, Toxic Wastes and Asbestos.</u>  If during the term of this Agreement, Manager becomes aware of the existence of hazardous materials or wastes, toxic substances or wastes, asbestos or asbestos-bearing materials and the like (collectively, "Hazardous

Materials") at, in, on, or under the Property, Manager shall immediately notify Owner of the condition, both orally and in writing. Subject to Section 5.06, Owner shall exclusively determine such further course of action with respect to such hazardous condition. Manager shall not supervise or oversee any work involving remediation of any hazardous or potentially hazardous wastes or conditions unless specifically hired by Owner to do so pursuant to a separate agreement between Owner. Manager shall always use its good faith commercially reasonable efforts to prevent and detect the occurrence or existence of any hazardous condition at the Property and shall reasonably cooperate with Owner, at no additional fee or cost to Owner, in abating and remedying any hazardous condition at the Property and in operating the Property so as to eliminate any such hazardous condition. Notwithstanding anything contained herein to the contrary, including, without limitation, the provisions of Section 5.06 hereof to the contrary, Owner and Manager agree that Owner shall have exclusive control over any issue concerning hazardous or potentially hazardous conditions at the Property and that Manager shall have no authority to act for or on behalf of Owner or to make any decisions or elections on behalf of Owner with respect to any such conditions.

F. <u>Owner Representative</u>. For the purposes of this Agreement, Servicer in its capacity as Owner's authorized agent is acting as Owner's representative; the burdens and liabilities of this Agreement shall extend only to Owner, and Servicer shall have no liability hereunder.

G. <u>Centralized Services Expenses</u>. Other than the items as otherwise may be expressly approved in writing by Owner, nothing contained herein shall be deemed to permit Manager to charge, as an Operating Expenses or as a Reimbursable Expense or otherwise, any costs or expenses of Manager's executive personnel or for Manager's overhead, office, administrative, or other expenses (the "***Centralized Services Expenses***"), it being the intent of Owner and Manager that the Management Fee payable by Owner shall include all such items.

H. <u>General Compliance with Laws</u>. Manager shall operate and maintain the Property in compliance with all applicable laws, statutes, ordinances, rules, regulations, requirements, orders, notices, and determinations of any federal, state or municipal authority, and the requirements of any insurance companies covering any of the risks against which the Property is insured. Without limiting the generality of the immediately foregoing sentence, Manager shall (i) upon request of Owner, contract with a qualified independent contractor to prepare an inspection report on behalf of Owner to determine whether the Property is in compliance with the Americans with Disabilities Act and if not in compliance, shall propose to Owner a plan to bring the non-complying Property into compliance, and (ii) promptly notify Owner of the necessity for and assist Owner in obtaining and maintaining any and all licenses, permits, or approvals required of Owner by any applicable federal, state or municipal authority in connection with the ownership or operation of the Property.

I. <u>Equal Opportunity Employer</u>. Manager represents and warrants to Owner that Manager is an equal opportunity non-discriminatory employer. Manager and Owner each mutually agree that there shall be no discrimination against or segregation of any person or of a group of persons on account of race, color, creed, religion, handicap, sex, sexual orientation or national origin, in the lease, transfer, use, occupancy, advertising, promotion, sale, tenure or enjoyment of the Property or in the provision of services thereto, nor shall Owner or

Manager permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of guests.

J.   Fidelity Bond.   Manager shall maintain, pay for and keep in full force fidelity bond and errors and omissions insurance coverage on all of its employees, agents, officers and directors who are involved in, or employed in connection with, the performance of Manager's obligations under this Agreement, which coverage shall be in a dollar amount ███████████████████████████ or (ii) three (3) times the monthly average Total Revenues projected in the Preliminary Operating Budget or the applicable Approved Budget, unless otherwise specified by Owner in writing.   Evidence of such fidelity bond and insurance coverage will be provided to Owner at Owner's request.   The cost of such bond and insurance coverage shall be the expense of the Manager.

K.   Duties Upon Termination of Agreement.   The termination of this Agreement for any reason shall not affect any right, obligation or liability which has accrued under this Agreement on or before the effective date of such termination.   Upon termination of this Agreement for any reason, the authority of Manager under this Agreement shall immediately cease and Manager shall have no further right to act for Owner or withdraw funds from the Bank Account.   In addition, upon the occurrence of an Event of Default by Manager, Owner shall have no further duty to pay or deposit any funds into the Bank Account or to pay to or for the benefit of Manager any funds other than the Management Fee.   In the event of termination, Manager shall fulfill all reporting and accounting functions hereunder through the period for which Owner agrees to pay Manager a Management Fee to be agreed upon at such time.   Upon termination Manager shall also: (i) deliver to Owner possession of the Property, (ii) deliver to Owner as received any monies due Owner under this Agreement but received after such termination, (iii) deliver to Owner all materials and supplies, keys, copies of contracts and documents, and copies of all other accounting papers and records pertaining to the operation of the Property as the Owner shall request, (iv) assign any right Manager may have in and to any existing contracts relating to the operation and maintenance of the Property as the Owner shall require and for which Owner agrees in writing to assume Manager's duties and obligations arising thereunder after the date of assignment, and (v) deliver to Owner or Owner's duly appointed agent all records, contracts, leases, receipts for deposits and unpaid bills in existence at the time of termination and all other papers or documents which pertain to the Property.

L.   Disclosure.   Manager shall disclose to Owner for Owner's reasonable approval any controlling ownership interest of Manager, any officer or employee of Manager, or any immediate family member (parent or parent-in-law, spouse, child, brother, sister, brother-in-law or sister-in-law or stepparent) of any officer or employee of Manager in any corporation, partnership, joint venture or other business which provides materials, products or services, directly or indirectly, for the Property.   Such disclosure shall be made to Owner, in writing, at least ten (10) days prior to the proposed entering into any contract or agreement with such business for the provision of such products, materials or service.   Any contract or agreement made by Manager with a related party shall be at rates or amounts not greater than those which would have been paid under an arms-length contract with a non-related party.

M.   Warranties and Representations of Manager.   Manager hereby makes the following representations, warranties and covenants to Owner, all of which shall survive the execution and delivery of this Agreement.

    (i)    Manager was duly organized, is validly existing, is in good standing under the laws of the state of its formation or incorporation, is in good standing under the laws of the state in which the Property is located, and has complied with all applicable laws in order to conduct business in such state;

    (ii)    Manager has sufficient expertise, staff and other resources to carry out Manager's duties hereunder in a prompt, efficient, and diligent manner;

    (iii)    This Agreement constitutes a legal, valid, and binding agreement of Manager, enforceable against Manager in accordance with its terms, except as limited by bankruptcy, insolvency, receivership and similar laws of general application to creditors' rights from time to time in effect;

    (iv)    Manager has or will obtain all licenses and permits, including all governmental licenses and permits, necessary to legally and validly execute, deliver and perform this Agreement;

    (v)    The terms and conditions of this Agreement are reasonable and customary for the area and type of property which is the subject of this Agreement; and

    (vi)    The Management Fees required to be paid to Manager under this Agreement are consistent with general market standards and are no less favorable than the management fees required to be paid to managers of similar Properties for services similar to those described in the Agreement.

N.   Confidentiality.   As used herein, the term *"Confidential Information"* means any information which is acquired by Manager in carrying out its duties under this Agreement and which had not become part of the body of public information prior to its disclosure in violation of this Special Stipulation N, including information regarding the Property or any litigation pertaining thereto. Except as otherwise required by any law or court order, or as authorized or permitted by Owner, Manager shall not disclose or permit the disclosure of any Confidential Information to anyone other than Owner, Owner's counsel, Servicer, or to persons designated by Owner's counsel, except as reasonably required to carry out the duties of Manager under this Agreement. Manager shall execute and deliver to Owner any document requested by Owner evidencing or otherwise concerning Manager's agreement to comply with the terms of this Special Stipulation N or any other agreement binding on Owner with respect to Confidential Information. Manager shall immediately notify Owner and its authorized agent of any court order or subpoena requiring disclosure of Confidential Information, shall cooperate with Owner's counsel in the appeal or challenge of any such order or subpoena, and shall not disclose any Confidential Information pursuant to such court order or subpoena until Owner has exhausted any lawful and timely appeal or challenge that owner elects to file or make. Owner shall be responsible for retaining counsel if Owner decides to appeal or challenge Manager for Manager's reasonable fees and

B-4

expenses related to the appeal or challenge of any such order or subpoena. All original documents shall be retained by Owner.

Owner may give Manager copies of documents in connection with the Property. Upon termination of this Agreement, all information in the possession of Manager relating to the Property shall be returned to Owner; provided, however, that Manager may retain copies of any information which Manager reasonably considers necessary for Manager's confidential business records. Manager shall take reasonable measures to avoid any unintentional or inadvertent disclosure of any Confidential Information to any unauthorized person by its employees, agents, or attorneys. Manager shall not use any Confidential Information for Manager's own gain, except as specifically permitted by this Agreement. The provisions of this Special Stipulation N shall not preclude Manager from disclosing Confidential Information relating to the Property to third parties as reasonably required to carry out the duties of Manager under this Agreement, so long as Manager obtains from any such persons or entities the execution and delivery of an agreement that imposes the same obligations upon such parties with respect to Confidential Information as were imposed upon Manager under this Special Stipulation N. The provisions of this Special Stipulation N shall survive the expiration and termination of this Agreement.

O.   <u>Business Conduct</u>. The maintenance of extremely high standards of honesty, integrity, impartiality, and conduct by Manager and its employees and agents is essential to assure the proper performance of business and the maintenance of public confidence in the Owner. The Owner expects Manager to uphold and meet these high standards and to use its best judgment to avoid misconduct and conflicts of interest and to require the same of its employees and agents. In general, Manager shall avoid any action which might result in or create the appearance of using its position for private gain, giving preferential treatment to any person, losing complete independence or impartiality, or making Owner's decisions outside authorized channels. Manager shall not take any action that would adversely affect the confidence of the public in the integrity of the Owner and shall not engage in conduct prejudicial to the Owner, including criminal, dishonest or immoral conduct. Manager shall not (i) misuse Owner's property, (ii) use inside information obtained as a result of retention by Owner for private gain for Manager or another person, particularly one with whom it has family, business or financial ties, (iii) use its retention by Owner to coerce, or give the appearance of coercing, a person to provide financial benefit to the employee or another person, particularly one with whom he or she has family, business or financial ties, or (iv) because of such retention, receive or solicit from a person having business with Owner anything of more than <u>de minimus</u> value as a gift, gratuity, loan, entertainment, or favor for the Manager or another person. Manager shall disclose all other employment and those financial interests Manager has which may be relevant to its contractual relationship with Owner. Other employment or financial interests that are held to conflict with Owner interests will not be permitted. Any violation of this Special Stipulation O by Manager or its employees, agents or representatives will constitute a breach of this Agreement by Manager. The provisions of this Special Stipulation O shall survive the expiration and termination of this Agreement.

P.   <u>Limitation on Liability</u>. Manager agrees to look solely to Owner to the extent of Owner's interest in the Property for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the

covenants, warranties, obligations or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Owner's affiliates with respect to any matters arising out of or in connection with this Agreement or the duties and obligations contemplated hereby.

**EXHIBIT C**

Property Description

Description of the Land:

**Parcels lettered "H", "J" and "K" in the subdivision entitled
"Langley Park, Plat No. 3", as per plat thereof recorded in Plat
Book WWW 16 at Plat 37 among the Land Records of Prince George's
County, Maryland, being in the 17th Election District.**

Community Type (e.g., garden, high rise, mid-rise, scattered, etc.):  Garden Apartments

Number of Apartment Units: 486 Units

# EXHIBIT D

Wiring Instructions

**EXHIBITE**

Cash Flow Distribution Protocol

Excess Cash Reconciliation

Property Name:

As Of Date — Enter Date--same as month-end balance sheet

(a) Operating Account Cash Balance on As Of Date — Includes all operating accounts (house banks, manager's accounts, payroll accounts, operating accounts, etc.) Does NOT include security deposits. This number should tie to the balance sheet.

Funds required for property operations:
(i) Accounts Payable — as of month-end as stated on balance sheet
(ii) Payroll — once or two periods as appropriate for the property
(iii) Accrued Expenses — as of month-end as stated on balance sheet. Does not include Taxes and Insurance paid by master servicer.
(iv) Advance Deposits/Prepaid Rent
(v) Allowed Minimum Balance Per PM Contract — Amount as stated in PM contract
(b) Total funds required for property operations — $ - — sum of (i) through (v)

Additional funds to be distributed:

(vi) Net cash surplus forecasted for current month — For one month following above "as of date" (i.e. if as of date is 2/28, forecast is for March); from forecast for hotel property, generally expected for seasonal properties. Entered as a positive figure to represent cash surplus.

Total Surplus adjustment — $ - — (vi)

Additional funds to be held back:

(vii) Net cash deficit forecasted/budgeted for next 3 months (not including capex) — This figure comes from cash flow forecast for 3 months following the as of date and ONLY for seasonal properties that annually have excess cash flow but expect deficit in short term. Entered as a negative figure to represent cash needs.

(viii) Capex approved/budgeted/in process — Capex only to be included to the extent approved, contracted and in process. Entered as a negative figure to represent cash needs.

(c) Total Deficit adjustment — $ - — (vii) plus (viii)

**RECONCILIATION:**

Available cash — $ - — Operating Account Cash Balance on As Of Date plus Net Cash surplus [(a) plus (vi)]

Funds Required for Property Operation — $ - — from (b) above

Additional funds to be held back/ Deficit adjustment — $ - — from (c) above

(e) Net cash excess/(deficit) — $ - — sum of above figures

| Excess Cash to be Wired to Owner | n/a |
|---|---|

from (e) above, formula included to set to "n/a" if (a) minus (d) is <=$1,000 OR if deficit is presented

Prepared by:

_____   _____
Property Manager (signature)           Date prepared

**Instructions to Property Manager:**
1. Blue fields are to be entered by Property Manager; grey and yellow fields are calculated
2. PM is to wire calculated excess cash within 3 business days of submission of this report, but in no event later than 2 business days prior to close of next period.

E-1

## **EXHIBIT F**

Reporting Requirements

Manager shall submit Monthly Financial Reporting Packages to Owner no later than the 10th of each month. Each package shall include:

1. *Narrative Summary* (Should provide a brief summary of monthly activity issues/concerns related to the property from an operational and marketing standpoint.)

2. *Balance sheet*

3. *Monthly, year-to-date and trailing-12 operating statements according*

4. *Monthly Variance Report* (This report must clearly explain any line item in which the variance from actual to budget exceeds 10% or $500 of budget.)

5. *Rent Roll* (must include deposits, rental rate, lease term, options and concessions)

6. *Aging Statement* (Must include a summary of efforts to collect past due rents on each tenant)

7. *Bank Statements and Reconciliations*

8. *General Ledger*

9. *Month-to-Date Trial Balance*

10. *Check Register*

11. *Proof of Cash Schedule*

12. *Property Management Fee Calculation*

13. *Report of any capital expenditures, including tenant improvements*

14. *Leasing Commission Schedule*

15. *Market Update* (Must include survey of competitive properties. Survey must provide number of units or square feet, rental rates, concessions and occupancy. The update should also include any changes in the neighborhood that may affect the property.)

16. *Leasing Activity / Prospect Report*

17. *Move-in/ Move-Out Schedule* (multifamily properties only; including 60-day projections)

18. *Recommended marketing strategy* (Must address but not be limited to rental rates, concessions, broker incentives and marketing events.)

PROPERTY MANAGEMENT AGREEMENT

between

VICTORIA UNITED LLC,
a Delaware limited liability company,
as Owner

and

REALTY MANAGEMENT SERVICES, INC.,
a Maryland corporation,
as Manager

effective as of January 1, 2016

VICTORIA STATION APARTMENTS
1401 Merrimac Drive
Hyattsville, Maryland

## TABLE OF CONTENTS

Article 1 - Definitions
Article 2 – Engagement; Term and Extensions
Article 3 - Management Fees and Payments to Manager & Owner
Article 4 - Operational Standards
Article 5 - Operation of the Property
Article 6 - Fiscal Matters
Article 7 - Disbursements
Article 8 - Insurance
Article 9 – Indemnification
Article 10 – Casualy and Condemnation
Article 11 – Default and Termination
Article 12 – Notices
Article 13 – Relationship and Further Actions
Article 14 – Applicable Law; Severability
Article 15 – Successors and Assigns
Article 16 – Force Majeure
Article 17 – General Provisions


Exhibit A-1 – Applicable Property Insurance Provisions

Exhibit A-2 – Insurance by Manager

Exhibit B – Special Stipulations

Exhibit C – Property Description

Exhibit D – Wiring Instructions

Exhibit E – Cash Flow Distribution Protocol

Exhibit F – Reporting Requirements

# PROPERTY MANAGEMENT AGREEMENT

between

## VICTORIA UNITED LLC,
a Delaware limited liability company,
as Owner

and

## REALTY MANAGEMENT SERVICES, INC.,
a Maryland corporation,
as Manager

effective as of January 1, 2016

**VICTORIA STATION APARTMENTS**
1401 Merrimac Drive
Hyattsville, Maryland

## Table Of Contents

Article 1 - Definitions
Article 2 – Engagement; Term and Extensions
Article 3 - Management Fees and Payments to Manager & Owner
Article 4 - Operational Standards
Article 5 - Operation of the Property
Article 6 - Fiscal Matters
Article 7 - Disbursements
Article 8 - Insurance
Article 9 – Indemnification
Article 10 – Casualty and Condemnation
Article 11 – Default and Termination
Article 12 – Notices
Article 13 – Relationship and Further Actions
Article 14 – Applicable Law; Severability
Article 15 – Successors and Assigns
Article 16 – Force Majeure
Article 17 – General Provisions


Exhibit A-1 – Applicable Property Insurance Provisions

Exhibit A-2 – Insurance by Manager

Exhibit B – Special Stipulations

Exhibit C – Property Description

Exhibit D – Wiring Instructions

Exhibit E – Cash Flow Distribution Protocol

Exhibit F – Reporting Requirements

## MANAGEMENT AGREEMENT

**THIS AGREEMENT** (this "*Agreement*") is dated as of January 1, 2016 and effective as of the Commencement Date, by and between **REALTY MANAGEMENT SERVICES, INC.** a Maryland corporation ("*Manager*"), and **VICTORIA UNITED LLC**, a Delaware limited liability company ("*Owner*").

### RECITALS:

A.      Owner is the owner of certain real property and certain improvements contained thereon, having a street address of 1401 Merrimac Drive, Hyattsville, Maryland and more commonly known as Victoria Station Apartments, including the related real and personal property, furniture, fixtures, equipment, licenses, permits, leases, contracts, agreements, and escrows, as further described on Exhibit C attached hereto (the "Property").

B.      Owner desires to engage Manager to operate and manage, and Manager desires to so operate and manage, the Property pursuant to the terms set forth in this Agreement,

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

**1.01    Definitions.**

As used herein the following terms shall have the respective meanings indicated below:

(a)     ***Affiliate*** - any corporation or other entity controlled by, controlling or under common control with Owner or Manager, as applicable.  The words "control," "controlled" and "controlling" mean ownership, directly or indirectly, of ten percent (10%) or more of the legal or beneficial ownership interest of such corporation or other entity or the power to direct or cause the direction of the management and policies of any such entity.

(b)     ***Annual Gross Operating Profit*** - the amount obtained by subtracting Operating Costs from Total Revenues for a Fiscal Year.

(c)     ***Approved Budget*** – as defined in Section 6.02(b).

(d)     ***Bank Account*** – as defined in Section 6.03(b).

(e)     ***Management Fee*** – as defined in Section 3.01.

(f)     ***Building*** - all buildings, structures and improvements now located or hereafter constructed on the Site and all fixtures and equipment attached to, forming a part of and necessary for the operation of such buildings,

structures or improvements as a multifamily community (including, without limitation, heating, lighting, plumbing, sanitary system, air-conditioning, refrigeration, kitchen, and similar items) and such (i) commercial space (ii) garage and parking spaces, (iii) storage and service areas, (iv) recreational facilities and areas, (v) public grounds, permanently affixed signage, (vi) other facilities and appurtenances  as presently exist on the Property or are hereafter added thereon during the Term, subject to the terms of this Agreement.

(g)   ***Capital Expenditures*** – as defined in Section 5.05.

(h)   ***Cash Flow*** – the amount obtained at any time by subtracting  from Total Revenues the sum of Operating Costs plus Fixed Charges plus Ownership Costs.

(j)   ***Cash Management Agreements*** – as defined in Section 6.05.

(i)   ***Centralized Services Expenses*** – as defined in Paragraph G of Exhibit B attached.

(j)   ***Commencement Date*** – as defined in Section 2.02.

(k)   ***Defaulting Party*** – as defined in Section 11.02(a).

(l)   ***FF&E*** - all fixtures, furniture, furnishings and equipment (not including Operating Equipment and Operating Supplies) required for the operation of the Building as a Property in accordance with the standards set forth in this Agreement including, without limitation, (i) office furnishings and equipment, and (ii) specialized Property equipment necessary for the operation of any portion of the Building, including, public rooms, parking spaces, and recreational facilities

(m)   ***Fiscal Year*** - the calendar year from January 1 to December 31, unless and until Owner and Manager otherwise mutually agree in writing, which agreement shall be attached hereto and incorporated herein where applicable.

(n)   ***Fixed Charges*** – those costs and expenses of the Property which are expressly excluded from Operating Costs, including the following:

   (i)   taxes and assessments in respect of the real or personal property located at the Property; and

   (ii)   the payment of interest on loans approved by Owner; and

   (iii)   rental payments or payments for purchase options under leases of equipment which are capital leases under the Uniform System of Accounts.

(o)   ***Force Majeure Event*** – as defined in Section 16.01.

2

(p)     **GAAP** - generally accepted accounting principles, consistently applied.

(q)     **Index** - the Consumer Price Index for All Urban Consumers (1982-84 = 100) as published by the United States Bureau of Labor Statistics [U.S. City Average], as amended.  If the compilation and/or publication of such Index shall be discontinued or transferred to any other governmental department or bureau or agency, Manager shall (subject to Owner's approval, which shall not be unreasonably withheld) fix an alternate index or method to implement the parties' intention that the purchasing power of the amounts to be adjusted by reference to the Index (as hereinafter provided in this Agreement) shall be the same as the purchasing power of the stated amounts as of the Commencement Date.  Likewise, if such Index shall be modified as to components, computing methods or otherwise, then Manager may (subject to Owner's approval, which shall not be unreasonably withheld) fix an alternate index or method, as aforesaid, or Manager may utilize an appropriate conversion factor so as to achieve substantially the same result as would have been obtained if the Consumer Price Index in effect and as computed, calculated and constituted on the Commencement Date were still then in effect.

(r)     **Initial Approved Budget** – as defined in Section 6.02(a).

(s)     **Initial Proposed Operating Budget** – as defined in Section 6.02(a).

(t)     **Interested Persons** – as defined in Section 17.05.

(u)     **Licenses** – as defined in Section 5.01.

(v)     **Losses** – as defined in Section 9.01(a).

(w)     **Management Fee** - the Management Fee payable to Manager, as set forth in Article 3.

(x)     **Manager's Representative** –as Manager may designate from time to time by notice to Owner.

(y)     **Net Operating Income** – Total Revenues less the aggregate of Operating Costs, Fixed Charges and Ownership Costs.

(z)     **Non-Defaulting Party** – as defined in Section 11.02(a).

(aa)    **Operating Costs** - the entire cost and expense of maintaining, operating and supervising the operation of the Property, excluding Fixed Charges. Operating Costs shall be the sum of such costs and expenses which are normally charged as a cost of operation under GAAP, excluding Fixed Charges, and including, without limitation, the following:

(i)     the cost of Operating Supplies and Operating Equipment;

3

(ii)  wages, salaries, employee benefits, payroll taxes, bonuses, relocation expenses and other costs related to employees at the Property;

(iii)  advertising and promotional expenses incurred directly by the Property;

(iv)  administrative and general expenses of the Property;

(v)  utility and energy costs;

(vi)  operating licenses and permits;

(vii)  grounds and landscaping maintenance costs;

(viii)  all expenditures made for routine maintenance and repairs to keep the Property in good condition and repair;

(ix)  applicable insurance premiums for the insurance coverages described in Exhibit A-1;

(x)  the  Management Fee provided for in Section 3.01;

(xi)  the cost of third party accounting fees, payroll services and legal fees for services directly related to the operation of the Property and its facilities;

(xii)  Reimbursed Expenses;

(xiii)  reasonable increases in reserves for uncollectible accounts receivable as set forth in the Proposed Annual Plan and Approved Budget, but not limited to the amounts set forth in such Proposed Annual Plan and Approved Budget

(bb)  ***Operating Equipment*** - all operating equipment required for the operation of the Property.

(cc)  ***Operating Supplies*** - all consumable items used in the operation of the Property,  fuel, soap, cleaning materials, tenant or invitees amenities, paper supplies, and all other similar items required for the operation of the Property.

(dd)  ***Operational Standards*** – as defined in Section 4.01.

(ee)  ***Owner's Report*** – as defined in Section 6.01(e).

(ff)  ***Owner's Representative*** – Benjamin Miller or such other person as Owner may designate from time to time by notice to Manager.

4

(gg)   **Ownership Costs** - those costs not directly related to the operation of the Property, including, but not limited to:

    (i)   debt service (interest and principal) on any Permitted Mortgage;

    (ii)   rental payments pursuant to any existing ground lease or installment sales contracts approved by Manager, including all charges for common area maintenance or owners' association dues;

    (iii)   rental payments pursuant to any capital leases approved by Manager;

    (iv)   other recurring and non-recurring ownership costs, such as Owner's entity administration and servicing costs; and

    (vi)   such other cash expenditures (including Capital Expenditures), which are normally treated as a capital expenditure under GAAP.

(hh)   **Permitted Mortgage** – any mortgage, deed of trust or other instrument conveying an interest in or encumbering the Property or any part thereof or any interest therein to secure any indebtedness, obligation or other liability of Owner or any other person or entity, which mortgage, deed of trust or other instrument shall have been approved and consented to by Owner in the exercise of its sole discretion.

(ii)   **Preliminary Operating Budget** – as defined in Section 6.02(a).

(jj)   **Property** – as defined in the Preamble.

(kk)   **Proposed Annual Plan** – as defined in Section 6.02(b).

(ll)   **Reimbursed Expenses** – as defined in Section 6.04.

(mm)   **Reserve Fund** – amounts set forth in a line item in the Operating Budget which provides detailed estimates of monthly expenditures for the ensuing Fiscal Year covering capital expenditures.

(nn)   **Security Deposit Account** – as defined in Section 6.04(c)

(oo)   **Site** – the land described in <u>Exhibit C</u>.

(pp)   **Term** – as defined in Section 2.02(a).

(qq)   **Total Revenues** - all revenues and income of any nature derived directly or indirectly from the Property or from the use or operation thereof, including revenues, rental or other payments from lessees and sublessees (but not the gross receipts of such lessees and sublessees), and the proceeds of business interruption, use, occupancy or similar insurance.  Total Revenues shall be determined on an accrual basis and in accordance with GAAP.

5

The calculation of Total Revenues shall exclude the following: (i) any proceeds from the sale or other disposition of the Property, or other capital assets; (ii) any interest received or accrued with respect to the Reserve Fund, the Bank Account or any other deposit or investment of Property funds; (iii) any fire and extended coverage insurance proceeds; (iv) any condemnation awards; and (v) any proceeds of financing or refinancing of the Property.

## ARTICLE 2
## ENGAGEMENT; TERM AND EXTENSIONS

**2.01    Engagement.**

Owner hereby appoints Manager, and Manager hereby accepts such appointment, to be Owner's exclusive manager of the Property pursuant to and in accordance with the terms, provisions and conditions set forth in this Agreement.

**2.02    Commencement Date.**

The commencement date (the "**Commencement Date**") of the Term hereunder shall be January 1, 2016.

**2.03    Term.**

(a)    This Agreement shall have a term (the "*Term*") commencing on the Commencement Date and expiring on the first anniversary of the Commencement Date (the "*Expiration Date*"), unless sooner terminated in accordance with the provisions of this Agreement. This Agreement shall automatically be extended for consecutive one-year renewal terms (each such renewal term to commence on the day immediately following the last day of the then-expiring term), at the same terms herein, until such time as either party terminates in accordance with this Agreement (the "*Extension Periods*").

(b)    Notwithstanding anything to the contrary contained herein (including, without limitation, Section 11.02) , Owner may terminate this Agreement with or without cause, prior to the expiration of the Term or any of the Extension Periods upon at least 30 days' prior written notice to Manager, and without the payment of any early termination fee or other penalty of any kind; provided, however, Owner may terminate this Agreement upon two (2) days' prior written notice to Manager if Manager shall have acted with gross negligence, malfeasance or willful misconduct.

## ARTICLE 3
## MANAGEMENT FEES AND PAYMENTS TO MANAGER & OWNER

**3.01    Management Fee.**

In consideration of the management of the Property by Manager, Owner agrees to pay to Manager the Management Fee. The "*Management Fee*" shall mean and refer to a fee equal

to two and three-quarters (2.75%) of Total Revenues with respect to each month (or portion thereof) during the Term of this Agreement.  The Management Fee for the immediately preceding month shall be paid monthly to Manager from the Bank Account.

**3.02**    **Intentionally Omitted.**

<br>

### ARTICLE 4
### OPERATIONAL STANDARDS

**4.01**    **Operational Standards.**

Manager covenants to and shall operate the Property in accordance with (i) the terms of this Agreement, (ii) the terms of any Permitted Mortgage, (iii) all laws, rules, regulations, and governmental requirements applicable to Manager and the Property, and (iv) commercially reasonable and prudent operational standards and business practices developed by Manager in connection with its property management business (the "***Operational Standards***"). Owner shall cooperate with Manager throughout the Term (as the same may be extended) so that Manager shall be able to operate the Property in accordance with the Operational Standards.  In accordance with and pursuant to the terms of this Agreement, Manager shall use its best efforts to take all actions consistent with the operation and management of the Property to the extent reasonably necessary and consistent with the Operational Standards, including but not limited to: (i) all actions required to lease apartment units at the Property, (ii) request, demand and receive rents and other charges, payments and income from the Property, (iii) pay expenses and liabilities of Owner in connection with the Property, and (iv) take all other actions as may be necessary to comply with any and all laws and governmental requirements affecting the Property.

**4.02**    **Manager & Owner Control.**

    (a)    The operation of the Property shall be under the exclusive supervision and control of Manager, who shall be responsible for the proper and efficient operation of the Property in accordance with the standards set forth in this Agreement.  Manager shall have the right, subject to the provisions of this Agreement, to determine operating policy, standards of operation, and any other matters affecting customer relations or the efficient management and operation of the Property, including, without limitation, the use of space therein.  Without limiting the foregoing, Manager shall have the right, with Owner's approval, and subject to the other provisions of this Agreement, to determine policies relating to labor policies, credit policies, receipt, holding and disbursement of funds, maintenance of bank accounts, and the procurement of inventories, supplies and services, promotion, and the use of other Property facilities by existing or potential customers, invitees, or tenants.

    (b)    Manager shall not engage legal counsel or prosecute legal claims relating to the Property without Owner's prior written consent, which consent may be

7

withheld in Owner's sole and absolute discretion; provided, however, that such consent shall not be required for legal claims relating to landlord and tenant actions or proceedings that are covered by insurance policies and that do not exceed, in the aggregate, $30,000.

**4.03   Contractual Authority.**

Subject to the limitations contained elsewhere in this Agreement, Manager is and shall be authorized to make, enter into and perform in the name of, for the account of, and on behalf of Owner, as an Operating Cost, any operating contracts and agreements deemed reasonably necessary by Manager to carry out and place in effect the terms and conditions of this Agreement, including the execution by Manager in Owner's name of equipment leases and the like relating to the Property. Notwithstanding anything to the contrary in the foregoing, Manager shall not, without Owner's prior written approval, execute any contract in Owner's name which (a) is not provided for in the Approved Budget; (b) extends beyond one year; (c) is not cancelable by Owner without penalty upon 30 days notice or less; (d) involves Capital Expenditures; or (e) provides for aggregate payments by Owner over the life of the contract (taking into account Owner's early termination rights, if any) in excess of $5,000.00.

**4.04   Meetings.**

Unless otherwise agreed to by the parties, Owner's Representative and Manager's Representative, shall meet or convene by telephonic conference call to discuss the operations of the Property. Meetings with respect to the Property shall not be held more frequently than monthly unless scheduled by Owner. Such meetings shall be held at the Property or with the agreement of the parties at the Manager's office or any other location, as mutually agreed upon by the parties or may be convened by telephonic conference call. At each such meeting, the parties will include a review of the following: (i) results of operations; (ii) Capital Expenditures; (iii) Proposed Annual Plan; and (iv) any variations from the Approved Budget. Upon Owner's request, minutes shall be prepared by Manager as to each such meeting and circulated thereafter to Owner for review and verification. Such minutes shall be in summary form and shall refer only to the agenda items discussed and the decisions and actions agreed to be taken with respect to such agenda items.

**ARTICLE 5**
**OPERATION OF THE PROPERTY**

**5.01   Licenses.**

In cooperation with Owner, Manager shall apply for, process, and take all necessary steps to procure (in Owner's, and/or Manager's name to the extent required by local authorities), as an Operating Cost, all licenses and permits (the "Licenses") required for the operation of the Property. Owner agrees to assist Manager in connection with Manager's efforts to obtain any such licenses. Manager undertakes to comply with any conditions set out in any such Licenses and at all times to operate and manage the Property in accordance with such conditions and any other legal requirements. Upon the expiration or sooner termination of this Agreement, Manager agrees, to the extent permitted by applicable law, to sell, assign,

transfer and convey to Owner or its designee all of Manager's right, title and interest in and to all such Licenses, without charge (other than any expenses of transfer, which shall be Reimbursed Expenses), or (in the event such assignment is not permitted by applicable law) to use reasonable efforts to provide Owner or Owner's designee with the use and benefits of such Licenses until such time (not to exceed 180 days) as Owner and/or its designee are able to obtain new Licenses.

**5.02    Operating Equipment and Operating Supplies.**

Manager shall procure, in an economical manner and pursuant to the Approved Budget, as an Operating Cost all Operating Supplies and Operating Equipment as Manager deems necessary to the normal and ordinary course of operation of the Property and to operate the Property in accordance with the Operational Standards.  Manager shall use its good faith reasonable efforts to qualify for cash and trade discounts, refunds, credits, concessions and other incentives available, and such discounts, refunds, credits, concessions or other incentives shall be applied toward reduction of Operating Expenses.  All Operating Supplies and Operating Equipment purchased as an Operating Cost shall be the property of Owner.

**5.03    Personnel.**

(a)    All personnel employed at the Property at all times shall be the employees of Manager or of an Affiliate of Manager. As deemed necessary by Manager, other employees of Manager or an Affiliate of Manager may be assigned temporarily or on a part-time basis to perform services at the Property, and the allocable portion of such temporary or part-time employee's salary (including employee benefits) while performing services at the Property will be reimbursed to Manager by Owner, as an Operating Expense.  Subject to the Operational Standards and in accordance with the Approved Budget, Manager shall have absolute discretion to hire, fire, promote, supervise, direct and train all employees at the Property, to fix their compensation and benefits, and generally to establish and maintain all policies relating to employment and employment benefits.   All costs of every kind and nature pertaining to all employees at the Property arising out of the employer-employee relationship, including, without limitation, salaries, benefits (including vacation, sick and personal days and accruals at the accrual rate established by Manager), bonuses, and costs incurred in connection with governmental laws and regulations and insurance roles.  Any costs, expenses, losses and damages incurred by Owner that are caused or related to Manager's breach of this Agreement or by Manager's gross negligence, willful misconduct, fraud or actions beyond the scope of the authority granted to Manager under this Agreement shall be paid solely by Manager from its own funds and Owner shall have no liability therefor.  Manager's overhead, office or administrative expenses and salaries relating to Manager's employees not employed at the Property shall not be reimbursed.

**5.04    Routine Maintenance and Repairs.**

Subject to the availability of sufficient funds therefor, and in accordance with the Approved Budget, Manager shall maintain the Property in good repair and condition and in conformity with the Operational Standards, and applicable laws and regulations, and shall make or cause to be made such routine maintenance, repairs and minor alterations, the cost of which can be expensed under GAAP, as Manager, from time to time, deems necessary for such purposes and in order for the Property to maintain a competitive position.  The reasonable cost of such routine maintenance, repairs and alterations shall be paid from Total Revenues and shall be treated as an Operating Cost; to the extent that Property revenues are insufficient therefor, Owner shall, upon Manager's request, provide sufficient funds to pay for such costs when due.  Expenditures under this Section 5.04 shall not be paid from the Reserve Fund. Unless specifically provided for in the Approved Budget, no single expenditure or one-time contract for service in excess of $5,000 shall be allowable without Owner's prior written approval.  Owner may request written bids from third parties for any expenditure under this Section 5.04 over $10,000.00.   Manager is required to submit a minimum of three (3) written bids from third parties for all expenditures under this Section 5.04 over $25,000.00.  The determination of whether an expenditure is for routine repairs and maintenance under this Section 5.04 or, in the alternative, a Capital Expenditure (as defined below) under Section 5.05 shall be made in accordance with this Agreement, GAAP, and the Uniform System of Accounts.

**5.05    Capital Expenditures.**

Manager shall not make Capital Expenditures without Owner's prior written consent, which consent may be withheld in Owner's sole and absolute discretion.  Owner may request written bids from third parties for any Capital Expenditure over $10,000.00.  Manager is required to submit a minimum of three (3) written bids from third parties for all Capital Expenditures over $25,000.00.  The determination as to whether the expenditure is a Capital Expenditure will be made in accordance with GAAP.   As used herein, "***Capital Expenditures***" shall mean and include repairs, replacements, alterations, renewals and improvements to the Property which are normally capitalized under GAAP, including, without limitation, those items defined as FF&E repairs, alterations, improvements, renewals or replacements to the Building's structure or to its mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation systems, exterior and interior repainting, and resurfacing building walls, floors, roofs and parking areas and expenditures for any computer and communications hardware, software, materials, and related labor expenses.

**5.06    Emergency Repairs: Repairs Required by Law.**

(a)     In the event a condition should exist in, on or about the Property of an emergency nature, which condition requires immediate action to preserve and protect the Property, to assure its continued operation without impacting Manager's forecasted Total Revenues (as set forth in Article 1 and reported in the Owner's Report) by more than five percent (5%) over a period of 30 days, or to protect Property guests or employees, Manager shall give Owner prompt notice thereof by telephone, electronic mail and facsimile