transmission and shall make reasonable efforts to secure Owner's prior approval of any actions which Manager proposes to take and of any expenditures which Manager deems necessary to repair and correct such condition. However, in the event of an emergency which requires immediate action and/or repairs to prevent further damage to the Property or to protect Property guests or employees, and Owner is not readily available for consultation, Manager shall be authorized to use its reasonable commercial judgment regarding same and on behalf of and at the sole cost and expense of Owner, is authorized to take such steps and to make such expenditures necessary to repair and correct any such condition, whether or not provisions have been made in the Approved Budget for any such emergency expenditures; provided, in such event, Manager shall notify Owner of any such emergency expenditures by the end of the business day next following such emergency and shall provide to Owner invoices reflecting such emergency expenditures. It is understood and agreed that any action taken by Manager under this Section 5.06(a) in connection with any particular emergency condition shall not create precedent or a duty on the part of Owner or Manager to take any action with respect to any future event. Expenditures under this Subsection 5.06(a) shall be paid from the Bank Account or, if necessary, by Owner, unless such expenditures were caused by or resulted from Manager's gross negligence, willful misconduct, fraud, breach of this Agreement or actions beyond the scope of the authority granted to Manager under this Agreement, in which event, the cost of such expenditures shall be paid by Manager from its own funds.

(b) In the event that, at any time during the Term, repairs to or additions, changes or corrections in the Property of any nature shall be required by reason of any laws, ordinances, rules or regulations now or hereafter in force, or by order of any governmental or municipal power, department, agency, authority or officer, whether such repairs, additions, changes or corrections are deemed Capital Expenditures or otherwise, Manager shall give Owner prompt notice thereof by telephone, electronic mail and facsimile transmission and shall secure Owner's prior approval of any actions which Manager proposes to take and of any expenditures which Manager deems necessary to comply with such laws, ordinances, rules, regulations or such order of any governmental or municipal power, department, agency, authority or officer. Owner may request written bids from third parties for and such expenditure over $10,000.00. Manager is required to submit a minimum of three (3) written bids from third parties for all such expenditures over $25,000.00. Upon obtaining Owner's approval, Manager shall make such repairs, additions, changes or corrections in accordance with Operational Standards which shall be paid for from the Bank Account or, if necessary, by Owner: (i) unless (and except for so long as) compliance therewith is in good faith being contested by Owner and enforcement is stayed in a manner reasonably satisfactory to Manager; or (ii) unless such required repairs to or additions, changes or corrections in the Property were caused by or resulted from Manager's gross negligence, willful misconduct, fraud, breach of this Agreement or actions beyond the scope of the

authority granted to Manager under this Agreement, in which event the costs of such required repairs to or additions, changes or corrections in the Property shall be paid by Manager from its own funds.

## ARTICLE 6
## FISCAL MATTERS

**6.01 Accounting and Reporting Matters.**

(a) Manager shall maintain an accurate accounting system, with its management of the Property. The books and records reflecting the Property operations shall be maintained at the Property, at the principal office of Manager or at a regional accounting office, at Manager's option; provided that Manager shall give notice to Owner of the location of such books and records.

(b) Owner, and the independent accounting firms of Owner, shall each have the right and privilege of examining said books and records at any reasonable time during normal business hours following twenty-four hours (24) advance notice to Manager, unless Manager shall be in default under this Agreement, in which case no advance notice to Manager shall be required. Any such review shall be completed without material disruption to the Property operations.

(c) Upon request of Owner, a certified audit of the Property operations shall be performed by a Certified Public Accounting firm as approved and appointed by Owner. Manager shall cooperate in good faith with Owner and its representatives to facilitate such audit.

(d) If any such audit prepared pursuant to Section 6.01(c) discloses an overcharge of any Management Fee for the period covered by the audit by ten percent (10%) or more, then the expense of such audit shall be an expense of Manager which Manager, from its own funds, shall pay to Owner immediately upon demand by Owner. In addition, if any such audit discloses a deficiency in the amount of funds which should have been turned over by Manager to Owner during the period covered by such audit by more than five percent (5%), then (i) Manager shall immediately, upon demand by Owner, pay from Manager's funds the amount of such deficiency to Owner; and (ii) to the extent such deficiency is the result of Manager's fraud, gross negligence or willful misconduct, the expense of such audit shall be an expense of Manager which Manager, from its own funds, shall pay to Owner immediately upon demand by Owner. If Manager does not pay to Owner any such overcharge on such deficiency or the cost of an audit required to be paid by Manager within ten (10) days after demand is made therefor by Owner, such failure shall be an Event of Default under the terms of this Agreement entitling Owner, at its election, to immediately terminate this Agreement and entitling Owner to receive interest at the rate of twelve percent (12%) per annum on the unpaid amount.

(e) Manager shall prepare and furnish to Owner all items set forth on Exhibit F attached hereto regarding the monthly financial reporting requirements within the timeframe set forth thereon, including, within 10 calendar days after the end of each calendar month, financial statements for the Property setting forth the financial position and results of operations of the Property for such calendar month and the calendar year-to-date with variations from the Approved Budget identified and with comparisons to the then current Operating Budget and the previous year's results if the previous year results have been prepared by Manager or provided to Manager in an acceptable form (collectively, the "***Owner's Report***"). Notwithstanding the foregoing, Manager shall also provide Owner with additional operating and financial data as Owner may reasonably request and as may be required pursuant to an loan documents executed in connection with a Permitted Mortgage; the cost of providing said data to be an Operating Cost of the Property.

(f) Manager shall prepare and furnish to Owner, on a weekly basis, written reports setting forth the operations of the Property for each such week, which reports shall be in a form approved by Owner.

**6.02 Proposed Annual Plan.**

(a) **<u>Preliminary Operating Budget; Estimates of Other Expenditures</u>.** Within 30 days after the Commencement Date, Manager shall submit to Owner an initial proposed annual plan, which shall include a preliminary operating budget and a list of costs and expenses associated with Capital Expenditures for the remainder of the Fiscal Year in which the Commencement Date occurs (collectively, the "***Initial Proposed Operating Budget***"). Manager shall review the Initial Proposed Operating Budget within such 30 days with Owner for Owner's approval, which shall not be unreasonably withheld. Once approved, the Initial Proposed Operating Budget shall become the "***Initial Approved Budget***" for such calendar year, to be implemented by Manager. In the event Owner objects to the Initial Proposed Operating Budget, or any specific line item or items contained therein, pending resolution thereof, the Initial Proposed Operating Budget or the specific line item or items of expense (not revenue) that have not been approved shall be not be implemented. Owner and Manager shall use their good faith efforts to resolve Owner's objections as soon as possible, whereupon such resolution shall be incorporated into the Initial Approved Budget.

(b) **<u>Operating Budget/Approval</u>.** No later than November 1 of each calendar year, Manager shall submit to Owner (i) an annual forecast for the operation of the Property for the immediately following Fiscal Year containing revenue projections and budgets of expenses, (ii) a marketing plan setting forth rental rates, amenities, and leasing incentives, and (iii) plans and estimates of the expenditures necessary, in such detail as Owner shall reasonably require, for Capital Expenditures(items (i), (ii), and (iii), collectively, the "***Proposed Annual Plan***"). Manager shall review the Proposed Annual Plan with

Owner for Owner's approval, which shall not be unreasonably withheld. Once approved, the Proposed Annual Plan shall become the "***Approved Budget***" for such Fiscal Year, to be implemented by Manager. In the event Owner objects to the Proposed Annual Plan or any specific line item or items of the Proposed Annual Plan prior to commencement of the applicable Fiscal Year, pending resolution thereof, the Proposed Annual Plan or the specific line item or items of expense (not revenue) that have not been approved shall be suspended and replaced for such Fiscal Year by an amount equal to the amount of such budget line item or items for the Fiscal Year prior thereto, adjusted (per item) by the percentage change in the Index over the twelve (12) month period immediately preceding the start of such Fiscal Year. Owner and Manager shall use their good faith efforts to resolve Owner's objections as soon as possible whereupon such resolution shall be incorporated into such Approved Budget.

(c) **Variance from Approved Budget.** Manager may, without Owner's approval, make aggregate expenditures in any Fiscal Year which exceed the Approved Budget, provided that such excess does not exceed more than ten percent (10%) (the "***10% Limitation***") of (i) any line item amount in the Approved Budget, or (ii) in the aggregate, all expenditure amounts as provided in the Approved Budget. Manager may expend in excess of the 10% Limitation for expenditures that are the result of an emergency, as described in Section 5.06, or of expenditures beyond the reasonable control of Manager, such as insurance, real estate taxes, weather related costs, and increases in the cost of utilities based upon changes in utility rates (provided such expenditures are reasonable in nature and are required to satisfy the Operational Standards).

The provisions of this Subsection 6.02(c) shall operate notwithstanding the provisions of Subsection 6.02(b) above. Manager shall promptly notify Owner of any expenditures that have been or are expected to be made in excess of the Approved Budget pursuant to this Subsection 6.02(c) and of the reasons therefor. Delivery of an Owner's Report to Owner will satisfy this notice requirement.

(d) **Revised Budget.** In addition to the additional amounts Manager may expend pursuant to Subsection 6.02(c) above, Owner and Manager acknowledge and agree that there may occur from time to time unpredicted significant changes, variables or events affecting the operation of the Property, including unanticipated changes in occupancy rates, market conditions, or additional unanticipated items of income or expense. In such event, Manager may request variance(s) from the Approved Budget, which are reasonable and necessary to continue to operate the Property in accordance with the Operational Standards. Owner's approval of such a request shall not be unreasonably withheld. Any such request by Manager shall be submitted to Owner in writing with an explanation thereof and shall be accompanied by supporting information for the request. If, after consultation with Manager, Owner disapproves of such a request for

variance(s) from the Approved Budget, then such variance(s) shall not be incorporated into the Annual Budget.

(e) **Consultation.** At the time of the review by Owner with Manager of the Proposed Annual Plan and at any additional meetings during the Fiscal Year called by Owner and Manager, Manager shall, as necessary, consult with Owner concerning any material changes Manager is contemplating with respect to its policies concerning management of the Property, sales, wage scales, general operating procedures, economics and operation, and other matters affecting the operation of the Property. Notwithstanding anything herein to the contrary, Manager shall consult with Owner regarding the hiring of sales and management personnel.

**6.03 Funding; Bank Accounts.**

(a) Owner will provide all funds from the Commencement Date and throughout the Term as necessary to pay for all Operating Costs, Ownership Costs and Fixed Charges relating to the Property, and to perform and satisfy Owner's covenants and responsibilities under this Agreement. The performance of all activities by Manager hereunder shall be on behalf, and for the account, of Owner. Accordingly, Manager shall be authorized to pay any Operating Costs, Owner's Costs or Fixed Charges out of the Bank Account.

(b) Owner shall establish in the name of Owner, and for Owner's account, bank accounts (collectively, the "***Bank Account***") for the operation of the Property at a bank or banks approved by Owner into which all funds advanced to the Property by Owner or otherwise derived from the operation of the Property shall be deposited. The Bank Account shall at all times contain a minimum balance (the "***Minimum Balance***"). The initial Minimum Balance shall be $5,000.00 (excluding the balance held in any Security Deposit Account (as hereinafter defined)). Thereafter, Owner shall maintain the Minimum Balance in accordance with the terms of Section 7.02 hereof. The Bank Account shall provide that Owner's designees and Manager's designees shall be the only parties authorized to draw upon the Bank Account. Owner and Manager shall have control of the Bank Account, and any and all monies received from the operation of the Property shall pass through the Bank Account. Manager agrees to handle such Bank Account as may be required by any Mortgagee, upon reasonable notice from Owner. Nothing herein contained shall be construed to deprive Manager of the right to maintain petty cash funds at the Property and to make payments therefrom pursuant to the standard practices employed in the industry; provided Manager shall make a complete accounting for the same as required under this Agreement.

(c) Owner shall establish a separate Bank Account which shall be used solely for the purpose of holding any security deposits posted by tenants of the Property (the "***Security Deposit Account***"). Manager shall promptly deposit any Security Deposits received by Manager into the Security Deposit

Account and such funds shall not be co-mingled with any other funds. Manager shall comply with all applicable laws governing the retention and release of any such security deposits. The Security Deposit Account shall be an interest bearing account, and shall be reflected on the balance sheet for the Property prepared by Manager. The Security Deposit Account shall be designated on such balance sheet as "Cash-Security Deposits".

**6.04 Reimbursement of Out-of-Pocket Expenses.**

It is agreed that Owner shall reimburse Manager and its Affiliates for actual, reasonable and necessary out-of-pocket costs which they shall incur as an Operating Cost in connection with the performance of this Agreement (collectively, the "***Reimbursed Expenses***"). Manager shall have the discretion, exercised reasonably, to determine the necessity for the expenditure of any such amounts, which shall include, without limitation, reasonable travel, meals, lodging, telephone, electronic communication, postage, air express, costs of recruitment (including applicable agent's fee) and other incidental expenses; provided that such Reimbursed Expenses shall be set forth in the Preliminary Operating Budget or the applicable Approved Budget and that none of the foregoing expenses shall be Centralized Services Expenses. It is agreed that Manager shall be entitled to reimbursement of these expenses directly from the Bank Account at the time incurred. Such reimbursements shall be in addition to the Management Fee.

**6.05 Cash Management.**

Notwithstanding anything contained herein to the contrary, all procedures for handling receipts and operating capital in connection with the Property shall be governed and controlled by those certain agreements, including, without limitation, a clearing account agreement (collectively, the "Cash Management Agreements"), which may from time to time be in effect as entered into by and among Owner, Manager (or any predecessor to Manager) and Owner's lender, if any. In the event of any inconsistency between such agreements and this Agreement, the Cash Management Agreements shall control.

## ARTICLE 7
## DISBURSEMENTS

**7.01 Disbursement of Funds.**

All funds derived from the operation of the Property shall be deposited into the Bank Account created pursuant to the requirements of Section 6.03. There shall in turn be disbursed by Manager for and on behalf of Owner, funds from the Bank Account toward the following items to the extent available (with appropriate reserves established to provide for items payable less frequently than monthly) in the following order of priority *unless directed otherwise by Owner*:

(a) all Operating Costs, including the Management Fee and all Reimbursed Expenses;

(b) payment of emergency expenditures as provided under Subsection 5.06;

(c) premiums on general liability insurance and premiums for other insurance pursuant to Article 8 and Exhibit A-1;

(d) all real and personal property taxes and assessments due and payable;

(e) debt service on any Permitted Mortgage;

(f) rental payments pursuant to any existing ground lease or capital leases, including any and all charges for common area maintenance or owners' association dues; and

(g) all other Ownership Costs not otherwise expressly set forth above.

**7.02 Owner's Distribution.**

After the disbursements pursuant to Section 7.01, Cash Flow shall be disbursed monthly to Owner into the Owner's operating account (AMAC Holdings LLC). The Manager shall disburse the Net Operating Income into the AMAC Holdings LLC Operating Account pursuant to the wire instructions provided by Owner and included herein as Exhibit D. The Manager hereby covenants and agrees that such wire instructions may only be changed only upon receipt by the Manager of written notice from Maurice Kaufman or any person designated in writing by Maurice Kaufman; provided that, at the time such disbursement is due the Bank Account balance shall equal at least the Minimum Balance. If at the time any such disbursement is due the Bank Account balance is less than the sum of the Minimum Balance plus the total amount of all outstanding current obligations of the Property, no amount will be distributed to Owner. Owner shall, in addition, cure any deficiency by depositing in the Bank Account sufficient funds to bring the balance in the Bank Account equal to the sum of the Minimum Balance plus the amount of such outstanding current obligations. Notwithstanding that Manager is authorized to and shall make the disbursements set forth above to the extent funds are available, Owner will be solely liable for (i) all Operating Costs, Fixed Charges, Ownership Costs and (ii) all sales taxes, excise taxes, or other taxes which may be assessed by any taxing authority with respect to the Property or the operation thereof.

Notwithstanding the foregoing, Owner has provided a protocol for the distribution of Cash Flow, a copy of which is attached hereto as Exhibit E, which may be amended by Owner, in its sole discretion.

## ARTICLE 8
## INSURANCE

**8.01 Insurance Coverage.**

Manager shall procure and maintain such comprehensive general liability insurance and other insurance coverages as are set forth in Exhibit A-1 and Exhibit A-2, unless otherwise instructed by Owner. In connection with all significant construction at the Property, Owner or Manager (whichever is the contracting party) will cause the general contractor to maintain, with a reputable insurer, Builder's Risk and General Liability insurance as set forth in Exhibit A-1.

**8.02 Insurance Policies.**

(a) All insurance provided for under this Article 8 shall be effected by policies issued by Qualified Insurers of good reputation and of sound financial responsibility and shall be subject to Manager's and Owner's approval. Such insurance may be carried under blanket policies covering the Property and other locations provided such policies otherwise comply with all of the requirements of Exhibit A-1 or Exhibit A-2, as applicable.

(b) Certificates of Insurance shall be delivered to Owner and Manager on or before fifteen days following the Commencement Date. All insurance policies shall be renewed, and proof of such renewals shall be delivered to Owner and Manager at least ten (10) days prior to their respective expiration dates.

(c) All insurance policies procured by Manager under Section 8.01 shall be written in the name of Manager or Owner based upon insurable interest, and any other appropriate parties designated by Owner or Manager being named thereon as additional insureds (as their respective interests may appear), except for workers' compensation insurance and other insurance with respect to which it is impractical and inappropriate to name other parties as additional insureds.

(d) All casualty insurance policies shall be endorsed specifically to the effect that the proceeds of any building, contents or business interruption losses shall be made payable to Owner, and if required, Manager jointly, as their interests may appear. When possible all such policies of insurance shall also be endorsed specifically to the effect that such policies shall not be canceled or materially changed without at least 30 days' prior written notice to Owner, and Manager. Each party shall use all reasonable efforts to cause any policy which it is responsible to obtain under Exhibit A-1 or Exhibit A-2, as applicable, to provide that the insurer shall not have any rights of subrogation to any claim which either party hereto may have or acquire against the other. Neither Owner nor Manager shall have any claim against the other with respect to the failure of any insurance carrier to provide the coverage or protection placed with such carrier as contemplated by this Agreement.

(e) Certificates of Insurance (and copies of policies, to the extent required) shall be sent to Manager and to Owner at their respective addresses set forth in Article 12 hereof and to the Mortgagee(s) at such addressees as the Mortgagee(s) shall designate.

(f) All coverage limits and deductible amounts set forth in Exhibit A-1 and Exhibit A-2 shall be reviewed by Owner and Manager from time to time for the purpose of determining the coverage limits and deductible amounts then appropriate for properties similar in type and construction to the Property

and for the nature of the business being conducted. Manager and Owner shall cooperate in good faith to arrive at an agreement on such matters.

**8.03 Manager's Blanket Insurance Coverage.**

Manager may, at its option (but shall not be obligated to) make available to Owner the opportunity to participate in blanket insurance policies carried by Manager for other properties, including, without limitation other Manager's Properties and which cover all or any portion of the insurance coverage specified in Exhibit A-1 (including all or any portion of that insurance required to be procured and maintained by Owner under Section 8.01). Owner has the sole option to participate in such blanket policies if (a) Manager determines to make such coverage available to Owner, and (b) the premiums for, and the coverage and financial strength provided by the insurer(s) under such blanket policies applicable to the Property shall be competitive with the premiums for, and the coverage and financial strength provided by the insurer(s) from which Owner would otherwise obtain such insurance. In such event, notwithstanding the provisions of Section 8.01 and Exhibit A-1 hereof, Manager shall be responsible for procuring and maintaining, as an Operating Cost, all insurance coverage represented by such blanket policies.

**8.04 Insurance by Manager.**

At all times during the term of the Agreement, Manager, at its sole cost and expense, shall carry the types and minimum amounts of insurance coverage as set forth on Exhibit A-2, attached hereto and made a part hereof.

## ARTICLE 9
## INDEMNIFICATION

**9.01 Liabilities; Indemnification; Third Parties.**

(a) Subject to the terms of this Agreement, all debts and liabilities arising in the course of business of the Property or otherwise in connection with the use, occupancy or operation thereof (including, without limitation, all such liabilities under or with respect to environmental laws, hazards or claims) during the Term are and shall be the obligation of Owner, and Manager shall not be liable or otherwise responsible for any such debts or liabilities by reason of its management, supervision and operation of the Property during such Term, including, without limitation, work-related injury claims which may have been incurred, but have not been received by Manager or, if applicable, Owner as of the termination thereof, except for any such debt or liability that arises because of Manager's gross negligence, intentional misconduct, fraud, breach of this Agreement or actions beyond the scope of authority granted to Manager under this Agreement.

(b) Notwithstanding anything to the contrary, Owner shall not be liable or responsible for any accident, loss, injury or damage attributable to the acts of Manager, its partners, agents, employees, successors and assigns, occurring or accruing on the Property during the term of the performance of this

Agreement or in connection therewith, and Manager shall and does hereby fully indemnify, protect, defend and hold harmless Owner, all its venture partners, employees, agents, predecessors, successors and assigns or legal representatives from and against all liens, demands, suits, fines, losses and expenses or any combination thereof, including attorney's fees, of any nature, kind or description, of any person or entity whomsoever, arising out of, caused by or resulting from (a) any act or omission constituting gross negligence, willful misconduct fraud, breach of this Agreement, willful reckless or criminal misconduct, or breach of fiduciary duty by any officer, director, agent or employee of Manager in connection with Manager's performance under this Agreement, (b) any action taken by or on behalf of Manager relating to the Property or to Owner which is not permitted by or pursuant to the provisions, or beyond the scope of authority granted to Manager under, of this Agreement, (c) the alleged or actual violation of Manager of any labor, employment or discrimination laws, or (d) any brokerage lien filed against the Property in connection with Manager's acts. This indemnity shall not be limited in any way by any limitations on the amount or type of proceeds, damages, compensation acts, disability benefit acts or other employee benefit acts currently held by Owner or Manager. The provisions of this Section shall survive the expiration or termination of this Agreement.

(c) No person or entity shall be deemed to be a third party beneficiary of any term or provision of this Agreement, including, without limitation, the terms and provisions of this Section 9.01, and no person or entity shall have any rights of subrogation or similar rights under this Section 9.01, other than Affiliates of Owner and Manager, respectively, entitled to indemnification pursuant to the provisions of this Article 9. Notwithstanding the foregoing, Servicer shall be deemed a third party beneficiary of the provisions of this Agreement. All indemnification obligations under this Agreement and the provisions of this Article 9 shall survive the expiration and any termination of this Agreement.

## ARTICLE 10
## CASUALTY AND CONDEMNATION

**10.01 Casualty.**

(a) If, during the Term, the Property incurs minor damage by fire, casualty or other cause, Owner shall at its sole cost and expense and with all reasonable diligence, repair or replace the damaged portion of the Property to the reasonably same condition as existed previously. To the extent available, proceeds from the insurance described in Article 8 shall be applied to such repairs or replacements.

(b) In the event damage or destruction to the Property from any cause materially and adversely affects the operation of the Property, Owner, at Owner's option, shall promptly commence and complete repairing, rebuilding or

replacement of the Property to substantially the same character as existed prior to the damage or destruction provided replacement is justified in comparison to the anticipated profitability of the Property during the remaining Term, and provided that the available insurance proceeds (plus the amount of the deductible with respect thereto) permit such repair, rebuilding or replacement. In the event Owner chooses to not undertake the repairs, rebuilding or replacements specified above, Manager's sole remedy shall be to terminate this Agreement upon 60 days' advance written notice to the Owner without the payment of any early termination fee or other penalty of any kind.

(c) Upon approval of the Owner, Manager shall have the right to discontinue operating any portion of the Property to the extent Manager deems necessary to comply with applicable law, ordinance, regulation or order or as necessary for the safe and orderly operation of the Property.

**10.02 Condemnation.**

(a) In the event all or substantially all of the Property shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Property shall be so taken, but the result is that it is uneconomic to continue to operate the Property as a Property of the same character and class, this Agreement shall terminate, and Manager shall not be entitled to any early termination fee or other penalty of any kind. Owner shall have the right to initiate such proceedings, as it deems advisable to recover any condemnation award to which it may be entitled.

(b) In the event a portion of the Property shall be taken by the events described in Subsection 10.02(a) or the entire Property is affected but on a temporary basis, and the result is not to make it unreasonable to continue to operate the Property, this Agreement shall not terminate. However, provided that Owner determines that the cost of repair, rebuilding or replacement is justified in comparison to the anticipated profitability of the Property during the remaining term of this Agreement so much of any award for any such partial taking or condemnation as shall be necessary to render the Property equivalent to its condition prior to such event shall be used for such purpose; the balance of such award, if any, shall be paid to Owner.

**ARTICLE 11**
**DEFAULT AND TERMINATION**

**11.01 Events of Default.**

It shall be an event of default hereunder (an "***Event of Default***") if any one or more of the following events shall occur:

(a) Subject to the terms of Article 16 below, if either party shall fail to timely perform any of its duties and obligations under, shall otherwise breach the terms of this Agreement or shall commit any fraud or intentional misappropriation of funds, beyond any applicable notice and cure periods.

(b) If either party shall do any of the following:

(i) voluntarily or involuntarily be dissolved (except that if either party is a partnership and is dissolved solely by reason of the death, insanity, disappearance, bankruptcy or lack of legal capacity of one or more of its general partners and its remaining partners, within 60 days, elect, pursuant the partnership agreement of such partnership to continue such partnership's business, then such party shall not be considered as "dissolved" for the purposes hereof);

(ii) apply for or consent to the appointment of a receiver, trustee or liquidator of all or a substantial part of its assets;

(iii) file a voluntary petition in bankruptcy or otherwise voluntarily avail itself of any federal or state laws for the relief of debtors;

(iv) admit in writing its inability to pay its debts as they become due;

(v) make a general assignment for the benefit of creditors;

(vi) file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law or file an answer admitting the material allegations of any petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or

(vii) be the subject of an order, judgment or decree entered by any court of competent jurisdiction, in the application of any one or more creditors of such party adjudicating it a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of its assets, and such order, judgment or decree shall become final.

**11.02 Termination.**

(a) Without in any way limiting Section 2.03(b), upon the occurrence of any Event of Default under Subsection 11.01(a) by or with respect to one of the parties hereto (the "***Defaulting Party***"), the other party hereto (the "***Non-Defaulting Party***") shall have the right (exercisable by the giving of written notice to the Defaulting Party) to terminate this Agreement if the Defaulting Party fails to remedy such Event of Default within ten (10) days after its receipt of notice to remedy if such default relates to the payment of a sum of money and, in all other cases, within 30 days after its receipt of notice to remedy; provided, however, that if such Event of Default be of a non-monetary nature and if it cannot reasonably be remedied within said 30 day

period, then such 30 day period shall be deemed to be extended for such additional period as may reasonably be required to remedy the same if the Defaulting Party shall promptly commence to remedy upon receipt of notice from the Non-Defaulting Party and shall continue therewith with due diligence. Notwithstanding anything to the contrary contained herein, there shall not be any cure period afforded to Manager for any Event of Default occurring as a result of fraud or intentional misappropriation of funds by Manager.

(b) With respect to the occurrence of an Event of Default under Subsection 11.01(b), this Agreement shall terminate upon such occurrence.

(c) The terms of this Agreement shall not be deemed to impair the right of any party to exercise any right or remedy, whether for damages, injunctions, specific performance or otherwise, upon any breach or wrongful termination hereof, available at law or in equity.

**11.03 Post-Termination Matters: Reimbursements to Manager.**

Upon any termination or expiration of this Agreement for any reason whatsoever (including, without limitation, pursuant to Section 11.02 above), Owner expressly agrees that Manager may remove any of its documents which are proprietary to Manager (including, without limitation, employee files, manuals, software programs, stored data, and internal correspondence of a proprietary nature) but specifically excluding financial records, documents, correspondence or other materials proprietary to the Property which shall be deemed property of Owner. Manager shall have the right to make copies of all other non-proprietary files and information relating to its management of the Property. Upon such termination or expiration for any reason other than Manager's default, within 20 days of billing thereof, Owner shall pay to Manager, in addition to any other amounts due pursuant to this Agreement (i) Manager's reasonable out-of-pocket costs incurred by reason of requests by Owner for assistance after termination of this Agreement and not otherwise reasonably expected of Manager in the orderly termination of its operations at the Property, and (ii) any unpaid fees and other charges and reimbursements due Manager hereunder.

**11.04 Post-Termination Matters: Deliveries to Owner.**

Upon termination of this Agreement for any reason whatsoever, Manager shall promptly deliver to Owner, but in no event more than 30 days after termination, the following:

(i) a final accounting, reflecting the balance of income and expenses for the Property and Owner as of the date of termination;

(ii) all Property funds and/or security deposits held by Manager in accounts as set forth in Section 6.03; and

(iii) all written data and materials belonging to Owner, including all records, contracts, leases, receipts for deposits, unpaid bills, and all other papers, plans books, drawings, documents and writings which pertain to the Property or the business and affairs of Owner that Manager had in its possession.

**11.05 Extension of Date of Termination.**

Notwithstanding anything to the contrary contained in this Agreement, to the extent required by applicable law, the date of termination of this Agreement because of Manager's default hereunder, shall be extended so that the date of termination after notice of termination is given to or by Manager shall be on a date which is not earlier than 15 days plus the number of days, if any, Manager is required to give its employees advance notice of termination of employment as required by the WARN Act, or any similar federal or state statute.

## ARTICLE 12
## NOTICES

All consents, approvals, notices or other communications provided for in this Agreement shall be in writing and delivered in person, or sent by reputable and trackable overnight delivery service or by postage prepaid Registered or Certified Mail, return receipt requested, to the respective addresses for Owner and Manager set forth below (with a copy thereof transmitted to the party to which such notice is being given by facsimile to the applicable number set forth below), until such time as written notice, as provided hereby, of a change of address with a new address (and/or facsimile number) to be used thereafter is delivered to the other party. Notices will be deemed delivered upon confirmation of delivery at the current notice address referenced above. Upon request, a party shall send copies of any notice or communication by ordinary mail as instructed by the other party.

**If to Owner, to:**

c/o AMAC Holdings II LLC
1818 Library Street, Suite 500
Reston, VA 20190
Attention: Benjamin Miller
Telephone Number: 703-956-3544

**If to Manager, to:**

Realty Management Services, Inc.
7910 Woodmont Avenue, Suite 350
Bethesda, Maryland 20814
Attention: David J. Miskovich, C.O.O.
Telephone Number: 301-657-8899
E-Mail:

In order to facilitate communications between Owner and Manager, Owner designates the Owner's Representative to act for Owner pursuant to this Agreement, and Manager designates Manager's Representative to act for Manager pursuant to this Agreement.

## ARTICLE 13
## RELATIONSHIP AND FURTHER ACTIONS

**13.01 Relationship.**

Manager and Owner shall not be construed as joint venturers or partners of each other and neither shall have the power to bind or obligate the other except as set forth in this Agreement.

**13.02 Further Actions.**

Owner agrees to execute all contracts, agreements and documents, and to take all actions as may be reasonably necessary to comply with the provisions of this Agreement and the intent hereof.

## ARTICLE 14
## APPLICABLE LAW; SEVERABILITY

The interpretation, validity and performance of this Agreement shall be governed by the laws of the State in which the Property is located (without regard to its conflicts of laws provision). If any of the terms and provisions hereof shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall in no event affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

## ARTICLE 15
## SUCCESSORS AND ASSIGNS

**15.01 Assignment.**

(a) Manager may not assign this Agreement without the prior written approval of Owner, which approval shall be at Owner's sole and absolute discretion, and any purported assignment without Owner's consent shall be void *ab initio* and an Event of Default under this Agreement.

(b) Owner shall have the right to assign this Agreement to (i) any subsidiary or Affiliate of Owner without Manager's prior written consent, and (ii) any third party acquiring the Property subject to Manager's prior written consent, which consent will not be unreasonably withheld or delayed. Any such assignee shall assume all obligations of Owner under this Agreement and the transferring Owner shall be released of all liability hereunder.

**15.02 Binding Effect.**

Subject to the restrictions on assignment set forth elsewhere in this Agreement, this Agreement shall be binding upon and inure to the benefit of Owner and its successors and

assigns, and shall be binding upon and inure to the benefit of Manager and its successors and assigns.

## ARTICLE 16
## FORCE MAJEURE

### 16.01 Operation of Property.

If at any time during the term hereof it becomes necessary in Manager's reasonable opinion to cease operation of the Property in order to protect the Property and/or the health, safety and welfare of the guests and/or employees of the Property for reasons including, without limitation, acts of war, national emergencies, natural disasters, terrorism, insurrection, civil strife and commotion, labor unrest, strikes, riots, utility failures, adverse weather, or acts of God (a "***Force Majeure Event***"), then in such event Manager may (upon Owner's consent) close and cease operation of all or part of the Property, reopening and commencing operation when Manager, with Owner's approval, deems that such may be done without jeopardy to the Property, its guests and employees. Notwithstanding anything to the contrary contained in Article 12 or otherwise in this Agreement, any such cessation of operation occurring pursuant to this Section 16.01 shall not be deemed or considered an Event of Default. Manager shall immediately reopen the Property after the termination or end of the Force Majeure Event, which caused the Property to be shut down.

### 16.02 Extension of Time.

With respect to any obligation to be performed by a party during the Term, such party shall in no event be liable for failure to perform when prevented by any Force Majeure Event. The time within which such obligation shall be performed shall be extended for a period of time equivalent to the delay from such Force Majeure Event.

## ARTICLE 17
## GENERAL PROVISIONS

### 17.01 Authorization.

Owner represents that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof. Manager represents that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof. On request, each party shall furnish to the other party evidence of such authority.

### 17.02 Formalities.

Any change to or modification of this Agreement must be in writing signed by both parties hereto. This Agreement shall be executed in one or more counterparts, each of which shall be deemed an original. The captions for each Article and Section are intended for convenience only.

**17.03 Consents.**

Except as otherwise expressly provided in this Agreement, wherever in this Agreement it is provided that an act or proposed act of Owner or Manager is subject to the consent or approval of the other, such consent or approval shall not be unreasonably withheld or delayed. If the approval or consent of one party hereto is required for any act or matter contemplated by the other party, the party desiring such consent may give to the party whose consent is desired, notice specifying in reasonable detail, the matter to which consent is requested. Unless otherwise specified herein, if the party whose consent is requested does not, within 20 business days after actual receipt of such notice, respond positively or negatively to such notice in writing, the requested consent shall be deemed withheld.

**17.04 Estoppel Certificate.**

Either party shall, at any time and from time to time, upon not less than ten (10) days' prior written request from the other, execute, acknowledge and deliver to the requesting party, in form reasonably satisfactory to the requesting party, a written statement certifying (if true) (i) that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) that there is no outstanding notice of an Event of Default hereunder and, to the best of such party's knowledge, no event has occurred or condition exists which, with the giving of notice or the passage of time or both, would constitute an Event of Default hereunder, and (iii) such other accurate information as may be reasonably requested by the requesting party or by any of the Interested Persons (as hereinafter defined). It is intended that any such statement delivered pursuant to this Section 17.04 may be relied upon by the requesting party, any current or prospective Mortgagee or other party providing financing to Owner or Manager (as the case may be), a prospective purchaser of the Property or permitted assignee of Manager's rights and interests hereunder, and the respective successors and assigns of any of the foregoing (the "***Interested Persons***").

**17.05 No Representations.**

Owner and Manager acknowledge there have been no representations, inducements, promises or agreements made by Manager or Owner other than those specifically set forth herein.

**17.06 Not an Interest in Real Estate.**

This Agreement is not, and shall not be deemed or construed, at any time or for any purpose, to be or create any interest in real estate or any lien or other encumbrance of any kind whatsoever against the Property or the land upon which it is erected and neither this Agreement nor any memorandum hereof shall be recorded.

**17.07 Special Stipulations.** The Special Stipulations set forth in Exhibit B attached hereto are incorporated herein by this reference. In the event of any conflict between any of the terms, conditions and provisions set forth in the Special Stipulations and any of the terms, conditions and provisions set forth elsewhere in this Agreement, the terms, conditions and provisions of the Special Stipulations shall control.

**17.08 Time.** Time is of the essence with respect to Manager's obligations under this Agreement.

**17.09 Severability.** If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**17.10 Authority Limited.** Manager's authority shall be derived wholly from this Agreement, and Manager has no authority to act for or represent Owner except as herein expressly specified.

**17.11 Exclusiveness of Compensation.** The payments to be made to Manager hereunder shall be in lieu of all other and further compensation or commissions of any nature whatsoever for the services described herein and this Agreement shall be considered as a special agreement between the parties hereto covering the appointment and compensation of Manager to the exclusion of any other method of compensation unless otherwise agreed to in writing. Without limiting the foregoing and except for the compensation expressly set forth in this Agreement, Manager shall not be entitled to any commission, fee or other compensation upon the sale or other disposition of the Property by Owner.

**17.12 Counterparts.** Any number of counterparts of this Agreement may be executed and delivered and each shall be considered an original and together they shall constitute one agreement.

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement effective as of the Commencement Date.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

**OWNER:**

VICTORIA UNITED LLC, a Delaware limited liability company

By: ____________________________
Name: Maurice Kaufman
Title: Authorized Signatory

**MANAGER**:

REALTY MANAGEMENT SERVICES, INC., a Maryland corporation

By: ____________________________
Name: DAVID J. MISKOVICH
Title: C.O.O.

## EXHIBIT A-1

Manager, unless otherwise instructed by Owner at Owner's expense, shall procure the insurance coverages hereinafter set forth and ensure that they are in full force and effect on the Commencement Date and that they remain in full force and effect throughout the Term of this Agreement. All cost(s) and expense(s) incurred by Manager in procuring the following insurance coverages shall be Operating Costs and shall be paid from the Bank Account(s):

**Coverages:** **Amounts Of Insurance:**

Workers' Compensation
Employer's Liability
Fidelity (Employee Dishonesty)
Money and Securities

Automobile Liability

Owned Vehicles (Statutory)
Non-Owned Vehicles
Uninsured motorist where required by statute

Automobile Physical Damage (Optional)

Comprehensive
Collision



The following insurance coverages shall be procured by Owner unless Owner instructs Manager to procure coverage. If coverage is procured by the Manager, cost(s) and expense(s) incurred by the Manager in procuring such shall be Operating Cost(s) paid from the Bank Account(s).

Comprehensive General Liability
Including:
Products/Completed Operations
Contractual
Personal Injury

Umbrella or Excess Liability
Underlying auto, general liability and employer liability must be scheduled as required so that excess limits will apply.

Builders Risk — Completed value of property

All risk for term of the initial and any subsequent Property construction and renovation

Real and Personal Property

Blanket Coverage where available and required(except for perils of floods and earthquakes)

Earthquake/Flood

Any coverage required in writing from Owner to Manager.

| Business Interruption | Calculated yearly based on estimated Property revenues |
|---|---|

Blanket Coverage for the perils insured against under Real and Personal Property in this Exhibit A-1. This coverage shall specifically cover manager's loss of Management Fees. The business interruption insurance shall be for a twelve (12) month indemnity period

All insurance coverages provided for under this Exhibit A-1 shall be effected by policies issued by insurance companies (i) that are authorized to do business in the state in which the Property is located; and (ii) that are of good reputation and of sound and adequate financial responsibility, having a Best Rating A or better, or a comparable rating if Best ceases to publish its ratings or materially changes its rating standards or procedures unless otherwise specified by owner.

Owner hereby authorizes Manager to utilize the services of and/or place the insurance set forth in this Exhibit A-1 with a third party insurance carrier, in each case meeting the specifications set forth above.

Manager shall deliver to Owner duly executed certificates, and, if requested by Owner and if available, duplicate copies of all policies of insurance to be procured hereunder, including existing, additional and renewal policies.

Each policy or insurance maintained in accordance with this Exhibit A-1 to the extent obtainable, shall specify that such policies shall not be canceled or materially changed without at least 30 days' prior written notice to Manager.

Except as otherwise provided in the Agreement, Manager and Owner each waives, releases and discharges the other, but only to the extent of collectible insurance proceeds, from all claims or demands which each may have or acquire against the other or the other's subsidiaries, affiliates, directors, officers, agents, employees, independent contractors or partners, with respect to any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by either of them on account of injury to persons or damage to

property or business arising out of the ownership, management, operation and maintenance of the Property, regardless whether any such claim or demand may arise because of the fault or gross negligence of the other party or its subsidiaries, affiliates, officers, employees, directors, agents or independent contractors. Each policy of insurance maintained in accordance with this Exhibit A-1 shall contain a specific waiver of subrogation reflecting the above.

All policies of insurance provided for under this Exhibit A-1 shall be carried in the name of Owner, Manager and Mortgagee (as applicable), and losses thereunder shall be payable to the parties as their respective interests may appear. All liability policies shall name the Owner and Manager, and in each case any of their affiliated or subsidiary companies, which they may specify, and their respective directors, officers, agents, employees and partners as additional named insureds.

All such policies of insurance shall be written on an "occurrence" basis to the extent obtainable.

**EXHIBIT A-2**

a. Property insurance in an amount equal to the sum of 100% of the replacement cost value of all personal property belonging to Manager. Said coverage to be written under an ISO Special Causes of Loss or equivalent policy form.

b. General liability insurance with minimum limits o[redacted] per occurrence and [redacted] in the aggregate. If general liability coverage is provided under a policy that covers multiple locations, said policy must be endorsed to state that the above coverage limits apply separately to each covered location.

c. Automobile liability insurance covering all owned, non-owned and hired automobiles belonging to Manager or its employees.

d. Workers compensation insurance complying with all statutory requirements of the state where the Property is located. Said policy to include coverage for employer's liability with minimum limits as follows:

1) [redacted] for bodily injury by accident

2) [redacted] for bodily injury by disease – each employee; [redacted]

3) [redacted] for bodily injury by disease policy limit.

e. Employee Benefits Liability with minimum limits [redacted] per occurrence a[redacted] annual aggregate.

f. Umbrella or excess liability insurance with minimum limits of ten million dollars ($10,000,000) per occurrence and in the aggregate. If umbrella or excess liability coverage is provided under a policy that covers multiple locations, said policy must be endorsed to state that the above coverage limits apply separately to each covered location. Said umbrella or excess liability policy shall provide coverage limits in excess of those specified above for general liability, automobile liability, employers liability and employee benefits liability.

g. Fidelity bond or employee dishonesty coverage, including a client loss extension, in an amount of not less than two (2) months' potential Gross Revenues of the Property. It is agreed that the cost of said fidelity bond shall be borne by the Owner and paid from by the Property Account.

h. Professional liability or errors & omissions insurance covering the professional actions of Manager and/or Manager's employee s with minimum limits of [redacted] annual a[redacted]

i. Manager agrees to procure all of the above referenced insurance coverages from insurance carriers that are rated A 8 or higher according to the most recent ratings issued by A.M. Best.

j. Upon written request from Owner, Manager shall provide Owner with a certificate of insurance confirming Manager's compliance with all of the above requirements.

# EXHIBIT B

Special Stipulations

A. Independent Contractor. Owner and Manager intend, acknowledge and agree that the relationship between Owner and Manager pursuant to this Agreement is that of a principal and an independent contractor and that all employees and personnel necessary for the operation of the Property shall in every instance be the employees or independent contractors of Manager and not of Owner or Servicer. At the expense of Manager, which shall be a Centralized Service Expense, executive personnel of Manager will oversee the performance of Manager's obligations under this Agreement and the general supervision, direction and control of Manager's employees and personnel in accordance with normal and prudent practices in the Property management industry. Manager shall exercise due care in hiring employees and selecting persons and entities to provide labor, services, products and materials required for Manager to perform its obligations under this Agreement. Nothing contained herein shall be deemed to constitute Owner and Manager as partners or joint venturers. Manager hereby covenants that it will refrain from any activity that could create, or be deemed to create, a conflict of interest with Owner in the discharge of Manager's obligations under this Agreement.

B. General Operations. Manager shall operate the Property and all its facilities in a manner in accordance with the highest standards achievable consistent with the Initial Approved Budget and the applicable Approved Budget in a good, orderly, safe, clean, sanitary, and sightly condition, and so as to maximize the earnings of the Property and its underlying value and to provide such services at the Property as are normally provided by operators of Properties of comparable class and size, subject, however to the Initial Approved Budget or the applicable Approved Budget.

C. Notices of Claim of Injury or Damage. Manager shall notify the Owner (and any insurer of Owner or the Property) of any personal injury or property damage occurring to or claimed by any employee, contractor, guest, customer, lessee or other third party on or with respect to the Property promptly upon obtaining knowledge thereof and shall promptly forward to the Owner within two (2) business days after Manager's receipt thereof, any summons, subpoena, or legal document served upon the Manager relating to actual or alleged potential liability of the Owner, the Manager or the Property.

D. Assistance with Proposed Sale, Financing, Refinancing. Manager shall cooperate with and assist Owner from time to time in any attempt(s) by Owner to sell, finance or refinance the Property. Such cooperation shall not entitle Manager to any additional compensation and Manager shall not be deemed to be acting as a broker unless Owner and Manager enter into a separate written agreement engaging Manager as broker with respect to the Property. Such cooperation shall include, without limitation, answering prospective purchasers' or lenders' questions about the Property or its operations.

E. Hazardous Materials, Toxic Wastes and Asbestos. If during the term of this Agreement, Manager becomes aware of the existence of hazardous materials or wastes, toxic substances or wastes, asbestos or asbestos-bearing materials and the like (collectively, "Hazardous

Materials") at, in, on, or under the Property, Manager shall immediately notify Owner of the condition, both orally and in writing. Subject to Section 5.06, Owner shall exclusively determine such further course of action with respect to such hazardous condition. Manager shall not supervise or oversee any work involving remediation of any hazardous or potentially hazardous wastes or conditions unless specifically hired by Owner to do so pursuant to a separate agreement between Owner. Manager shall always use its good faith commercially reasonable efforts to prevent and detect the occurrence or existence of any hazardous condition at the Property and shall reasonably cooperate with Owner, at no additional fee or cost to Owner, in abating and remedying any hazardous condition at the Property and in operating the Property so as to eliminate any such hazardous condition. Notwithstanding anything contained herein to the contrary, including, without limitation, the provisions of Section 5.06 hereof to the contrary, Owner and Manager agree that Owner shall have exclusive control over any issue concerning hazardous or potentially hazardous conditions at the Property and that Manager shall have no authority to act for or on behalf of Owner or to make any decisions or elections on behalf of Owner with respect to any such conditions.

F. Owner Representative. For the purposes of this Agreement, Servicer in its capacity as Owner's authorized agent is acting as Owner's representative; the burdens and liabilities of this Agreement shall extend only to Owner, and Servicer shall have no liability hereunder.

G. Centralized Services Expenses. Other than the items as otherwise may be expressly approved in writing by Owner, nothing contained herein shall be deemed to permit Manager to charge, as an Operating Expenses or as a Reimbursable Expense or otherwise, any costs or expenses of Manager's executive personnel or for Manager's overhead, office, administrative, or other expenses (the "***Centralized Services Expenses***"), it being the intent of Owner and Manager that the Management Fee payable by Owner shall include all such items.

H. General Compliance with Laws. Manager shall operate and maintain the Property in compliance with all applicable laws, statutes, ordinances, rules, regulations, requirements, orders, notices, and determinations of any federal, state or municipal authority, and the requirements of any insurance companies covering any of the risks against which the Property is insured. Without limiting the generality of the immediately foregoing sentence, Manager shall (i) upon request of Owner, contract with a qualified independent contractor to prepare an inspection report on behalf of Owner to determine whether the Property is in compliance with the Americans with Disabilities Act and if not in compliance, shall propose to Owner a plan to bring the non-complying Property into compliance, and (ii) promptly notify Owner of the necessity for and assist Owner in obtaining and maintaining any and all licenses, permits, or approvals required of Owner by any applicable federal, state or municipal authority in connection with the ownership or operation of the Property.

I. Equal Opportunity Employer. Manager represents and warrants to Owner that Manager is an equal opportunity non-discriminatory employer. Manager and Owner each mutually agree that there shall be no discrimination against or segregation of any person or of a group of persons on account of race, color, creed, religion, handicap, sex, sexual orientation or national origin, in the lease, transfer, use, occupancy, advertising, promotion, sale, tenure or enjoyment of the Property or in the provision of services thereto, nor shall Owner or

Manager permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of guests.

J. Fidelity Bond. Manager shall maintain, pay for and keep in full force fidelity bond and errors and omissions insurance coverage on all of its employees, agents, officers and directors who are involved in, or employed in connection with, the performance of Manager's obligations under this Agreement, which coverage shall be in a dollar amount equal to the greater [REDACTED] (ii) three (3) times the monthly average Total Revenues projected in the Preliminary Operating Budget or the applicable Approved Budget, unless otherwise specified by Owner in writing. Evidence of such fidelity bond and insurance coverage will be provided to Owner at Owner's request. The cost of such bond and insurance coverage shall be the expense of the Manager.

K. Duties Upon Termination of Agreement. The termination of this Agreement for any reason shall not affect any right, obligation or liability which has accrued under this Agreement on or before the effective date of such termination. Upon termination of this Agreement for any reason, the authority of Manager under this Agreement shall immediately cease and Manager shall have no further right to act for Owner or withdraw funds from the Bank Account. In addition, upon the occurrence of an Event of Default by Manager, Owner shall have no further duty to pay or deposit any funds into the Bank Account or to pay to or for the benefit of Manager any funds other than the Management Fee. In the event of termination, Manager shall fulfill all reporting and accounting functions hereunder through the period for which Owner agrees to pay Manager a Management Fee to be agreed upon at such time. Upon termination Manager shall also: (i) deliver to Owner possession of the Property, (ii) deliver to Owner as received any monies due Owner under this Agreement but received after such termination, (iii) deliver to Owner all materials and supplies, keys, copies of contracts and documents, and copies of all other accounting papers and records pertaining to the operation of the Property as the Owner shall request, (iv) assign any right Manager may have in and to any existing contracts relating to the operation and maintenance of the Property as the Owner shall require and for which Owner agrees in writing to assume Manager's duties and obligations arising thereunder after the date of assignment, and (v) deliver to Owner or Owner's duly appointed agent all records, contracts, leases, receipts for deposits and unpaid bills in existence at the time of termination and all other papers or documents which pertain to the Property.

L. Disclosure. Manager shall disclose to Owner for Owner's reasonable approval any controlling ownership interest of Manager, any officer or employee of Manager, or any immediate family member (parent or parent-in-law, spouse, child, brother, sister, brother-in-law or sister-in-law or stepparent) of any officer or employee of Manager in any corporation, partnership, joint venture or other business which provides materials, products or services, directly or indirectly, for the Property. Such disclosure shall be made to Owner, in writing, at least ten (10) days prior to the proposed entering into any contract or agreement with such business for the provision of such products, materials or service. Any contract or agreement made by Manager with a related party shall be at rates or amounts not greater than those which would have been paid under an arms-length contract with a non-related party.

M. Warranties and Representations of Manager. Manager hereby makes the following representations, warranties and covenants to Owner, all of which shall survive the execution and delivery of this Agreement.

(i) Manager was duly organized, is validly existing, is in good standing under the laws of the state of its formation or incorporation, is in good standing under the laws of the state in which the Property is located, and has complied with all applicable laws in order to conduct business in such state;

(ii) Manager has sufficient expertise, staff and other resources to carry out Manager's duties hereunder in a prompt, efficient, and diligent manner;

(iii) This Agreement constitutes a legal, valid, and binding agreement of Manager, enforceable against Manager in accordance with its terms, except as limited by bankruptcy, insolvency, receivership and similar laws of general application to creditors' rights from time to time in effect;

(iv) Manager has or will obtain all licenses and permits, including all governmental licenses and permits, necessary to legally and validly execute, deliver and perform this Agreement;

(v) The terms and conditions of this Agreement are reasonable and customary for the area and type of property which is the subject of this Agreement; and

(vi) The Management Fees required to be paid to Manager under this Agreement are consistent with general market standards and are no less favorable than the management fees required to be paid to managers of similar Properties for services similar to those described in the Agreement.

N. Confidentiality. As used herein, the term "***Confidential Information***" means any information which is acquired by Manager in carrying out its duties under this Agreement and which had not become part of the body of public information prior to its disclosure in violation of this Special Stipulation N, including information regarding the Property or any litigation pertaining thereto. Except as otherwise required by any law or court order, or as authorized or permitted by Owner, Manager shall not disclose or permit the disclosure of any Confidential Information to anyone other than Owner, Owner's counsel, Servicer, or to persons designated by Owner's counsel, except as reasonably required to carry out the duties of Manager under this Agreement. Manager shall execute and deliver to Owner any document requested by Owner evidencing or otherwise concerning Manager's agreement to comply with the terms of this Special Stipulation N or any other agreement binding on Owner with respect to Confidential Information. Manager shall immediately notify Owner and its authorized agent of any court order or subpoena requiring disclosure of Confidential Information, shall cooperate with Owner's counsel in the appeal or challenge of any such order or subpoena, and shall not disclose any Confidential Information pursuant to such court order or subpoena until Owner has exhausted any lawful and timely appeal or challenge that owner elects to file or make. Owner shall be responsible for retaining counsel if Owner decides to appeal or challenge Manager for Manager's reasonable fees and

expenses related to the appeal or challenge of any such order or subpoena. All original documents shall be retained by Owner.

Owner may give Manager copies of documents in connection with the Property. Upon termination of this Agreement, all information in the possession of Manager relating to the Property shall be returned to Owner; provided, however, that Manager may retain copies of any information which Manager reasonably considers necessary for Manager's confidential business records. Manager shall take reasonable measures to avoid any unintentional or inadvertent disclosure of any Confidential Information to any unauthorized person by its employees, agents, or attorneys. Manager shall not use any Confidential Information for Manager's own gain, except as specifically permitted by this Agreement. The provisions of this Special Stipulation N shall not preclude Manager from disclosing Confidential Information relating to the Property to third parties as reasonably required to carry out the duties of Manager under this Agreement, so long as Manager obtains from any such persons or entities the execution and delivery of an agreement that imposes the same obligations upon such parties with respect to Confidential Information as were imposed upon Manager under this Special Stipulation N. The provisions of this Special Stipulation N shall survive the expiration and termination of this Agreement.

O. Business Conduct. The maintenance of extremely high standards of honesty, integrity, impartiality, and conduct by Manager and its employees and agents is essential to assure the proper performance of business and the maintenance of public confidence in the Owner. The Owner expects Manager to uphold and meet these high standards and to use its best judgment to avoid misconduct and conflicts of interest and to require the same of its employees and agents. In general, Manager shall avoid any action which might result in or create the appearance of using its position for private gain, giving preferential treatment to any person, losing complete independence or impartiality, or making Owner's decisions outside authorized channels. Manager shall not take any action that would adversely affect the confidence of the public in the integrity of the Owner and shall not engage in conduct prejudicial to the Owner, including criminal, dishonest or immoral conduct. Manager shall not (i) misuse Owner's property, (ii) use inside information obtained as a result of retention by Owner for private gain for Manager or another person, particularly one with whom it has family, business or financial ties, (iii) use its retention by Owner to coerce, or give the appearance of coercing, a person to provide financial benefit to the employee or another person, particularly one with whom he or she has family, business or financial ties, or (iv) because of such retention, receive or solicit from a person having business with Owner anything of more than de minimus value as a gift, gratuity, loan, entertainment, or favor for the Manager or another person. Manager shall disclose all other employment and those financial interests Manager has which may be relevant to its contractual relationship with Owner. Other employment or financial interests that are held to conflict with Owner interests will not be permitted. Any violation of this Special Stipulation O by Manager or its employees, agents or representatives will constitute a breach of this Agreement by Manager. The provisions of this Special Stipulation O shall survive the expiration and termination of this Agreement.

P. Limitation on Liability. Manager agrees to look solely to Owner to the extent of Owner's interest in the Property for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the

covenants, warranties, obligations or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Owner's affiliates with respect to any matters arising out of or in connection with this Agreement or the duties and obligations contemplated hereby.

# EXHIBIT C

Property Description

Description of the Land:

***Parcel lettered "F" in the subdivision known as "Langley Park, Plat No. 2", as per plat of said subdivision recorded in Plat Book 16, Plat 36, among the Land Records of Prince George's County, Maryland; being in the 17th Election District.***

Community Type (e.g., garden, high rise, mid-rise, scattered, etc.): Garden Apartments

Number of Apartment Units: 101 Units