# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIT OF MARYLAND

| | |
|---|---|
| CASA de Maryland, Inc., *et al.* | |
| Plaintiffs, | |
| v. | Civil Action No. 8:21-cv-01778-CBD |
| Arbor Realty Trust, Inc., *et al*. | |
| Defendants. | |

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................. 1

SUMMARY OF FACTS ................................................................................................... 4

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT .................................................................................................................... 8

   I.   The Requirements of Pleading an FHA Claim ...................................................... 9

     A.   The FHA Has a Broad Purpose and Remedial Intent......................................... 9

     B.   The FHA Permits Claims for Disparate Treatment, Disparate Impact, and Perpetuation of Segregation........................................................................................................ 10

     C.   The Amended Complaint alleges facts well recognized as supporting an inference of intentional discrimination. ...................................................................................... 18

     D.   Plaintiffs' Amended Complaint states a theory of disparate impact .............................. 26

   II.   Plaintiffs have pled valid claims under the Fair Housing Act ........................................... 37

     A.   Defendants' discriminatory maintenance of the BVS Properties in the overwhelmingly minority community of Langley Park adversely affects their availability for rent, in violation of Section 3604 of the Fair Housing Act ............................................................. 38

     B.   The discriminatory maintenance of the BVS Properties perpetuates segregation in violation of the Fair Housing Act. ........................................................................... 39

     C.   Plaintiffs' Amended Complaint states a claim under 42 U.S.C. § 3617. ...................... 42

   III.   Plaintiffs Have Pled a Claim for Breach of the Implied Warranty of Habitability Against all Parties........................................................................................................... 44

     A.   Plaintiffs Have Pled Breach of the Implied Warranty of Habitability Against the Arbor Entities and the Arbor Family Entities ................................................................... 45

     B.   Plaintiffs' Breach of the Implied Warranty of Habitability Claim against Ross is Grounded in Ross' Duty to Plaintiffs ...................................................................... 47

IV.     Ross is Liable as an Agent for a Partially Disclosed Principal on the Contract Claims  48

V.    Individual Plaintiffs are Third Party Intended Beneficiaries of the Management
Agreements...................................................................................................................... 50

VI.    Plaintiffs Have Stated a Claim for Civil Conspiracy Against All Defendants............... 53

VII.    CASA Has Standing......................................................................................................... 56

VIII.    Plaintiffs Have Not Engaged in Inadmissible Group Pleading ...................................... 57

CONCLUSION.................................................................................................................... 59

## **TABLE OF AUTHORITIES**

**Cases**

*Adkins v. Morgan Stanley*,
   No. 12 CV 7667 HB, 2013 WL 3835198 (S.D.N.Y. July 25, 2013) ....................................... 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................................... 26

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
   818 F.3d 493 (9th Cir. 2016) ..................................................................................... 10, 15

*Bank of Am. Corp. v. City of Miami, Fla.*,
   137 S. Ct. 1296 (2017) ...................................................................................................... 10

*Bank of Am. Corp. v. City of Miami, Fla.*,
   140 S. Ct. 1259 (2020) ...................................................................................................... 10

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................... 7

*Benik v. Hatcher*,
   358 Md. 507 (Md. 2000) ....................................................................................... 44, 47, 50

*Betsey v. Turtle Creek Assocs.*,
   736 F.2d 983 (4th Cir. 1984) ..................................................................................... 29, 40

*Boykin v. Gray*,
   895 F. Supp. 2d 199 (D.D.C. 2012) .................................................................................. 40

*Brooks v. Lewin Realty*,
   378 Md. 70 (Md. 2003) ..................................................................................................... 47

*Brown v. Dermer*,
   357 Md. 344 (2000) ........................................................................................................... 44

*Casa de Maryland v. U.S. Dep't of Homeland Sec.*,
   284 F. Supp. 3d 758 (D. Md. 2018) .................................................................................. 57

*Chevron v. Apex Oil Co.*,
   113 F. Supp. 3d 807 (D. Md. 2015) .................................................................................. 58

*City of Miami v. Wells Fargo & Co.*,
   923 F.3d 1260 (11th Cir. 2019) ................................................................. 10

*Coastal Labs., Inc. v. Jolly*,
   502 F. Supp. 3d 1003 (D. Md. 2020) ....................................................... 55

*Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. Ex rel. Walker*,
   719 F.3d 322 (4th Cir. 2013) .................................................................... 18

*Crosse v. Callis*,
   263 Md. 65 (Md. 1971) ....................................................................... 48, 49

*Dix v. Spampinato*,
   278 Md. 34 (Md. 1976) ............................................................................. 46

*Ebert v. Millers Fire Insurance Co.*,
   220 Md. 602 (1959) ................................................................................... 52

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ...................................................................... 7

*Ellis v. City of Minneapolis*,
   860 F.3d 1106 (8th Cir. 2017) ............................................................. 34, 35

*Equal Rts. Ctr. v. Equity Residential*,
   No. CCB-06-1060, 2016 WL 1258418 (D. Md. Mar. 31, 2016) ............ 17

*Falzarano v. United States*,
   607 F.2d 506 (1st Cir. 1979) .................................................................... 51

*Fraidin v. Weitzman*,
   93 Md. App. 168 (Md. Ct. Spec. App. 1992) .......................................... 54

*Frazier v. U.S. Bank Nat. Ass'n*,
   No. 118775, 2013 WL 1337263 (N.D.Ill. Mar. 29, 2013) ...................... 58

*Gladstone Realtors v. Vill. Of Bellwood*,
   441 U.S. 91 (1979) ...................................................................................... 9

*Glanzer v. Shepard*,
   135 N.E. 275 (1922) .................................................................................. 46

*Griffin v. Breckinridge,*
  403 U.S. 88 (1971) ................................................................................................... 10

*Harnish v. Herald-Mail Co.,*
  264 Md. 326 (1972) ................................................................................................... 54

*Ibarra v. United States,*
  120 F.3d 472 (4th Cir. 1997) ...................................................................................... 7

*In re Riddell Concussion Reduction Litig.,*
  77 F. Supp. 3d 422 (D.N.J. 2015) ............................................................................. 58

*Kemp v. Armstrong,*
  40 Md. App. 542 (Md. Ct. Spec. App. 1978) ............................................................ 46

*La Clinica de la Raza v. Trump,*
  No. 19- CV-04980-PJH, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ................... 57

*Laufman v. Oakley Bldg. & Loan Co.,*
  408 F.Supp. 489 (S.D.Ohio 1976) ............................................................................ 10

*Letke v. Wells Fargo Home Mortg., Inc.,*
  No. RDB-12-3799, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013) .................... 12

*Linmark Associates, Inc. v. Township of Willingboro,*
  431 U.S. 85 (1977) ................................................................................................... 10

*Little v. Union Trust Co.,*
  45 Md. App. 178 (Md. Ct. Spec. App. 1980) ............................................................ 51

*Lloyd v. General Motors Corp.,*
  397 Md. 108 (Md. 2007) ........................................................................................... 53

*Lovell Land, Inc. v. State Highway Administration,*
  408 Md. 242 (Md. 2009) ........................................................................................... 50

*Mackubin v. Curtiss-Wright Corp.,*
  190 Md. 52 (Md. 1948) ............................................................................................. 50

*Marmott v. Maryland Lumber Co.,*
  807 F.2d 1180 (4th Cir. 1986) .................................................................................. 54

*Masano v. Albritton*,
 245 Md. 423 (Md. 1967) ................................................................................. 52

*Mayers v. Ridley*,
 465 F.2d 630 (1972) ...................................................................................... 10

*McCauley v. City of Jacksonville*, N.C.,
 829 F.2d 36, 1987 WL 44775 (4th Cir. Sept. 8, 1987) ............................... 43

*McDaniel v. Baranowski*,
 419 Md. 560 (2010) ....................................................................................... 44

*McDonnell Douglas Corp. v. Green*,
 411 U.S. 792 (1973) ............................................................ 12, 18, 23, 24, 26

*Meacham v. Knolls Atomic Power Lab'y*,
 554 U.S. 84 (2008) ........................................................................................ 33

*Metro. Hous. Dev. Corp. v. Vill. Of Arlington Heights*,
 558 F.2d 1283, 1289 (7th Cir. 1977) ............................... 9, 11, 18, 19, 20, 21

*Meyer v. Holley*,
 537 U.S. 280 (2003) ...................................................................................... 11

*Miller v. Countrywide Bank, N.A.*,
 571 F. Supp. 2d 251 (D. Mass. 2008) ..................................................... 14, 34

*Montauk Corporation v. Seeds,*
 215 Md. 491 (1958) ....................................................................................... 52

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. Of Mount Holly*,
 658 F.3d 375 (3d Cir. 2011) ......................................................................... 16

*Nat'l Fair Hous. All. V. Bank of Am., N.A.*,
 401 F. Supp. 3d 619 (D. Md. 2019) ............................... 32, 33, 36, 40, 41, 43, 44

*Nat'l Fair Hous. All. v. Deutsche Bank*,
 No. 18 C 0839, 2018 WL 6045216 (N.D. Ill. Nov. 19, 2018) ................... 40

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n ("Fannie Mae")*,
 294 F. Supp. 3d 940 (N.D. Cal. 2018) ......................................................... 34

*Nerenhausen v. Washco Mgmt. Corp.*,
  No. CV JKB-15-1313, 2017 WL 1398267 (D. Md. Apr. 18, 2017) ....................................... 47

*Ojo v. Farmers Grp., Inc.*,
  600 F.3d 1205 (9th Cir. 2010) ..................................................................................... 15

*Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*,
  675 F. Supp. 1100 (N.D. Ohio 1987) ............................................................................ 12

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ..................................................................................... 19

*Presley v. City of Charlottesville*,
  464 F.3d 480 (4th Cir. 2006) ......................................................................................... 7

*Prince George's Cnty. V. Wells Fargo & Co.*,
  397 F. Supp. 3d 752 (D. Md. 2019) ........................................................................ 10, 15

*Richwind v. Brunson*,
  335 Md. 661 (Md. 1994) ......................................................................................... 45, 47

*Saint-Jean v. Emigrant Mortg. Co.*,
  50 F. Supp. 3d 300 (E.D.N.Y. 2014) ............................................................................ 15

*See Montgomery Cnty. V. Bank of Am. Corp.*,
  421 F. Supp. 3d 170 (D. Md. 2019) ........................................................................ 10, 15

*Smith v. Town of Clarkton, N.C.*,
  682 F.2d 1055 (4th Cir. 1982) ....................................................................................... 8

*Sprint Solutions, Inc. v. Fils–Amie*,
  44 F.Supp.3d 1224 (S.D.Fla.2014) ............................................................................... 58

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
  17 F.4th 950 (9th Cir. 2021) ........................................................................................ 15

*Swierkiewicz v. Sorema N. A.*,
  534 U.S. 506, (2002) .......................................................................................... 7, 8, 11

*Testerman Co. v. Buck Curtis G* ,
  340 Md. 569 (Md. 1995) ............................................................................................. 49

*Texas Dep't of Hous. & Cmty. Affs. V. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015) ............................................................................... 9, 12, 13

*Thompson v. U.S. Dep't of Hous. & Urban Dev.*,
348 F. Supp. 2d 398 (D. Md. 2005) ............................................................... 19

*Trafficante v. Metro Life Ins. Co.*,
409 U.S. 205 (1972) ................................................................................. 10, 37

*Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*,
No. 13–639, 2015 WL 4040882 (S.D.N.Y. July 2, 2015)............................... 58

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
113 F. Supp. 3d 555 (D. Conn. 2015) ............................................................ 15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ......................................................................................... 8

*Walker v. City of Lakewood*,
272 F.3d 1114 (9th Cir. 2001) ........................................................................ 10

*Walters v. McMahen*,
684 F.3d 435 (4th Cir. 2012) ............................................................................ 7

*Wards Cove Packing Co., Inc. v. Atonio*,
490 U.S. 642 (1989) ........................................................................................ 13

*Wells Fargo & Co. v. City of Miami, Fla.*,
140 S. Ct. 1259 (2020) .................................................................................... 10

*White v. City of Annapolis by & through City Council*,
439 F. Supp. 3d 522 (D. Md. 2020) ................................................................ 14

*Williams v. Hous. Auth.*,
361 Md. 143 (2000)......................................................................................... 44

*Young-Bey v. S. Mgmt. Corp., Inc.*,
No. CV TDC-18-2331, 2019 WL 1992905 (D. Md. May 6, 2019) ................. 22

**Statutes**

12 C.F.R. § 701.31 ................................................................................... 32
24 C.F.R. § 100.500 ................................................................................. 13
42 U.S.C. § 3601 ........................................................................... 9, 37, 42

42 U.S.C. § 3604 ................................................................................ 37, 38, 39, 42, 43, 57
42 U.S.C. § 3605 ................................................................................................................. 11
42 U.S.C. § 3617 .................................................................................................. 37, 42, 43, 57
Prince George's County Code § 13-153 ........................................................................... 45

**Other Authorities**

Wright & A. Miller, Federal Practice and Procedure ................................................... 8

**Rules**

Fed. R. Civ. P. Rule 1 ...................................................................................................... 45
Fed. R. Civ. P. Rule 12 ...................................................................................................... 7
Fed. R. Civ. P. Rule 8 ...................................................................................................... 45
Fed. R. Civ. P. Rule 9 ...................................................................................................... 55

**Treatises**

3 Corbin on Contracts § 554 (1960) ............................................................................ 52
3 Williston § 616 ............................................................................................................. 52
Restatement (Second) of Agency § 4(2) (1958) ..................................................... 48, 49
Restatement (Second) of Property, Landlord and Tenant § 17.6 (1977) ...................... 47

## INTRODUCTION

The Arbor Family Defendants, that is, (1) Arbor Realty Trust, Inc. ("Arbor"), (2) Arbor Realty Limited Partnership ("ARLP"), (3) Arbor Realty SR, Inc. ("Arbor SR"), and (4) Arbor Management Acquisition Company ("AMAC"), Amended Complaint, p. 32 n2, have pursued a joint defense strategy from the infancy of the present litigation which attempts to shield the true policymakers from liability. The publicly traded parent entity and Real Estate Investment Trust ("REIT") Arbor, its wholly-owned REIT, Arbor SR, and its operating partnership, ARLP, all housed in the same New York headquarters and represented by a major New York-based law firm, profess complete ignorance about a humdrum landlord-tenant dispute 250 miles away in the distant inner-ring suburbs of the D.C. Beltway. The first page of their brief proclaims: "The gravamen of the 159-page Amended Complaint is that the eight named Defendants are responsible for the living conditions at the BVS Properties. [Arbor, Arbor SR, and ARLP] are certainly not."  Arbor Brief, p.1. [1]

---

[1] The "Arbor Family Defendants," as defined on page 32 of the Amended Complaint, include Arbor, Arbor SR, ARLP, and AMAC.  Alternatively, the "Arbor Related Defendants" are each of the seven (7) Defendants, wholly owned and controlled by Arbor, including the four (4) Arbor Family Defendants.  These designations were defined on page 40 of the Amended Complaint. Despite this fact, Arbor Related Defendants have chosen to becloud the issue by filing two briefs by two different law firms as if one group of Arbor Defendants is completely separate and unrelated to the other. They are not.

There is no need for the confusion. The four Arbor Family Defendants – Arbor, Arbor SR, ARLP, and AMAC – are all controlled by Ivan Kaufman, Arbor's founder, chairman and CEO, or his immediate family members. Importantly, these Arbor Family entities each have actual human employees.  The remaining three defendants are all single-purpose Delaware LLCs controlled by Arbor Family, with one independent director.  These entities are Bedford United, LLC, which owns the Bedford Station apartments; Victoria United, LLC, which owns the Victoria Station Apartments; and Hyattsville United, LLC, which manages each of the former. These shell companies have no humans directly attached to them but are simply LLCs managed by other LLCs.

Defendants vociferously object to this logical and permissible taxonomy. Their laughable contention is that this pleading organization is somehow a "Group Pleading" in violation of Rule 8, an argument which will be dispensed with *infra*. Defendants' table pounding is animated by the

Unable to refute the facts of the inhuman conditions at the BVS Properties, the Arbor Family Defendants rely on the notion that Arbor, Arbor SR, and ARLP do not technically "own" the properties, because their entities do not hold title to the underlying real estate.  This misplaced idea is essentially their entire defense.  Then, the Arbor Family Defendants jointly attempt to cleave off AMAC and place it with the Hyattsville Defendants, making it the only member of that group with actual human employees.  The parties strategized that any liability found against AMAC is merely collateral damage; a successful defense will allow the genuinely discriminatory parties – the Arbor Family Defendants – to evade responsibility with the shell companies left holding the bag, potentially with no meaningful assets to account.

Nowhere do Defendants present viable arguments why Plaintiffs' FHA claims should be dismissed.  Defendants wish to divert the court's attention to extraneous matters involving ownership, but property **ownership has no relation whatsoever to liability under the Fair Housing Act**.

Collectively, these Defendants created a strategy to seek immunity from federal law by

---

fact that this organization does not comport with their own litigation strategy, i.e., create an artificial reality in which Arbor divorces itself from its **wholly owned** subsidiaries.

In furtherance of this approach, and despite Arbor's claims that they are "left guessing as to which allegations actually apply to them," Arbor Brief, p. 28, Defendants attempt to re-shuffle the deck to their advantage. The Amended Complaint alleges AMAC is one of the four (4) Arbor Family Defendants.  The "Arbor Family Defendants[] are the operating and controlling entities within Arbor Realty Trust, Inc."  Amended Complaint, p.40 n3. Yet Defendants pull AMAC out of that grouping, create a new category, the "Hyattsville Defendants," and place AMAC there. This clumsy, transparent maneuver to place AMAC outside the Arbor Family Defendants is intended to confuse, mislead, and insulate.

Nonetheless, to ensure all parties can comprehend this Opposition, the brief filed by Arbor, Arbor SR, and ARLP is referred to hereinafter as the "Arbor Brief."  And the brief filed by AMAC and the Shell Companies (collectively self-identified by these wholly owned Arbor subsidiaries as the "Hyattsville Defendants") will be referred to hereinafter as the "AMAC Brief."

asserting: (1) there can be no liability under the Fair Housing Act where Arbor, Arbor SR, ARLP, and AMAC do not hold actual title to the physical homes of the tenants; and purportedly at the same time (2) Arbor Realty Trust, Inc.'s wholly owned subsidiaries, expounded upon in AMAC's Brief, cannot be held liable because the alleged discriminatory policies cannot apply to the shell companies which only own one property each. [2]

Defendants' position is a clumsy ruse.  It is one thing for Defendants to file a motion to dismiss pursuant to Fed. Rule Civ. Proc. 12(b)(6), discussing the elements of claims that should be dismissed.  It is quite another to assert nominal corporations can evade federal law in this way. The Court is required to consider whether in fact Plaintiffs have failed to state a claim under the FHA, but given the Arbor and AMAC Briefs, it is instead faced with a broad-brush misrepresentation of the law, and a concomitant wholesale dispute of the facts, a tack which is irrelevant (and plainly misleading) at this stage of the litigation.

The fundamental question is **not** whether the Arbor Related Defendants have ownership and/or control of the **properties**, but whether they have ownership and/or control of the **policies alleged in the Amended Complaint**. Contrary to Defendants wishful thinking, a company that owns or controls its real estate through a subsidiary is not insulated from Fair Housing Act claims

---

[2] Once again, like Cinderella not receiving an invitation to the ball, AMAC is excluded from this novel "case closed" analysis.  Although AMAC should properly be thought of as one of the four entities comprising the Arbor Family Defendants, which are alleged throughout the Amended Complaint to have a controlling and ownership role in each of Arbor's 139 properties nationwide, it is treated differently in the AMAC Brief. Defendants' counsel, after six months of contemplation and one failed mediation, have apparently concluded it is best to exile AMAC from its brethren. The cynical reason for this sorting is obvious.  Defendants believe AMAC – an investment arm of the Arbor Family that reported it had acquired $2 billion worth of multifamily properties since 2012 – is the only entity in this group not merely a corporate shell. Should there be a settlement or verdict in the present litigation, AMAC could be a funding vehicle for damages, bypassing any disclosure requirements necessary for the remainder of the Arbor Family Defendants, which are formally under the umbrella of the publicly held Arbor Realty Trust, Inc.

by doing so.

Defendant Realty Management Services, Inc., ("Ross" or "Ross Management") offers its own incorrect and self-serving interpretation of how the Fair Housing Act cannot apply to them. That argument being that, since Ross did not set any of the Arbor Defendants' four policies, they are free from liability. While Ross did not create the policy, they were an active, willing participant in implementing the policies.

The rationale for the Arbor Defendants' liability is not only well-established in the Fourth Circuit, but is in fact, quite basic and easily understood. Defendants' strategy is a desperate one, and for the reasons discussed *infra*, each of their pending Motions should be denied so that discovery may proceed expeditiously. Violation of plaintiffs' civil rights is acute, ongoing and constant. Further delay only compounds the suffering of Plaintiffs and their fellow ignored tenants.

Additionally, Plaintiffs have brought several common law claims which Defendants either ignore (Arbor Brief) or address by ignoring the allegations and the law to seek dismissal only for certain entities.

## SUMMARY OF FACTS

After the Great Recession of 2008, and in many instances through foreclosure proceedings such as the previous foreclosure of the BVS properties, ¶ 14, many multifamily real estate properties became available on the national real estate market, ¶ 53. Defendant Arbor Realty Trust, Inc. is a publicly traded REIT which invests in multifamily property for the benefit of its shareholders. ¶ 4. Arbor has previously identified the profitability of these types of multifamily homes, to which Arbor's CEO refers to as the "multifamily asset class," and which Arbor has identified as being "extremely resilient" to large scale economic events like the Great Recession. ¶ 61. As a result of that recognition, Arbor created an "operational strategy" to seek investment in

these types of "multifamily" properties.  *Id.*  While much of their business is related to the underwriting of mortgages for multifamily properties, Arbor also invests "in real estate-related joint ventures and … directly acquire[s] real property and invest[s] in real estate-related notes and certain mortgage-related securities."  Amended Complaint at n4 (p.54).  As a result of this strategy, and according to their CEO, one of Arbor's closely related subsidiaries is AMAC, "an investment firm created in 2012, which owns and operates over 8,000 units and has acquired more than $1.75 billion of multifamily properties across the country."  ¶ 71.  In truth, Arbor, and its subsidiaries, including AMAC and the other Arbor Family Defendants, own and control approximately 139 multifamily residential developments in at least twelve (12) states, including the BVS properties at issue in this case.  ¶ 10.

Through the ownership and control of the BVS Property-holding companies of Bedford United, LLC and Victoria United, LLC, as well as Hyattsville United, LLC (hereinafter referred to collectively as the "Shell Companies"), ¶¶ 31-33, and in agreement with its wholly owned subsidiaries of AMAC, ARLP, and its property manager, Ross Management, ¶¶ 27-36, Arbor has intentionally discriminated against the minority Hispanic protected class tenants of their BVS Properties.  This discrimination is most poignantly illustrated through a comparison of the targeted acquisition of the BVS Properties, ¶ 5, and premeditated neglect of those properties by refusal to invest or make any substantial or needed improvements to the property, ¶ 195, with the otherwise inexplicable quick investment and updating of properties in White communities or communities that are "rapidly changing" from minority to majority White, ¶¶ 176-179, which have even lesser pressing needs for capital infusion, ¶ 178, but where such investment will lead to quicker profits for the Arbor owners and shareholders.  Indeed, it is the Arbor Family's "business [] to financialize,

harvest, and intentionally refuse to invest in maintenance, sufficient management or renovation in the low-income and multifamily housing properties" located at BVS.  ¶ 4.

In addition to the intentional, targeted, and discriminatory acquisition of the BVS Properties by the Arbor Family Defendants, the Arbor Family has also created and implemented four (4) facially neutral policies, ¶¶ 197-221, each of which individually has a disparate and incredibly adverse effect on the minority BVS Tenants, ¶¶182-195.  This adverse effect is due to the simple and straightforward causal relationship between the landlord's decision and long-implemented strategy not to invest in a property it owns, and the fact that such refusal to invest naturally results in properties that manifest abhorrent conditions.  Amended Complaint, pp. 2-29. The intentional nature of Arbor's actions are further illustrated, and compounded, by the fact that Arbor's premeditated neglect relates to properties that are 75 years old, and have never received any significant renovation, ¶ 151, a status that gives rise to the obvious inference that no reasonable landlord would purchase such a property without recognizing significant capital investment is required to keep the properties safe for habitation, ¶ 56, *see generally* ¶¶ 200-207 discussing Arbor's "Harvesting Policy."  Nothing more readily demonstrates Arbor's premeditated neglect of the BVS Properties than its full awareness that, according to AMAC, even in September 2012, "prior to its acquisition by Arbor," AMAC Br. P. 9, Arbor knew that these properties were in deplorable condition, but nevertheless the properties were purchased, maintenance was almost entirely ignored, and rents were harvested for the shareholders and owners.  ¶ 206.

The (1) targeting of these foreclosed properties in minority neighborhoods, ¶ 5, and the premeditated neglect, ¶ 5, of the properties, as well as (2) the disparate effect of the Arbor Family's Policies on the BVS Properties, result in clear violations of the Fair Housing Act as well state law as discussed herein.

6

## STANDARD OF REVIEW

"'[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Thus, a court should not grant a motion to dismiss under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Presley*, 464 F.3d at 483.  When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

To survive a motion to dismiss, the factual allegations of a complaint need only "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements."  *Walters v. McMahen,* 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).  "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'"  *Id.* (*quoting Twombly*, 550 U.S. at 570).

"Moreover, the precise requirements of the *prima facie* case can vary with the context and were never intended to be rigid, mechanized, or ritualistic."  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (citation and quotations omitted).  Given the nature of the discrimination claims before the Court, Plaintiffs are not to be held to a high standard at this pleading stage, because the discovery will provide Defendants with any additional detail they crave after having

consumed the exhaustively detailed 159-page Amended Complaint.  "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed. 1990).  Citing the preceding passage from Wright & Miller, a unanimous Supreme Court also held:

> Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case. Given that the prima facie case operates as a flexible evidentiary standard, **it should not be transposed into a rigid pleading standard for discrimination cases**.

*Swierkiewicz*, 534 U.S. at 512 (emphasis added).

## ARGUMENT

Plaintiffs' Amended Complaint states more than plausible claims against each of the seven (7) Arbor Related Defendants and Ross for both intentional discrimination and disparate impact on the basis of race and/or national origin.  There are two theories of discrimination cognizable under the Fair Housing Act: disparate treatment (or intentional discrimination) and disparate impact.  *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). Plaintiffs here allege both theories of discrimination as forming the bases for their causes of action under the FHA.  Plaintiffs are "not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages." *Id.*  Indeed, the two theories of liability can and often do work in tandem, with an alleged disparate impact providing "an important starting point for determining discriminatory intent," *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), and "some evidence of discriminatory intent," (though not enough to establish intentional discrimination), is a factor in determining disparate impact, *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982).  Plaintiffs have elected to rely on both theories of discrimination

8

and have satisfied the pleading standards for each.

Plaintiffs' common law claims for breach of contract, breach of warranty, and civil conspiracy are also well-pled against each Defendant against whom they were filed.

## I.     The Requirements of Pleading an FHA Claim

Defendants drop more than ninety pages of briefs upon this Court but pay mere lip service to discussing elements of an FHA claim or the requirements for pleading one.  Instead of asserting Plaintiffs' failure to state a claim, the Court is inundated with legally unsupported affirmative defenses or cursory allegations.  The Court is not only left with a useless pile of paper, but it falls to Plaintiffs to furnish the Court with the necessary legal requirements for an FHA claim, and how the Plaintiffs meet them.

### A.  The FHA Has a Broad Purpose and Remedial Intent

"[T]he Fair Housing Act of 1968 . . . broadly prohibits discrimination in housing throughout the Nation." *Gladstone Realtors v. Vill. Of Bellwood*, 441 U.S. 91, 93 (1979); *see* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.").  The purpose of Congress in enacting the FHA was "to provide, within constitutional limitations, for fair housing throughout the United States." *Metro. Hous. Dev. Corp. v. Vill. Of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir. 1977) (quoting 42 U.S.C. § 3601).  Congress passed the Act in the wake of Dr. Martin Luther King's assassination to combat both "open and covert racial discrimination that prevented black families from obtaining better housing and moving to integrated communities[.]" *Texas Dep't of Hous. & Cmty. Affs. V. Inclusive Communities Project, Inc.*, 576 U.S. 519, 529-30 (2015) (internal citations omitted).  With its lasting power to address discrimination, the FHA "is one of the most important pieces of legislation to be enacted by the Congress in the past 60 years. It strikes at the heart of the persistent racism that so deeply troubles our Nation." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d

493, 496 (9th Cir. 2016).  *See Montgomery Cnty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 176

(D. Md. 2019) (quoting *Prince George's Cnty. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 757-

58 (D. Md. 2019) (quoting *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir.

2019))) ("The FHA, which has a 'broad remedial purpose' is a ' 'far-reaching' statute that 'takes

aim at discrimination that might be found throughout the real estate market and throughout the

process of buying, maintaining, or selling a home.''").

As a first principle, this Court is called upon to interpret the FHA consistent with its "broad

remedial purpose" to prevent and redress discrimination "throughout the real estate market."  *Id*.

Courts have responded to the congressional policy statement by holding that the Act **must be**

**interpreted broadly**.[3]

### B. The FHA Permits Claims for Disparate Treatment, Disparate Impact, and Perpetuation of Segregation

These FHA provisions encompass a broad range of acts.  *See Walker v. City of Lakewood*,

272 F.3d 1114, 1129 (9th Cir. 2001) (*quoting Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209

(1972)) ("The Supreme Court has instructed that we are to treat '[t]he language of the [FHA as]

broad and inclusive.'").  Each violation of the FHA can be supported upon two theories of

discrimination: 1) "disparate treatment;" and/or 2) "disparate impact."

---

[3] *See, e. g., Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, (1972); *Mayers v. Ridley*, 465 F.2d 630, 632-35 (1972) (en banc ) (Wright, J., concurring ); *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489 (S.D.Ohio 1976); *United States v. City of Parma*, (1973) Equal Opportunity in Housing Rptr. (Prentice-Hall) P 13,616 (N.D.Ohio 1973). *See also Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 95 (1977) (recognizing that "Congress has made a strong national commitment to promoting integrated housing"); *Griffin v. Breckinridge*, 403 U.S. 88, 97 (1971) (Supreme Court has interpreted civil rights statutes broadly).  The Court has also noted that later Congresses amended the FHA with full knowledge of the Court's broad readings and without changing the language the Court broadly construed. *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1278 (11th Cir. 2019), cert. granted, judgment vacated sub nom. *Bank of Am. Corp. v. City of Miami, Fla.*, 140 S. Ct. 1259 (2020), and cert. granted, judgment vacated sub nom. *Wells Fargo & Co. v. City of Miami, Fla.*, 140 S. Ct. 1259 (2020)  (citing the Supreme Court in *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017).

The FHA's liability focus is not on the **role** or the **identity** of a given defendant, or its relationship to a property. Instead, "[t]he Fair Housing Act itself focuses on prohibited **acts**." *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (emphasis added). The FHA is not limited in its application to specific people; but, instead, "the Act forbids any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate, for example, because of race." *Id.* (quoting 42 U.S.C. § 3605(a)) (internal quotation marks omitted). Any person who "acts" in a way inconsistent with the FHA that causes a violation of the FHA to a person, therefore, is a proper defendant. With this, FHA claims routinely proceed against mortgage lenders, management companies, appraisers, and other entities that have no "interest," including an ownership interest, in the property at issue, including claims made by **neighboring properties** for which the Defendant has no ownership or management interest nor any relationship other than as a neighbor. *Infra*.

### 1. Pleading Disparate Treatment Claims Under the FHA

The FHA has long acknowledged the theory of disparate treatment or intentional discrimination. *See Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265-66 (1977) (holding that "proof that a discriminatory purpose has been a motivating factor in the decision" violates a party's civil rights). To establish a *prima facie* case of discriminatory animus in this litigation, Plaintiffs must allege (1) the housing at issue is in a minority neighborhood, (2) the housing was eligible for the services at issue (here, routine interior maintenance and required renovation to ensure tenants' safety and habitability of property), and (3) the services were either not provided or were not provided in the same way for similarly situated housing. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) ("the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic" (citation omitted)); *see also Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F.

Supp. 1100, 1103 (N.D. Ohio 1987) (applying factors from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to fair housing claim based on neighborhood composition).

Though this matter is at the pleading stage, review of the **summary judgment** standard that may be imposed upon Plaintiffs reveals that the Arbor Family and Arbor Related entities are seeking dismissal based on facts wholly irrelevant to FHA claims. The Fourth Circuit has recognized the burden-shifting framework of *McDonnell Douglas* "is routinely used in housing and employment discrimination cases alike." *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990). Under *McDonnell Douglas*, Plaintiffs must first "show that discriminatory animus was a motivating factor" of a defendant's actions, "but they do not have to show that it was the primary or dominant purpose." *Letke v. Wells Fargo Home Mortg., Inc.*, No. RDB-12-3799, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013) (citations omitted). "Once the plaintiff shows that the action was based, at least in part, on discriminatory animus, the burden shifts to defendants to show a legitimate nondiscriminatory reason for their actions. If defendants are able to make a prima facie showing of a legitimate, nondiscriminatory reason, the burden returns to plaintiff to demonstrate that the reason was a pretext." *Id.* (citations omitted).  Still nowhere is there a requirement to show ownership.

### 2.   Pleading Disparate Impact and Perpetuation of Segregation Claims Under the FHA

The Supreme Court has also recognized that violations of the FHA can be proven under a theory of "disparate impact."  *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 545 ("The Court holds that disparate-impact claims are cognizable under the Fair Housing Act").   In *Inclusive Communities Project, Inc.*, the Supreme Court emphasized that disparate impact claims are necessary to achieve the Fair Housing Act's "central purpose." *Id.* at 521.  That is, disparate impact claims permit plaintiffs to counteract unconscious prejudices and disguised animus that escape

easy classification as disparate treatment and may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping.  *Id*. at 540.

"To state an FHA claim under a disparate-impact theory of liability, the plaintiff is required to demonstrate that the challenged practices have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 419 (4th Cir. 2018) (quoting *Inclusive Communities Project, Inc.*, 576 U.S. at 524).

Like disparate treatment claims, *supra*, analyzing the review standard at **summary judgment** is likewise helpful to see the error of Defendants' arguments.  Beyond what is necessary to plead a case, a three-step burden shifting analysis is required by the Court for Plaintiffs to demonstrate a prima facie case of disparate impact at summary judgment:

> [A]n FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework. Under the first step, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class.  Under the second step, the defendant has the burden of persuasion to "state and explain the valid interest served by their policies."  Under the third step of the framework, and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interests "could be served by another practice that has a less discriminatory effect."

*Reyes*, 903 F.3d at 424 (citing *Inclusive Communities*, 576 U.S. at 541-542 (quoting 24 C.F.R. § 100.500(c)(3)) (citing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 653 (1989)) *superseded by statute as stated in Inclusive Communities*, 576 U.S. at 542.

Notably absent from these FHA liability bases is any requirement, reference or consideration whatsoever that the potential violators of the Act be title-holding owners or managers of the properties at issue.  The Arbor Related Defendants – through both the Arbor and AMAC Briefs – primarily argue that a lack of ownership interest in the BVS properties is material to the Court's analysis.  AMAC Br. 17; Arbor Br. 13-16.  **It is not material in any way**.  A

property right is not a prerequisite or a necessary element for an FHA violation claim. Therefore, at no point in this litigation will Plaintiffs be required to show ownership or title of property to present a case for disparate impact to a jury.

Each of the following cases are instances in which disparate impact was specifically alleged and subsequently found sufficient to sustain claims of FHA violations. While a blanket string citation of hundreds of such cases would convincingly demonstrate the misrepresentations of law in the Arbor Family's briefs, the following citations and descriptions are directly analogous to the entirely legitimate and legally sufficient factual allegations of the Amended Complaint. Not only did these courts find the allegations sufficient despite defendant's lack of ownership of underlying property, but notably, undersigned counsel was unable to find **even one case** where defendants had even attempted the argument that lack of ownership of property was a shield to FHA liability:

- *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522 (D. Md. 2020) (residents of public housing owned and operated by the housing authority and not the city sufficiently alleged FHA disparate impact claim against the city regarding city's decision not to enforce the inspection and licensing requirements of its residential property code on housing authority-owned and operated public housing properties that were overwhelmingly occupied by African Americans);

- *Adkins v. Morgan Stanley*, No. 12 CV 7667 HB, 2013 WL 3835198 (S.D.N.Y. July 25, 2013) (five African American homeowners sufficiently alleged *prima facie* disparate impact claims under FHA where non-title holding bank Morgan Stanley had implemented five (5) policies and practices which caused New Century Mortgage Company to target borrowers for loans that had a disparate impact upon African Americans);

- *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008) (African American borrowers sufficiently alleged prima facie disparate impact claims under FHA where bank, its wholly-owned subsidiaries, and two retail mortgage lenders implemented discretionary pricing policy which allowed bank's retail salesmen, independent brokers, and correspondent lenders to add various charges and fees based on subjective non-risk factors, and which, in turn, had a racially discriminatory impact on African American borrowers);

14

- *Ojo v. Farmers Grp., Inc*., 600 F.3d 1205 (9th Cir. 2010), as amended (Apr. 30, 2010) (insured African American plaintiff sufficiently alleged *prima facie* disparate impact claims under FHA against insurer and its affiliates, subsidiaries, and reinsurers on behalf of similarly situated minorities who were issued or applied for homeowners' property and casualty policies, claiming disparate impact race discrimination in violation of the FHA, based on increased premiums due to allegedly discriminatory credit-scoring system);

- *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555 (D. Conn. 2015) (landlords and nonprofit civil rights organization sufficiently alleged prima facie disparate impact claims under FHA against property insurer based on insurer's underwriting criteria that charged higher premiums or denied coverage to landlords who rented apartments to tenants receiving Section 8 housing assistance);

- *Montgomery Cty., Maryland v. Bank of Am. Corp.*, 421 F. Supp. 3d 170 (D. Md. 2019) (counties sufficiently alleged FHA disparate impact claim against non-title holding mortgage lenders and servicers alleging that lenders and servicers engaged in equity-stripping scheme against minority borrowers);

- *Prince George's Cty., Maryland v. Wells Fargo & Co.*, 397 F. Supp. 3d 752 (D. Md. 2019) (counties sufficiently alleged FHA disparate impact claim against non-title holding lender and related entities seeking to recover damages allegedly sustained as result of lender's discriminatory equity-stripping mortgage lending scheme targeting minority residents);

- *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950 (9th Cir. 2021) (public housing residents sufficiently alleged prima facie disparate-impact claim under FHA against public utility who did not own the properties but had a service policy that resulted in a disparate impact on minorities);

- *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493 (9th Cir. 2016) (land developers sufficiently alleged disparate impact and disparate treatment claims under the FHA against city related to city's denial of developers' application which bared more heavily on one race than another in light of historical patterns of segregation by race and class and city's denial of their application to build moderately priced housing which had a disproportionate effect on Hispanics);

- *Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300 (E.D.N.Y. 2014) (homeowners and former homeowners who refinanced mortgages, received financing, or had related financial dealings with a bank sufficiently alleged prima facie disparate impact claims under FHA claiming that where the bank had engaged in a predatory practice of originating discriminatory and abusive mortgage refinance instruments through an equity-stripping scheme); and

15

- *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. Of Mount Holly*, 658 F.3d 375 (3d Cir. 2011) (association and current and former residents of neighborhood sufficiently alleged prima facie disparate impact claims under FHA claiming township and township officials' redevelopment plan violated various anti-discrimination laws).

The Arbor Related Defendants' "affirmative defense" of lack of ownership of the BVS Properties is no defense at all.  The requirements for pleading a violation of the FHA are outlined herein, and there is simply no requirement – none – that a defendant own the property, have title to it, or even have a security interest in it.  Period.

### 3. Reliance by the Arbor Family on the limited liability of a corporate shell is in no way defensible under or consistent with the Fair Housing Act

At its most basic level this case is about the creation and implementation of harmful and discriminatory **policies**, not about the ownership of property.  Defendants raise various notions of ownership and agency as a distraction from their REIT Scheme which has lined their pockets – specifically the Arbor Family Defendants – to the tune of tens of millions of dollars.  *See* note 5 *infra*.  The argument is repulsive on its own, but Defendants seek to have the Court waste time considering a red herring with no legal support.

Perhaps Defendants sincerely believe the shell game manipulations of New York City financiers have crafted a Kryptonite corporate veil,[4] or that they will find refuge in a protracted

---

[4] Alter ego has been sufficiently pled in the alternative, ¶¶ 35-36, despite the fact that no piercing of the corporate veil is necessary where, as here, the actions giving rise to the liability are those of the creation and implementation of the Arbor Family Policies by the four (4) Arbor Family Defendants themselves, and not the Shell Companies that hold the properties. It can be plainly inferred from the Complaint the Arbor Family has abused the shell company corporate form, but that does nothing to blunt the fact the FHA violation allegations are as against the Arbor Family Defendants themselves.  The Fourth Circuit has identified the following factors that may be relevant to a court's decision to pierce the corporate veil:

**[1]** Gross undercapitalization [alleged at ¶ 36(a)], **[2]** insolvency [alleged at ¶ 36(a)], **[3]** siphoning of funds [alleged at ¶ 36(b)], **[4]** failure to observe corporate formalities and

discussion about the English common law origins of privity of contract.  Meanwhile, here in the United States, in 2022, such arguments have **absolutely no place** in the realm of civil rights litigation.  Liability under the Fair Housing Act, as intended by Congress, was deliberately designed to avoid such sea-lawyerly argument, and, through its proper interpretation and construction by this Court, such impotent excuses must be laid bare.  Defendants' misunderstandings sound in harmony with a resulting attitude that Plaintiffs here have somehow targeted the Defendants – instead of the other way around – in such a way that the very principles of liability themselves have been bent and broken by the claims of these aggressive and unthinking litigants.

Reality strikes a different chord.  No matter how many layers of corporate shells are intentionally placed between the owners of property and the party that implemented the policy, the parties responsible for the illicit policy are liable under the FHA.  Consistent with their protestations, Defendants have moved this Court without a single supporting citation to their

---

maintain proper corporate records, **[5]** non-functioning of officers [alleged at ¶ 36(c)], **[6]** control by a dominant stockholder [alleged at ¶3(d)], and injustice or fundamental unfairness [*see* Amended Complaint generally].  Other factors properly considered by the district court in this case include **[7]** intermingling of funds [alleged at ¶ 36(b)]; **[8]** overlap in ownership, officers, directors, and other personnel [alleged at ¶ 36(e)]; **[9]** common office space [alleged at ¶ 36(f)]; **[10]** the degrees of discretion shown by the allegedly dominated corporation [alleged at ¶ 36(g)]; and **[11]** whether the dealings of the entities are at arm's length[alleged at ¶ 36(h)].

*Equal Rts. Ctr. v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *4 (D. Md. Mar. 31, 2016).  Interestingly, the analysis of the alter ego argument by the Arbor Family itself, *see* Arbor Br. 16-24, supports that each of the above allegations have in indeed been pled sufficiently.  The Arbor Family is keen to dispute **the facts** of the allegations. Plaintiffs look forward to that dispute after discovery is complete.

Regardless, a dismissal for failure to prove alter ego liability at this stage would be premature, and if the allegations of the Complaint are shown to be true in the discovery phase, this issue would only then be appropriate for resolution at a later stage.

disillusioned end.  Despite the extensive body of FHA case law undersigned counsel too, have been unsuccessful in locating the existence of case law that would support the vapid arguments of Defendants one way or another, and it may be that these "defenses" are in fact of first impression – not a surprising result given their detachment from reality.  If that is the goal, this Court must consider the fact, that, as Plaintiffs have robustly alleged, while this case is about greed, more than that, it is about **control**. ¶¶ 10, 27, 28, 29, 30, 31, 32, 33, 36, 68, 71, 80, 124, 135, 142, 148.  Control of wholly-owned entities.  Control of policy.  Control of profits.  Control of the lives of human beings.  Defendants are welcome to dispute the facts, but not now.  For the Court to dismiss this case, at this stage, based on Defendants' bogus claims related to their lack of "ownership," the Court would have to completely ignore allegations that the Arbor Family Defendants, with Ross as their willing agent, have total control over the lives of the BVS Tenants in the condition, habitability, and security of their homes.  Such ruling would be in no way consistent with the FHA, and for that reason, these "defenses" must be disregarded out of hand.

### C. The Amended Complaint alleges facts well recognized as supporting an inference of intentional discrimination.

Plaintiffs' allegations more than suffice to meet the pleading standards for a claim of intentional discrimination under the Fair Housing Act. Discriminatory intent can be shown "directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test." *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. Ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013) (citation omitted).

### 1. The totality of Plaintiffs' allegations of circumstantial evidence establishes that Defendants acted with discriminatory intent.

Under longstanding Supreme Court precedent, a plaintiff can prove discriminatory intent from the totality of the circumstances. *See Arlington Heights*, 429 U.S. at 266-68 (considering intent under the totality of the circumstances for an Equal Protection claim); *see also Thompson v.*

*U.S. Dep't of Hous. & Urban Dev.*, 348 F. Supp. 2d 398, 417 (D. Md. 2005) (finding that "intent" under the Fair Housing Act "is defined consistently with the definition used in Equal Protection Cases").

The factors used to determine whether "discriminatory purpose" was a motivating factor of a defendant's actions may include: whether the impact of the action "bears more heavily on one race than another"; whether there is a "clear pattern, unexplainable on grounds other than race" that emerges from the effect of the defendant's action; the "historical background" of the action; the sequence of events leading up to the defendant's action; departures from normal procedures; and substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S 266-67; *see also Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) ("[I]t is well established that the *Arlington Heights* factors also provide one way for a plaintiff who alleges statutory discrimination to establish discriminatory intent." (collecting cases)).

Plaintiffs' facts overwhelmingly satisfy the *Arlington Heights* factors.  The Amended Complaint before the Court has set forth such a balanced, detailed, and plausible disparate treatment claim, that it is difficult to imagine a non-discriminatory alternative explanation for the behavior of both the Arbor Family and Ross Management.[5]  Viewed through the lens of the

---

[5] The audacity with which Arbor has undertaken its ongoing discriminatory scheme likely informs the genesis of the Arbor Family's attempt at wholesale distraction through its "bifurcate and focus on ownership" strategy.  Nothing else appears to explain the otherwise near perfect irrelevance of their "non-ownership" arguments.

Furthermore, as discussed herein, while the establishment and implementation of the Arbor Family's discriminatory policies and the implementation of the same, plainly bears heavily on the actions of the Arbor Related Defendants, Ross Management is equally responsible for the mistreatment and discrimination at the BVS Properties.  Indeed, quite a strong argument can be

*Arlington Heights* factors, the liability resulting from defendants' actions also becomes crystal clear. Numerous actions of the Arbor Family "**bear[] more heavily on one race than another,**" such as their concentration on acquiring property in minority communities like BVS, ¶¶ 6, 9, but only reinvesting in Arbor-owned properties in rapidly changing or gentrifying communities, where they can justify the reinvestment to their shareholders, ¶¶11, 12, actions which are unexplainable when viewed alongside their contemporaneous refusal to invest in the properties they have targeted in stagnating communities such as that of BVS where they increase rents despite refusing to make updates to the properties, ¶14; targeting particular demographics, ¶¶65-66, specifically targeting older properties such as BVS which are comprised almost exclusively of Hispanic tenants (or their other PG County holdings comprised disproportionately of African Americans), ¶144, and which have never been significantly updated, ¶¶83, 88-89; the alleged discriminatory policies are implemented across Arbor's nationwide portfolio of approximately 139 multifamily properties comprising 17,000 units, which are significantly and disproportionality occupied by minority tenants, with White tenant occupation of the Arbor Properties on average being 18% lower than the states as a whole,  ¶¶123-132; but certainly each of the Arbor Policies, ¶¶180-221, and specifically the Harvesting Policy, ¶¶206-207, and Divestment Policy, ¶¶208-213, fall

---

made that Ross' discriminatory actions eclipse Arbor's blatant discrimination given that it fell to Ross to look these tenants in the eyes and blithely ignore their pleas for help. This fact should not be overlooked simply because Ross was the getaway car driver from only the Langley Park bank heist, and may not be otherwise indicated in the nationwide scheme. Ross has been complicit **for years,** and has overseen the transfer of **literally millions of dollars** in rent payments from the pockets of the BVS Tenants to the corpulent bank accounts of the Arbor Related Defendants, all the while taking a cut for themselves in the form of a management fee. The average monthly rent of the individual Plaintiffs is $1,560. ¶¶ 22-26. Considering there are 587 units in BVS, ¶135, the property generates approximately $915,720 in rent **per month**. In other words, even if BVS is only 90% occupied, Ross has enabled Arbor to collect an annual gross rent of approximately $9,889,776. At 95% occupancy, that number jumps to $10,439,208 annually. Without their willing compliance, BVS would never have become an Arbor Family cash machine without Ross driving the scheme.

significantly harder on the minority Hispanic tenants of BVS.

Arbor's ownership decisions reflect a "**clear pattern, unexplainable on grounds other than race,**" which is plainly evident for many of the same reasons the decisions "bear more heavily" on the BVS Tenants, as well the fact that Arbor invests in some properties while ignoring others in greater need of maintenance, ¶¶11-12, ¶¶208-213, and made their initial investment in and took their subsequent actions related to the BVS Properties while fully aware of the conditions of the residences, whose tenants subsequently complained loud and often to no avail, ¶¶103-108, 179, Exhibits A-F to Amended Complaint.  The "**historical background**" and "**sequence of events**" leading up to the purchase of the BVS Properties and the implementation of the Arbor Policies are rooted in the Great Recession beginning in 2008, ¶¶59, 61, which resulted in PG County's already disproportionately minority population, ¶84, disproportionately suffering from the foreclosure crisis as compared to other counties in Maryland, ¶86, after which time Arbor acquired BVS along with its other disproportionately minority property interests in PG County, ¶¶141-145, while throughout, Arbor retained full awareness of the conditions of the BVS Properties prior to purchase, ¶65, as well as subsequent to their ownership, ¶¶103-108, 179, Exhibits A-F to Amended Complaint.

However, it is the "**departures from the normal procedural sequence,**" and specifically the "**substantive departures…particularly [where] the factors usually considered important by [the Arbor Family and Ross]**" as here "**strongly favor a decision contrary to the one[s] reached**" that raise such a clear inference of intentional discrimination.  *Arlington Heights*, 429 U.S. at 267.  The Arbor Family's neglect of these properties was intentional and premeditated. ¶¶5, 195.  According to the CEO of Arbor and Principal of AMAC, the two companies own and operate over 8,000 units of multifamily housing, ¶¶70-71 – though the actual number is closer to

17,000 units, ¶¶125 – worth a claimed, $1.75 billion, ¶153.  That same Arbor Family purchased the BVS Properties for over $30 million, ¶¶ 110-111, and then proceeded to invest practically nothing in maintaining – much less renovating – these 75-year-old properties, opting for a policy of neglect that verges on the criminal, ¶¶ 11, 151.  Nevertheless, the Arbor Family increases the rents year over year, ¶14, and harvests the rents in the way a strip-mining firm harvests coal, ¶¶15, 206-207.  These actions **would not be possible** but for willingly complicit property manager Ross, who has enabled each of the illicit policies described in the Amended Complaint, ¶¶180-221.  Ross' behavior is so far outside the bounds of a reasonable property manager, ¶¶146-152, it is of itself "**unexplainable on grounds other than race**." It cannot be emphasized strongly enough that Ross enabled Arbor's discriminatory behavior. "[B]ut for Ross Management's unlawful conduct, undertaken with the full agreement of the Arbor Family, the discrimination at Arbor Family's properties would not be possible," ¶152.

Arbor and Ross fail to rebut the inference of discrimination created by Plaintiffs' well-pled factual allegations. Their mere seven (7) paragraphs combined devoted to this issue reflects either a lack of understanding of these claims or a lack of seriousness in rebutting them. Both Defendants latch onto the same cherry-picked language they believe is beneficial to their plight, which is from the unreported case of *Young-Bey v. S. Mgmt. Corp., Inc.*, No. CV TDC-18-2331, 2019 WL 1992905, at *3 (D. Md. May 6, 2019).  That case was dismissed because Mr. Young-Bey, who was frustrated with, *inter alia*, the fact that his property manager would not accept rental payments through its online portal, "had not provided any direct evidence of discrimination, and his allegations [were] insufficient to raise a plausible inference of housing discrimination because they fail[ed] to allege facts to show that tenants of a different race or color were treated differently under similar circumstances.  *Id.* at *3.  That case is inapposite to the present, but the related

tangential arguments made by Arbor and Ross are connected to the *McDonnel Douglas* burden shifting analysis, which will be discussed at pages 24-26 *infra*.

With regard to the FHA Claims in general, Defendants attempt to corral the actions of Arbor and Ross, segregating them away from the larger picture.  Neither Defendant so much as addresses the intentional discrimination claims outlined *supra*.  Instead, they bob-and-weave, discussing almost everything except the issues at hand.  Arbor begins their argument with the following irrelevance: "None of the properties described by Plaintiffs in the FAC is [*sic*] owned by [AMAC or the Shell Companies] (other than BVS) and therefore, cannot serve as comparators to state an FHA claim."  AMAC Br. 27.  Arbor proceeds with an attempt to narrowly reduce Plaintiffs' allegations of intentional discrimination to an analysis of the disparate impact allegations related to the Chinatown property alone, conveniently eliding all of the disparate impact analysis related to the Arbor Family's ownership interests in PG County, San Antonio, and Miami. Omitted is any acknowledgement of the disproportionate minority population of their interests nationwide.  In the end, Arbor's entire argument boils down to an irrelevant factual dispute about its "non-ownership" of BVS and its subjective belief it has made sufficient capital improvements.  Arbor is entitled to its opinion, of course, but merely asserting it falls far short of the comprehensive and legally legitimate analysis necessary to secure a dismissal at this juncture.

Ross' pleading is reminiscent of their management of BVS: a refusal to see the facts right in front of them. They never – as the law requires – offer an explanation for their inexplicable deviation from commonsense standards of even a minimally competent property manager. Instead, they seize upon only one of the many allegations against them and argue Plaintiffs cannot collaterally attack evictions carried out in accordance with Maryland law.  In the end, Ross argues Plaintiffs "fail to allege adequately that RMS acted with discriminatory intent in violation of the

FHA, [as] there is no basis to impose liability on the alleged agent [Ross] for the purported improper policies of the principal."  Ross Br. p. 10.  Even assuming, incorrectly, Ross was not acting as an agent "for the improper policies of the principal," that is hardly a bar to any liability whatsoever.  *Id.*  Simply considered on its own terms, Ross has offered no justifications for its actions, which can only lead to the conclusion that its behavior – in and of itself – is "**unexplainable on grounds other than race**."  It does not matter if the getaway driver had a prior agreement with the mastermind of the bank robbery or happened upon on the scene and chose to offer their services, they are still implicated in the crime.

### 2.  Plaintiffs state a theory for intentional discrimination based on the *McDonnel Douglas* burden-shifting framework

Plaintiffs have gone beyond what is required at this early stage of litigation and pled all of the elements required to make out a prima facie case of discriminatory intent under *McDonnell Douglas*.  Alternatively, Defendants do not even appear to be aware of the elements or have otherwise taken a head-in-the-sand approach to that analysis.  The Amended Complaint alleges that the BVS Properties (1) are located in an overwhelmingly minority neighborhood, (2) are owned by the Arbor Family and managed by Ross and thus eligible for routine interior maintenance and required renovation to ensure the safety and habitability of the property by Defendants just as the Arbor Family had upgraded its properties in other majority White neighborhoods or neighborhoods which were rapidly changing and trending towards a White majority, but (3) did not receive the same level of routine interior maintenance and required renovation to ensure the safety and habitability of the property as Arbor Family-owned properties in those other White or trending towards majority-White neighborhoods.  *See, e.g.*, Compl. ¶¶ 11-13, 153-195.  The Amended Complaint's allegations of fact assert: the Arbor Family owns approximately 17,000 properties in 12 states which are occupied disproportionately by minorities,

¶¶ 123-132; the Arbor Family owns approximately 2,500 units of multifamily housing in the disproportionately minority County of Prince George in Maryland, ¶ 84; that those Arbor Family-owned Maryland properties were targeted for ownership, ¶¶ 145, 179, 181, 269, 277, 284, by the Arbor Family and are also disproportionately occupied by minorities even in light of the minority nature of the County itself, *compare* ¶84 (White population of 12% in PG County) *with* ¶185 (Arbor Family Properties in PG County have White population of 6.1%); that, as compared to the HUD DC Market as defined in the Amended Complaint, ¶ 183, the Arbor Properties are disproportionately comprised of minorities, ¶¶ 183-188; that, alternatively, in the Arbor Family's San Antonio property of the Quarry Station Community that is disproportionately White given the demographics of the greater San Antonio Metropolitan Area as a whole, ¶¶189-195; where AMAC Principal Maurice Kaufman explained that "[t]he property has not been renovated in over 10 years and presents a tremendous value-add opportunity through unit upgrades and an operational overhaul, ¶ 169; that the Arbor Family's 10 Rutgers Property in Manhattan was purchased by the Arbor Family in 2018, ¶157; which is located in a neighborhood where the minority "Asian population … has been steadily declining and the fastest growing demographic has been the White population," ¶ 161; that acquisition was made because according to Maurice Kaufman, the purchase presented an "attractive opportunity" to acquire the property located in a "rapidly-changing neighborhood," ¶162; that the Arbor Family now markets the property as one located in a neighborhood that has "undergone great change" and presents a "new kind of resident…for a new generation of New Yorkers," ¶ 164; that the Arbor Family chose to completely renovate and maintain the 10 Rutgers Property in a safe and habitable condition for its future tenants, ¶ 166; because it represented a "value-add" investment of a "quality and scale" that was "unique" to the submarket, ¶162; in the face of the fact that BVS Properties are now 75 years old and have never

received any significant renovations whatsoever, ¶ 151; and continue to exist to the present in a deplorable state in the nearly identical condition to that of when they were purchased by the Arbor Family nearly a decade ago, pp. 2-29. These facts are more than sufficient to state a claim of intentional discrimination under *McDonnell Douglas*. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(to overcome a motion to dismiss a plaintiff need only provide enough facts to create a "reasonable inference that the defendant is liable for the misconduct alleged").

### D.  Plaintiffs' Amended Complaint states a theory of disparate impact

Plaintiffs have properly pled a disparate impact claim. The challenged practices present in this case, *inter alia*, can be summed up in a sentence: Arbor Realty Trust, Inc. and its subsidiaries have four policies that "have a disproportionately adverse effect on minorities and are otherwise unjustified by legitimate rationale." The Arbor Family, through the AMAC Brief, continues to take issue with Plaintiffs' interpretation of the Fair Housing Act as not containing any requirement policymakers such as Arbor can only be held accountable **if** they are the title-holding owners of the underlying property over which they exert control. This argument persists in the absence of any authority through the AMAC Brief's disparate impact analysis. Consistent with their other arguments, Defendants take a scattershot approach in their defense. [6]

---

[6] In perhaps the most audacious attempt to deter this Court from recognizing the grave violations of the FHA present in this case, the Arbor Family sought refuge in the following language:

> If the specter of disparate-impact litigation causes private developers to no longer **construct or renovate housing units** for low-income individuals, then the FHA would have undermined its own purpose as well as the free-market system.

AMAC Br. at p. 3 (citing *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. at 544. This language is relied upon, despite the overwhelming allegation woven intrinsically through the Amended Complaint that the Arbor Family **completely refused to renovate the BVS Properties**.

### 1. Plaintiffs have adequately pled disparate outcomes based on race or national origin.

Plaintiffs have alleged a statistically significant difference between Defendants' routine interior maintenance and required renovation to ensure the safety and habitability of the Arbor Family Properties located at BVS compared to those in disproportionately White neighborhoods. *See, e.g.*, Compl. ¶¶ 11-13, 153-195.  Whether because of intentional misrepresentation, or simple confusion, Defendants appear to misunderstand the disparate impact allegations, which can be found at ¶¶180-221 of the Amended Complaint.

First, Plaintiffs have alleged a clear statistical disparity at the BVS Properties.  Within the HUD DC Market as a whole, Whites account for 38.8% of renters, Blacks account for 35.0% of renters, Hispanic/Latinos account for 15.6% of renters and 10.6% of renters identify as Other. ¶ 183.  However, at the Arbor Family's BVS Properties, Whites account for 0.0% of renters, Blacks account for 8.2% of renters, Hispanic/Latinos account for 91.8% of renters, and 0% of renters identify as Other.  ¶184.  Similarly disparate, in Arbor's other multifamily properties across the entire HUD DC Market and located in PG County, Whites account for 6.1% of renters, Blacks account for 59.8% of renters, Hispanic/Latinos account for 26.1% of renters, and 7.9% of renters identify as Other.  ¶185.  Based on these facts alleged, the proportion of Hispanic residents in Arbor's BVS Properties where Arbor's nationwide policies are being enforced is 5.73 times greater (573% greater) than the proportion of Hispanic residents in the HUD DC Market as a whole.  ¶ 186.  Additionally, the proportion of Hispanic residents in all of the Arbor Family properties within the HUD DC Market where these policies are being enforced is 1.63 times greater (63% greater) than the proportion of Hispanic residents in the HUD DC Market as a whole, ¶ 187, while the proportion of Black residents in all of the Arbor properties within the HUD DC Market where

27

these policies are being enforced is 2.37 times greater (237% greater) than the proportion of Black residents in the HUD DC Market as a whole, ¶ 188.

Second, and as a comparator, Plaintiffs have alleged an alternative, but equally clear statistical picture at the Arbor Family properties located in San Antonio. Within the City of San Antonio, Texas, Whites account for 23.4% of renters, Blacks account for 6.5% of renters, Hispanic/Latinos account for 63.9% of renters and 6.2% of renters identify as Other.  ¶ 189. Indeed, to further clarify the statistical picture, a review of the racial composition of renters across the **entire** San Antonio Metropolitan Area as a whole reflects a similar picture, where Whites account for 32.8% of renters, Blacks account for 6.5% of renters, Hispanic/Latinos account for 54.3% of renters and 6.4% of renters identify as Other. ¶ 190. In other words, Hispanics are the majority population of renters in the City of San Antonio, as well as the greater San Antonio Metropolitan Area as a whole. ¶191.  However, that is not the case in the Arbor Family's property in San Antonio. Alternatively, in the Quarry at Alamo Heights ("the Quarry" or "Quarry Station"), Whites account for 47.9% of renters, Blacks account for 7.7% of renters, Hispanic/Latinos account for 36.5% of renters, and 6.4% of renters identify as Other.  ¶191.  Stated another way, the proportion of Hispanic renters in Arbor's San Antonio Property, where these nationwide policies are enforced, is 33% lower than the proportion of Hispanic residents in the San Antonio Metropolitan Area as a whole, ¶192, while the proportion of White residents in Arbor's Quarry Station Property where these policies are being enforced is 40% greater than the proportion of White renters in the San Antonio Metropolitan Area as a whole, ¶193.

As a result of these disparities, the same nationwide Policies, which serve to allow for the disintegration of the homes of the disproportionately (and overwhelmingly) minority Hispanic BVS Tenants in Maryland through premeditated neglect, have the reverse effect on the

predominantly and disproportionately White tenants of Arbor's San Antonio Property. The outcome is plain: where investment in the BVS Property by Arbor Family Defendants would not increase profits and dividends, none was made; alternatively, based on the same Policies, monetary investment in the San Antonio Property would increase returns for shareholders and owners, so the investments were made, the profits were returned, and the homes of the predominantly White tenants were improved. ¶195.

Defendants attack these allegations as "plainly improper comparison populations for measuring disparate impact." AMAC Br. 23. To that end, the Arbor Family seeks refuge in language of Fourth Circuit decisions, which Defendants clearly do not fully understand and therefore misconstrue. To its credit, Arbor properly recognizes, "[t]he correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984). Well, as alleged, the four Policies, applied equally at both BVS and in San Antonio have a disproportionate and adverse impact on the Hispanic Residents of BVS, while the disproportionately White Quarry Station tenants benefit from the identical Policies. Arbor proceeds with the following argument:

> Plaintiffs must "compare whether Latinos that are subject to the [p]olicy—i.e., Latino tenants at the [properties subjected to the policy]—are disproportionately impacted by the [p]olicy as compared to non-Latinos that are subject to the [p]olicy—i.e., non-Latino tenants at the [properties subjected to the policy]."

AMAC Br. 23 (quoting *Reyes*, 903 F.3d at 429 n.8). Again, that is precisely what Plaintiffs **have** done. The Hispanic BVS tenants are subject to the same Policies as their White counterparts in San Antonio property. Defendants' confusion perhaps stems from the fact that the *Reyes* case concerned a policy that was **only** in effect at Waples Mobile Home Park, and not at numerous locations nationwide, as is the case with the Arbor Family Policies. *Reyes*, 903 F.3d at 419.

Further buried in their confusion, the Arbor Family spills much ink about the 139 properties Plaintiffs allege are subject to the REIT Scheme.

- "Plaintiffs introduce naked and speculative statistics that purport to show higher rates of non-White tenants at the 139 properties overall (48.4%) than the rates of non-White persons "on the whole, in the twelve states" (39.4%)."  AMAC Br. p. 24.

- "Plaintiffs do not even identify the 'communities' in which each of these 139 properties are located." *Id.*[7]

- "This is a fishing expedition, based purely on speculation, intended to improperly expand this action from focusing on the tenants of two properties (BVS) to conducting nationwide discovery, which is exactly the scenario that *Twombly* and *Iqbal* were meant to prevent." *Id.*

The Arbor Family's confusion stems from the following misapprehension: "Plaintiffs cannot plausibly allege a disparate impact on each community, particularly since Plaintiffs do not even identify the 'communities' in which each of these 139 properties are located."  AMAC Br., p. 24. Plaintiffs have made no such an allegation.  Indeed, the allegations reflect that the Arbor Family's 139 properties comprising 17,000 units across 12 states are comprised of a population which is disproportionately non-White.  As alleged, as a direct result of the Arbor Family Defendants' acquisitions, the White population of Arbor's properties nationwide is 18% lower in Arbor's properties themselves than is the population of the states in which the Arbor properties are located as a whole. ¶132.  This is a significant disparity.  It is significant because it indicates that, indeed, when the Arbor Family Policies are applied across their nationwide portfolio, **whatever the outcome is**, consistent with the *Arlington Heights* factors discussed *supra*, the Arbor Family

---

[7] The specific discrete locations of these properties have **zero** relevance at this stage of litigation, plus, Defendants are welcome to ask their own employees, Messrs. Ottaviano and Katz, ¶¶ 127-128, about where their own properties are located.  Never fear however, Plaintiffs will happily provide the addresses of these properties once this case has reached its discovery phase.

Policies "**bear more heavily on one race than another.**"  The bottom line is that the Arbor Family seeks to confuse the clear statistical disparity revealed in the comparison between the BVS Properties and the Quarry, by injecting an entirely unnecessary statistical analysis of the remaining Arbor Family portfolio of approximately 139 properties nationwide.  Of course, these other properties are certainly alleged to be subject to the Arbor Family Policies, and the discovery process may indeed reveal that the policy is in fact having the same adverse impact on these disproportionately non-White properties, as the allegations have already revealed exists at BVS.  Only time will tell, but the allegations of Arbor's ownership of the additional 139 properties nationwide relates to the allegations of disparate **treatment** and **not** disparate **impact**.  *See* ¶¶ 123-132.

### 2.   Plaintiffs adequately allege a policy causing the alleged disparities.

Defendants' assertion that the Amended Complaint fails to plead any facially neutral policy that caused the disparities described above is patently erroneous.  AMAC Br. 19-22, Ross Br. 10-11.  Plaintiffs allege the Arbor Family's following neutral policies, as enforced by Ross, have a disparate impact on the BVS Communities: (1) the **Financialization Policy** whereby the Arbor Family uses multifamily housing as financial instruments to park, grow, leverage, and/or hide capital, often collateralizing the properties in such a way as to benefit its owners at the expense of its tenants, ¶¶ 197-199; (2) the **Harvesting Policy**, whereby the Arbor Family Defendants assess a potential investment property, categorize the property according to one of its four investment strategies, develop an investment thesis for the property which will yield the absolute maximum ROI for its investors, and implement the investment thesis for optimal return regardless of its effect on residents, ¶¶ 200-207; (3) the **Divestment Policy** in which maintenance expenditures for Arbor Family Properties are not set based upon need, but on the property's age and/or value, ¶¶ 208-213; and (4) the **Outsourcing Policy**, which requires property management to be outsourced to the third

parties and not undertaken by the Arbor Family Defendants or any of their related entities, ¶¶ 214-218.

Importantly, the Divestment Policy and the Outsourcing Policy have already been upheld by this Court as sufficient allegations in a disparate impact case.  The identical policies were alleged in the case of *Nat'l Fair Hous. All. V. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 642 (D. Md. 2019).  There, the Divestment Policy was described as "basing maintenance practices on the age and/or the value of properties," *id.* at 632, while the Outsourcing Policy was described as "outsourcing to third parties compliance with the statutory and common law obligations that are placed on owners of real property, without appropriate monitoring or review," *id.*[8]  In upholding the sufficiency of those allegations at this identical stage of the litigation, the court provided the following basis for its ruling:

> The plaintiffs have sufficiently pled a policy and practice by the defendants of abdicating their responsibility to maintain REOs. Whether articulated as undue delegation of maintenance discretion (and discrimination by the parties handed discretion) or a failure to properly supervise maintenance responsibilities, the policy alleged is sufficiently concrete for purposes of this motion to dismiss. The defendants are wrong to contend that inaction cannot provide the basis for a policy

---

[8] The alleged Divestment Policy is specifically codified as an illicit practice in the parallel context of facially neutral lending practices which result in a discriminatory effect.

> (b) Nondiscrimination in Lending.
> …
> (3) Consideration of any of the following factors in connection with a real estate-related loan is not necessary to a Federal credit union's business, **generally has a discriminatory effect, and is therefore prohibited**:
> > (i) **The age or location of the dwelling**;
> > (ii) Zip code of the applicant's current residence;
> > (iii) Previous home ownership;
> > (iv) **The age or location of dwellings in the neighborhood of the dwelling;**
> > (v) **The income level of residents in the neighborhood of the dwelling….**

12 C.F.R. § 701.31 (emphasis added).

> under the disparate impact framework, *see, e.g., Brown v. Nucor Corp.*, 785 F.3d
> at 917, and it is not the case that undue discretion is only cognizable as a disparate
> treatment claim.

*Id*. at 633.  Those allegations identically mirror the Divestment and Outsourcing Policies pled in

the case at bar and given those policies have been sufficiently pled, no further analysis related to

the other two policies is necessary.  Nevertheless, Defendants are wrong about the sufficiency of

the Financialization and Harvesting Policies as well.

As they are wont to do, Defendants persist in not responding directly to the Amended

Complaint's detailed factual allegations.  The Arbor Family haughtily dismisses no fewer than 24

paragraphs and subparagraphs, comprising fifteen (15) pages of detailed Policy allegations of the

Amended Complaint, ¶¶ 197-207, as nothing more than "a hodgepodge of vague operational and

investment practices … based on the Arbor Family's use of multifamily housing as financial

instruments by securitizing and cross-collateralizing the properties," AMAC Br. 20 (internal

quotation marks omitted).  The implications of the Harvesting Policy are ignored, and instead we

are treated to this anodyne characterization: "REITS invest in properties and make personalized

investment strategies based upon the characteristics of a potential investment property for the

purpose of maximizing return of the investment."   *Id.*   Based on the Arbor Family's simply

ignoring the allegations related to these policies, they go on to impudently argue that, "Plaintiffs

may not point to a generalized policy, but instead are obliged to do more[] to isolate and identify

the **specific** . . . practices that are allegedly responsible for any observed statistical disparities."

AMAC Br. 19 (citing *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100 (2008) (emphasis

in AMAC Brief) (internal quotation marks omitted).  Defendants are correct in identifying

Plaintiffs' burden, and certainly, if the Court were to ignore pages 108 through 127 of the Amended

Complaint as Defendants have, the Court may share that conclusion.  Of course, the Court will

give a fair reading to those allegations and must conclude Defendants' argument is entirely without

merit.  They erroneously demand a granular explanation of how their policies caused the identified, specific disparities at BVS.  Ironically, Plaintiffs have indeed pled with such granularity despite the fact that there is no such obligation to do so at this pleadings stage.  *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n ("Fannie Mae")*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) ("Ultimately, 'the question of causation—to what extent the discrepancy is explainable by objective data or race—is premature. It seems clear that Plaintiff's complaint gives rise to a fair inference of causation; the question of proof will become an issue at later stages in the proceedings.'" (quoting *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 259 (D. Mass. 2008)).

Furthermore, the Arbor Family argument that these policies are a "bootstrapped" "series of individualized, one-time decisions," AMAC Br. 21, is yet another deliberate misrepresentation or misunderstanding of case law.  Their argument is rooted in this premise: "a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all."[9]  *Texas Dep't of Hous. & Cmty. Affs. V. Inclusive Communities Project*, Inc., 576 U.S. at 543.  This language is cited in *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1113 (8th Cir. 2017), which was then incorporated by Defendants.  AMAC Br. 21.  However, use of the *Ellis* language is entirely inapposite to the facts of this case.

In *Ellis*, owners of private low-income housing had been cited repeatedly by the City of Minneapolis for housing code violations related to health and safety.  *Ellis*, 860 F.3d at 1111. Those citations were comprised of "numerous disagreements with the City over application of the

---

[9] The allegations of the Amended Complaint are nowhere near similar to that type of one-time decision of a developer.

housing code at each of their various properties" over the course of numerous inspections. *Id.* at

1113. Plaintiffs claimed that "[t]he City applie[d] preferential standards to public housing even

though the public housing in Minneapolis ha[d] a significant volume of documented and

admittedly serious code violations." *Id*. at 1109 (internal quotation marks omitted). Plaintiffs

alleged there was a shortage of low-income housing in Minneapolis, *id.* at 1107, and alleged the

city was holding these private owners to higher standards than public housing properties, and, as

a consequence, was depriving housing to minorities already disproportionately affected by the

low-income housing shortage., *id.* at 1107. In other words, the plaintiffs argued that while their

properties were bad, public housing was worse, and that by raising the habitability standards on

the homes owned by plaintiffs, they were putting the *Ellis* slumlords out of business. The *Ellis*

court held that the simple "fact that the Ellises have had numerous disagreements with the City

over application of the housing code does not, without more, plausibly suggest a City policy to

misapply the housing code.[10]  *Id*. at 1113. However, no reasonable reading of the allegations of

the Amended Complaint could result in the interpretation that the alleged polices were just a "series

of individualized, one-time decisions," as found in *Ellis.*

Defendants final attempt to divert discussion away from the factual allegations, is that even

if the Arbor Family policies were sufficiently alleged, "Plaintiffs have failed to raise such an

inference of causation … because Plaintiffs do not provide facts showing how their analysis

controls for independent variables that could impact the integrity of their data results." AMAC

---

[10] As an aside, the Ellis case also stands for the proposition that "governmental entities ... must not
be prevented from achieving legitimate objectives, such as ensuring compliance with health and
safety codes." *Id.* at 1113. Importantly, the *Ellis* plaintiffs were admonished in their cause of
action to some extent because it was an objection to government enforcement of code standards.
The court warned "an FHA disparate-impact claim may not be used to lower housing standards
for everyone merely because housing standards are inconsistently applied. *Id.* at 1112.

Br. 26.  Were it not for the citation to the *Nat'l Fair Hous. All. v. Bank of Am., N.A.* case, Defendants' misplaced concern regarding "control" for "independent variables" might just be confused as nonsense given its otherwise complete lack of context.  Nevertheless, here is what the Arbor Family is attempting to argue with this illusory allusion.

First, the *Bank of America* case was significant for a number of reasons, but not the least of which was its shear scope.  The "Historical Context" section of the Amended Complaint alluded[11] to the substance of allegations presented in that case, but for much different reasons than those presented by the Arbor Family.  The allegations of that case related to the widespread foreclosures resulting from the Great Recession.  Bank of America was subsequently unable to sell many of the real estate owned ("REOs") properties it possessed and allowed these properties to deteriorate.  *Id.* at 623.  Plaintiffs undertook an extensive seven-year (2011-2018) investigation of Bank of America's "maintenance and marketing" of its REOs. *Id.*  The investigation found properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies than Bank of America-owned homes in White areas. They concluded there was a "systemic and particularized pattern of differential treatment … on the basis of race, color, and/or national origin."  *Id.* at 623-624.  Plaintiffs' investigation there had to be wide-ranging because the allegation was the **nationwide policy** of Bank of America was having a **nationwide effect** on all of its REO homes across the country. That is **not** what is alleged here, and that is why such an extensive causation study is unnecessary.    Unlike    *Bank    of    America,* Plaintiffs have alleged the **nationwide policies of the Arbor Family have had a**

---

[11] "Once those predatory mortgages reached their obvious conclusion, i.e., foreclosures and homelessness of their targets and the repossession of the houses by the banks, financial institutions took ownership of the homes, and in many instances across the country – and almost exclusively in the Black and Brown neighborhoods – ceased maintaining the vacant homes themselves." Amended Complaint ¶ 58.

**disparate impact on the homes of the BVS Tenants**, and the investigation can stop with the 29 pages of photos indisputably showing the effects of Arbor's nationwide polices on the BVS Community.  To put it in different terms, to prove their policy was having a disparate impact on the homes of the minority residents of all of the neighborhoods in which the Bank of America's REO properties were located, plaintiffs needed to show at the pleading stage that all of those homes were suffering at least to some degree from the alleged policies.  The Arbor Family's present fundamental misunderstanding is the same one referenced above, that: "Plaintiffs cannot plausibly allege a disparate impact on each community, particularly since Plaintiffs do not even identify the "communities" in which each of these 139 properties are located."  AMAC Br. 24.  Again, those are not the allegations of the Amended Complaint, so no more advanced causation allegations are required than that of the disastrous effect of the policies on the BVS Properties themselves.

## II.    Plaintiffs have pled valid claims under the Fair Housing Act

The FHA prohibits housing discrimination on the basis of race, color, religion, sex, familial status, disability, and national origin. 42 U.S.C. §§ 3601 *et seq*., 3604(a), 3604(b), 3617.  These four (4) independent bases of liability are anchored in the Fair Housing Act's text and long history of case law construing the same.  Instead of challenging those independent bases, the Arbor Family Defendants retreat to their spurious argument they are immune from any Fair Housing Act violations because they do not "own" the properties.  Well, Gov. George Wallace did not "own" the University of Alabama when he stood in the schoolhouse door to block the university's integration in 1963.  The law is crystal clear.  The Fair Housing Act must be given "a generous construction" because it embodies a "policy of the United States that Congress considered to be of the highest priority." *Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972) (citation omitted).  Bearing in mind the importance of this policy of fair, open, and equal housing rights underlying the Act, Plaintiffs sufficiently allege violations of 42 U.S.C. §§ 3604(a)-(b), 3617, and

adequately allege a claim under the Fair Housing Act for the Defendants in engagement of the perpetuation of segregation.

> **A. Defendants' discriminatory maintenance of the BVS Properties in the overwhelmingly minority community of Langley Park adversely affects their availability for rent, in violation of Section 3604 of the Fair Housing Act**

Discriminatory maintenance of properties makes many of the BVS units unavailable and denies to the BVS Tenants the use of their rented homes in violation of the FHA.  The FHA makes it unlawful to "make unavailable or deny, a dwelling to any person because of race … or national origin.  42 U.S.C. § 3604(a).  Further, the HUD regulations make it "unlawful, because of race [or] national origin . . . to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." ¶ 268.  It is furthermore unlawful to "discriminate against any person in the terms, conditions, or privileges of … rental of a dwelling, or in the provision of services or facilities in connection therewith."  42 U.S.C. § 3604(b).   HUD's regulations implementing § 3604(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings because of race [or] national origin." ¶ 275.

Plaintiffs' Amended Complaint is replete with detailed allegations of how the combined actions of Defendants make the BVS Properties (1) unavailable to the tenants, and (2) how the Arbor Family and Ross Defendants refuse maintenance services to the properties for discriminatory reasons, each of which are distinct forms of unlawful conduct under the FHA. Indeed, Defendants make no attempt to refute the numerous and specific allegations about the uninhabitability of the properties, ¶¶ 22-26, 231, or the fact some properties have been made entirely unavailable to their inhabitants, ¶ 232-234.  Nor do Defendants directly contest the many dangerous conditions that have resulted from Defendants' policies and their enforcement.  *See* Amended Complaint pp. 2-29, ¶¶ 22-26.  These actions combine to "make unavailable or deny,

38

[these dwellings] to [the BVS Tenants] because of race … or national origin.  42 U.S.C. § 3604(a).

However, Defendants do more than make the housing unavailable. They strangle it.  As exhaustively detailed, by implementation of their policies, the Arbor Family, through Ross, limits the resources available to update, renovate, or remodel the properties.  ¶¶ 146-152.  Specifically, "[s]ubjecting the BVS Properties to a management agreement that provides routine maintenance, repairs and minor alterations only to the extent that there is an availability of sufficient funds and only in accordance with the Approved Budget plainly prevents even routine maintenance from being undertaken if the Arbor Family does not provide enough money for the proper and legal maintenance of the BVS Properties."  ¶ 90 (internal quotation marks omitted).  The budget provided to the properties as compared to the Arbor Family's other newer and more valuable properties where investments are made, ¶¶ 153-179, is direct evidence that the Arbor Family treats the BVS Properties differently with regard to its "provision of services," in direct violation of 42 U.S.C. §3604(b), ¶ 274.

## B. The discriminatory maintenance of the BVS Properties perpetuates segregation in violation of the Fair Housing Act.

HUD's regulations implementing the Fair Housing Act state that "a practice has a discriminatory effect where it…creates, increases, reinforces, or perpetuates segregated housing patterns because of race." ¶ 283.  Arbor's refusal to properly maintain its properties, and Ross' complicity in support of that action, act to perpetuate segregation through (a) destabilization of minority and immigrant communities like the one at BVS; (b) alienation and expulsion of minorities and immigrants from historically minority communities to be replaced by White tenants who are more financially sound such as the Arbor Family's acquisition of 10 Rutgers Street in Manhattan; and (c) financial damage to minority and immigrant communities already existing in the lowest income categories who are forced to make modest repairs on their own to Arbor's

properties to simply maintain their presence in the homes, thereby furthering the wealth gap and the concomitant inability to purchase or rent homes in more affluent integrated neighborhoods.

"Perpetuation of segregation is, in effect, an alternate avenue of pleading disparate impact under the FHA." *Bank of Am., N.A.*, 401 F. Supp. 3d at 641. "[I]f a policy perpetuates segregation and thereby prevents interracial association, it will be considered invidious under the Fair Housing Act notwithstanding the fact that it may have no immediate impact." *Turtle Creek Assocs.*, 736 F.2d at 987 n.3; *see also Boykin v. Gray*, 895 F. Supp. 2d 199, 213-14 (D.D.C. 2012), *aff'd sub nom. Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016); *Nat'l Fair Hous. All. v. Deutsche Bank*, No. 18 C 0839, 2018 WL 6045216, at *10-11 (N.D. Ill. Nov. 19, 2018). As in the case of *Bank of Am., N.A.*, the Arbor Family Policies "forestall housing integration and freeze existing racial segregation patterns." 401 F. Supp. 3d at 641.

The nature of the statistical evidence needed to make out a prima facie case differs slightly between the disparate impact claims and those of a perpetuation of segregation claim. While the disparate impact analysis discussed *supra* is relevant to the discussion of the perpetuation of segregation claim, it differs in its focus. Where the disparate impact analysis is construed through the more nationwide lens – the policies' effects on the BVS Tenants versus the policies' effects on the tenants of the Quarry at Alamo Heights – the perpetuation of segregation claim focuses more narrowly on the immediate impact on the local community. "If the paradigmatic disparate impact claim alleges that a policy has a greater adverse impact on one group over another, a perpetuation of segregation claim concerns the effect of the decision on the subject community." *Bank of Am., N.A.*, 401 F. Supp. 3d at 641.

Nothing more clearly illustrates the perpetuation of segregation in the local community by the Arbor Family's policies than comparisons with other multifamily housing developments in

Langley Park.  As alleged, the Arbor Family Properties within PG County are disproportionately occupied by minorities even considering the minority nature of the County itself.  As alluded to *supra*, a comparison of White population of 12% in PG County, ¶84, with the Arbor Family Properties in PG County which have a White population of 6.1%, ¶185, reveals that even in that microcosm, Arbor' Properties are disproportionately non-white by a factor of two (2) as compared to the County as a whole.  Furthermore, however, and specifically for the purposes of the perpetuation of segregation claim, a review of the allegations related to the BVS Properties as compared to the other low-income multifamily properties in the immediate community yields a compelling portrait.

Of the total multifamily housing units located in Langley Park, 71% of the units are located within the 13 apartment complexes represented in Figure 1 of the Amended Complaint.  ¶90.  Among these complexes, Bedford Station had the highest number of inspections and violations every year during the time period from 2014-2017, while the complex with the lowest number of inspections and violations varied each year. ¶ 91.[12]  Between the two properties, there have been

---

[12] Arbor Family disputes the inspection figures alleged between 2014 and 2017 arguing Plaintiffs "fail to provide those same figures for 2018 through 2022—the most relevant time period for purposes of statutes of limitation."  AMAC Br. 10.  First, there is no statute of limitations issue in the present litigation, as the Arbor Family's illicit policies are still in effect.  Here, as in the case of *Nat'l Fair Hous. All. V. Bank of Am., N.A.*,

> there is no contention here that the allegedly unlawful practice ended two years before this suit was filed, and the plaintiffs' home maintenance grievances are squarely the kind of unlawful practice contemplated by the statute. In no way is the harm complained of here a discrete act of discrimination or just one incident of conduct violative of the Act. Because the plaintiffs allege a continuing unlawful practice, [this lawsuit] is timely.

401 F. Supp. 3d at 630.  Second, however, and amusingly, Defendants appear unaware of the global pandemic which froze the inspection and licensing regimes of local government authorities across the United States – and likely the world – between February 2020 and in many cases, up to the present. This would have been self-evident had the Arbor Family's Figure 1 of the AMAC

thousands of code violations discovered over the years. Between 2014 and 2017 alone there were approximately 2,162 code violations.  ¶ 92.  As a result, over this time period, for every inspection of a BVS unit that was undertaken by PG County, there were 3.3 code violations discovered.[13] ¶92.  During the same period across these 13 multifamily developments and including the BVS violations, however, there was a total of 3,023 code violations.[14]  ¶90.  Stated differently, of the 13 properties that comprise the overwhelming majority of multifamily housing units in Langley Park, the BVS Properties by themselves accounted for **72% of the total code violations**.[15]

Plaintiffs have more than sufficiently alleged distinct violations of both disparate impact and perpetuation of segregation underlying their claims related to §§3604 and 3617 (discussed *infra*) as well as that of §3601 *et seq*.

### C.  Plaintiffs' Amended Complaint states a claim under 42 U.S.C. § 3617.

The Arbor Family Defendants attempt to dispense with the § 3617 claim generally as follows: "Plaintiffs' perpetuation of segregation claim fails for the same reasons that Plaintiffs failed to plausibly allege that the Hyattsville Defendants' policies have a disparate impact on 'communities of color….'"  AMAC Br. 28.  The Arbor family goes on to claim the conclusory allegations are too far removed from any plausible theory of causation, and finally that the

---

Brief provided the number of "inspections" instead of simply the number of "violations," as was included in the comparable Figure 1 of the Amended Complaint by Plaintiffs.  However, their failure to include the number of inspections is simply consistent with the cumulative obfuscation seen throughout their motions.  Apropos of their analysis, the Arbor Family appear to be avoiding legitimate arguments related to that time period like our fellow humans were avoiding COVID 19 during the same.

[13] Friendly reminder, that despite these abysmal results, these numbers only account for inspections of 28.25% of the total number of BVS Properties harvested by the Arbor Family. ¶93.

[14] 978 + 912 + 500 + 633 = 3023.  ¶90

[15] 2,162 / 3,023 = 71.5%

allegations against the Arbor Family reflect no intent to discriminate.  *Id.* 28-29.  Of course, the AMAC Brief made almost no attempt whatsoever to genuinely analyze the allegations of intentional discrimination.  Meanwhile, Ross continues in its belief that its conspiracy to violate the rights of Plaintiffs shouldn't count, because "[Ross] is only alleged to manage the BVS properties and there are no facts or allegations that [Ross] manages the properties differently based on any protected status."  Ross Br. 14.  Defendants are, again, incorrect.  As discussed at length *supra*, the allegations of intentional discrimination as against all Defendants plainly rise to the level sufficient for allegations of a violation of § 3617 at this stage of the proceedings.

The broad language of the Fair Housing Act "makes it unlawful, among other things, to interfere with any person in the exercise or enjoyment of . . . any right granted or protected by other provisions of the Act. 42 U.S.C. § 3617."  ¶ 288.  Courts have been clear that this language does not require a showing of threatening or violent conduct and covers actions (like those alleged here) that obstruct, impede, or hinder the ability to rent a property, as well as other practices that interfere with housing rights.  "Indeed, allegations of interference with rights protected by the FHA have been permitted to proceed under § 3617."  *Bank of Am., N.A.*, 401 F. Supp. 3d at 642.  *See, e.g., McCauley v. City of Jacksonville*, N.C., 829 F.2d 36, 1987 WL 44775, at *2 (4th Cir. Sept. 8, 1987) (holding that "the complaint sufficiently alleges [that the plaintiff] has offered to provide racially integrated housing, the city has denied him sewer services because of race in violation of § 3604(b) and interfered in violation of § 3617 with his aiding and encouraging prospective minority tenants to rent the housing that he proposes.").  In *Bank of Am., N.A*, the plaintiffs sufficiently alleged that the defendants' REO maintenance practices interfered with the rights of homeowners and prospective buyers in communities of color.

Here, Plaintiffs allege that because of the Arbor Family Defendants' draconian Policies,

43

and Ross Management assisting the enforcement of the same, CASA is interfered with in its ability to fully support the Hispanic community with its full array of services and to provide recommendations or guidance on the location of convenient, affordable, and safe housing within the Langley Park area to its predominantly Hispanic population.  ¶291.  Further, it is alleged that if the Arbor Family Policies did not exist and the BVS Properties were properly maintained, CASA could better assist these minority community members in finding appropriate housing in Langley Park.  However, as a result of Defendants' bad acts, the pool of habitable and affordable housing is illegally diminished, in a place where such housing is already scarce.  *Id.*  As in the *Bank of America* case, "[these] contention[s] also will be subject to more exacting factual scrutiny on summary judgment, [but] the claim meets the plausibility pleading standard."  *Bank of Am., N.A.*, 401 F. Supp. 3d at 642.

### III. Plaintiffs Have Pled a Claim for Breach of the Implied Warranty of Habitability Against all Parties

Maryland allows three ways, the third of which is pled here, that a claim for breach of the implied warranty of habitability may be brought: 1) as a breach of contract; 2) as a violation of the Maryland Consumer Protection Act; or 3) as a **violation of a duty** imposed upon an owner or manager of a property by virtue of local ordinance.  *See, e.g. McDaniel v. Baranowski*, 419 Md. 560, 581-82 (2010); *Williams v. Hous. Auth.*, 361 Md. 143, 158 (2000); *Brown v. Dermer*, 357 Md. 344, 360 (2000) (each analyzing breach of implied warranty of habitability claims brought for violations of local ordinances); *see also Benik v. Hatcher*, 358 Md. 507, 532-33 (Md. 2000) (describing local ordinances as imposing "specific duties and obligations" upon landlords and management companies to maintain a premises.).  *Richwind v. Brunson* settled that violation of a local code gave rise to a breach of warranty claim that is analyzed under negligence principles.

44

335 Md. 661, 671-72 (Md. 1994).  Such a claim, like Plaintiffs', for breach of the implied warranty

of habitability is a tort claim, not a contractual claim.

Plaintiffs' Amended Complaint unequivocally pleads a breach of the implied warranty of

habitability claim for violation of a local statute.  The cause of action is titled "Count VI – Breach

of the Implied Warranty of Habitability for Violation of Local Code.  Doc. 43, p. 151.  It further

states:

> Prince George's County Local Code imposes upon Defendants a legal duty to "to
> maintain all facilities supplied with the leased dwelling unit and/or as enumerated
> in the lease." The Prince George's County Local Code further incorporates all state
> legal obligations requiring that Defendants "comply with all applicable provisions
> of any Federal, State, County, or municipal statute, Code, regulations, or ordinance
> governing the maintenance, construction, use, or appearance of the dwelling unit
> and the property of which it is a part."

*Id*. ¶ 309.  The two quoted sections are found in the Prince George's County Local Code (exactly

as stated) and should have been easily discovered by Defendants at § 13-153.  Requiring pinpoint

citations is inapposite with multiple Rules of Civil Procedure, including Rule 1 and Rule 8.  FRCP

1 (The Rules "should be construed, administered, and employed by the court and the parties to

secure the just, speedy, and inexpensive determination of every action and proceeding."); FRCP

8(d)(1) ("Each allegation must be simple, concise, and direct. No technical form is required.").  A

party is not required to cite statutes or case law to state a claim in federal court.

### A. Plaintiffs Have Pled Breach of the Implied Warranty of Habitability Against the Arbor Entities and the Arbor Family Entities

The Arbor entities make no specific attack against Plaintiffs' Breach of the Implied

Warranty of Habitability claim, but Hyattsville United and AMAC (each Arbor Related

Defendants) specifically argue that a habitability claim cannot be made against them.  Taking the

allegations in the Amended Complaint as true, no Defendant is entitled to dismissal.

45

A party who voluntarily comes to and takes on an obligation owes a duty of reasonable care to perform that duty to a third party.  "'It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all'." *Kemp v. Armstrong*, 40 Md. App. 542, 546-47 (Md. Ct. Spec. App. 1978) (quoting *Glanzer v. Shepard*, 135 N.E. 275, 276 (1922) (Cardozo, J.)); *see also, e.g., Dix v. Spampinato*, 278 Md. 34, 40 (Md. 1976) ("It is apparent therefore that Mrs. Horak may have been in a better position to observe the traffic than was Miss Dix. While Mrs. Horak was under no duty to direct Miss Dix to cross the street, having attempted to do so she was bound to exercise ordinary care.") (citing *Glanzer*).

Based on information and belief, and as pled in their claim, AMAC and Hyattsville have purposely availed themselves to the BVS properties and make determinations as to the management and maintenance of the properties (in accord with the Arbor entities).

- "Arbor Realty Trust, Inc. is the parent company and/or exerts controlling authority over the codefendants and subsidiaries…" Doc. 43 ¶ 27
- ARLP "is the operating partnership of Arbor Realty Trust, Inc. through which substantially all of Arbor Realty Trust, Inc.'s operations are conducted. This includes the operation of BVS as Arbor Realty Trust, Inc. operates and otherwise controls operations of BVS through ARLP" *Id*. ¶ 28
- "AMAC is the management arm of Arbor Realty Trust, Inc. and along with ARLP manages BVS subject to the discretion, control, and policy decisions of Arbor Realty Trust, Inc." *Id*. ¶ 29.
- "Arbor Realty Trust, Inc. controls the operations of Arbor Realty SR, Inc., including its investment decision into BVS." *Id*. ¶ 30.

Each of these entities, as pled in good faith and with reasonable basis for belief, has purposely chosen to take on some of the management and/or maintenance obligations at BVS.  With this, they were obliged by settled negligence principles to act with reasonable care.  Plaintiffs each alleged that they failed to do so based upon pages of pictures and identified failures to maintain

the property.  Therefore, the breach of the implied warranty claim is well-pled against all Arbor

Related Defendants and all Arbor Family Entities.

    **B.  Plaintiffs' Breach of the Implied Warranty of Habitability Claim against Ross is Grounded in Ross' Duty to Plaintiffs**

    RMS cannot escape liability for breach of the implied warranty of habitability under

defenses to contract claims because when the cause of action is pled as a violation of a local code,

the action sounds in tort and negligence principles apply.  *Supra*.  The matter of *Richwind v.*

*Brunson* settled RMS' argument against RMS that such a claim can be brought against the

management company.  The *Richwind* Court held in no uncertain terms:

> We agree with § 17.6 of the *Restatement (Second) of Property, Landlord and*
> *Tenant*. We therefore conclude that a private cause of action in a landlord/tenant
> context can arise from a violation of any statutory duty or implied warranty
> created by the Baltimore City Code. If Richwind violated one of the city code
> provisions, that violation could provide the basis for a negligence action against
> it **and its agent, Scoken Management Corporation.**

*Richwind,*, 335 Md. at 671-72. (overruled on other grounds by *Brooks v. Lewin Realty*, 378 Md.

70 (Md. 2003) (emphasis added); *see also id*. at 671 (quoting *Restatement (Second) of Property,*

*Landlord and Tenant* § 17.6 (1977)).  What Maryland case law makes clear is that a claim for

breach of the implied warranty of habitability may be based on a violation of a local ordinance or

statute, 2) that this type of warranty claim follows the tort principles of a negligence action, and 3)

these claims may be brought against the management companies (like RMS) that are responsible

for maintaining the properties.  *See also Nerenhausen v. Washco Mgmt. Corp*., No. CV JKB-15-

1313, 2017 WL 1398267, at *5 (D. Md. Apr. 18, 2017) (citing *Benik v. Hatcher*, 750 A.2d 10, 23

(Md. 2000) ("In Maryland, the basis for alleging breach of an implied warranty of habitability in

the context of residential leases is generally found in municipal housing codes.").

**IV.     Ross is Liable as an Agent for a Partially Disclosed Principal on the Contract Claims**

Ross acknowledges that agents for partially disclosed principles are liable for the for the contracts of their principals.  Ross Br. 15 ("The label 'partially disclosed principal' is a legal conclusion in agency law, wherein agents can be held liable for contracts of their principals, depending on certain circumstances.") (citations omitted).  In fact, Maryland law is clear on this point: "Whether one speaks of an agent for an undisclosed principal or of an agent for a partially disclosed principal, if an agent wishes to avoid liability he must seasonably disclose the identity of his principal." *Crosse v. Callis*, 263 Md. 65, 73 (Md. 1971).  An agent does not evade liability because it disclosed that the agent was acting for another.  *See* Doc. 50, p. 15 ("The leases could not have been more clear in indicating that RMS was plainly . . . acting as the agent of another' and accordingly, bear no liability.").  But RMS is wrong that they have protected themselves merely by disclosing their agency status.

In *Crosse*, the Maryland Court of Appeals relied upon the Restatement (Second) of Agency to define a partially disclosed principal.

> (2) If the other party has notice that the agent is or may be acting for a principal but has no notice of the principal's identity, the principal for whom the agent is acting is a partially disclosed principal.

*Crosse*, 263 Md. at 72 (quoting *Restatement (Second) of Agency* § 4(2) (1958)).  As *Crosse* makes clear, a partially disclosed principal is one for whom the party has notice exists but does not know the principal's identity.  That is precisely the disclosure here.

The leases attached to the AMAC Motion contain the following boilerplate language of a partially disclosed principal.  Indeed, each of the leases states:

> This Apartment Lease Contract (the "Lease") is between *you*, the resident(s)… and **Realty Management Services, Inc.,** as agent for the owner of the improved residential real estate known as **Bedford and Victoria Station…**

*See* Doc. 46-8, *e.g.* p. 6 of 106 (emphasis in original).  The lease agreement does not identify the principal in any way.  Therefore, under *Crosses* and a litany of Maryland case law on point, RMS remains liable for breach of the contract because the owners were partially disclosed, and not fully disclosed.

RMS' discussion of *Testerman Co. v. Buck Curtis G.* is a misleading alteration of the court's finding.  *Testerman* re-stated the following long-standing rule: "The rule in Maryland is clear that 'if an agent fully discloses the identity of his principal to the third party, then, absent an agreement to the contrary, he is insulated from liability.'"  *Testerman Co.*, 340 Md. 569, 576 (Md. 1995).  This rule was unchanged by *Testerman*.  RMS seizes on a later use of the phrase "of another," but part and parcel of this phrase was that the **identity** of the "another" was known or disclosed.  The law in Maryland is not that merely identifying yourself as an agent "of another" is sufficient to insulate an agent from liability.  If that were the law, the rule pertaining to a "partially disclosed principal" would have no effect because a partially disclosed principal is defined as disclosing that an agent is acting for "another," but **not** disclosing the **identity** of that principal.  *Supra*, *Crosse*, 263 Md. at 72 (quoting *Restatement (Second) of Agency* § 4(2) (1958)).

Finally, Plaintiffs note RMS remarks Plaintiffs have now properly alleged the principal for whom they operated.  This was not known to the Plaintiffs at the time they entered into their lease and Plaintiffs had no notice of such when they did sign.  The fact that this was able to be discovered after legal research into court and property documents has no bearing on the liability of RMS at this time.  The alternative argument that all any agent to a partially disclosed principal ever has to do is disclose the principal after litigation commences to avoid liability, is wholly unsupported in the law, and RMS makes no attempt to support the proposition.

**V.     Individual Plaintiffs are Third Party Intended Beneficiaries of the Management Agreements**

The law in Maryland as explained by the Maryland Court of Appeals in *Lovell Land, Inc. v. State Highway Administration*, 408 Md. 242 (Md. 2009) is that when a duty is owed to a third party and a contract delegates that responsibility to the third party, the third party is an **intended** creditor beneficiary.   "[T]he Courts now generally recognize the right of a third-party beneficiary to sue on a contract made **expressly for the benefit of either a donee beneficiary or a creditor beneficiary**." *Lovell Land, Inc.*, 408 Md. at 260 (quoting *Mackubin v. Curtiss-Wright Corp.*, 190 Md. 52, 57 (Md. 1948)) (emphasis supplied by *Lovell Land*).  *Lovell Land* defined:

> (2) a *creditor* beneficiary as one "where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee, or a right of [t]he beneficiary against the promisee which has been barred by the Statute of Limitations, or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds."

408 Md. at 261 (citations omitted).   If performance of the promise "will satisfy an actual or supposed duty of the promise" (*i.e.*, Ownership), then the third party **is** an intended beneficiary who can sue on the contract.  This is the current law in Maryland.

Here, the Arbor Related Defendants owe an actual and supposed "duty" to the Plaintiffs and the classes. *Benik*, 358 Md. at 530 ("As we have seen, a landlord leasing or agreeing to rent a dwelling intended for human habitation is deemed to covenant and warrant that it is fit for human habitation.").  *Supra* Prince George's County Code of Ordinances, § 13-153.   Ownership then **contracted** this duty to RMS under its agreement.  ECF No. 40-2, Management Agreement ¶ 4.01 ("Manager covenants to and shall operate the Property in accordance with…(iii) all laws, rules, regulations, and governmental requirements applicable to Manager and the Property…").   This property management agreement clearly intends to benefit the tenants because it specifically

delegates the duties of Arbor and the United entities to comply with county rules and ordinances to RMS.  As a matter of law, it intends to benefit the tenants.

RMS' reliance on *Little v. Union Trust Co.*, 45 Md. App. 178 (Md. Ct. Spec. App. 1980), a 1980 Court of Special Appeals opinion interpreting a contract between the Department of Housing and Urban Development and a landlord, is a desperate attempt to avoid accountability. First, the matter was a special case in which tenants sought to sue on a "Regulatory Agreement" signed pursuant to the federal Housing Act between a landlord and the government which was acting as an "insurer" of the property.  *Little*, 45 Md. at 182 ("the purpose of the Act and the Regulatory Agreement was to protect the United States Government **as insurer of the mortgages**") (emphasis added). This was not a contractual agreement between a landlord and a management company to maintain the property for tenants.  Instead, this was an agreement between the government, which owed no legal obligations to the tenants, and the landlord who owned the property.  RMS' reliance on *Little* would be persuasive if Plaintiffs were seeking to hold Ownership's mortgage insurance provider liable pursuant to an insurance agreement between Ownership and its insurance carrier.  That type of contract does not contemplate the tenants, even if it required certain maintenance standards.  Instead, Plaintiffs seek relief on a contractual agreement that delegates a duty owed by Ownership to the Plaintiffs and the Classes.  This type of contract seeks to delegate the performance of a duty owed to the tenants by Ownership to RMS. *Supra*, *Lovell Land*.

Second, the Court of Special Appeals was mindful to rely upon federal courts' interpretation of the Fair Housing Act's meaning.  *Little*, 45 Md. at 181 (quoting *Falzarano v. United States,* 607 F.2d 506, 511 (1st Cir. 1979)).  Wisely, the Court of Special Appeals heavily weighed federal courts' interpretation of a federal governmental contract made pursuant to a

federal law.  Upending federal law and creating disparate law interpreting the same federal contract throughout fifty-states would have caused unnecessary confusion amongst the various sovereign jurisdictions.  The Court of Special Appeals was circumspect to rely upon federal courts' interpretation of a federal contract made pursuant to federal law.  But this is not a concern here; instead, the Court need simply apply binding Maryland Court of Appeals case law and recognize that the tenants are intended creditor beneficiaries as defined by *Lovell Land*.

At a minimum, tenants are **alleged** to be third-party intended creditor beneficiaries, this issue should be decided by the fact finder, and the Court should "assume the truth" of Plaintiffs' allegations.  The Management Agreement clearly intends to provide the tenants with maintenance that makes the property habitable.  However, when a contract's terms are ambiguous, the interpretation of the contract is for the jury and should not be resolved by the Court at any pretrial stage.

> Where, however, the surrounding circumstances, as shown by the evidence properly admissible or admitted without objection, create a doubt as to the meaning of the contract, the question of the meaning of the contract may be submitted to the jury.

*Masano v. Albritton*, 245 Md. 423, 431 (Md. 1967) (quoting *Ebert v. Millers Fire Insurance Co.,* 220 Md. 602, 610 (1959) (quoting *Montauk Corporation v. Seeds,* 215 Md. 491 (1958), and cases and authorities therein cited, including 3 Williston,  § 616; *see also* 3 Corbin on Contracts, § 554 (1960))).

The question of "whether the contract clearly intends to benefit the tenants" is a jury question not for the Court.  The contracts' dueling paragraphs are far from clear, rendering its terms ambiguous, at worst.   *See* Doc. 50, p. 21, *compare* Doc. 50, Ex. 1 § 4.01 ("Manager covenants to and shall operate the Property in accordance with…(iii) all laws, rules, regulations, and governmental requirements applicable to Manager and the Property…").  This Court should

resolve issues of admissibility of evidence in the form of testimony and documents from the parties.  But, respectfully, this Court cannot determine in a preliminary motion to dismiss the meaning of a contract when two provisions are so readily capable of different interpretations.  That question must be presented to the jury in a special verdict form asking them to determine whether the parties clearly intended to benefit the Plaintiffs and tenants of BVS.

RMS's request for a preliminary dismissal of Plaintiffs' third-party-intended beneficiary claims is extremely premature.

## VI.    Plaintiffs Have Stated a Claim for Civil Conspiracy Against All Defendants

Maryland has established a claim for Civil Conspiracy.  A claim for civil conspiracy requires proof of the following elements:

1) A confederation of two or more persons by agreement or understanding;

2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and

3) Actual legal damage resulting to the plaintiff.

*Lloyd v. General Motors Corp.*, 397 Md. 108, 154 (Md. 2007) (citations omitted).  Plaintiffs Amended Complaint alleges that all of the Defendants work with a concerted understanding and by agreement in violation of the FHA and common law tort obligations resulting in legal damage to Plaintiffs.  Amended Complaint ¶¶ 327-30.

Plaintiffs spent multiple paragraphs explaining how Defendants have agreed to act, and then actually acted, in a way that results in the lack of maintenance to BVS.  Amended Complaint ¶¶ 27-36.  These acts are in violation of the FHA for the reasons stated above and throughout the Amended Complaint.  And these actions violate the duties imposed by Prince George's County Local Ordinances.  *Supra*.

The Arbor Family Defendants move to dismiss the civil conspiracy for the sole reason that there is allegedly no predicate violation.  AMAC Br. 29.  The FHA and common law duty violations all suffice under *Lloyd*.

RMS makes additional arguments.  **First**, RMS misinterprets case law to assert that an agent cannot conspire with its principal as a matter of law.  This is factually immaterial on the allegations as RMS has a contract with only Bedford United and Victoria United.  It does not have a contract for anything with any other Defendant, and seeks to distance itself from the other defendants, including the Arbor Entities.  But the Amended Complaint makes clear that all the entities worked in concert together and that the policies were created by Arbor Entities and RMS agreed to implement those tortious and unlawful policies.  On the allegations, Plaintiffs do not allege that the conspiracy was simply pursuant to a contractual agreement, nor that it was between a principal and an agent.  Even assuming the interpretation of the law was correct, RMS is not insulated by this defense from unlawful and tortious agreements alleged to have been held between it and any defendant other than Bedford United and Victoria United.

Additionally, RMS stretches the case law beyond its stated limits.  *Fraidin v. Weitzman*, 93 Md. App. 168 (Md. Ct. Spec. App. 1992), analyzed specifically lawyers acting on behalf of their clients and in so doing looked at whether there can be an agreement between a **corporation** and its **employees** that may give rise to a claim for Civil Conspiracy.  *Id*. (quoting *Harnish v. Herald-Mail Co.,* 264 Md. 326, 337 (1972) ("It is doubtful at the least that an employee of a corporation and that corporation can conspire where the employee is acting only for the corporation and not for any personal purpose of his own."); *Marmott v. Maryland Lumber Co.,* 807 F.2d 1180, 1184 (4th Cir. 1986) *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 700 (1987) ("[A] conspiracy between a corporation and its agents, acting within the scope of their employment, is a

legal impossibility.")).  This did not stand for the proposition that two entities cannot engage in a civil conspiracy if they have a written agreement where one acts as the agent for the other.  Instead, it stands for the proposition that when an entity and its employees or agents are working for the joint benefit of the entity, there may be no such a claim.  However, here RMS is working for its own benefit.  It is agreeing not to perform maintenance because it saves them time, money, and resources.  It further provides them additional compensation in the form of managing other properties because Arbor knows RMS is a willing participant in its scheme.  RMS is engaged in this conspiracy to benefit itself, not to benefit anyone else.

**Second**, Plaintiffs' Amended Complaint meets the pleading requirements of Rule 8.  *See Coastal Labs., Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1026 (D. Md. 2020) (finding civil conspiracy claim was pled correctly under Rule 8 and refraining from imposing Rule 9's heightened particularity requirements).  RMS seeks to require Plaintiffs to plead the "when" and "where" the conspiracy was formed.  Ross Br. 25.  But that is not required under Rule 8.  Instead, Plaintiffs spent pages devoted to explaining how the parties work in concert to refrain from investing and maintaining BVS because of the policies of Arbor which RMS **then implements**.

**Finally**, the Amended Complaint lays out which unlawful acts RMS conspired to engage.  RMS tries to reframe the property management agreements as the "agreement" in furtherance of a conspiracy.  But the civil conspiracy is based on the agreement and understanding to **not** perform those maintenance and investments that are required under the Management Agreement.  RMS' attempts to cast the signed Property Management Agreement as the one that causes a civil conspiracy are inconsistent with the allegations.  *See* Amended Complaint ¶ 329.

Therefore, Plaintiffs have pled a Civil Conspiracy claim against all Defendants.

## VII.    CASA Has Standing

Plaintiff CASA de Maryland, Inc. (CASA) is a nonprofit, membership-based immigrant rights organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.  Amended Complaint ¶ 224.  Its mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities.  *Id.* To further this mission, CASA offers a wide variety of services to immigrant communities.  These services include community organizing, helping tenants form tenants' associations, and navigating government assistance. ¶ 226.  In the legal sphere, CASA provides advice, counseling, and direct representation on a range of housing cases, from improving housing conditions to eviction prevention.  *Id.*

CASA receives dues from members who are able to pay.  Membership provides individuals access to free legal services and free health and social services, as well as language classes and vocational training, among other benefits.  ¶ 225.  The majority of CASA members are noncitizen renters, from countries around the world, with low incomes and limited financial means.

CASA's history with BVS runs deep. Quite literally, the apartments are in CASA's backyard.  In order to get to CASA's headquarters, one must pass by or through the BVS apartments and view the horrendous conditions on the premises: gaping foundation holes, boarded up windows, moldy exterior walls, and trash piled up.  *See generally* Amended Complaint pp. 2-29.  Over several years, CASA has been fighting on behalf of the tenants to secure better conditions. This constant battle with BVS management and ownership has resulted in CASA needing to divert funding and staff time from other organizing and legal projects just to help the BVS tenants secure the rights to which they are legally entitled.  ¶ 226

As numerous courts have held over the years, CASA has both organizational and associational standing to bring cases on behalf of its members.  *See, e.g.*, *La Clinica de la Raza v.*

*Trump*, No. 19- CV-04980-PJH, 2020 WL 4569462, *4 (N.D. Cal. Aug. 7, 2020); *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 771 (D. Md. 2018) (remarking that CASA, as "a special interest group[] directly focused on aiding immigrants and their communities," is a "prototypical example[]" of an organization with associational standing), *aff'd on other grounds*, 924 F.3d 684 (4th Cir. 2019), *cert. denied*, 2020 WL 3492650 (2020).

Defendants have not pointed to any reason why the standing analysis would be different for CASA here.  First, all of the Plaintiffs are CASA members; many if not most of the proposed class members are also CASA members.  Second, CASA spends considerable time and energy organizing, representing, and otherwise interacting with BVS Tenants. Prior to the filing of this suit, CASA organized rallies and held meetings on the grounds of BVS apartments. Third, at various points during these activities, CASA had to redirect efforts from its grant-funded activities towards rectifying the conditions at BVS.  ¶ 229.

Finally, CASA does not need organizational or associational standing to pursue their own § 3617 claim which states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, **or on account of his having aided or encouraged any other person** in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617 (emphasis added).  Here, CASA alleges that on account of having aided other individual tenants, including the current named Plaintiffs, they have suffered damages.  Therefore, they have standing to pursue their own damages on account of Defendants unlawful interference with CASA's own efforts to aid or encourage their members to exercise the rights provided by the FHA.

## VIII.   Plaintiffs Have Not Engaged in Inadmissible Group Pleading

Defendants provide a perfunctory and meritless "group pleading" allegation.  "Group

pleading" is only disfavored when **unrelated** Defendants who do not act in alleged concert are "lumped" together with resulting confusion as to which parties are responsible for which actions. However, Parties may be grouped into terms such as "Arbor Family Defendants" and "Arbor Related Defendants" and still have proper notice under Rule 8(a).  "'[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant,' as [Plaintiffs] ha[ve] done here." *Chevron v. Apex Oil Co.*, 113 F. Supp. 3d 807, 815 n.1 (D. Md. 2015) (quoting *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.,* No. 13–639, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) (internal citation and quotation omitted); (citing *Sprint Solutions, Inc. v. Fils–Amie,* 44 F.Supp.3d 1224, 1227 (S.D.Fla.2014) ("a plaintiff may plead claims against multiple defendants by referring to them collectively"); *Frazier v. U.S. Bank Nat. Ass'n,* No. 118775, 2013 WL 1337263, at *3 (N.D.Ill. Mar. 29, 2013) ("Although Plaintiff refers to [defendants] collectively, Plaintiff has provided sufficient factual detail about the nature of his allegations and about each defendant to provide fair notice of his claims.")).  Defining collectives of Defendants in so-called "group pleading" is permissible if "it is apparent that Plaintiffs assert their claims against all Defendants for their concerted conduct…" and "are all owned by the [the same entities], represented by the same counsel, accepted service as a single entity, and all joined in the instant motion to dismiss." *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 431-32 (D.N.J. 2015) (citation omitted).

Here, Plaintiffs stated with more than sufficient detail the roles that each individual Defendant plays.  Amended Complaint ¶¶ 27-34.  Plaintiffs also adequately alleged the relationship between the individual defendants, including the *alter ego* nature and other factors that explain which entities make which decisions amongst the groups.  *Id.*  ¶¶ 35-36.

58

Defendants group pleading argument appears to be a *pro forma* argument likely learned during a course in continuing legal education and pasted into the motions here.  But it has no applicability to the allegations of the Amended Complaint which adequately define each individual Defendant's bad acts and role in implementing those bad acts, providing Rule 8 compliant notice of the claims made against each.

## **CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that the Court deny all Defendants' Motions to Dismiss.  In the event that the Court grants all or part of the Defendants' Motions, Plaintiffs seek leave of the Court to amend their Complaint in accordance with the Court's ruling.

Date:   March 25, 2022

**The Donahue Law Firm, LLC**

*/s/ P. Joseph Donahue*
P. Joseph Donahue, Esquire
Bar Number: 06245
18 West Street
Annapolis, Maryland 21401
Telephone: 410-280-2023
pjd@thedonahuelawfirm.com

**Nidel & Nace, P.L.L.C.**

*/s/ Jonathan Nace*
Jonathan Nace, Esquire
Bar Number: 18246
One Church Street
Suite 802
Rockville, MD 20850
Telephone: (202) 780-5153
jon@nidellaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed in this case with the clerk of the court and served this 25th day of March, 2022 through the court's CM/ECF system, which will send notification of this filing to all counsel of record.

/s/ P. Joseph Donahue
P. Joseph Donahue, Esquire