IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CASA de MARYLAND, INC., et al.    :

                                 :

    v.    :    Civil Action No. DKC 21-1778

                                 :

ARBOR REALTY TRUST, INC., et al.    :

                                 :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this housing discrimination and landlord-tenant case are the motions to dismiss filed by Defendants Arbor Realty Trust, Inc., Arbor Realty Limited Partnership, Arbor Realty SR, Inc., Arbor Management Acquisition Company, LLC, Hyattsville United, LLC, Bedford United, LLC, Victoria United, LLC, and Realty Management Services, Inc., (ECF Nos. 46, 47, 49)[1]; the motion to compel the opening of discovery filed by the collective Plaintiffs, (ECF No. 67); and the motion

---

[1] The motion filed on behalf of Arbor Management Acquisition Company, LLC, Hyattsville United, LLC, Bedford United, LLC, and Victoria United LLC, (ECF No. 46), asserts failures to state claims due to insufficient attribution of policies and ownership of comparables, and failure to plead sufficient claims for disparate impact or discriminatory intent.  They also challenge subsidiary and other statutory claims, standing, and assert a statute of limitations defense.  Those defendants expressly incorporate the motions filed by other defendants.  (ECF No. 46-1, at 12 n.1). The motion filed on behalf of Arbor Realty Trust, Inc., Arbor Realty Limited Partnership, and Arbor Realty SR, Inc., (ECF No. 47), asserts that they don't own the properties in question and explicitly incorporates the arguments advanced in ECF No. 46. Finally, Realty Management Services, Inc. filed its own motion and separate memorandum, (ECF Nos. 49 and 50).

for leave to file surreply by Defendants Arbor Management Acquisition Company, Hyattsville United, Bedford United, and Victoria United, (ECF No. 72).  The issues have been briefed, and the court now rules, no hearing being necessary.  Local Rule 105.6. For the following reasons, the motions to dismiss will be granted and denied in part.  The motions to compel the opening of discovery and for leave to file surreply will also be denied.

I.   **Background**

   **A. Factual Background**

   The following facts are alleged in the 159 page, 332 paragraph Amended Complaint, and construed in the light most favorable to Plaintiffs.  Arbor Realty Trust, Arbor Realty Limited Partnership, Arbor Realty SR, and Arbor Management Acquisition Company "operate collectively" to own and/or control approximately 139 multifamily residential developments in twelve states.  (ECF No. 43, at ¶10).

   Arbor Realty Trust is a publicly traded real estate investment trust ("REIT") incorporated in Maryland.[2]  (ECF No. 43, at ¶27). It is a real estate finance company that invests in real estate-

---

[2] A real estate investment trust acquires and holds real estate as an investment.  (ECF No. 43, at ¶40).  The REIT then pays out a portion of the rents it receives from its properties to its shareholders.  (ECF No. 43, at ¶¶41, 42).  There are three types of REITs: (1) Equity REITs which own and operate income-producing real estate; (2) Mortgage REITs which lend money directly to real estate owners through mortgages, loans, or mortgage-backed securities; and (3) Hybrid REITs which are a combination of an Equity REIT and a Mortgage REIT.  (ECF No. 43, at ¶46).  Arbor Realty Trust and Arbor SR are Hybrid REITs.  (ECF No. 43, at ¶48).

related loans and assets, such as multifamily apartment buildings. (*Id.*).    Arbor  Realty  Limited  Partnership  is  the  operating partnership of Arbor Realty Trust.  (ECF No. 43, at ¶28).  Arbor Realty  SR  is  also  an  REIT  incorporated  in  Maryland  and  a "Significant Subsidiary of" Arbor Realty Trust.  (ECF No. 43, at ¶¶30, 73).  As a subsidiary of Arbor Realty Trust, Arbor Realty SR makes the initial investment in Arbor holding companies, enabling Arbor entities to acquire ownership of real estate.  (ECF No. 43, at  ¶30).    Arbor  Management  Acquisition  Company  ("AMAC")  is  a subsidiary of Arbor Realty Trust, a member of the "Arbor family of companies," and a national commercial real estate investment firm that owns and operates real estate across the country.  (ECF No. 43, at ¶¶29, 78).  Plaintiffs allege that among the properties AMAC owns and/or controls are two multifamily apartment buildings which are the subject of this action, Bedford Station and Victoria Station (collectively, the "BVS Properties").  (ECF No. 43, at ¶29).  Each property, consisting of one and two bedroom units, was constructed  in  1947  and  is  located  in  Langley  Park,  Maryland. Arbor Realty Trust, Arbor Realty Limited Partnership, Arbor Realty SR, and AMAC are alleged to be part of a collective that makes decisions for the Arbor business pyramid.  (ECF No. 43, at ¶10). Plaintiffs refer to these four Defendants collectively as the "Arbor Family Defendants."  (ECF No. 43, at ¶10 n.2).

Three other Defendants are alleged to be part of the pyramid topped by Arbor Realty Trust.  Hyattsville United is a single purpose single member Delaware limited liability company which "is owned and controlled by Arbor Realty Trust." (ECF No. 43, at ¶33). Hyattsville United is the sole member of Defendants Bedford United and Victoria United.  Bedford United and Victoria United are holding shell companies for the Bedford Station Apartments and Victoria Station Apartments, respectively.

Plaintiffs refer to these seven Defendants collectively as the "Arbor Related Defendants."  (ECF No. 43, at ¶27 n.3). Plaintiffs allege that this corporate family invests in real estate across the country.  At the top, Arbor Realty Trust decides which properties to purchase.  Arbor SR then makes a loan to a holding entity, which purchases the real estate.  The holding entity then assigns the rents to Arbor SR as collateral.  In this case, the BVS Properties were purchased by Bedford United and Victoria United in 2013 with a loan from Arbor SR.  (ECF No. 43, at ¶¶110, 111). Arbor Realty Trust recorded alongside each deed an Assignment of Leases and Rents to Arbor SR.  (ECF No. 43, at ¶112).  The mortgages were subsequently refinanced with a third-party, German American Capital Corporation.  (ECF No. 43, at ¶117).

Finally, the eighth defendant is not part of this hierarchy. Instead, Realty Management Services is the management company

operating the BVS Properties on behalf of its co-defendants. (ECF No. 43, at ¶34). It does business as "Ross Management." (*Id.*).

Plaintiffs are seven tenants of the BVS multifamily apartments, as well as immigrant advocacy organization CASA de Maryland. (ECF No. 43, at ¶¶21-26). Tenant plaintiffs have national origins of either El Salvador or Guatemala, and describe themselves as Hispanic men and women. Plaintiffs complain of disrepair, rodent infestations, and other failures to maintain and repair at the BVS Properties. (ECF No. 43, at ¶1). They allege that the eight defendants discriminated against them through the deficient maintenance and repair of their apartments. According to Plaintiffs, Defendants established four "policies" which result in a failure to maintain the properties. The alleged policies are not formal policies but are instead labels Plaintiffs have assigned to conduct on the part of the "Arbor Related Defendants." Those policies are:

1.  Financialization Policy—using multifamily housing as a financial instrument, (ECF No. 43, at ¶198);

2.  Harvesting Policy—acquiring properties with different intentions for upkeep and renovation depending on the cost of doing that work versus revenue the properties will generate with or without investment; among the properties purchased are "cash cow" properties which the "Arbor Family Defendants" acquire with intent to make

5

little to no capital improvement while continuing to obtain rents from the property, (ECF No. 43, at ¶206);

3.    Divestment Policy—scheduling and funding property maintenance by the age and/or value of the property, (ECF No. 43, at ¶209); and

4.    Delegation of Duties, or Outsourcing Policy—outsourcing day to day management of properties to third-party management companies, (ECF No. 43, at ¶216).

**B. Procedural Background**

On July 19, 2021, Plaintiffs filed their complaint against the eight defendants. (ECF No. 1). Defendants moved to dismiss for failure to state a claim. (ECF Nos. 30, 35, 40). Plaintiffs responded by filing the First Amended Complaint. (ECF No. 43). Defendants again moved to dismiss for failure to state a claim (ECF Nos. 46, 47, and 49). Plaintiffs opposed, (ECF No. 53), and Defendants replied, (ECF Nos. 58, 59, and 60). During the pendency of the motions to dismiss, Plaintiffs filed a motion to compel the opening of discovery, (ECF No. 67), and some of the Defendants filed a motion for leave to file surreply in opposition to the motion to compel the opening of discovery, (ECF No. 72).

The First Amended Complaint asserts eight claims:

1.    Violation of Section 804(a) of the Fair
      Housing Act, 42 U.S.C. § 3604(a);

2.    Violation of Section 804(b) of the Fair
      Housing Act, 42 U.S.C. §3604(b);

6

3.   Perpetuation of Segregation in violation of the Fair Housing Act, 42 U.S.C. § 3601;

4.   Violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617;

5.   Breach of Contract (lease agreement);

6.   Breach of the Implied Warranty of Habitability for Violation of Local Code;

7.   Breach of Contract (management agreement);

8.   Civil Conspiracy.

All claims are brought against all Defendants, except for Count VII, which is brought against only Realty Management.

The First Amended Complaint purports to bring class action claims on behalf of a "BVS Class"—a class of all tenants of the BVS Properties—and an "Arbor Family Nationwide Class"—a class of all tenants of properties owned by the Arbor Family Defendants or any affiliate of Arbor Realty Trust, Inc.  (ECF No. 43, at ¶242). Plaintiffs have not moved for class certification.

## II.  Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor."  *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021).  A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a)(2), which requires a

7

"short and plain statement of the claim showing that the pleader is entitled to relief[.]"  A Rule 8(a)(2) "showing" still requires more than "a blanket assertion[] of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007), or "a formulaic recitation of the elements of a cause of action[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).

## III. Analysis

Defendants' motions to dismiss initially challenge the sufficiency of the First Amended Complaint because, they argue, it relies on impermissible group pleading and the alter ego theory of piercing the corporate veil, which they say Plaintiffs have insufficiently alleged.  They then argue that the individual claims are insufficiently supported by allegations of fact.

### A. Group Pleading

As explained above, Plaintiffs have grouped the Defendants into the "Arbor Family Defendants," and the "Arbor Related Defendants."  Those seven Defendants reject that framing of their relationships and have filed motions to dismiss as the "Arbor Defendants" (Arbor Realty Trust, Arbor Realty Limited Partnership, and Arbor Realty SR), (ECF No. 47), and the "Hyattsville

Defendants" (Arbor Management Acquisition Company, Hyattsville
United, Bedford United, and Victoria United), (ECF No. 46). Realty
Management Services filed a motion to dismiss on behalf of itself.
(ECF No. 49). Defendants insist these alternative groupings are
based on the reality of the relationships between and among
themselves (or the lack thereof) and that grouping them together
as "Arbor Family Defendants" or "Arbor Related Defendants" means
Plaintiffs have failed to state a claim because the First Amended
Complaint does not sufficiently allege specific conduct against
individual Defendants. Specifically, the "Hyattsville Defendants"
argue that Plaintiffs have engaged in impermissible group
pleading, (ECF No. 46-1, at 19), and the "Arbor Defendants" argue
that Plaintiffs have engaged in impermissible group pleading,
which is particularly problematic regarding them because
Plaintiffs have not sufficiently alleged that the "Arbor
Defendants" own or control the BVS Properties, (ECF No. 48, at 18,
19, 22, 30).

"Group pleading is pleading which attributes allegations to
'a subset of defendants' rather than to 'a particular defendant.'
*J.A. v Miranda*, 2017 WL 3840026, at *3 (D.Md. Sept. 1, 2017)."
*Navient Sols., LLC v. L. Offs. of Jeffrey Lohman*, No. 1:19-cv-461
(LMB/TCB), 2020 WL 1867939, at *7 (E.D.Va. Apr. 14, 2020). Judge
Titus explained the fault of group pleading in *Proctor v. Metro.
Money Store Corp.*, 579 F.Supp.2d 724, 744 (D.Md. 2008):

9

> At best, such pleading amounts to a conclusory
> allegation that . . . [each Defendant] [was] somehow
> responsible for the wrongful conduct[.] At worst, the
> repeated refrain that all three individuals committed
> each and every act must be read as an allegation that
> one of the three did each act, an assertion that amounts
> to speculation and which is deficient under [*Bell Atl.*
> *Corp. v.* ] *Twombly*[, 550 U.S. 544 (2007)].

At the beginning of litigation, however, it may be permissible for
a plaintiff to be less than precise on the role of each putative
defendant:

> Yet, nor do *Iqbal* and *Twombly* demand that a plaintiff
> possess full and complete knowledge of the defendant's
> alleged actions. Rather, a plaintiff need only submit
> facts sufficient to plead a plausible claim for relief.
> Indeed, it is the purpose of discovery to establish the
> presence or absence of facts with which the plaintiff
> intends to prove his claim.

*Burgess v. Baltimore Police Dep't*, No. 15-cv-0834-RDB, 2016 WL
795975, at *10 (D.Md. Mar. 1, 2016). Thus, the initial fact based
issue requires a common sense assessment of the available
information and may turn on whether the plaintiff has made a
sufficient pre-filing investigation. *Wilson v. PL Phase One
Operations L.P.*, 422 F.Supp.3d 971, 980 (D.Md. 2019).

Plaintiffs' theory of connection among the defendants is
essentially that (1) Defendants Arbor Realty Trust, Arbor Realty
Limited Partnership, Arbor Realty SR, and Arbor Management
Acquisition Company, are an interconnected series of entities at
the top of a corporate pyramid who more or less work together to
make decisions for the Arbor corporate pyramid; (2) Hyattsville
United, Bedford United, and Victoria United are owned and/or

controlled by the "Arbor Family Defendants" and are at the bottom of the Arbor corporate pyramid; and (3) Realty Management Services is the property manager for Bedford Station and Victoria Station and thus, while not part of the Arbor corporate pyramid, is connected.

Plaintiffs have sufficiently alleged a connection among the "Arbor Family Defendants" such that, if Plaintiffs have otherwise stated a claim sufficiently, the case may proceed against all of those defendants. Plaintiffs' allegations about the relationship among Arbor Realty Trust, Arbor Limited Partnership, and Arbor SR, and the role each plays in the collective business, are sufficient to make plausible the allegations of a subsidiary relationship and, at minimum, that the three defendants are working together. *Wilson*, 422 F.Supp.3d at 979 ("Plaintiffs detail Defendants' interlocking corporate structure and attribute specific roles to each Defendant where feasible.") Plaintiffs have also sufficiently alleged the connection of AMAC to that group. Plaintiffs allege that AMAC is a "subsidiary" of Arbor Realty Trust, (ECF No. 43, at ¶29), and a member of the "Arbor family of companies," (ECF No. 43, at ¶78). Plaintiffs also allege that Ivan Kaufman, Founder, Chairman, President, and CEO of Arbor Realty Trust, (ECF No. 43, at ¶70.a.), is the Co-Founder and Principal of AMAC, (ECF No. 43, at ¶70.c.). The exact relationship AMAC has with Arbor is not crystal clear based on these allegations, but

Plaintiffs have alleged enough to make it plausible that AMAC has some relationship with Arbor Realty Trust, Arbor Realty Limited Partnership, and Arbor SR, and is either controlled by, or working collectively with, those entities.[3] *Wilson*, 422 F.Supp.3d at 980 ("Here, Plaintiffs adequately allege the interrelationship among all defendants and outline the role played by each."); *Chestnut v. Kincaid*, No. 20-cv-2342-RDB, 2021 WL 1662469, at *8 (D.Md. Apr. 28, 2021) ("[I]t is the purpose of discovery to establish the presence or absence of facts with which the plaintiff intends to prove his claim.") (quoting *Burgess*, 2016 WL 795975, at *10).

Plaintiffs have also made factual allegations connecting Hyattsville United, Bedford United, and Victoria United to the higher up corporate defendants.  They allege that the subsidiary defendants are owned and/or controlled by Arbor Realty Trust, Ivan Kaufman, and the "Arbor Family Defendants," (ECF No. 43, at ¶¶31-33, 36d, 69).  Plaintiffs also have alleged that the "Arbor Family [Defendants] and [Realty Management]" have provided to tenants of BVS W-9 forms indicating that Hyattsville United "is the entity that collects rents on behalf of Arbor"; and (2) that AMAC

---

[3] AMAC argues that the court can take judicial notice of its corporate disclosure form, which states that is not owned by any entity.  While true that judicial notice can be taken of such public records, *316 Charles v. Liberty Mutual Insurance Company, et al.*, that does not make it implausible that AMAC is working with and/or controlled by the other "Arbor Family Defendants." No. 21-cv-0787-DKC, 2022 WL 228010, at *4 (D.Md. Jan. 26, 2022).

Holdings, LLC, has the same registered address as Arbor Realty Trust.  (ECF No. 43, at ¶¶75, 137 n.6).  The second allegation is noteworthy because AMAC Holdings, LLC, is one of the entities who owns Hyattsville United.  (ECF No. 33) (corporate disclosure form). Plaintiffs have plausibly alleged a chain of ownership and control by the "Arbor Family Defendants" over the three subsidiary defendants.[4]  That interrelationship, however, is an insufficient basis from which to infer that Hyattsville United, Bedford United, and Victoria United took actions which would make them individually liable.  Plaintiffs needed to allege additional acts by those three

---

[4] Arbor Realty Trust, Arbor Realty Limited Partnership, and Arbor Realty SR argue that they do not own the BVS Properties and thus Plaintiffs have not stated claims against them.  They argue that other courts have found that "defendants who did not own the underlying property could not be liable for alleged FHA violations connected to actions which only an owner, landlord, or agent could undertake." (ECF No. 58, at 7-10).  Their citations, however, are not applicable here where Plaintiffs' theory is that the Arbor Family Defendants own and exercise control over properties through a chain of corporate relationships. *Cf. Hoostein v. Mental Health Ass'n (MHA), Inc.*, 98 F.Supp.3d 293, 298 (D.Mass. 2015) (finding landlord plaintiffs lacked cause of action under FHA against their tenants); *Sunrise Dev. Inc. v. Lower Makefield Tp.*, No. 2:05-CV-02724, 2006 WL 626806, at *4 (E.D.Pa. Jan. 23, 2006) (filing appeal against zoning decision did not "make unavailable" dwelling); *Garcia v. Brockway*, CASE NO. CV 03-193-S-MHW, 2004 WL 7334542, *8-9 (D.Idaho Apr. 22, 2004)(finding designers and constructors of housing do not remain liable under the FHA after sale of the home); *Hardaway v. Equity Residential Servs., LLC*, No. 13-cv-0149-DKC, 2015 WL 858086, at *4 (D.Md. Feb. 26, 2015), *aff'd sub nom. Hardaway v. Equity Residential Mgmt. LLC*, 675 Fed.App'x 381 (4th Cir. 2017) (finding Plaintiffs sued defendants in corporate family who did not have a connection to allegations).  Those cases are not analogous to this one where Plaintiffs have identified defendants whom they allege owned and controlled properties and were the ultimate decision makers for those properties.

subsidiaries to justify group pleading against them.  Having failed to do so, Plaintiffs will not be able to proceed on a theory of group pleading against all seven "Arbor Related Defendants."

For clarity's sake, the four higher up Defendants will be referred to as the "Arbor Family Defendants," the three subsidiary defendants will be referred to as the "Arbor Subsidiary Defendants," and the seven together will be referred to as the "Arbor Related Defendants."

**B. Pierce Corporate Veil**

As an alternative, Plaintiffs argue that each Defendant, other than Realty Management, is liable based on an alter ego theory.  Defendants argue that Plaintiffs insufficiently pleaded this theory.  Defendants propose three different standards for veil piercing: (1) federal; (2) Maryland; and (3) Delaware.  They argue that irrespective of the choice of law analysis, the result is the same.  (ECF Nos. 46-1, at 21 n.13; 48, at 23 n.13).  Plaintiffs provide no argument on choice of law, and just argue that they alleged a theory of veil piercing.  They argue by analyzing the factors of the federal standard.  As is explained below, Plaintiffs have failed to allege a claim under the FHA.  Thus, the federal standard does not need to be considered.  *See Equal Rights Center v. Equity Residential*, No. 06-cv-1060-CCB, 2016 WL 1258418, at *3 (D.Md. Mar. 31, 2016) ("The court applies federal common law in deciding whether to pierce the corporate

veil because that decision implicates an important federal interest: liability for violations of the FHA."); *but see Antonio v. Sec. Servs. of America, LLC*, 701 F.Supp.2d 749, 759-760 (D.Md. 2010) (applying Maryland standard for corporate veil piercing in case involving federal and state claims against Maryland and non-Maryland defendants without analysis).

The result is the same for Plaintiffs and their other claims under either Maryland or Delaware law because both require higher allegations of wrongdoing than Plaintiffs have alleged.  The Fourth Circuit has summarized the fraud requirement under Delaware law:

> [T]he act of one corporation is not regarded as the act of another merely because the first corporation is a subsidiary of the other, or because the two may be treated as part of a single economic enterprise for some other purpose.  Rather, to pierce the corporate veil based on an agency or "alter ego" theory, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."
>
> *In re Sunstates Corp.,* 788 A.2d 530, 534 (Del.Ch.2001) (quoting *Wallace v. Wood,* 752 A.2d 1175, 1184 (Del.Ch.1999)).  Thus, "[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity" and "a common central management alone is not a proper basis for disregarding separate corporate existence." *Skouras v. Admiralty Enter., Inc.,* 386 A.2d 674, 681 (Del.Ch. 1978).

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 309 n.5 (4th Cir. 2003).  The injustice must be more than a breach of contract or the burden of bringing the action in another forum.

*Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del.Supr. 1996) (cited in *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del.Ch. 1999)).  Plaintiffs have not alleged that Arbor Realty Trust's subsidiaries are shams and only exist as a vehicle of fraud.  On the contrary, Plaintiffs have alleged different roles for the subsidiaries in the Arbor real estate family, such as loaning money or directly holding real estate assets.

Under Maryland law the result is similar:

> By contrast, where liability is concerned, Maryland courts decline to pierce the corporate veil "except where it is necessary to prevent fraud or enforce a paramount equity," even where evidence suggests that a corporate entity was established for the sole purpose of dodging legal obligations. *Iceland Telecom, Ltd. v. Info Sys. & Networks Corp.*, 268 F.Supp.2d 585, 591 (D.Md. 2003) (quoting *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225, 233-34 (Md. 1975)). Compared to other states, "Maryland has a markedly restrictive approach to piercing the corporate veil." *Id.; see also Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 728 A.2d 783, 790-91 (Md.Ct.Spec.App. 1999).  Indeed, "[d]espite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged the piercing of the corporate veil 'for reasons other than fraud' have failed in Maryland courts." *Residential Warranty*, 728 A.2d at 789 (citing *Travel Committee, Inc. v. Pan American World Airways, Inc.*, 603 A.2d 1301 (1992)).  Here, Liverpool does not show—or even plead—that the Court must take the extraordinary step of disregarding CBAC Borrower's separate legal identity to prevent fraud or enforce a paramount equity.

*Liverpool v. Caesars Baltimore Mgmt. Co.*, No. 21-cv-0510-JKB, 2021
WL 3116106, at *4 (D.Md. July 22, 2021), *amended*, No. 21-cv-0510-
JKB, 2021 WL 5909718 (D.Md. Dec. 14, 2021).  The "paramount equity"
standard is:

> [W]hen substantial ownership of all
> the stock of a corporation in a
> single individual is combined with
> other factors clearly supporting
> disregard of the corporate fiction
> on grounds of fundamental equity and
> fairness, courts have experienced
> "little difficulty" and have shown
> no hesitancy in applying what is
> described as the "alter ego" or
> "instrumentality" theory in order
> to cast aside the corporate shield
> and to fasten liability on the
> individual stockholder.
>
> *Travel Committee, Inc. v. Pan American World
> Airways, Inc.*, 91 Md.App. 123, 158-59 [603
> A.2d 1301] (1992) (quoting *DeWitt Truck
> Brokers, Inc. v. W. Ray Flemming Fruit Co.*,
> 540 F.2d 681, 685 (4th Cir. 1976)).  The
> factors used in analyzing whether a paramount
> equity should be enforced include, *inter
> alia*, "whether the corporation was grossly
> undercapitalized, . . . the dominant
> stockholder's siphoning of corporate funds, .
> . . the absence of corporate records, and the
> corporation's status as a facade for the
> stockholders' operations."  *Id.* at 159 [603
> A.2d 1301] (quoting *DeWitt*, 540 F.2d at 686-
> 87).
>
> *Residential Warranty Corp.*, 126 Md. App. at
> 307, 728 A.2d 783.

*Qun Lin v. Cruz*, 247 Md.App. 606, 640-41 (2020).  Maryland courts
continue to "resist[] piercing the corporate veil for reasons other
than fraud, [although] the Court of Appeals has continued to affirm

17

the validity of the paramount equity rationale." *Id.*  Again, Plaintiffs have not alleged fraud.  Plaintiffs have not alleged that Arbor Realty Trust's alleged subsidiaries exist only to dodge legal obligations, and such an allegation would not have warranted piercing the corporate veil in any event.  Plaintiffs failed to cite any authority supporting their contention that they meet the "paramount equity" standard—a standard that so many other courts have found not to be met.  *Cf. Iceland Telecom, Ltd. v. Info. Sys. & Networks Corp.*, 268 F.Supp.2d 585, 591 (D.Md. 2003) (declining to become "first federal court sitting in diversity in Maryland to pierce corporate veil upon a theory of the need to enforce a paramount equity").  If each Defendant is not shown to be liable based on its own conduct, the alter ego theory will not supply the link.

### C. FHA Claims Against the Seven Arbor Related Defendants

Plaintiffs do not divide their discrimination arguments between separate counts brought under the FHA, but instead argue disparate treatment and impact as alternative predicates to their specific FHA counts.  *See Nat'l Fair Hous. All. v. Bank of America, N.A.*, 401 F.Supp.3d 619, 631 (D.Md. 2019).  "[A]n FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages.  *See Wright v. Nat'l Archives & Records Serv.*, 609 F.2d

702, 711 n.6 (4th Cir. 1979)." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018).

Plaintiffs allege against the "Arbor Family Defendants" a theory of disparate impact based on a series of four policies derived from race-neutral factors. (ECF No. 43, at ¶180). They also allege a theory of disparate treatment against the "Arbor Family Defendants" based on engaging in a pattern and practice of systemic and intentional race discrimination in communities of color. (ECF No. 43, at ¶¶81, 82). They do not make the disparate impact or disparate treatment allegations against the Arbor Subsidiary Defendants. Instead, Plaintiffs allege that the policies and the race discrimination are actions of the Arbor Family Defendants. Because of this failure to plead against the individual Arbor Subsidiary Defendants, and the insufficiency of Plaintiffs' group pleading allegations, the four FHA claims will be dismissed as against those three Defendants.

## 1. Disparate Impact

The Fourth Circuit has recited the standard for pleading a disparate impact claim:

> To state an FHA claim under a disparate-impact theory of liability, the plaintiff is required to demonstrate that the challenged practices have a "'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, --- U.S. ----, 135 S.Ct. 2507, 2513, 192 L.Ed.2d 514 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557,

577, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)).
Additionally, the plaintiff must demonstrate
a robust causal connection between the
defendant's policy and the disparate impact.

*Reyes*, 903 F.3d at 419.

To establish causation in a disparate-impact
claim, "[t]he plaintiff must begin by
identifying the specific [ ] practice that is
challenged." *Wards Cove*, 490 U.S. at 656, 109
S.Ct. 2115 (quoting *Watson v. Fort Worth Bank
& Tr.*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101
L.Ed.2d 827 (1988)). The plaintiff must also
"demonstrate that the disparity they complain
of is the result of one or more of the [ ]
practices that they are attacking . . . ,
specifically showing that each challenged
practice has a significantly disparate impact"
on the protected class. *Id.* at 657, 109 S.Ct.
2115. In other words, "a disparate-impact
claim that relies on a statistical disparity
must fail if the plaintiff cannot point to a
defendant's policy or policies causing that
disparity." *Inclusive Communities*, 135 S.Ct.
at 2523. Additionally, "the plaintiff must
offer statistical evidence of a kind and
degree sufficient to show that the practice in
question has caused the exclusion [complained
of] because of their membership in a protected
group. Our formulations, which have never
been framed in terms of any rigid mathematical
formula, have consistently stressed that
statistical disparities must be sufficiently
substantial that they raise such an inference
of causation." *Watson*, 487 U.S. at 994-95,
108 S.Ct. 2777.

*Id.* at 425.

Plaintiffs' disparate impact claim is, at bottom, that the

Arbor Family Defendants have four policies which have the effect

of investing in maintenance and renovation of newer multifamily

apartment buildings, and not investing in maintenance and

20

renovation of older multifamily apartment buildings.  This decision, spread across the four policies, boils down to an assessment of cost and benefit—the newer buildings are cheaper to renovate, and such renovations will ultimately increase profits. The older buildings are more expensive to renovate, and it is more profitable to not invest that heavily in them, but instead simply to collect rents with little to no investment.

Plaintiffs' allegations in support are the alleged statistical disparity between the race demographics of the BVS Properties and other Prince George's County properties owned and/or controlled by the Arbor Family Defendants relative to the race demographics of the HUD DC Market; two properties allegedly owned and controlled by the Arbor Family Defendants—one in New York (the "Chinatown Property") and one in Texas (the "San Antonio Property"); and an alleged statistical disparity between the race demographics of the approximately 139 properties owned and/or controlled by the Arbor Family Defendants and the twelve states in which those properties are located.  (ECF No. 53, at 37-41). Plaintiffs' Amended Complaint contains somewhat superficial descriptions of the various properties, omitting even the age.

These allegations do not adequately allege the necessary "robust causal connection."  As the Fourth Circuit has identified, and Plaintiffs concede, "[t]he correct inquiry is whether the policy in question had a disproportionate impact on minorities in

the total group to which the policy was applied." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984) (quoted in Plaintiff's Omnibus Opposition Brief, ECF No. 53, at 39). Pointing to a handful of properties across the country is an insufficient sample size from which to allege that the challenged policies had a "disproportionate impact on minorities in the total group to which the policy was applied," *i.e.*, the tenants of the 139 multifamily apartment buildings Plaintiffs allege the Arbor Family Defendants own and/or control.

The alleged statistical disparity between the race demographics of the 139 properties and the twelve states in the buildings are located is also an insufficient allegation. It alleges nothing about the race demographics of the renter populations of those states, or the race demographics of the renter populations of the communities in which the buildings are located. Thus, this "significant disparity" may not even be a disparity— Plaintiffs' allegations simply do not provide the level of detail necessary to support their claims.

The inadequacy of this "bare statistical discrepancy," *Reyes*, 903 F.3d at 426, is highlighted by other cases where plaintiffs adequately pleaded the robust causal connection. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F.Supp.3d 940, 943-44, 948 (N.D.Ca. 2018) (alleging four year investigation of predominantly white neighborhoods and predominantly minority

neighborhoods, across 38 metropolitan areas, which involved investigating over 2,300 properties owned and maintained by defendants, and the taking of 49,000 photographs); *Nat'l Fair Hous. All. v. Bank of America, N.A.*, 401 F.Supp.3d 619, 624, 637-38 (D.Md. 2019) (alleging investigation of defendant owned properties in white neighborhoods and minority neighborhoods, across 37 different metropolitan areas, which examined 1,677 properties owned by defendant and used a list of 37 aspects to evaluate the properties).[5]  While the investigations in those cases do not necessarily set the floor for what is required to allege disparate impact, it is clear that here, where Plaintiffs seek a nationwide class action and have alleged nationwide policies, a more robust investigation and allegation of causation is required.  Lastly, Plaintiffs' argument that, while they are alleging nationwide polices, they are alleging a disparate impact on BVS tenants, and thus need only show a local disparate impact, are both internally inconsistent with their other allegations and inconsistent with the law as explained above.  Plaintiffs have not adequately alleged a theory of disparate impact to support their FHA claims.

---

[5] Those investigations also subjected their data to regression analyses, a mathematical process by which variables—such as race—can be isolated to determine if they have caused an outcome.

**2. Disparate-Treatment**

"Under a disparate-treatment theory of liability, a "plaintiff must establish that the defendant had a discriminatory intent or motive[.]" *Reyes*, 903 F.3d at 421. Discriminatory intent or motive can be established "either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test." *Corey v. Secretary, U.S. Dept. of Housing & Urban Development ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013) (citations omitted). Plaintiffs must allege they are members of a protected class and that they were treated differently than other tenants because of their membership in that class. *See, e.g.*, *Hardaway v. Equity Residential Services, LLC*, No. 13-cv-0149-DKC, 2015 WL 858086, at *6 (D.Md. Feb. 26, 2015). Plaintiffs have proposed a different framing of what they must allege:

> (1) the housing at issue is in a minority neighborhood, (2) the housing was eligible for the services at issue (here, routine interior maintenance and required renovation to ensure tenants' safety and habitability of property), and (3) the services were either not provided or were not provided in the same way for similarly situated housing.

(ECF No. 53, at 21). In any event, Plaintiffs also agree that they needed to allege facts at least supporting an inference that discriminatory animus was a motivating factor. (ECF No. 53, at 22) (quoting *Letke v. Wells Fargo Home Mortg., Inc.*, No. 12-cv-3799-RDB, 2013 WL 6207836, at *3 (D.Md. Nov. 27, 2013)).

24

Plaintiffs failed to allege direct evidence of discriminatory intent.  Plaintiffs also fail to allege facts supporting an inference of discriminatory intent.  They attempted to allege such an inference through (1) comparators outside the protected class that were treated better and (2) a totality of the circumstances approach.

Defendants argue that properties alleged to be comparators are not owned by Defendants.  (ECF Nos. 46-1, at 35; 58, at 14, n.7).  Plaintiffs have alleged, however, that the "Arbor Family Defendants" purchased the two proposed comparators, the Chinatown Property and the San Antonio Property, and exercised control over decisions made at the properties.  (ECF No. 43, at ¶¶157, 167).  That is sufficient at the pleading stage.[6]

Defendants also argue that the properties cannot serve as similarly situated comparators.  (ECF No. 46-1, at 35).  They are correct.  Regarding the Chinatown Property, Plaintiffs only allege that the property is in a 94.4% non-white neighborhood that is "trending" towards a higher proportion of white residents.  (ECF No. 43, at ¶158).  Plaintiffs do not make any allegation about the demographic makeup of the Chinatown Property itself.  Nor do they

---

[6] Defendants argue that property records, which are public records the court can consider at this stage, demonstrate that the Arbor Family Defendants do not own the properties.  (ECF Nos. 46-1, at 25-26; 48, at 22).  Whether the Arbor Family Defendants are the direct owner of a property does not completely negate the plausibility that they exercise ultimate ownership or decision-making control.

allege the Property's age, or what its maintenance status was prior to acquisition.  Plaintiffs have not alleged enough to make plausible that this property is similarly situated and a comparator for the BVS Properties.  Regarding the San Antonio Property, Plaintiffs allege that the race demographics of renters in San Antonio, Texas, are 23.4% white and 76.6% non-white, (ECF No. 43, at ¶189); that the race demographics of renters across the entire San Antonio Metropolitan Area are 32.8% white and 67.2% non-white, (ECF No. 43, at ¶190), and that the San Antonio Property's race demographics are 47.9% white and 50.6% non-white, (ECF No. 43, at ¶191).[7]  This property is in a majority-non-white region, not a majority white region.  Plaintiffs have also not alleged the San Antonio Properties' age.  They only allege that it had not been renovated in over ten years prior to purchase by the Arbor Family Defendants.  (ECF No. 43, at ¶169).  They do not allege the extent or cost of the renovations undertaken.  Plaintiffs' allegations do not make plausible that this property is a similarly situated comparator for the BVS Properties.

In their opposition, Plaintiffs argue that they can rely on a totality of the circumstances approach to alleging an inference of discriminatory intent.[8]  They rely on factors from *Arlington*

_____

[7] Plaintiff does not explain why these percentages only add up to 98.5%.

[8] Defendants challenge the appropriateness of the totality of the circumstances approach on the ground that *Arlington Heights*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977).
They are: (1) whether the impact of the action bears more heavily
on one race than another; (2) whether there is a clear pattern,
unexplainable on grounds other than race, that emerges from the
effect of defendant's action; (3) the historical background of the
action; (4) the sequence of events leading up to the defendant's
action; (5) departures from normal procedures; and (6) substantive
departures, particularly if the factors usually considered
important by the decisionmaker strongly favor a decision contrary
to the one reached.

Plaintiffs point to multiple actions: (1) Defendants
"concentration on acquiring property in minority communities like
BVS" (citing ECF No. 43, at ¶¶6, 9); (2) "only reinvesting in
Arbor-owned properties in rapidly changing or gentrifying
communities" (citing ECF No. 43, at ¶¶11, 12); (3) "refusal to
invest in the properties they have targeted in stagnating
communities such as that of BVS where they increase rents despite
refusing to make updates to the properties" (citing ECF No. 43, at
¶14); (4) specifically targeting older properties such as BVS which
are comprised almost exclusively of Hispanic tenants or other
Prince George's County holdings comprised disproportionately of

—————————

concerned government defendants.   (ECF No. 60, at 14 n.10).   In
any event, the totality of the circumstances does not save
Plaintiffs' claims.

African Americans (citing ECF No. 43, at ¶144); and (5) the Harvesting and Divestment policies. (ECF No. 53, at 30).

These conclusions all rely on either the comparators disposed of above, or the "statistical analysis" of the Arbor Family Defendants' nationwide portfolio, which is similarly unhelpful. The allegations of targeting are a conclusion derived from that "statistical analysis." (ECF No. 43, at ¶132). As discussed above, that bare statistical discrepancy is inappropriate and unhelpful to resolving the questions presented in this case. Plaintiffs do not fare any better under the *Arlington Heights* factors.

First, Plaintiffs argue that the "numerous actions," recited above, bear more heavily on non-white tenants. When evaluating whether a defendant's action "bears more heavily on one race than another . . . the Court considers whether 'a clear pattern, unexplainable on grounds other than race' has emerged from the" various actions. *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, No. 8:20-cv-02540-PX, 2022 WL 3019762, at *11 (D.Md. July 29, 2022) (quoting *Arlington Heights*, 429 U.S. at 266 (citing cases). Cases of a "clear pattern" are "rare." *Arlington Heights*, 429 U.S. at 266. Defendants argue that Plaintiffs have not offered statistical analysis to show a pattern, much less a clear pattern. (ECF No. 60, at 15-16). Defendants are correct. As already explained, the "statistical analysis" alleged by Plaintiffs is

inadequate.   Not only has it not been subjected to a regression analysis to isolate non-racial explanations, but the entire populations of twelve states does not help analyze Arbor Family Defendants' alleged actions toward renters.  Plaintiffs argue that the fact that the Arbor Family Defendants "invest in some properties while ignoring others in greater need of maintenance," and specifically have not invested in renovations to the BVS Properties, amounts to a clear pattern.  (ECF No. 53, at 31).  It does not.  Plaintiffs have not made factual allegations which would contextualize the alleged lack of investment at BVS as being part of a pattern of nationwide conduct.

Plaintiffs address the historical background and specific sequence of events factors together.  They argue that they have alleged that the Great Recession, which preceded Defendants' acquisition of the BVS Properties, inflicted disproportionate foreclosures on Prince George's County's minority population, and that Defendants were aware of the "conditions" of the BVS Properties prior to purchasing them.  (ECF No. 53, at 31).  As Defendants point out, the Great Recession is not a "series of official actions taken [by Defendants] for invidious purposes." *Arlington Heights*, 429 U.S. at 267.  Moreover, the First Amended Complaint does not allege what "conditions" Arbor Family Defendants knew of at BVS prior to purchase.  It merely alleges that investors have access to certain information, including age

of the property and history of renovation; rental rate history; various statistics about tenants; operational costs; and data about the surrounding community and neighboring properties. (ECF No. 43, at ¶65). Even assuming Plaintiffs sufficiently alleged that Defendants knew the properties needed maintenance when they purchased them, this is not enough to create an inference of discriminatory intent where Plaintiffs have alleged that investment decisions were unique to properties and where allegations are viewed under the totality of the circumstances.

For the final factors, deviation from normal procedural sequence and substantive departure from factors usually considered, Plaintiffs allege that the Arbor Family Defendants neglected the BVS Properties, and that the decision to do so was intentional and premeditated. (ECF No. 53, at 32) (citing ECF No. 43, at ¶¶5, 195). First, this argument is based on conclusory allegations of premeditation. Second, Plaintiffs have alleged that Defendants develop "investment thes[es]" for individual properties, contradicting the notion that there are normal procedures to depart from when it comes to deciding whether to invest in renovating a building. (ECF No. 43, at ¶201 and n.11). Third, as Defendants argue, it is illogical for Plaintiffs to argue simultaneously that they have alleged discrimination as a standard operating procedure, (*see* ECF No. 43, at ¶82), and that Defendants deviated from that standard operating procedure to discriminate.

At bottom, Plaintiffs have not alleged discrimination, and their comparator allegations and statistical analysis allegations are insufficient to create an inference of discriminatory intent. Plaintiffs have failed to state a claim for disparate treatment under the FHA. Counts I, II, III, and IV will be dismissed against the seven Arbor Related Defendants.[9]

### 3. Perpetuation of Segregation Claim

Plaintiffs' perpetuation of segregation claim also fails, for two reasons. First, it fails because Plaintiffs needed to (1) plead facts sufficient to show discrimination; and (2) a cognizable perpetuation of segregation claim. "Affirmative answers to both questions are necessary for this case to proceed." *See Bank of America*, 401 F.Supp.3d at 630. As already explained, Plaintiffs have failed to plead discrimination on both a disparate-impact theory and a disparate-treatment theory.

Second, the allegations in support of the perpetuation of segregation claim are insufficient. Plaintiffs bring this claim on behalf of themselves, the BVS Class, and the Arbor Family Nationwide Class. (ECF No. 43, at 153).

> Perpetuation of segregation is, in effect, an alternate avenue of pleading disparate impact under the FHA . . . . If the paradigmatic disparate impact claim alleges that a policy

---

[9] The failure sufficiently to allege discriminatory intent also means that Plaintiffs failed to allege their interference claim under § 3617, and a predicate violation of § 3604. *Hardaway*, 2016 WL 3957648, at *6 (recognizing plaintiffs need sufficiently to allege discriminatory intent).

> has a greater adverse impact on one group over
> another, a perpetuation of segregation claim
> concerns the effect of the decision on the
> subject community.

*Bank of America*, 401 F.Supp.3d at 641.  There, the court found such a claim adequately alleged where it "alleged, using detailed dissimilarity indices as a baseline, that the defendants' policies forestall housing integration and freeze existing segregation patterns."  *Id.*

Plaintiffs' allegations here are (1) the BVS Properties and other Prince George's County Arbor properties are disproportionately non-white compared to Prince George's County's overall population, (ECF No. 53, at 51); and (2) that between 2014-17 the majority of the housing code violations reported in a subset of the buildings in Langley Park (where the BVS Properties are located) were reported at the BVS Properties, (ECF No. 53, 51-52). They allege that the result of the lack of maintenance is the destabilization of minority communities; the expulsion of minorities from communities in places such as the Chinatown Property; and financial damage to minority communities who are forced to make repairs to their residences on their own, which prevents them from moving to more affluent neighborhoods.  (ECF No. 43, at ¶284).  Plaintiffs, again, have identified bare statistical discrepancies and not connected them to their conclusions.  That the tenants of the Arbor Family Defendant's Langley Park properties are disproportionately non-white compared

to the entirety of Prince George's County's population, and that there were a high number of housing code violations at the properties, does not plausibly allege that Arbor Family Defendants' alleged policies are causing or perpetuating segregation. *Cf. Boykin v. Gray*, 895 F.Supp.2d 199, at 213-14 (D.D.C. 2012) (allegations that policy had effect of closing homeless shelters in white parts of the city and thus forced predominantly minority homeless persons to seek shelter in predominantly minority areas of city, and that former residents of a shelter had been displaced from "significantly Caucasian" census tracks to predominantly Black census tracks, survived motion to dismiss). Here, Plaintiffs have not pleaded sufficient factual allegations about neighborhoods or communities in Prince George's County, or about the existence or creation of segregation.[10] Moreover, Plaintiffs have totally failed to make allegations about the existence of segregation in any of the communities in which 139 Arbor Family-owned properties are located. *Cf. Bank of*

---

[10] Plaintiffs allege elsewhere in the First Amended Complaint that (1) the majority of Hispanic people living in Prince George's County reside in several neighborhoods, one of which is Langley Park, (ECF No. 43, at ¶85); and (2) that 61.4% of Langley Park residents are foreign born and 34% of the residents speak only English or English very well, compared to 88% of Prince George's County's residents speaking only English or English very well, (ECF No. 43, at ¶97). Although these are statistics about Langley Park, Plaintiffs have not cited them in support of their segregation claim. (*See* ECF No. 53, at 49-52). In any event, these statistical allegations are not of sufficient rigor to support an allegation of perpetuation of segregation.

*America*, 401 F.Supp.3d at 641 (alleging nationwide investigation producing dissimilarity indices establishing existence and perpetuation of segregation).

### D. FHA Claims Against Realty Management

Realty Management argues that Plaintiffs fail to state claims against it under the FHA because Plaintiffs have not alleged discriminatory treatment, either through direct evidence or inference, or a policy of Realty Management that has a disparate impact on members of a protected class.  (ECF No. 50, at 15-17).

Plaintiffs have failed sufficiently to allege a theory of disparate impact.  Plaintiffs have not alleged a policy of RMS that disproportionately impacted members of a protected class.  They have alleged no statistical evidence regarding RMS' evictions or maintenance.  They have not stated a claim for disparate impact against RMS.  Nor have they stated a claim for perpetuation of segregation, as explained above.

Plaintiffs have also failed sufficiently to allege direct evidence of discriminatory intent against Realty Management, or an inference of discriminatory intent.  Plaintiffs allege that Realty Management manages other properties owned by Arbor, (ECF No. 43, at 136), and that those are also majority non-white multifamily apartments, (ECF No. 43 at ¶¶142, 144).  Plaintiffs have not alleged any comparators managed by Realty Management on either the maintenance or eviction theories, or any evidence that creates the

inference that maintenance or eviction decisions were taken because of discriminatory intent—such as alleging that white tenants' apartments were better maintained, or white tenants were less likely to be evicted.  Plaintiffs have attempted to argue that Realty Management has "enabled" each of the alleged "illicit" Arbor policies. (ECF No. 53, at 32).  Plaintiffs' failure to state a claim of discrimination based on those policies leaves this theory likewise unplausible, as does Plaintiffs' allegation that Arbor sets the budget for maintenance at BVS.  (ECF No. 43, at ¶149).  It is not plausible that an alleged failure to maintain is unexplainable on grounds other than race when Plaintiffs have supplied a likely explanation.  Counts I, II, III, and IV will be dismissed against Realty Management.

**E. Count VIII—Civil Conspiracy**

Defendants argue that the civil conspiracy claim is derivative of the FHA claims and so should be dismissed.  (ECF Nos. 46-1, at 37; 50, at 30).  Plaintiffs argue that the First Amended Complaint "alleges that all of the Defendants work with a concerted understanding and by agreement in violation of the FHA and common law tort obligations resulting in legal damage to Plaintiffs."  (ECF No. 53, at 63).

The First Amended Complaint alleges:

> 328. A confederation of each of the named Defendants, including but not limited to Realty Management Services, Inc. have an agreement or understanding to engage in

> unlawful activity at the Bedford and Victoria
> Station apartments.
>
> 329. Specifically, the Defendants
> conspired to refrain from performing
> maintenance or making repairs for known or
> reasonably knowable defects to further the
> policies identified above in violation of the
> FHA.

(ECF No. 43).

An opposition to a motion to dismiss is not the place to amend a complaint. *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184-85 (4th Cir. 2013) (citations omitted); *NAACP v. Bureau of the Census*, 382 F.Supp.3d 349, 376 n.17 (D.Md. 2019) ("[A]n opposition to a motion to dismiss is not a vehicle for amending a complaint.") (citation omitted).

"It is well established that a conspiracy, or agreement to do a wrongful act, is not itself a tort; rather, some act must be committed by one of the parties in furtherance of that agreement, which is itself a tort, and which injured plaintiffs." *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F.Supp.2d 424, 428 (D.Md. 2000) ("Thus, plaintiffs must show that defendants committed some underlying tort."). The First Amended Complaint premises the civil conspiracy claim on a violation of the FHA. Plaintiffs have failed adequately to allege violation of the FHA. The conspiracy to commit civil conspiracy will also be dismissed against all Defendants.

**F. Breach of Contract Claims—Counts V, VI, and VII**

Plaintiffs assert Counts V and VI against all the Defendants. They assert Count VII only against Realty Management. Defendants argue that CASA de Maryland does not have standing to bring Counts V and VI, that Counts V and VI have not been sufficiently alleged, and that none of the Plaintiffs is a third-party beneficiary of the management contract Realty Management had with its co-Defendants, and thus Plaintiffs do not have standing to bring Count VII.

**1. Standing of CASA de Maryland**

To assert standing under Article III, a plaintiff must show (1) actual or threatened injury that is both concrete and particularized, and not conjectural or hypothetical; (2) injury fairly traceable to the defendant's challenged action; and (3) injury likely redressable by a favorable court decision. *Burke v. City of Charleston*, 139 F.3d 401, 405 (4th Cir. 1998) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

An organization such as CASA may show standing to bring a suit under two theories: organizational standing in its own right or representational standing, based on the fact that members it represents have been harmed. *Md. Highways Contractors Ass'n., Inc. v. State of Maryland,* 933 F.2d 1246, 1250 (4th Cir. 1991) (citations omitted).

Defendants argue that CASA does not have either type of standing.  (ECF No. 46-1, at 41).  They argue (1) that CASA lacks representational standing to bring claims on its members' behalf for money damages because such damages analysis involves "'individualized proof' concerning the 'fact and extent' of each member's unique injury, vitiating representational standing[,]'" (ECF No. 46-1, at 41); and (2) that CASA lacks organizational standing to pursue money damages on its own behalf for the state law contract claims, Counts V and VI.  (ECF No. 46-1, at 41).  Plaintiffs respond that (1) in other cases CASA has been found to have organizational standing; (2) Plaintiffs are CASA members and many of the proposed BVS class members are CASA members; (3) CASA has spent considerable time and energy meeting with and organizing the BVS tenants; (3) CASA has redirected efforts from its grant-funded activities towards advocacy concerning BVS; and (4) that CASA does not need "organizational or associational standing" to pursue its own § 3617 claim.  (ECF No. 53, at 67).

CASA is an immigrant advocacy organization.  Plaintiffs allege that CASA de Maryland has suffered injury because it has diverted resources from usual projects to supporting tenants of the BVS Properties.  (ECF No. 43, at ¶226).  CASA's organizing campaign with the BVS Properties "is one of the largest and longest continuous projects in CASA's 35-year history."  (ECF No. 43, at ¶228).  Plaintiffs allege that over the past several years CASA

has spent "hundreds of hours of staff time organizing BVS tenants"
to petition Defendants to remedy the living conditions at BVS.
(ECF No. 43, at ¶228).  Over the last year alone, CASA has held
over 35 meetings attended by hundreds of tenants and community
members, with over 1,500 unique visits to the meetings.  (ECF No.
43, at ¶229).  CASA has spent at least 200 hours of staff time
organizing and recruiting tenants for the meetings, which
themselves lasted for a total of 75 hours.  (ECF No. 43, at ¶229).
CASA has designed, printed, and distributed 10,000 flyers on
various topics related to organizing at BVS, including tenants'
rights, meeting information, legal help, and renter protections
related to Covid-19.  (ECF No. 43, at ¶229).  CASA has also spent
100 hours arranging press conferences and organizing rallies about
the conditions at BVS.  (ECF No. 43, at ¶229).  CASA has spent 30
hours of staff time assisting tenants in reporting 35 complaints
to Prince George's County for housing code violations.  (ECF No.
43, at ¶229).  CASA has assisted 15 tenants with eviction
proceedings and an additional 10 tenants with "ancillary legal
support," for a total of 50 hours staff time.  (ECF No. 43, at
¶229).

     Count V of the First Amended Complaint alleges that "All
Defendants" breached the lease agreements of Plaintiff tenants by
not providing safe and clean units at BVS.  (ECF No. 43, at ¶¶296,
299).  Count VI of the First Amended Complaint alleges that "All

Defendants" breached the implied warranty of habitability by not complying with Prince George's County Local Code, which they allege imposed on Defendants "a legal duty to 'maintain all facilities supplied with the leased dwelling unit and/or as enumerated in the lease.'" (ECF No. 43, at ¶309). Specifically, they allege Defendants failed to maintain safety and cleanliness in the BVS units. (ECF No. 43, at ¶310).

Plaintiffs have alleged that CASA re-directed its resources to support the tenants of the BVS Properties, spending many staff hours over the last several years in multiple ways. CASA has satisfied the constitutional standing requirements contained in Article III. Defendants argue, however, that CASA has not alleged facts to support organizational standing on Counts V and VI because CASA cannot "'rest [its] claim to relief on the legal rights or interests of third parties,' *Warth*, 422 U.S. at 499, unless the third-party demonstrates '(1) that the litigant has a close relationship with the third party; and (2) that the third party faces some obstacle to asserting her own right." (ECF No. 46-1, at 41-42) (quoting *Equal Rights Crt. v. Abercrombie & Fitch Co.*, 767 F.Supp.2d 510, 523 (D.Md. 2010)). This appears to be a reference to the "prudential standing considerations," which, among other things, prevent an organization which otherwise has demonstrated Article III standing from having standing when the

organization would be raising another person's rights.[11]
*Abercrombie & Fitch Co.*, 767 F.Supp.2d at 520.

Defendants have correctly recited the test: (1) that the litigant has a close relationship with the third party; and (2) that the third party faces some obstacle to asserting its own right. *Abercrombie & Fitch Co.*, 767 F.Supp.2d at 523 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). CASA has failed to make such a showing here. Its brief does not address the prudential standing question and it has not alleged facts that BVS tenants (or other tenants of alleged Arbor owned properties) face obstacles in bringing breach of contract claims. Moreover, the BVS tenants' "status as co-plaintiff[s] demonstrates" that third party individuals face no impediment to bringing their own suit for breach of contract. *Id.* at 523 (citing *Md. Minority Contractor's Ass'n v. Md. Stadium Auth.*, 70 F.Supp.2d 580, 589 (D.Md. 1998)).

CASA has not adequately alleged that it has representational standing to bring the breach of contract claims either.

---

[11] "[S]tanding under the FHA is 'as broad as is permitted by Article III of the Constitution,' [so] the constitutional and prudential limitations merge in a case brought under the FHA." *Mayor & City Council of Balt. v. Wells Fargo Bank, N.A.*, 677 F.Supp.2d 847, 849 (D.Md. 2010) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S 91, 108 (1979)). Thus, a court only needs to evaluate whether a plaintiff has met the constitutional requirements of standing for FHA claims.

> The Supreme Court of the United States has articulated a three factor test for associational standing:
>
>> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
>
> *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

*Abercrombie & Fitch Co.*, 767 F.Supp.2d at 523.  Beyond its factual arguments, CASA only points to two cases in which it says other courts found it had organizational or associational standing.  The first case, *La Clinica de la Raza v. Trump*, says nothing of the sort.  477 F.Supp.2d 951 (N.D.Cal. 2020).  Rather, in a footnote, the court acknowledges a recent Fourth Circuit opinion holding that CASA **did not** have standing to challenge a rule promulgated by the Department of Homeland Security.  *Id.* at 966 n.4.  In the second case, *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, the court found that CASA was a "prototypical example[]" of an organizational plaintiff possessing associational standing because (1) it had members who would have standing; (2) the recission of DACA had an absolute nexus to the organization's purpose; and (3) the relief sought was injunctive and declaratory relief, "not

damages or any other remedy requiring the individual Dreamers." 284 F.Supp.3d 758, 771 (D.Md. 2018) *rev'd in part on other grounds*, 924 F.3d 684 (4th Cir. 2019). Here, the breach of contract claims are for damages. (ECF No. 43, at ¶¶306, 316). Such claims and the relief requested require individual participation. The damages sought

> are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof.

*Warth*, 422 U.S. at 515. Individual tenants will have individualized problems (or not) with their apartment. Some have been evicted or subjected to eviction requests. (ECF No. 43, at ¶¶276, 314). Others have spent their own resources on making repairs. (ECF No. 43, at ¶284). Theses damages require individualized assessments. *Cf. City of South Lake Tahoe Retirees Ass'n v. City of South Lake Tahoe*, No. 2:15-cv-02502-KJM-CKD, 2016 WL 4001120, at *4 (E.D.Cal. July 26, 2016) (finding third *Hunt* prong not met on breach of contract claims where monetary damages were sought to compensate for premiums that had been subsidized on an escalating scale based on retirees' dates of hire and years of public service). CASA does not have standing to bring the breach of contract claims—Counts V and VI.

## 2. Count V—Breach of Contract

Defendants argue that the Count V should be dismissed against the four Arbor Family Defendants and Hyattsville United because those parties are not alleged to have been in contractual privity with Plaintiffs. (ECF No. 46-1, at 38). They rely on the lease agreements, attached as an exhibit, which no party disputes the authenticity of, and which are integral to the Plaintiffs' claims. *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006). Those agreements were between each tenant and "Realty Management Services, Inc., as agent for the owner of the improved residential real estate known as Bedford and Victoria Station[.]"

Plaintiffs argue that the "common law claims for breach of contract, breach of warranty, and civil conspiracy are also well-pled against each Defendant against whom they were filed." (ECF No. 53, at 19). Plaintiffs do not, as the Defendants point out, respond to Defendants' privity argument. (ECF No. 60, at 21). Thus, the question is whether Plaintiffs have plausibly alleged that Arbor Realty Trust; Arbor Realty Limited Partnership; Arbor Realty SR; AMAC; or Hyattsville United were in privity with any of Plaintiffs. Otherwise, the breach of contract claim would have to be dismissed against those five defendants. *Fenzel v. Group 2 Software, LLC*, No. 13-cv-0739-DKC, 2016 WL 865363, at *11 (D.Md. Mar. 7, 2016) ("[A] person cannot be held liable under a contract to which he was not a party.") (quotations and citations omitted).

The complaint alleges, on information or belief, that the owner of each apartment complex is "Arbor" or Arbor Realty Trust, Inc., who was the allegedly partially disclosed principal of RMS. (ECF No. 43, at ¶296).  It appears undisputed that the apartments were owned by Bedford United, LLC and Victoria United, LLC.  The problem, of course, is whether, through judicially noticeable documents, the notion that other defendants also "owned" the apartment complexes has been refuted conclusively.  Plaintiffs' opposition to the motions to dismiss takes the position that the Arbor Family Defendants own OR control the properties, and they never specifically engage Defendants' presentations on the technical ownership question.  Plaintiffs appear to be relying solely on the alter ego theory which has been found insufficient. Accordingly, Count V will be dismissed as to Arbor Realty Trust; Arbor Realty Limited Partnership; Arbor Realty SR; AMAC; and Hyattsville United.

Defendants also argue that the breach of contract claim brought by Plaintiff Anita Ramirez should be dismissed because she was not in privity with any of the defendants—she is not a signatory on her husband's lease and is not listed as a non-signatory occupant—and because she is not a third-party beneficiary.  (ECF No. 46-1, at 40).  As with the above privity arguments, Plaintiffs' opposition did not respond to this argument.  The lease agreement required signatories to list non-

signing occupants of the apartment, and then stated that "[n]o one else may occupy the Apartment." (ECF No. 46-8, at 6). Plaintiff Anita Ramirez's breach of contract claim (Count V) will be dismissed.

Defendant Realty Management argues that Count V should be dismissed against it because it was acting as an agent for the owners of the BVS Properties—Bedford United and Victoria United. (ECF No. 50, at 22). Plaintiffs allege that Realty Management acted as an agent for a "partially disclosed principal," (ECF No. 43, at ¶296), and thus is liable on the contract. (ECF No. 53, at 58). The parties agree that the lease agreements state that the leases are between the tenants and "Realty Management Services, Inc., as agent for the owner of the improved residential real estate known as Bedford and Victoria Station[.]" The parties disagree as to whether such allegations are sufficient to state a claim that Realty Management only partially disclosed its principal.

Clearly, the lease agreements reveal that Realty Management was acting on behalf of a principal, but do not name the principals. The Court of Special Appeals of Maryland has explained the difference between a partially disclosed principal and an undisclosed principal by quoting the RESTATEMENT (SECOND) OF AGENCY § 4 (1958):

> (2) If the other party has notice that the
> agent is or may be acting for a principal but

> has no notice of the principal's identity, the
> principal for whom the agent is acting is a
> partially disclosed principal.
>
> (3) If the other party has no notice that
> the agent is acting for a principal, the one
> for whom he acts is an undisclosed principal.

*Hill v. Cnty. Concrete Co.*, 108 Md.App. 527, 533 (1996). "[I]f an agent wishes to avoid liability he must seasonably disclose the identity of his principal." *Id.* (quoting *Crosse v. Callis*, 263 Md. 65, 72-73 (1971)).   Liability is to be determined by the conditions known at the time the contract was made or other transaction had.  *Crosse*, 263 Md. at 74 (citation omitted).

Realty Management argues that "notice of the principal's identity" has a broader meaning than "actual knowledge of the principal's identity."   They offer the definition of Black's Law Dictionary, which was quoted and relied upon by the Court of Special Appeals in *Prince George's Cnty. Dep't of Soc. Svcs. v. Knight*:

> A person has notice of a fact or condition if
> that person (1) has actual knowledge of it;
> (2) has received a notice of it; (3) has reason
> to know about it; (4) knows about a related
> fact; or (5) is considered as having been able
> to ascertain it by checking an official filing
> or recording . . .

158 Md.App. 130, 138 (2004).   There, the court was defining "notice" in the context of a family law statute.  Realty Management argues that the fifth definition is applicable here, and that Plaintiffs had notice because they could have ascertained the

identity of the principal from checking an official filing or
recording.  (ECF No. 59, at 7-8).  The Restatement (Second) of
Agency seems to agree.  It defines "notice":

> (1) A person has notice of a fact if he knows
> the fact, has reason to know it, should know
> it, or has been given notification of it.
>
> (2) A person is given notification of a fact
> by another if the latter
>
>> (a) informs him of the fact by adequate
>> or specified means or of other facts from
>> which he has reason to know or should
>> know the facts[;] or
>
>> (b) does an act which, under the rules
>> applicable to the transaction, has the
>> same effect on the legal relations of the
>> parties as the acquisition of knowledge
>> or reason to know.
>
> (3) A person has notice of a fact if his agent
> has knowledge of the fact, reason to know it
> or should know it, or has been given a
> notification of it, under circumstances coming
> within the rules applying to the liability of
> a principal because of notice to his agent.

RESTATEMENT (SECOND) OF AGENCY § 9 (1958).  The Fifth Circuit construed
the Restatement in circumstances similar to this one.  There, an
agent argued that a third-party should have known the identity of
its principal because the third-party knew the name of the ship
the principal owned.  The Fifth Circuit agreed, if the principal
could have been discovered from readily available sources, such as
maritime reference sources.  *Port Ship Service, Inc. v.
International Ship Management & Agencies Service, Inc.*, 800 F.2d

1418, 1421-22 (5th Cir. 1986).  The Fifth Circuit remanded the case because the record did not indicate whether such resources existed.

Plaintiffs, of course, must allege facts showing the contractual obligation of each defendant, with "certainty and definiteness," in order to state a viable claim for breach of contract.  *Norris v. PNC Bank, N.A.*, No. 20-cv-3315-ELH, 2022 WL 2193303, at *22 (D.Md. June 16, 2022) (quoting *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362 (2012)).  Here, Plaintiffs have alleged that Bedford United, LLC and Victoria United, LLC are holding shell companies for the apartment complexes, the sole member of each being Hyattsville United, LLC, but that they are "owned and controlled by Arbor Realty Trust, Inc. and its subsidiaries."  (ECF No. 43, at ¶¶31, 32).  The lease agreements only stated that Realty Management acted as agent for the "owner" of the apartment.  The complaint concludes that the partially disclosed principal is, upon information and belief, Arbor Realty Trust, Inc.  (*Id.*, at ¶296).  The complaint, then, along with documents integral thereto, does not show categorically that there were readily available resources from which they could have determined the identities of the Realty Management's principal at the time each Plaintiff signed the lease.  Thus, this count can proceed against Realty Management, although the outcome may well be different on summary judgment or at trial.

### 3. Count VI—Breach of Implied Warranty of Habitability

Defendants initially argued that this claim should be dismissed for the same reason as Claim V—lack of privity. (ECF No. 46-1, at 38-39). Plaintiffs responded that a claim for breach of implied warranty of habitability can arise under tort law when a statute or local ordinance imposes a duty upon an owner or manager of property. (ECF No. 53, at 54). Defendants then responded with a variety of arguments: (1) that Plaintiffs' cited authorities deal with warranty of habitability claims arising under the Maryland Consumer Protection Act and simple negligence claims arising from violation of statutes, not implied warranty of habitability claims arising from violation of statutes creating such implied warranties; that AMAC, Hyattsville United, and the other Arbor Family Defendants are not parties to the leases and do not owe duties under the leases; that Plaintiffs have not identified a provision of the Prince George's County Code creating an implied warranty of habitability; and that the Prince George's County Code does not purport to create a private cause of action. (ECF Nos. 59, at 4-6; 60, at 22-23).

A statutory provision can give rise to a warranty of habitability. *Nerenhausen v. Washco Management Corp.*, No. 15-cv-1313-JKB, 2017 WL 1398267, at *5 n.5 (D.Md. April 18, 2017) ("In Maryland, the basis for alleging breach of an implied warranty of habitability in the context of residential leases is generally

found in municipal housing codes.") (citing *Benik v. Hatcher*, 358 Md. 507, 530-32 (2000) (recognizing that Baltimore City Code expressly creates an implied warranty of habitability in leases through § 9-14.1, and that §§ 702, 703, and 706 set "minimum standards" for habitability that "giv[e] meaning to the implied warranty").  The Court of Appeals of Maryland has held that "[A] private cause of action in a landlord/tenant context can arise from a violation of any statutory duty or implied warranty created by" local government.  *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 671-72 (1994), *overruled on other grounds by Brooks v. Lewin Realty III, Inc.*, 378 Md. 70 (2003).  In support, the Court of Appeals cited the RESTATEMENT (SECOND) OF PROPERTY, LANDLORD AND TENANT § 17.6 (1977), which states:

> A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:
>
> > (1) an implied warranty of habitability; or
> >
> > (2) a duty created by statute or administrative regulation.

*Id.* at 671.

Among the purposes of the Prince George's County Code's Landlord-Tenant Regulations is to "[e]ncourage landlords and

tenants to maintain and improve the quality of housing in this
County[.]" Prince George's Cnty. Code § 13-136(b)(2). Here, the
Prince George's County Code creates maintenance duties for
landlords:

> (a) The landlord shall expressly warrant that
> at all times during the tenancy he will comply
> with all applicable provisions of any
> Federal, State, County, or municipal statute,
> Code, regulations, or ordinance governing the
> maintenance, construction, use, or appearance
> of the dwelling unit and the property of which
> it is a part.
>
> (b) The landlord shall be obligated to
> maintain all facilities supplied with the
> leased dwelling unit and/or as enumerated in
> the lease. The landlord may, however,
> promulgate written rules to be consistent
> with the lease governing the use of the leased
> dwelling unit and the property of which it is
> a part, so long as the rules are reasonable
> and are not in violation of the applicable
> provisions of any Federal, State, County, or
> municipal law cited above and/or are not
> inconsistent with the provisions of the
> lease. The tenant shall be notified in
> writing of any changes in the aforesaid rules.

Prince George's Cnty. Code, § 13-153. Moreover, the Code defines
"landlord" broadly as:

> (7) **Landlord** shall mean the legal and
> equitable owner(s) of a property, or any
> portion thereof, used or to be used as a
> single-family rental facility or a
> multifamily rental facility and shall
> include, without limitation, a mortgagee,
> vendee, contract purchaser, assignee of
> rents, receiver, trustee, executor, personal
> representative, lessee, or any person, firm,
> or corporation who manages the multifamily
> rental facility by contractual agreement with
> the owner.

52

Prince George's Cnty. Code, §13-138(a) (emphasis in original).
The Prince George's County Code also incorporates the
International Property Maintenance Code. § 13-101. The
International Property Maintenance Code contains maintenance
standards ranging from requiring interior surfaces to be
maintained in good, clean, and sanitary conditions, § 305.3, to
requirements that structures be kept free from insect and rodent
infestations, § 309.1. *See* International Property Maintenance
Code (2018) (https://codes.iccsafe.org/content/IPMC2018, last
accessed September 3, 2022). The Prince George's County Code, and
the incorporated International Maintenance Code, can be considered
as their authenticity is not disputed, and they are integral to
the First Amended Complaint.

Although not as explicit as the Baltimore City Code in
creating an implied warranty of habitability, the Prince George's
County Code seems to have done so. It requires "landlords" to
maintain all facilities provided to tenants and sets standards for
that maintenance through an incorporation of the International
Property Maintenance Code. The Prince George's County Code then
broadly defines landlords to include equity owners of property and
property managers. As discussed above, Plaintiffs have adequately
alleged that the seven Arbor Defendants exercise ownership and/or
control over the BVS Properties, and that Realty Management manages
the BVS Properties through a contractual agreement. The actuality

and/or scope of that ownership and control is a question for discovery.

Whether titled a "breach of the implied warranty of habitability claim" or a "negligence claim," it seems clear at this stage that Plaintiffs have pleaded a "private cause of action in a landlord/tenant context [arising] from a violation of a[] statutory duty or implied warranty created by" the Prince George's County Code which is governed by a negligence standard. No party proposes a standard or set of elements for Plaintiffs' claim by which their factual allegations can be considered. Plaintiffs merely analyze whether Defendants "purposely availed themselves to the" BVS Properties. (ECF No. 53, at 56). Nonetheless, in considering the claim under general negligence principles, it seems that Plaintiffs have sufficiently alleged a violation of the duty and maintenance standards imposed on landlords by the Prince George's County Code, (ECF No. 43, at ¶3), harm from those violations, (ECF No. 43, at ¶¶231-35), and notice on the part of Defendants, (ECF No. 43, at ¶¶103-08). Defendants' collective motions to dismiss will be denied on Count VI.[12]

---

[12] Defendants also argued that Count VI should be dismissed as to Plaintiff Anita Ramirez for the same reasons Count V should be dismissed—lack of privity. Given that Count VI is not predicated on the breach of a lease agreement, Count VI will not be dismissed as to her. *See also* Prince George's Cnty. Code, § 13-138(a)(11) ("**Tenant** shall mean any person who occupies a rental dwelling unit for living or dwelling purposes.") (emphasis in original).

**4. Time Barred Damages**

The First Amended Complaint alleges that the Defendants' damaging conduct has been occurring on a continuing and ongoing basis from at least April 2013 to the present. (ECF No. 43, at ¶236). Defendants argue that Plaintiffs' damages under the breach of contract and breach of implied warranty of habitability claims are time barred outside of Maryland's three-year statute of limitations. (ECF No. 46-1, at 42-43). Plaintiffs do not substantively respond, only asserting "there is no statute of limitations issue in the present litigation, as the Arbor Family's illicit polices are still in effect." (ECF No. 53, at 51 n.12).

Maryland law provides a three-year statute of limitations for civil claims. Md. Code Ann., Cts. & Jud. Pro. § 5-101. A statute of limitations defense may be raised in a Rule 12(b)(6) motion when the face of the complaint reveals that the cause of action has not been brought within the applicable limitations period. *Brooks v. City of Winston—Salem, N.C.,* 85 F.3d 178, 181 (4th Cir. 1996); *see* 5B CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2004) ("A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6).").

The Court of Appeals of Maryland has said, in the context of a contract containing an ongoing duty to provide electricity:

> We believe the rationale expressed by the foregoing cases is sound.  For that reason, and because barring such claims would not serve to promote the policies that statutes of limitations reflect, *see Pierce v. Johns-Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020 (1983), we conclude that where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew, with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations.

*Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 79 Md.App. 461, 475 (1989).  Thus, the statute of limitations is not calculated from the first breach, but is calculated for each individual breach of a continuing duty.  *Ely v. Sci. Applications Int'l Corp.*, 716 F.Supp.2d 403, 407-08 (D.Md. 2010) ("But in any case, the *Singer* Court held that the statute of limitation restarted only for the specific breaches that occurred within the limitations period and not for the entire claim."). Here, the face of the First Amended Complaint reveals that some of Plaintiffs' damages claims are outside the three-year statute of limitations, despite their allegations of continuous breach. Defendants' motion will be granted and only claims for damages occurring within the three-year limitations period will be considered.

**5. Count VII—Breach of Management Contract**

Realty Management moves to dismiss Count VII, breach of the management agreement between Realty Management and the owners of BVS Properties, because Plaintiffs are not third-party beneficiaries to the management agreement. (ECF No. 50, at 26). The First Amended Complaint paraphrased the contents of the agreement:

> 321. The contract provided that [Realty Management] would provide property management services to Plaintiffs, would maintain the tenants' properties in a habitable condition for the benefit of the tenants, and would otherwise manage the property to the benefit of the tenants, including the Plaintiffs.
>
> 322. A material term of each contract was that [Realty Management] keep all leased Units in clean, safe, and sanitary conditions at all times and that [Realty Management] maintain the common areas and each individual unit in a manner that is free from unhealthy indoor molds and water intrusion and environmental hazards.

(ECF No. 43, at ¶¶321, 322). Realty Management, however, attached a copy of the management agreement it had with Bedford United. No one disputes its authenticity, or contends that the management agreement with Victoria United was different. It is clearly integral to Plaintiffs' claim. It can be considered. *Blankenship*, 471 F.3d at 526 n.1.

The parties point to two different provisions in the agreement. Defendants assert that the agreement clearly states that it is not creating third party beneficiaries:

## Article 9
## Indemnification

**9.01   Liabilities;   Indemnification;   Third Parties.**

* * *

> (c) No person or entity shall be deemed to be a third party beneficiary of any term or provision of this Agreement, including, without limitation, the terms and provisions of this Section 9.01, other than Affiliates of Owner and Manager, respectively, entitled to indemnification pursuant to the provisions of this Article 9. Notwithstanding the foregoing, Servicer shall be deemed a third party beneficiary of the provisions of this agreement. All indemnification obligations under this Agreement and the provisions of this Article 9 shall survive the expiration and any termination of this Agreement.

(ECF No. 49-1, at 22-23). Plaintiffs assert that the agreement

intends them to be "creditor beneficiaries"[13] because it states:

> Manager covenants to and shall operate the Property in accordance with (i) the terms of this Agreement, (ii) the terms of any

---

[13] Plaintiffs' claim to creditor beneficiary status is likely misplaced. *See Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 263-64 (2009) ("The change [in the Restatement] does, however, create a problem for one seeking status as a creditor beneficiary, for, as noted, it limits what formerly was regarded as creditor beneficiary contracts to those in which performance of the promise will satisfy the promisee's obligation to pay *money* to the beneficiary."). As explained below, Plaintiffs' allegations fall short of the more modern approach of asking whether "circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance." *Id.* at 264 (internal quotes omitted) (emphasis in original).

> Permitted Mortgage, (iii) all laws, rules,
> regulations, and governmental requirements
> applicable to Manager and the Property, and
> (iv) commercially reasonable and prudent
> operational standards and business practices
> developed by Manager in connection with its
> property management business (the
> "*Operational Standards*").

(ECF No. 49-1, at 10) (emphasis in original).

"Under Maryland law, individuals who are not parties to a contract may nevertheless have standing to enforce the contract if they meet the requirements for third-party beneficiaries." *Amaya v. DGS Constr., LLC*, No. 16-cv-3350-TDC, 2019 WL 3945933, at *4 (D.Md. Aug. 21, 2019). Maryland follows the Restatement (Second) of Contracts, which states that:

> (1) unless otherwise agreed between promisor
> and promisee, a beneficiary of a promise is an
> intended beneficiary if recognition of a right
> to performance in the beneficiary is
> appropriate to effectuate the intention of the
> parties and either
>
> > (a) the performance of the promise will
> > satisfy an obligation of the promisee to
> > pay money to the beneficiary; or
> >
> > (b) the circumstances indicate that the
> > promisee intends to give the beneficiary
> > the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary
> who is not an intended beneficiary.

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457-58 (2012) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 302 (AM.LAW.INST. 1981). 

Judge Chuang recently summarized Maryland's approach to third-party beneficiaries:

In assessing whether an individual is a third-party beneficiary, a court should "look to 'the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention.'" [*Tower I*, 56 A.3d] at 213 (quoting *Ferguson v. Cramer*, 709 A.2d 1279, 1283 (Md. 1998)); see *Volcjak v. Wash. Cty. Hosp. Ass'n*, 723 A.2d 463, 477-78 (Md. Ct. Spec. App. 1999).

When evaluating the contract, intent must be "garnered from the terms considered as a whole, and not from the clauses considered separately." *Laurel Race Course v. Regal Constr.*, 333 A.2d 319, 327 (Md. 1975). One "crucial fact" to consider is "whether the pertinent provisions in the contract were 'inserted to benefit' the third party." [*Tower I*], 56 A.3d at 212 (alteration omitted) (quoting *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 298 (Md. 2009)). While not dispositive, "whether the third party is named in the contract or its 'antecedent agreements'" is another key factor. *Id.* at 212 (quoting *Lovell Land*, 969 A.2d at 297-98); see *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 298 (Md. 2009). Whether the contract expressly gives enforcement power to the putative third-party beneficiary also bears on the analysis. *Long Green Valley Ass'n v. Bellevale Farms Inc.*, 46 A.3d 473, 485-86 (Md. Ct. Spec. App. 2012), *aff'd*, 68 A.3d 843 (Md. 2013). The provisions purporting to create the third-party interest should be "central" to the contract as a whole, rather than merely "peripheral." [*Tower I*], 56 A.3d at 213. In assessing the parties' intent, consideration of extrinsic evidence is permitted. Id. at 213 n.61.

"Maryland law is quite restrictive on the issue of whether one may be considered a third-party beneficiary." *CX Reinsurance Co., Ltd. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016), *aff'd*, 691 F.App'x 130 (4th Cir.

> 2017).  In particular, Maryland courts focus
> on whether the third party is the "primary
> party in interest."  [*Tower I*], 56 A.3d at
> 213.  "It is not enough that the contract may
> operate to [the plaintiff's] benefit.  It must
> clearly appear that the parties intend to
> recognize [the plaintiff] as the primary party
> in interest and as privy to the promise."
> *Mackubin v. Curtiss-Wright Corp.*, 57 A.2d 318,
> 321 (Md. 1948); *Volcjak*, 723 A.2d at 478
> (quoting *Weems v. Nanticoke Homes, Inc.*, 378
> A.2d 190, 195 (Md. Ct. Spec. App. 1977)).

*Amaya*, 2019 WL 3945933, at *4–5.  "[A] third[-]party qualifies as a third[-]party beneficiary of a contract only if the contracting parties intend to confer standing to enforce the contract upon that party."  *Volcjak*, 124 Md.App. at 509 (citation omitted)).

Plaintiffs have not alleged any facts about the formation of the management agreement.  Their only allegations are about the paraphrased portion of the agreement, which, it turns out, are contradicted by the text of the actual agreement.  The text of the agreement clearly states it does not intend to create third party beneficiaries.  At best, Plaintiffs have alleged that Realty Management contracted to follow applicable laws in managing the BVS Properties.  That does not make it plausible that the purpose of the contract was to make tenants third-party beneficiaries. Count VII will be dismissed for failure to state a claim.

## IV.  Conclusion

For the foregoing reasons, Defendants' motions to dismiss, (ECF Nos. 46, 47, and 49), are granted in part and denied in part. Once Defendants have answered the remaining claims, a scheduling

order will be issued setting a timeline for the parties to conduct discovery.  Thus, Plaintiffs' motion to compel the opening of discovery, (ECF No. 67), is moot and will be denied.  Defendants' motion for leave to file a surreply to Plaintiff's reply brief regarding the motion to compel discovery, (ECF No. 72), will likewise be denied as moot.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge