**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | |
|---|---|
| CASA DE MARYLAND, INC., et al, | |
| Plaintiffs, | |
| v. | Civil Action No. DKC-21-01778 |
| ARBOR REALTY TRUST, INC., et al, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CLASS-RELATED ALLEGATIONS**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ...................................................................................................................3

I.     Defendants' Motion Is Timely and Procedurally Appropriate .....................................3

II.    Individual Inquiries Will Predominate in Litigation About the Remaining
Claims ...................................................................................................................7

        A.    Questions Identified by Plaintiffs Are Not Common and Will Not
Predominate ............................................................................................7

        B.    Decisions Granting Class Certification in Landlord-Tenant Cases
Illustrate Why Class Treatment Is Inappropriate Here ...................................11

        C.    Statistical Sampling Cannot Transform This Case Into a Class Action .........13

III.    Certification of a "Notice" Issue Class Is Also Untenable ..........................................16

IV.    The "Limited Fund" Doctrine Does Not Apply.........................................................18

CONCLUSION...............................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akeem v. Dasmen Residential, LLC*,
  2021 WL 4804049 (E.D. La. Oct. 14, 2021) ....................................................9, 10

*Baker v. Equity Residential Mgmt., LLC*,
  390 F. Supp. 3d 246 (D. Mass. 2019) ...........................................................9, 10, 11

*Bennett v. Donaldson Grp., LLC*,
  2022 WL 2981494 (Md. Ct. Spec. App. July 28, 2022) ....................................10, 17

*Brooks v. Lewin Realty III, Inc.*,
  378 Md. 70 (2003) ...............................................................................................16

*Claborne v. Hous. Auth. of New Orleans*,
  165 So. 3d 268 (La. Ct. App. 2015), *writ denied*, 176 So. 3d 1039 (La. 2015)......................12

*Cox v. Stone Ridge at Vinings, LLC*,
  2014 WL 12663763 (N.D. Ga. Sept. 30, 2014) .........................................8, 10, 11

*Dallas Cty., Tex. v. MERSCORP, Inc.*,
  2012 WL 6208385 (N.D. Tex. Dec. 13, 2012) ...........................................................5

*Diamond v. New York City Hous. Auth.*,
  179 A.D. 3d 525, 118 N.Y.S.3d 77 (N.Y. App. Div. 1st Dep't 2020)....................12

*Dochak v. Polskie Linie Lotnicze LOT S.A.*,
  2017 WL 2362570 (N.D. Ill. May 30, 2017) ...........................................................5

*Edmond v. City of Chicago*,
  2018 WL 5994929 (N.D. Ill. Nov. 15, 2018) ...........................................................4

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ...............................................................................11

*Equity Residential Props. Tr. v. Yates*,
  910 So. 2d 401 (Fla. Dist. Ct. App. 2005) ...........................................................13

*Lumpkin v. E.I. Du Pont De Nemours & Co.*,
  161 F.R.D. 480 (M.D. Ga. 1995) ...........................................................................5

*Morgan v. Carlyle Grp., Inc.*,
  2007 WL 9780604 (D. Md. Jan. 5, 2007) ...............................................................10

*Navelski v. Int'l Paper Co.*,
   244 F. Supp. 3d 1275 (N.D. Fla. 2017).................................................................12

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999).................................................................................18, 19

*Peviani v. Arbors at California Oaks Prop. Owner, LLC.*,
   62 Cal. App. 5th 874 (2021) .............................................................................12

*Pilgrim v. Universal Health Card, LLC*,
   660 F.3d 943 (6th Cir. 2011) ..............................................................................4

*Richards v. NewRez LLC*,
   2021 WL 1060286 (D. Md. Mar. 18, 2021)................................................................4

*Roberts v. Ocean Prime, LLC*,
   148 A.D.3d 525, 49 N.Y.S.3d 666 (N.Y. App. Div. 1st Dep't 2017)....................................12

*Rose v. City of Hayward*,
   126 Cal. App. 3d 926 (1981) ............................................................................12

*Ross-Randolph v. Allstate Ins. Co.*,
   2001 WL 36042162 (D. Md. May 11, 2001) (Chasanow, J.) .....................................3

*Strange v. Norfolk & W. Ry. Co.*,
   809 F.2d 786 (4th Cir. 1987) ..........................................................................4, 5

*Techer v. Roberts-Harris*,
   83 F.R.D. 124 (D. Conn. 1979).........................................................................13

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)............................................................................7, 13, 14

*Vinole v. Countrywide Home Loans, Inc.*,
   246 F.R.D. 637 (S.D. Cal. 2007), *aff'd*, 571 F.3d 935 (9th Cir. 2009)....................................5

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ..........................................................................4, 6

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)............................................................................ *passim*

*Williams v. Potomac Fam. Dining Grp. Operating Co.*,
   2019 WL 5309628 (D. Md. Oct. 21, 2019) .........................................................3, 4

*Williams v. Superior Court*,
   221 Cal. App. 4th 1353 (2013) ........................................................................12

**Statutes**

Fair Housing Act (FHA) ...............................................................................................6, 19

Prince George's County Code § 13-157(c)...................................................................16

**Other Authorities**

Douglas C. Montgomery, STATISTICAL QUALITY CONTROL, A MODERN INTRODUCTION,
    632 (6th ed. 2009).............................................................................................15

Fed. R. Civ. P. 12 ............................................................................................... *passim*

Fed. R. Civ. P. 23 ............................................................................................... *passim*

Restatement (Second) of Property, Landlord & Tenant § 17.6 cmt. c (1977)..............16

Defendants respectfully submit this reply memorandum in further support of their Motion to Dismiss the Amended Complaint's Class-Related Allegations pursuant to Rules 23(c)(1)(A) and/or 23(d)(1)(D) of the Federal Rules of Civil Procedure (the "Motion").[1]

## PRELIMINARY STATEMENT

Plaintiffs describe the Motion as an effort to conceal "the truth."  Not so.  Defendants have actually asked the Court to *assume*, for purposes of the Motion, that all of the factual allegations in Plaintiffs' Amended Complaint are true.  The question is whether, given that assumption, Plaintiffs' remaining causes of action can be litigated in a class action.  The answer is they cannot.

Plaintiffs seek to avoid this conclusion, first, by sidestepping the merits.  They argue that the Motion is "waived" or otherwise procedurally improper.  Plaintiffs' procedural arguments flow from their effort to recast the Motion as arising under Rule 12(f).  That effort requires Plaintiffs to ignore the plain text of the Federal Rules and a wealth of decisions from the Fourth Circuit, from other courts in this District, and from this Court itself—all of which show that the instant Motion is governed by Rule 23 and is procedurally appropriate.

On the merits, Plaintiffs labor to identify "common questions" but end up showing only that putative class members might have similar *legal* theories.  This is not enough to meet the standard set forth in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  Each of Plaintiffs' purportedly "common" questions either (i) would require tenant-specific proof to answer or (ii) will play no role in resolving Plaintiffs' remaining claims.  And even assuming, *arguendo*,

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the memorandum of law in support of the Motion.  *See* ECF No. 89-1.

that Plaintiffs could meet the threshold requirement of commonality under Rule 23(a) (they cannot), they certainly cannot satisfy Rule 23(b)(3)'s more rigorous predominance requirement.

Throughout their opposition, Plaintiffs make no effort to distinguish or otherwise address the numerous persuasive decisions holding that class certification is inappropriate in landlord-tenant cases, like this one, where different tenants have suffered different alleged injuries from different alleged conditions.  Instead, Plaintiffs rely on decisions approving classes of residents who all suffered the same injury from the same event, like the collapse of a negligently maintained dam.  Such decisions are inapposite.

In an effort to find a reason for class-related discovery to continue, Plaintiffs manufacture a number of workaround theories—each of which further underscores why this lawsuit should not be allowed to proceed on a class basis.  Plaintiffs offer the promise that statistical sampling will supply some basis for class certification.  It will not.  Plaintiffs and their retained declarants acknowledge that assessing whether a given apartment unit is "habitable" or not requires an individualized inspection of that unit.  And even assuming sampling could be employed to estimate what *percentage* of the BVS Properties were "defective" in some way, that percentage would not answer any question relevant to Plaintiffs' remaining claims.  The Supreme Court has discussed the kinds of putative class actions in which sampling evidence may be used, and this is not one of them.

Plaintiffs' next effort to forestall the inevitable is their suggestion that an "issue class" might be used to determine whether Defendants had notice of the allegedly defective conditions. But resolution of that issue would collapse into highly individualized litigation about the diverse conditions themselves, and which specific ones could or could not have been discovered through the exercise of reasonable diligence.

Finally, Plaintiffs' last resort—to a "limited fund" theory under Rule 23(b)(1)—fails as a matter of law. The Supreme Court has cautioned against an "adventurous" use of the limited fund doctrine like the one Plaintiffs encourage, and the factual allegations in the Amended Complaint do not allow an inference that the doctrine could apply here.

Further discovery is unnecessary because Plaintiffs' own allegations show that class certification is impossible. Accordingly, the Court should dismiss the Amended Complaint's class-related allegations.

**ARGUMENT**

**I.      DEFENDANTS' MOTION IS TIMELY AND PROCEDURALLY APPROPRIATE**

Plaintiffs challenge the Motion's timeliness and procedural propriety, asserting that Defendants are asking the Court to "create a wholly new path." *See* ECF No. 96-1 ("Pl. Opp.") at 3-5. Their arguments disregard clear guidance provided by this Court and other courts within the District when granting precisely the kind of relief Defendants request here. *See*, *e.g., Williams v. Potomac Fam. Dining Grp. Operating Co.*, 2019 WL 5309628, at *4 (D. Md. Oct. 21, 2019); *Ross-Randolph v. Allstate Ins. Co.*, 2001 WL 36042162, at *4 (D. Md. May 11, 2001) (Chasanow, J.). Those authorities and others demonstrate that there is no procedural defect in, nor anything "unusual" about, the Motion.

Plaintiffs' procedural arguments are premised on their effort to recast the Motion as being governed by Rule 12(f). *See* Pl. Opp. at 3-4. This effort fails. The Motion is not brought under Rule 12(f), but under Rules 23(c)(1)(A) and/or 23(d)(1)(D), the latter of which expressly invites an order requiring "that the pleadings be amended to eliminate allegations about representation of absent persons." *See* ECF No. 89-1 ("Def. Br.") at 1, 6, 7 n.2. Moreover, Plaintiffs ignore even *this Court's* guidance about the relevant procedural mechanism: In *Ross-Randolph*, the Court analyzed a similar motion under Rule 23, and did not mention Rule 12(f) at any point. *See*

-3-

2001 WL 36042162, at **4-9.  And, despite citing *Williams* multiple times (Pl. Opp. at 2, 4),

Plaintiffs also ignore that decision's explanation "that courts generally have *not* used doctrine

applicable to traditional uses of Rule 12(f) in addressing motions to strike class allegations."

2019 WL 5309628, at *4 n.5 (emphasis added); *see also Strange v. Norfolk & W. Ry. Co.*, 809

F.2d 786 (4th Cir. 1987) (making no mention of Rule 12(f)); *Richards v. NewRez LLC*, 2021 WL

1060286, at *28 (D. Md. Mar. 18, 2021) (considering motion under Rule 23(d)(1)(D) despite

defendant's invocation of Rule 12(f)).  Courts of appeals in other circuits likewise identify Rule

23, and not Rule 12(f), as the basis for granting a motion like this one.[2]

Disregarding this ample authority, Plaintiffs cite two unpublished decisions from Florida

federal courts that applied Rule 12(f) to motions to dismiss class-related allegations.  *See* Pl.

Opp. at 4 (citing *Sharfman v. Premier Med., Inc.*, 2021 WL 6884683, at *3–4 (M.D. Fla. Dec.

29, 2021); *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *5 (S.D. Fla. Oct. 19,

2018)).  Those opinions do not grapple persuasively with the plain text of Rule 23(d)(1)(D),

which creates a freestanding basis, independent of Rule 12, to address a pleading's sufficiency

with respect to class-related allegations.  Importantly, as described above, they are inconsistent

with the majority view and the approach taken in this District.  Moreover, at least one decision

cited by Plaintiffs (*see* Pl. Opp. at 4) actually undermines their position about the relevant

procedural vehicle.  In *Edmond*, the court explained that "motions to strike class allegations" are

evaluated "under Rule 23, ***not*** Rule 12(f)."  *Edmond v. City of Chicago*, 2018 WL 5994929, at

*14 (N.D. Ill. Nov. 15, 2018) (emphasis added; citations and internal quotation marks omitted).

---

[2] *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011) (addressing ruling on "motion to strike the class allegations"; no mention of Rule 12(f)); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939–41 (9th Cir. 2009) (addressing ruling on motion to deny class certification prior to discovery cutoff; no mention of Rule 12(f)).

Because the Motion is not brought under Rule 12(f), it is immaterial that Defendants previously made a motion under Rule 12(b)(6).  Rule 12 merely prohibits a second "motion *under this rule* raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2) (emphasis added).  The Motion is brought under Rule 23 and is not subject to that limitation.  Furthermore, the defectiveness of a complaint's class-related allegations is not listed in Rule 12(h)(1) among the "defenses" that are waived if not asserted in a party's initial Rule 12 motion.  Plaintiffs' argument that the Motion is "waived" (Pl. Opp. at 5) therefore fails.

Plaintiffs also suggest that the Motion is "untimely" because it was made after Defendants' Rule 12 motion was decided and after Defendants answered the Amended Complaint.  Pl. Opp. at 4-5.  This, too, is wrong.  No rule or decision cited by Plaintiffs imposes such a deadline.  Rule 23 merely requires a court to decide certification "at an early practicable time."  Moreover, federal courts routinely entertain motions like this one as "a proper means" of objecting to class treatment "even after a motion to dismiss has been filed under Rule 12." *Dallas Cty., Tex. v. MERSCORP, Inc.*, 2012 WL 6208385, at *2–4 (N.D. Tex. Dec. 13, 2012) (collecting cases).  The fact that discovery has commenced—and is in its nascent stage—does not prevent the Court from considering the Motion on its merits.[3]  It is actually a reason for the

---

[3] *See*, *e.g.*, *Strange*, 809 F.2d at 786 (affirming elimination of class allegations "as *further* discovery was unneeded" to decide certification) (emphasis added); *Dochak v. Polskie Linie Lotnicze LOT S.A.*, 2017 WL 2362570, at *3–4 (N.D. Ill. May 30, 2017) (dismissing class allegations at the close of discovery); *Vinole v. Countrywide Home Loans, Inc.*, 246 F.R.D. 637, 639–40 (S.D. Cal. 2007) (addressing propriety of class treatment where discovery deadline was three weeks away), *aff'd*, 571 F.3d 935 (9th Cir. 2009); *Lumpkin v. E.I. Du Pont De Nemours & Co.*, 161 F.R.D. 480, 481 (M.D. Ga. 1995) (denying class treatment under Rule 23(c)(1) "based solely on Plaintiffs' pleadings and discovery responses and prior to provi[sion]" of defendant's discovery responses).

Court to consider (and grant) the Motion because no amount of discovery could eliminate the fundamental barriers to class certification.

Plaintiffs are also wrong to criticize Defendants for not addressing the Amended Complaint's class-related allegations in their Rule 12(b)(6) motion.  Defendants believed that motion would dispose of the entire case, rendering the issue of class certification moot.  Although the Court did not dismiss the entire case, it did dismiss the causes of action under the Fair Housing Act ("FHA") and for conspiracy.  The FHA and conspiracy claims were the only ones that conceivably could have met Rule 23's requirements, since they were predicated on allegations (albeit fanciful) that Defendants committed racial discrimination on a national scale.  Now that the only remaining causes of action are state common-law claims that are patently inappropriate for class treatment, the Motion is an efficient way of avoiding the unnecessary expenditure of judicial resources.

Finally, contrary to Plaintiffs' contention (*see* Pl. Opp. at 5), the Motion is consistent with the operative case schedule (*see* ECF Nos. 86, 87).  If the Court grants the Motion, then the deadline for Plaintiffs to move for class certification will be moot.  Otherwise, Plaintiffs can make their motion as scheduled.  A scheduling order does not grant Plaintiffs "an exclusive right . . . to address the issue of class certification" at their own leisure.  *See Vinole*, 246 F.R.D. at 639–40.

By raising class certification at this stage, Defendants' Motion comports with the applicable rules and caselaw from this District, and it paves the way for disposition of an important issue "at an early practicable time."

## II.    INDIVIDUAL INQUIRIES WILL PREDOMINATE IN LITIGATION ABOUT THE REMAINING CLAIMS

Hoping to delay the inevitable, Plaintiffs urge that "after the record is developed [they] may be able to show that" common questions predominate under Rule 23(b)(3).  Pl. Opp. at 10.  However, this landlord-tenant dispute is a quintessential example of a case unsuitable for class treatment because it concerns allegations of diverse conditions affecting specific apartment units in different ways, at different times, and with different results.  No amount of discovery can change the fact that individualized questions will predominate.

### A.    Questions Identified by Plaintiffs Are Not Common and Will Not Predominate

Relying on Plaintiffs' own allegations, Defendants demonstrated in their opening brief the individualized nature of the remaining causes of action and the particularized questions that will abound when litigating those claims.  Def. Br. at 3-4, 7-9.  Without even attempting to address these unit-specific inquiries, Plaintiffs identify "six issues" that they assert are common to the putative class.  Pl. Opp. at 9-10.  But those issues do not qualify under Rule 23(a) as "common questions," which must be subject to "class-wide proof" rather than evidence that "varies from member to member."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  At best, Plaintiffs' list of issues merely restates their legal theories, the resolution of which will require member-specific proof.

Taking them seriatim, Plaintiffs' first and second purportedly "common" issues are "[w]hether Defendants are in breach of contract for violating an implied warranty of habitability" and "[w]hether Defendants are in breach of the implied warranty of habitability for violation of local codes and ordinances."  Pl. Opp. at 9.  But *Dukes* forecloses inventive attempts like this to create "common" questions out of generic legal theories.  "Commonality requires the plaintiff to

demonstrate that the class members have suffered the same injury"; it "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349-50.

Plaintiffs' third "issue" is "[w]hether Defendants failed to perform adequate maintenance at BVS." Pl. Opp. at 9. This one also fails the *Dukes* standard. Determining whether Defendants' maintenance of the apartment complexes was "adequate" in some abstract sense is irrelevant to whether Defendants breached their lease agreement with, or an implied warranty to, any given member of the putative class. It would not "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Instead, the factfinder would need to examine the conditions in each class member's apartment, determine the causes of those conditions (*e.g.*, whether they were caused by failures on the tenant's part, such as failure to report issues warranting repairs, refusal to allow entry to the premises to make necessary repairs, etc.), and then decide whether those conditions violated applicable duties. Accordingly, courts have rejected class treatment of claims based on allegations of generally inadequate maintenance. *See Cox v. Stone Ridge at Vinings, LLC*, 2014 WL 12663763, at *5 (N.D. Ga. Sept. 30, 2014) ("[C]lass members would have to prove [f]acts relating to [d]efendants['] handling and maintenance of each of their individual apartments even if they were successful in presenting probative evidence of [d]efendants' deficient overall maintenance and building management practices.").

Plaintiffs' fourth purportedly common question is whether "issues within the units are the product of years of neglect and Defendants['] failure to provide reasonable maintenance." Pl. Opp. at 9. But this question merely invites other individualized questions: What are the "issues within the units," and what were their causes? To prove his or her claim, any member of the putative class would need to answer these questions for his or her "unit" and for the specific

"issues" of which he or she complains.  Indeed, Plaintiffs' own framing concedes that this

question requires examination of "*the units*."  The factfinder will need to determine the cause of

any particular condition within any particular unit, and whether Defendants had a reasonable

opportunity to remediate it.  This determination will require analysis of individualized proof on a

member-by-member basis.[4]

Plaintiffs' sixth purportedly common question (*see* Pl. Opp. at 10) is similar to the fourth,

in that it incorporates reference to unspecified "conditions."  Here, Plaintiffs ask whether

Defendants had "constructive notice" of those conditions.  Again (and as discussed further in

Section III below) the answer to that question will depend, among other things, on the specific

"condition," the specific apartment unit in which it was allegedly present, and the specific time

period during which it was allegedly present.

Plaintiffs therefore have not identified any truly "common" questions for purposes of

Rule 23—much less any such questions that would predominate.  This conclusion comports with

extensive authority—entirely ignored by Plaintiffs—that the class action device is not suited to

landlord-tenant disputes that are based on a variety of unit-specific allegations.  *E.g.*, *Akeem v.

Dasmen Residential, LLC*, 2021 WL 4804049, at *8 (E.D. La. Oct. 14, 2021) (no commonality

and no predominance where claims would require "examining whether and to what extent each

individual apartment unit was affected by the alleged water intrusion, mold, maintenance

problems, or other disrepair"); *Baker v. Equity Residential Mgmt., LLC*, 390 F. Supp. 3d 246,

---

[4] It is hard to discern what Plaintiffs mean by their fifth purportedly "common" issue—*i.e.* whether one could "consider the entire complex uninhabitable under the Prince George's County Housing Code" (*see* Pl. Opp. at 9)—but it fails for the same reason.  Plaintiffs have not cited any provision of the Code that would impose liability based on the conditions of a multi-building housing complex without requiring each tenant to show that his or her leased premises were defective in some way and giving the defendant an opportunity to rebut that evidence.

260-61 (D. Mass. 2019) ("Given the variety of complaints about the project, [p]laintiffs cannot

show via common proof that the project caused uninhabitable conditions in each

apartment. . . ."); *Cox*, 2014 WL 12663763, at *4 ("[T]hough the residents may face some of the

same serious building maintenance problems, their claims will rise and fall on the specific

factual and legal circumstances of their individual cases rather than due to a predominant cause

or building deficiency similarly operative in all apartments."); *Morgan v. Carlyle Grp., Inc.*,

2007 WL 9780604, at *4-5 (D. Md. Jan. 5, 2007) (no commonality and no predominance in

putative class action by mobile-home tenants for breach of lease); *Bennett v. Donaldson Grp.,*

*LLC*, 2022 WL 2981494, at *5 (Md. Ct. Spec. App. July 28, 2022) (finding individualized

questions would "engulf" common issues where "each tenant would have to establish that their

unit was uninhabitable and that there were damages").[5]

     These decisions also demonstrate that the individualized nature of Plaintiffs' claims will

affect every aspect of the litigation.  Plaintiffs try to reframe the defects in their class-related

allegations as pertaining only to the calculation of damages.  *E.g.*, Pl. Opp. at 6, 10-11.  But the

individualized issues in this case, and others like it, go to the heart of *liability* as well.  *See*, *e.g.*,

*Akeem*, 2021 WL 4804049, at *8 (addressing "*both* liability *and* damages") (emphasis added);

*Cox*, 2014 WL 12663763, at *4 (same); *Bennett*, 2022 WL 2981494, at *8 ("[T]he issue of

liability as to each claim can only be resolved through individualized trials."); *see also* 9/6/2022

---

[5] *Baker* rejected a proposed "Riser Replacement Class" due to the individualized nature of alleged injuries arising from a construction project.  *See* Def. Br. at 11.  Plaintiffs attempt to distinguish that holding by claiming, incorrectly, that the rejected class "was based on the covenant of quiet enjoyment, not the warranty of habitability."  *See* Pl. Opp. at 7 n.1.  In reality, the *Baker* court expressly applied its reasoning about the Riser Replacement Class to all of the claims at issue, including the "habitability claim."  *See* 390 F. Supp. 3d at 261 ("To the extent Plaintiffs seek to certify the Riser Replacement Class for their *three other causes of action*, certification is not warranted for the same reasons.") (emphasis added).

Mem. Op., ECF No. 76, at 43 ("Individual tenants will have individualized problems (*or not*) with their apartment.") (emphasis added).

Finally, Plaintiffs' theory that Defendants had a "policy" of performing inadequate maintenance (*e.g.*, Pl. Opp. at 10, 14) does not create the kind of predominant common issue necessary for class certification.  As one court persuasively found, an allegation of "poor building management practices" does not satisfy the *Dukes* standard where those practices "manifest and injure individual residents in hundreds of apartments situated in diverse ways." *Cox*, 2014 WL 12663763, at *4.  Furthermore, the Fourth Circuit has explained that "the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014).  "Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation." *Id.*  Here, the central issues in the litigation are not Defendants' "policies," but the specific conditions of individual Plaintiffs' apartments.

### B.   Decisions Granting Class Certification in Landlord-Tenant Cases Illustrate Why Class Treatment Is Inappropriate Here

Plaintiffs cite a smattering of decisions permitting class certification in disputes between landlords and tenants.  None of those authorities undermine the holdings in the cases cited above.  Rather, they illustrate the circumstances under which landlord-tenant disputes *might* qualify for class treatment—and why such circumstances are absent here.

Cases against landlords where class certification has been granted typically have concerned a single event, defective condition, or building-wide outage that injured all class members in the same way such that their claims would be subject to the same proof.  *See*, *e.g.*, *Baker*, 390 F. Supp. 3d at 262 (D. Mass. 2019) (building-wide outages of heat and hot water);

*Diamond v. New York City Hous. Auth.*, 179 A.D. 3d 525, 527-28, 118 N.Y.S.3d 77, 79-80 (N.Y. App. Div. 1st Dep't 2020) (system-wide outages of heat and hot water); *Roberts v. Ocean Prime, LLC*, 148 A.D.3d 525, 525, 49 N.Y.S.3d 666, 667 (N.Y. App. Div. 1st Dep't 2017) (injuries all resulting from Superstorm Sandy); *Claborne v. Hous. Auth. of New Orleans*, 165 So. 3d 268, 281 (La. Ct. App. 2015) (injuries all resulting from the "common source" of mold), *writ denied*, 176 So. 3d 1039 (La. 2015); *see also Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275 (N.D. Fla. 2017) (claims by neighborhood residents concerning collapse of a dam). Here, by contrast, each of the Plaintiffs asserts a distinct combination of conditions affecting his or her unit, with a diverse array of effects. *See* ECF No. 43 ("Am. Compl.") ¶¶ 22-26.

Plaintiffs are also incorrect to rely on *Peviani v. Arbors at California Oaks Prop. Owner, LLC*, 62 Cal. App. 5th 874 (2021). As an initial matter, there are key differences in how California state courts approach class certification relative to federal courts. California state courts apply a less exacting standard to class certification than is required under the federal rules. *See*, *e.g.*, *Rose v. City of Hayward,* 126 Cal. App. 3d 926, 934 (1981) (no minimum number required to satisfy numerosity requirement); *Williams v. Superior Court*, 221 Cal. App. 4th 1353, 1365 (2013) (allowing more flexibility than federal courts on damages calculation issues). More importantly, central to the reasoning of *Peviani* was the fact that "the warranty of habitability cause of action [was] *solely* focused on the common areas of the property." 62 Cal. App. 5th at 891 (emphasis added). Plaintiffs in this case have not similarly confined their claims. And while the Amended Complaint makes passing references to the BVS Properties' common areas, it is clear from Plaintiffs' own allegations that issues concerning the common areas will not predominate: The Amended Complaint describes at length the diverse conditions

that allegedly affected the named Plaintiffs' units (Am. Compl. ¶¶ 22-26), but it alleges only in conclusory fashion that the common areas were also subject to defects (*e.g.*, *id.* ¶¶ 245, 298).

Other decisions cited by Plaintiffs are equally unpersuasive and inapplicable. *Yates* did not address claims for breach of contract or for breach of the implied warranty of habitability arising from physical conditions in the plaintiffs' apartments. *See Equity Residential Props. Tr. v. Yates*, 910 So. 2d 401 (Fla. Dist. Ct. App. 2005). Rather, the case was about a landlord who allegedly "collect[ed] what amounted to double rent" in violation of Florida's consumer-protection statutes. *Id.* at 403. *Techer*, meanwhile, was decided decades before the Supreme Court's decisions in *Dukes* and *Bouaphakeo*, and it granted class certification only provisionally to enforce a preliminary injunction. *Techer v. Roberts-Harris*, 83 F.R.D. 124, 131 (D. Conn. 1979). In both *Yates* and *Techer*, the discussions about class certification are terse and provide no guidance regarding the allegations at issue here.

### C.   Statistical Sampling Cannot Transform This Case Into a Class Action

Statistical sampling cannot solve Plaintiffs' failure to identify any common question that would predominate over individualized ones. Even assuming Plaintiffs are correct that sampling could be used "to determine what *percentage* of the units have been uninhabitable" (Pl. Opp. at 13-14 (emphasis added)), that is not the answer to any question relevant to their claims. To have a valid claim, each Plaintiff would need to demonstrate that her specific unit was affected by conditions that breached her lease agreement and/or the implied warranty of habitability during the limitations period. The percentage of tenants who might *also* have valid claims is immaterial; what matters to *her* claim is the condition of *her* apartment. Sampling does not change the required analysis.

*Bouaphakeo* makes this clear. There, the Court explained that use of a sample is only permissible in a class action if it also "could have been used to establish liability in an individual

action." *Bouaphakeo*, 577 U.S. at 458.  Otherwise, reliance on a sample would "violate[] the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action."  *Id.*  In an individual action against the Defendants here, no Plaintiff could establish liability for breach of contract or for breach of the implied warranty of habitability merely by using statistical inferences extrapolated from other peoples' units.  She would have to offer evidence—which Defendants, of course, must have an opportunity to rebut—about her own unit.

The declarations submitted by Plaintiffs do not compel a different conclusion.  While they are vague and conclusory, the declarations acknowledge that assessing the habitability of an apartment unit is an inherently individualized project.  Joshua Julius, for example, claims that over the course of two days in July 2022, he "inspected twenty-one apartments within the complex" and that "*each* apartment was found to have at least one condition associated with poor maintenance practices."  ECF No. 96-2 ¶¶ 2-3 (emphasis added).[6]  Field & Tung Structural Engineers, meanwhile, "visited multiple *units* in the twelve building[s]."  ECF No. 96-3 at 1 (emphasis added).  Field & Tung even concede that there were "disparities on the exact findings between units."  *Id.*  In any individual action, a plaintiff would have to come forward with the "exact findings" about her unit, and Defendants would have an opportunity to test and rebut those "findings."  Styling their case as a class action does not relieve Plaintiffs of this burden of proof, as *Bouaphakeo* makes clear.

The declaration from Plaintiffs' statistician (ECF No. 102-1) is entirely consistent with these points and does not support Plaintiffs' position.  Dr. Singh proposes the use of "acceptance

---

[6] The declarants do not claim that the units they visited in July 2022 were selected randomly, or that they are representative of the overall population.  *See id.* ¶ 5 ("Inspections of randomly selected apartments within the complex would allow for a more conclusive evaluation. . . .").

sampling," a method of assessing whether the percentage of "unsafe" units within the apartment complexes exceeds a particular threshold. *Id.* ¶¶ 13-14. One of the sources Dr. Singh cites describes a "typical application" of acceptance sampling:

> A company receives a shipment of product from a supplier. . . . A sample is taken from the lot, and some quality characteristic of the units in the sample is inspected. On the basis of the information in this sample, a decision is made regarding lot disposition. Usually, this decision is either to accept or to reject the lot.

Douglas C. Montgomery, STATISTICAL QUALITY CONTROL, A MODERN INTRODUCTION, 632 (6th ed. 2009).

Assuming, *arguendo*, that Dr. Singh can perform the "acceptance sampling" analysis she describes,[7] that would not change the analysis under the Federal Rules. At best, her analysis would estimate the percentage of "defective" apartment units within a broader population. *See* ECF No. 102-1 ¶ 14; Pl. Opp. at 13-14. Such an analysis might be relevant to claims for breach of a sale agreement in which the seller guaranteed that a minimum percentage of widgets would conform to certain specifications. In such a case, the plaintiff might seek to introduce statistical evidence allowing the factfinder to assess liability without having to examine every single widget. But similar evidence would be irrelevant in this case, because there exists no substantive or evidentiary doctrine that would hold a landlord liable to one tenant merely because some threshold percentage of *other* tenants' apartments were "defective."

---

[7] This is a generous assumption. Among other issues that would surely arise, neither Dr. Singh nor Plaintiffs explain how one could inspect a randomly selected sample of apartments at some future point in this litigation and use the findings to assess Defendants' liability dating back to 2018, especially given that no Defendant has owned or controlled the buildings since May 2022 (*see* Def. Br. at 12).

The outcome of this litigation will not be "to accept or to reject" the apartment complexes as a whole.  It will be a determination whether each individual Defendant is liable to individual tenants.  And that determination will depend on individualized proof.

## III.   CERTIFICATION OF A "NOTICE" ISSUE CLASS IS ALSO UNTENABLE

Plaintiffs' fallback argument that an "issue class" might be warranted (*see* Pl. Opp. at 14-16) fares no better.  Determining whether Defendants had notice of the allegedly defective conditions will depend predominantly, if not exclusively, on individualized inquiries.

The parties agree that to be held liable for breach of the implied warranty of habitability, a defendant must have had notice, in some form, of the problematic condition.  *See* Pl. Opp. at 15-16.[8]  Plaintiffs acknowledge that under common law principles, a landlord is subject to liability "only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care."  Restatement (Second) of Property, Landlord & Tenant (the "Restatement") § 17.6 cmt. c (1977); *see also* Pl. Opp. at 15 n.5.  The Restatement explains further:

> Ordinarily, the landlord will be chargeable with notice of conditions which existed prior to the time that the tenant takes possession. Where the condition arises after the tenant takes possession, the landlord may not be able, in the exercise of reasonable care, to discover the condition, in which case the landlord will not be liable under the rules of this section until he has had a reasonable opportunity to remedy the condition after the tenant notifies him of it.

---

[8] *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70 (2003), concerned negligence claims based on violations of lead-paint-related provisions in the Baltimore City Code.  It did not address a claim for breach of the implied warranty of habitability—and certainly did not hold that notice is not an element of such a claim.

Restatement § 17.6 cmt. c.[9]  This comment is consistent with Section 13-157(c) of the Prince George's County Code, which imposes an affirmative duty on tenants to report promptly "[a]ny defective condition within the leased dwelling unit which comes to the tenant's attention, which he has reason to believe is unknown to the landlord."  This requires individualized proof.

Plaintiffs appear to believe that simply by calling this framework a "constructive notice" regime, they can gloss over the panoply of individualized issues it invites.  They cannot.[10]  As both the Restatement and the County Code make clear, the focus of any class member's claim will be the allegedly defective condition or conditions "within the leased dwelling unit." Determining whether the "notice" element is satisfied with respect to any such condition will depend on a host of particularized questions:  When did the condition "arise"?  Was it present before or after the tenant took possession?  If after, did the tenant notify each Defendant?  If the tenant did not provide notice, did each Defendant know about the condition anyway?  If not, is it a condition that each Defendant could have discovered with reasonable care?

It is no answer to say that "the entire property was in disrepair."  *See* Pl. Opp. at 14. Accepting Plaintiffs' allegations as true, different units were "in disrepair" in different ways and at different times.  Am. Compl. ¶¶ 22-26.  Whether, in the exercise of reasonable care, Defendants could have known about one or more of the issues allegedly affecting a given putative class member's apartment is a question that merely replicates the host of individualized questions discussed above.  For these reasons, resolving the issue of notice does not depend on

---

[9] The Court has previously relied on this section of the Restatement when addressing the warranty-of-habitability claim.  *See* 9/6/2022 Mem. Op., ECF No. 76, at 51.

[10] Plaintiffs also ignore Maryland authority suggesting that damages only begin to accrue "when the landlord ha[s] *actual* knowledge of the breach."  *Bennett*, 2022 WL 2981494, at *5 (emphasis added).  But the Court need not decide the applicable notice standard at this time.  No matter what, individualized litigation would be necessary to resolve this element of each tenant's claim.

any common question that will predominate and does not offer a "superior" method over others "for fairly and efficiently adjudicating th[is] controversy."  Fed. R. Civ. P. 23(b)(3).

## IV.    THE "LIMITED FUND" DOCTRINE DOES NOT APPLY

The absence of a common question under Rule 23(a) renders consideration of Rule 23(b) unnecessary.  Nevertheless, the Court can easily reject Plaintiffs' argument that certification may be appropriate pursuant to Rule 23(b)(1) under a "limited fund" theory.[11]

Plaintiffs suggest that a limited fund is something that a court itself can create "to ensure a recovery."  Pl. Opp. at 17.  This contention reflects a grave misunderstanding of the meaning and purpose of the "limited fund" doctrine.  A limited fund is not a remedy a court may award to deserving classes.  Indeed, the Supreme Court has expressly warned against using the doctrine as a "functional equivalent to bankruptcy by embracing 'funds' created by the litigation itself." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 843 (1999) (quoting Henry Paul Monaghan, *Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members*, 98 COLUM. L. REV. 1148, 1164 (1998)).

*Ortiz* explained further that certain elements are "presumptively necessary" in a limited fund case under Rule 23(b)(1):  There must be a "fund" with a "definitively ascertained limit"; there must be claimants who hold liquidated claims based on a "common theory of recovery"; the fund must be inadequate to satisfy those claims in the aggregate; and the entirety of the fund must be destined for distribution to the claimants.  *See id.* at 838-42.  The Amended Complaint does not plead a single fact that would establish any of these elements.

To the extent Plaintiffs intend to suggest in their Opposition that Defendants could be rendered insolvent as a result of seriatim suits by individual tenants, they miss the mark.  For one

---

[11] Plaintiffs concede that they cannot seek certification under Rule 23(b)(2).  Pl. Opp. at 17.

thing, they have not pleaded such a theory in their Amended Complaint, which alleges that the Arbor Defendants and Hyattsville Defendants are part of a nearly two-billion-dollar enterprise. *See* Am. Compl. ¶¶ 27-33, 35.  Nor would such a theory pass the plausibility test.  Following dismissal of their FHA claims, Plaintiffs have no basis to seek punitive damages and concede that their compensatory damages "are limited to the difference between the amount of rent paid or owed and the reasonable rental value of the dwelling in its deteriorated condition."  Pl. Opp. at 12 (quoting *Williams v. Hous. Auth. of Baltimore City*, 361 Md. 143 (2000)); *see also* Am. Compl. ¶¶ 22-26 (alleging monthly rents for named Plaintiffs ranging from $1,520 to $1,613). Defendants' exposure is further limited by this Court's holding that Plaintiffs can only be awarded damages arising within the three-year period prior to the suit's commencement.  *See* 9/6/2022 Mem. Op., ECF No. 76, at 55-56.

Plaintiffs have given the Court no basis upon which to find that Rule 23(b)(1) could conceivably apply to this case—indeed, they have not cited a single decision granting class certification on that basis.  The Court should heed *Ortiz*'s caution against "adventurous application" of the limited fund theory, 527 U.S. at 845, and reject Plaintiffs' half-hearted and unsupported invocation of that theory here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court issue an Order pursuant to Rules 23(c)(1) and 23(d)(1)(D) determining that a class action is unwarranted and requiring that the pleadings be amended to eliminate allegations about absent persons.

Dated: January 4, 2023                    Respectfully submitted,

*/s/ Ray McKenzie*
Ray McKenzie (Bar Number 21069)
**WTAII PLLC**
1101 Wilson Boulevard, Suite 968

Arlington, VA 22209
(202) 688-3150 (Telephone)
(202) 869-1882 (Facsimile)
ray.mckenzie@wtaii.com

*/s/ Peter W. Tomlinson*
Peter W. Tomlinson (*pro hac vice*)
Muhammad U. Faridi (*pro hac vice*)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000 (Telephone)
(212) 336-2222 (Facsimile)
pwtomlinson@pbwt.com
mfaridi@pbwt.com

*Counsel for Arbor Realty Trust, Inc., Arbor Realty Limited Partnership, Arbor Realty SR, Inc.*

*/s/ Sarah B. Meehan*
Sarah B. Meehan (Bar Number 30428)
Amanda R. Lawrence (*pro hac vice*)
John B. Williams III (Bar Number 20916)
**BUCKLEY LLP**
2001 M Street NW, Suite 500
Washington, D.C.  20036
(202) 349-8000 (Telephone)
(202) 349-8080 (Facsimile)
smeehan@buckleyfirm.com
alawrence@buckleyfirm.com
jwilliams@buckleyfirm.com

Scott T. Sakiyama (*pro hac vice*)
**BUCKLEY LLP**
353 N. Clark St., Suite 3600
Chicago, IL 60654
(312) 924-9800 (Telephone)
(312) 924-9899 (Facsimile)
ssakiyama@buckleyfirm.com

*Counsel for Defendants*
*Bedford United, LLC*
*Victoria United, LLC*
*Hyattsville United, LLC*
*Arbor Management Acquisition Company, LLC*

*/s/ Meghan T. Mantzavinos*
Megan T. Mantzavinos (Bar Number 16416)
Kieran E. Fox (Bar Number 23993)
**MARKS, O'NEILL, O'BRIEN, DOHERTY &
KELLY, P.C.**
600 Baltimore Avenue, #305
Towson, MD 21204
(410) 339-6880 (Telephone)
(410) 339-6881 (Facsimile)
mmantzavinos@moodklaw.com
kfox@moodklaw.com

*Counsel for Realty Management Services, Inc.*