IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | : |
| CASA de MARYLAND, INC., et al. | : |
| | : |
| v. | : Civil Action No. DKC 21-1778 |
| | : |
| ARBOR REALTY TRUST, INC., et al. | : |
| | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this housing conditions case are the unopposed motions filed by Plaintiffs (ECF Nos. 163; 165) seeking an order that:  (1) grants final approval of the settlement agreement (the "Settlement Agreement") (ECF No. 160-2, at 1-32) between Named Plaintiffs Norma Guadalupe Beltran, Maria Arely Bonilla, Jesus Gonzalez, Maria Lara, Ramiro Lopez, Anita Ramirez, and Ervin Obdulio Rodas (collectively, "Named Plaintiffs") and Defendants Bedford United, LLC and Victoria United, LLC; (2) grants final certification of the settlement class ("Settlement Class") pursuant to Federal Rule of Civil Procedure 23; (3) approves a payment of $900,000 to class counsel for attorneys' fees; (4) approves a payment of $78,965.18 to class counsel for litigation expenses; (5) approves incentive payments to Named Plaintiffs in the amount of $7,500 each; and (6) dismisses this action with prejudice, with the court to retain jurisdiction over the interpretation, enforcement, and

implementation of the Settlement Agreement and the final order. The court held a fairness hearing on March 8, 2024. For the following reasons, the motions will be granted and the case dismissed.

I.   **Background**

The relevant factual background in this case is set out in a prior opinion. (ECF No. 76, at 2-6); *CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*, No. 21-cv-1778-DKC, 2022 WL 4080320, at *1-2 (D.Md. Sept. 6, 2022). In short, Plaintiffs CASA de Maryland, Inc. et al ("Plaintiffs") alleged that Defendants Arbor Realty Trust, Inc. et al ("Defendants") failed to maintain and repair the properties in which Plaintiffs lived and discriminated against them through the deficient maintenance and repair of their apartments. (ECF Nos. 1, at 114-130; 76, at 5); *CASA*, 2022 WL 4080320, at *2. On their own behalf and on behalf of those similarly situated, Named Plaintiffs filed this suit on July 19, 2021. (ECF No. 1). They alleged violations of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, Prince George's County Code § 13-153, and Maryland common law. (*Id.* at 110, 114-130).

After Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on December 20, 2021, (ECF Nos. 30; 35; 40), Plaintiffs filed an amended complaint as of right on January 10, 2022. (ECF No. 43). On February 18, 2022, Defendants again moved to dismiss. (ECF Nos. 46; 47; 49). The court dismissed all claims

2

except those alleging breach of contract and breach of implied warranty of habitability. (ECF No. 76, at 31, 36, 43-54, 61). After denying Defendants' motion to dismiss class allegations, (ECF No. 139), the court granted the parties' joint motion to stay proceedings to finalize a settlement, (ECF No. 146), and the parties' three joint motions to extend the stay, (ECF Nos. 149; 151; 153).

While discovery was ongoing, the parties participated in three day-long mediation sessions with a private mediator. (ECF Nos. 157-1, at 14; 157-2, at 1, 90-91; 157-9, at 1-2). Following mediation and arms-length negotiations with counsel, (ECF Nos. 157-1, at 14; 157-2, at 72), the parties agreed to settlement terms including dismissal of six Defendants, leaving Bedford United, LLC and Victoria United, LLC as the only remaining Defendants, (ECF Nos. 154; 155; 157-1, at 4; 157-2, at 1, 10). On September 6, 2023, Plaintiffs filed an unopposed motion for preliminary approval of a settlement agreement. (ECF No. 157). The court denied the motion without prejudice, determining that "the parties ha[d] not provided enough information to assess whether the [a]greement [could] be approved preliminarily." (ECF No. 158, at 8). On October 6, 2023, Plaintiffs submitted an unopposed corrected motion for preliminary approval of class settlement, which contained additional information and included revised notices. (ECF Nos. 160-1; 160-5, at 3; 160-7, at 1). The court

granted the motion on October 26, 2023, concluding that "[o]verall, the size of the recovery to the class is fair, reasonable, and adequate in light of the strength of the case against Defendants and the risks of litigation." (ECF No. 162, at 11). The court also preliminarily certified the class; preliminarily approved the settlement subject to further consideration at the final fairness hearing; appointed Named Plaintiffs to serve as class representatives; appointed the law firms of Nidel & Nace, P.L.L.C. and The Donahue Law Firm, LLC to serve as class counsel; appointed American Legal Claims Services to serve as the settlement administrator; approved the class notice, claim and release form, and publication notice; approved the notice protocols; and scheduled a final fairness hearing. (ECF No. 162, at 13-18).

The preliminarily approved Settlement Agreement created a Settlement Class consisting of all current and prior tenants who resided at the Bedford Station and Victoria Station ("BVS") apartment complexes between July 19, 2018 and May 23, 2022. (ECF No. 160-1, at 2). It called for a settlement fund ("Settlement Fund") of $3,000,000 to be used first to cover attorneys' fees and costs, settlement administration costs, and service payments to Named Plaintiffs, before the remaining amount (the "Net Settlement Fund") is distributed to class members. (*Id.*). In exchange, the Settlement Class agrees to waive all claims arising out of, based

upon, or related in any way to the allegations set forth in the complaint. (*Id.* at 2; 160-9, at 5).

The method for distributing the Net Settlement Fund is as follows:

> Individual Apartment Recovery = ((N)\*Net Settlement Fund)/ (Total Number of Occupancy Years for All Claimed Units)
>
> N = Maximum number of partial years residing at BVS during the Class Period (1, 2 or 3) but no more than 3 for a specific unit

(*Id.*).

The class notice was sent via first-class mail to 996 members of the Settlement Class, and via email to 214 members. (ECF No. 165-1, at 15). 43 notices came back undeliverable for which a search turned up no other viable addresses. (*Id.*). The publication notice was published for a period of four consecutive weeks in *El Tiempo Latino* (in Spanish) in November 2023 and in *Hyattsville Life and Times* (in English) in December 2023. (*Id.*).

On December 1, 2023, Plaintiffs filed an unopposed motion for attorneys' fees, reimbursement of expenses, and plaintiff incentive awards. (ECF No. 163). On February 23, 2024, Plaintiffs filed an unopposed motion for final approval of the settlement and final certification of the class. (ECF No. 165). No class member opted out of or filed an objection to the Settlement Agreement,

(ECF No. 165-1, at 2), nor did any objector appear at the March 8, 2024 final fairness hearing.

## II.  Analysis

After carefully considering the terms of the Settlement Agreement; the unopposed motions for attorneys' fees, reimbursement of expenses, plaintiff incentive awards, final approval of the settlement, and final certification of the class; and the statements of counsel for both parties at the final fairness hearing held on March 8, 2024, the court now addresses whether the Settlement Class should receive final certification; whether the Settlement Agreement is fair, reasonable, and adequate; and whether class counsel's request for attorneys' fees and expenses, as well as incentive awards for the Named Plaintiffs, should be granted.

### A. Rule 23 Class Certification

For a class action to be certified pursuant to Rule 23, the class must meet each of the four prerequisites identified in Rule 23(a) and fit within one of the three categories identified in Rule 23(b).  Fed.R.Civ.P. 23. District courts must pay "undiluted, even heightened, attention" to these requirements when certifying a class for the purpose of settlement. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Grice v. PNC Mortg. Corp. of Am.*, No. 97-cv-3084-PJM, 1998 WL 350581, at *2 (D.Md.

May 21, 1998) ("Despite the parties' agreement, class certification must be carefully scrutinized.").

### 1.   Rule 23(a) Prerequisites

Under Rule 23(a), a group of plaintiffs may sue in a class action if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The Settlement Class meets the numerosity, commonality, typicality, and adequacy requirements.

First, although Plaintiffs do not identify the exact number of class members in their motion for final approval of class settlement, it is clear that the class contains 589 people at the very least because there are approximately 589 units at BVS, most with multiple occupants. (ECF No. 165-1, at 7). In prior papers, class counsel have estimated that the class contains 2,356 members. (ECF No. 160-1, at 5-7). 996 notices were sent via mail, with 43 notices deemed undeliverable, and 214 notices were sent via email. (*Id.* at 1-2). 137 valid claims were made. (*Id.* at 2). Even if the class only contains 589 people, that number well exceeds that which has been required for numerosity in other cases, and joinder would certainly be impracticable. *See Dameron v. Sinai Hosp. of*

*Baltimore, Inc.*, 595 F.Supp. 1404, 1408 (D.Md. 1984) ("A class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical.").

Second, there are questions of law and fact common to all members of the class, including:

> 1. Whether Defendants violated the implied warranty of habitability;
> 2. Whether Defendants violated local codes and ordinances including, but not limited to, Sec. 13-153 of the Prince George's County Code of Ordinances;
> 3. Whether Defendants failed to perform adequate maintenance at BVS;
> 4. Whether the issues within the units were the product of Defendants' purported failure to provide reasonable maintenance[;]
> 5. Whether the conditions at BVS were sufficiently severe to consider the entire complex uninhabitable under the Prince George's County Housing Code; and
> 6. Whether Defendants had constructive notice of the conditions at BVS.

(ECF No. 165-1, at 7).  These questions are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Third, the Named Plaintiffs' claims are typical of the claims of the class.  As Plaintiffs point out, "all the [N]amed Plaintiffs were tenants at BVS between July 19, 2018, and May 23, 2022, and each have claims relating to habitability and alleged maintenance

issues like the proposed class members." (ECF No. 165-1, at 8). Even if the conditions in Named Plaintiffs' units are not perfectly identical to those in every class member's unit, "a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 217 (D.Md. 1997). Because Named Plaintiffs allege that they and all other class members were subject to the same habitability and maintenance issues, the typicality requirement is met.

Finally, Named Plaintiffs and class counsel are adequate class representatives. "Representation is adequate if: (1) the named plaintiff's interests are not opposed to those of other class members, and (2) the plaintiff's attorneys are qualified, experienced, and capable." *Graham v. Famous Dave's of Am., Inc.*, No. 19-cv-0486-DKC, 2022 WL 17584274, at *5 (D.Md. Dec. 12, 2022) (quoting *Singleton v. Domino's Pizza, LLC*, 976 F.Supp.2d 665, 676 (D.Md. 2013)). Named Plaintiffs' interests are aligned with those of the class members because they all seek to maximize compensation for their shared harm. (ECF No. 165-1, at 9). Additionally, class counsel are qualified, experienced, and capable. Class counsel represent that they identified and investigated potential class claims by (1) speaking with hundreds of class members; (2) recruiting a certified industrial hygienist and several structural

engineers to perform multiple day-long site inspections of class members' units; (3) retaining and consulting with an expert in environmental statistics who determined whether a representative sample could be taken and whether the results portended the existence of class-wide habitability concerns; (4) litigating this case through three day-long mediations, multiple motions to dismiss, and multiple discovery motions; (5) leading efforts to obtain discovery from Defendants and third-parties; and (6) reviewing thousands of pages of discovery from Defendants and third parties. (ECF No. 165-1, at 10). Class counsel have "combined extensive experience with class action litigation, including environmental class actions, and Maryland habitability law in their representation of the proposed class members." (*Id.*). Finally, class counsel represent that they have already devoted more than one thousand hours to this case. (*Id.*).

Thus, all four of the Rule 23(a) prerequisites are met.

## 2. Rule 23(b) Requirements

The class must also meet the requirements of at least one of the three Rule 23(b) categories. The most applicable category for this case is that in Rule 23(b)(3), which covers cases where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and

10

efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The relevant factors to consider are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum[.]

*Id.; see also Amchem*, 521 U.S. at 620 (noting that district courts need not consider the fourth factor, described in Fed.R.Civ.P. 23(b)(3)(D) as "the likely difficulties in managing a class action," when deciding whether to certify a class for settlement purposes only).

As previously discussed, there are questions of law and fact common to the class members, many of which are central issues of the case—namely, whether Defendants' failure to properly maintain class members' units caused habitability issues at BVS. (ECF No. 165-1, at 11). There is also no indication that any other class members are pursuing separate litigation of their claims. Finally, concentrating the litigation of these claims is desirable because managing individual actions would require duplicative discovery and likely multiple trials regarding the same issues, which would unnecessarily consume judicial resources. (*Id.* at 12). That no class members have opted out or filed an objection further demonstrates the superiority of the class settlement.

(*Id.*).   Concentrating the litigation will also allow Plaintiffs, many of whom are working class and not native English speakers, to recover without having to bear the onerous cost of bringing their own individual suits.   (ECF No. 163, at 4).

Because the requirements of both Rule 23(a) and Rule 23(b)(3) are met, the court will grant final certification of the Settlement Class.

**B. Final Approval of the Settlement Agreement**

Rule 23 provides that the claims of a certified class can only be settled with the court's approval.   Fed.R.Civ.P. 23(e). Specifically, the court must conduct a hearing and make a "finding that it is fair, reasonable, and adequate" prior to approving a settlement agreement that binds the class.   *Id.* at Fed.R.Civ.P. 23(e)(2).   Having conducted a hearing, the court now makes its finding.   In doing so, the court's "primary concern . . . is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations."   *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

**1.   Fairness and Reasonableness**

When evaluating the fairness and reasonableness of a proposed settlement agreement, courts consider:   "(1) the presence or absence of collusion among the parties; (2) the posture of the case at the time settlement is proposed; (3) the extent of discovery that has been conducted; and (4) the circumstances

surrounding the negotiations and the experience of counsel." *Graham*, 2022 WL 17584274, at *7 (quoting *Singleton*, 976 F.Supp.2d at 678). "The purpose of this inquiry is to protect against the danger that counsel might agree to settle for an inadequate amount to secure a fee." *Id.* (citing *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1383 (D.Md. 1983)).

Here, each fairness factor weighs in favor of final approval. There is no evidence of collusion between the parties. The settlement was reached through arm's length negotiations including three day-long mediation sessions with a private mediator. (ECF No. 165-1, at 14). The parties reached settlement after litigating the case for over two years and engaging in extensive discovery, during which class counsel collected in-person data in dozens of BVS apartments, reviewed thousands of pages of discovery from Defendants and third parties, and litigated a motion to compel discovery. (*Id.* at 10, 13, 14, 17; *see also* ECF Nos. 67-75). Both class counsel and defense counsel are experienced in cases of this type, and each had the opportunity to present their respective positions and negotiate until they reached a fair and reasonable compromise. (ECF No. 165-1, at 14).

### 2. Adequacy

When evaluating whether a proposed settlement is adequate, courts consider: "(1) the relative strength of the plaintiff's case on the merits and probability of success at trial; (2) the

anticipated duration and expense of additional litigation; (3) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (4) the degree of opposition to the settlement." *Graham*, 2022 WL 17584274, at *7 (quoting *Singleton*, 976 F.Supp.2d at 679). "The purpose of this inquiry is to 'weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement.'" *Id.* (quoting *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F.Supp. at 1384).

On balance, the adequacy factors weigh in favor of final approval. The court partially denied Defendants' motion to dismiss, but whether Plaintiffs would be able to prevail on the merits if the case were to proceed to trial is uncertain. Genuine disputes exist as to whether Realty Management was acting as an agent for a partially disclosed principal, and is thus liable for breach of contract, or whether Plaintiffs had notice of the principal's identity, (ECF No. 76, at 46-49), and the actuality and/or scope of Defendants' ownership and control over the BVS properties, which could hinder the viability of the breach of implied warranty of habitability claim, (ECF No. 76, at 61-62). Plaintiffs contend that if the case were to proceed to trial, under Maryland law, "the ceiling in per-apartment compensatory or restitution damages under a breach of contract and breach of the implied warranty of habitability damages" would be $18,798 per year (based on the average rent in BVS of $1,566.50 per month).

(ECF No. 160-1, at 9).  In contrast, the Settlement Agreement provides for a payment of approximately $4,976.49 to each class member per year of tenancy (if the court grants Plaintiffs' requested relief for attorneys' fees, costs, class representative awards, and costs to the settlement administrator).  (ECF No. 165-1, at 14).  Although the figure under the Settlement Agreement is lower than the maximum amount recoverable at trial, the existence of genuine questions as to Defendants' liability makes proceeding to trial risky.  As class counsel contend, "[a]bsent this [S]ettlement [A]greement, class members would face significant challenges, expenses, and delays in obtaining relief, if any, including moving for class certification, completing fact and expert discovery, briefing and litigating summary judgment, and a lengthy trial."  (ECF No. 165-1, at 14).  Additionally, the fact that no class members opted out or objected supports final approval of the Settlement as fair, adequate, and reasonable.

Although BVS has recently been sold, there is no indication that Defendants would be unable to satisfy a judgment if one were eventually entered.  Given the uncertainty, risk, expense, and delay involved in proceeding to trial, however, the Settlement Agreement is a good result for the class members.  Accordingly, the Settlement Agreement will be approved.

## C. Attorneys' Fees, Expenses, Settlement Administration Expenses, and Incentive Awards

Rule 23 permits a court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). Plaintiffs have moved for an attorneys' fee award of $900,000, which represents 30% of the Settlement Fund, as contemplated by the Settlement Agreement. (ECF Nos. 160-2, at 51; 163, at 5). Plaintiffs also seek incentive awards in the amount of $7,500 for each Named Plaintiff, reimbursement of litigation expenses in the amount of $78,965.18, and payment of administrative expenses to the claims administrator in the amount of $27,701.00. (ECF No. 163, at 4, 9; 165-2, at 2-4).

### 1. Attorneys' Fees

"In determining whether an attorney's fee award is reasonable, courts generally take two approaches: (1) the 'percentage of recovery' or 'percentage of the fund' method; or (2) the 'lodestar' method." *Graham*, 2022 WL 17584274, at *10 (quoting *Singleton*, 976 F.Supp.2d at 681). "Although this circuit has not decided which approach to adopt, the 'current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.'" *Id.* (quoting *Singleton*, 976 F.Supp.2d at 681). When the percentage of

the fund method is used, it is supplemented with a lodestar cross-check.

### a.   "Percentage of the Fund" Method

"Under the percentage of the fund method, the court awards attorneys' fees as a percentage of the common fund used to pay class members." *Graham*, 2022 WL 17584274, at *10 (first citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); then citing *Singleton*, 976 F.Supp.2d at 681).  When using the percentage of the fund method, district courts in this circuit typically analyze: "(1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy." *Id.* (quoting *Singleton*, 976 F.Supp.2d at 682). "The factors 'need not be applied in a formulaic way,' and no one factor is necessarily dispositive." *Id.* (quoting *Singleton*, 976 F.Supp.2d at 682).

### i.   Results Obtained for the Class

"[A] major advantage of the 'percentage of recovery' method is that it considers the results that class counsel actually obtained for the class as opposed to the number of hours they expended." *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 463 (D.Md. 2014) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 436

17

(1983); *Brodziak v. Runyon,* 145 F.3d 194, 196 (4th Cir. 1998); Fed.R.Civ.P. 23(h) advisory committee notes to 2003 amendments).

Class counsel achieved a $3 million fund to be distributed based on number of years of tenancy to the 137 class members who timely submitted claims.  Assuming the court grants all the requested fees, each class member who submitted a claim will receive $4,976.49 per year of tenancy.  This is an impressive result when compared to the maximum value of each class member's claim at approximately $18,798 per year under Maryland breach of contract and breach of the implied warranty of habitability law, and when considering Defendants' potential defenses.  (ECF No. 160-1, at 8-9) (citing *Bennett v. Donaldson Grp., LLC*, No. 1372, Sept. term, 2021, 2022 WL 2981494, at *8-9 (Md.Ct.Spec.App. July 28, 2022), *cert. denied sub nom. Bennett v. Donaldson Grp.*, 482 Md. 33 (2022)).  The fact that no objections have been filed further suggests that the result achieved is a desirable one.

## ii.   **Quality, Skill, and Efficiency of the Attorneys Involved**

Plaintiffs' attorneys are experienced and skilled housing and class action litigators who achieved a favorable result for the Settlement Class.  Counsel exchanged discovery with Defendants, litigated a motion to compel discovery and multiple motions to dismiss, and participated in three full-day mediation sessions. (ECF No. 163, at 6).  This case involved complex analysis and

coordination from multiple experts from multiple disciplines. (*Id.*; *see also* ECF No. 165-1, at 10). Plaintiffs' attorneys also "reached a favorable settlement after evaluating the strengths and weaknesses of the respective positions and negotiating with sophisticated defense attorneys[]" from firms including Orrick, Herrington & Sutcliffe LLP, a global law firm. *Boyd*, 299 F.R.D. at 464 (quoting *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 262 (E.D.Va. 2009) (quality of opposing counsel is a factor to be considered in evaluating class counsel performance)).

### iii.    Risk of Nonpayment

"In determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis." *Boyd*, 299 F.R.D. at 464 (quoting *Jones v. Dominion Res. Servs., Inc.*, 601 F.Supp.2d 756, 762 (S.D.W.Va. 2009)). "The risk undertaken by class counsel is evaluated by, among other things, the presence of government action preceding the suit, the ease of proving claims and damages, and, if the case resulted in settlement, the relative speed at which the case was settled." *Id.* (first citing *Jones*, 601 F.Supp.2d at 762; then citing *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F.Supp. 499, 503 (E.D.Va. 1995) (finding that risks to plaintiffs' counsel were minimized by settlement within six-months

from the filing of the complaint and consequently reducing the percentage award from 30% to 25% of the Settlement Fund)).

There existed a meaningful risk of non-recovery in this suit because class counsel took this matter on a contingency fee basis and their path to proving breach of contract and breach of implied warranty of habitability was far from clear-cut. (ECF No. 163, at 6). The fact that the parties litigated the case for over two years before reaching a settlement further demonstrates the risk to class counsel.

### iv.    Objections

As noted above, class members were notified directly via mail and/or email of the proposed settlement terms in the Settlement Agreement, including an explanation of the attorneys' fee request. (ECF Nos. 160-2 at 14; 165-1, at 1). Notices were published in relevant newspapers. Because the properties had been sold earlier in this litigation, no notices could be posted there. No one filed objections to either the settlement terms or the proposed attorneys' fees. Furthermore, no class member objected at the final fairness hearing on March 8, 2024. The lack of objections tends to show that at least from the class members' perspective, the requested fee is reasonable for the services provided and the benefits achieved by class counsel.

v.      **Awards in Similar Cases**

"Attorneys' fees awarded under the percentage of the fund method 'are generally between twenty-five (25) percent and thirty (30) percent of the fund.'"  *Boyd*, 299 F.R.D. at 464 (quoting *Singleton*, 976 F.Supp.2d at 684).

In *Boyd*, which involved a $3.6 million fund—close in size to the $3 million fund here—this court determined that:

> In considering awards in similar cases, courts look to cases of similar size, rather than similar subject matter. *See In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 737 (3[]d Cir. 2001); *The Mills Corp.,* 265 F.R.D. at 263-64 ("comparing the size of the fund and percentage of the award in other cases to the present case . . . provides a valuable point of reference."). Fees awarded under "the percentage-of-recovery" method in settlements under $100 million have ranged from 15% to 40%. *See Stoner v. CBA Information Services,* 352 F.Supp.2d 549, 553 (E.D.Pa. 2005). Cases in this circuit involving settlement comparable to the $3.6 million settlement fund here have resulted in awards of attorneys' fees in the ranges of 25% to 28% of the common fund. *See In re SPX Corp. ERISA Litig.* (*W.D.N.C.* 2007) (28% of the fund awarded, where the fund was $3.6 million); *Smith v. Krispy Kreme Doughnut Corp.,* 2007 WL 119157, at *3 (M.D.N.C. 2007) (26% of the fund awarded where the fund was $4,750,000; *Mason v. Abbot Labs.* (N.D.W.Va. 2001) (25% of the fund awarded where the fund was $1,705,200); *Braun v. Culp, Inc.* (M.D.N.C. 1985) (25% of the fund awarded where the fund was $1.5 million). Furthermore, a recent study in the *Journal of Empirical Studies* found that for class recoveries in the range of $2.8 to $5.3 million, the mean attorneys' fee percentage award from 1993-2008 was approximately 26.4%, and the median was 25.0%. *See* Theodore

> Eisenberg & Geoffrey P. Miller, *Attorney Fees
> and Expenses in Class Action Settlements:
> 1993–2008,* 7 J.Emp.L.Studies 248, 265 T.7
> (June 2010).

*Boyd*, 299 F.R.D. at 465.   There, this court determined that attorneys' fees of 28% of the fund would "[s]trik[e] the balance between the percentage awarded in cases in this circuit for an award of this magnitude and those given in cases of this type across the nation[.]" *Id.*

Even though courts usually look to cases of similar settlement size rather than similar subject matter, it is also useful to examine the attorneys' fees awards approved in similar class actions as a comparison.   This court is unaware of any other housing conditions class actions in this circuit, so it will consider civil rights class actions broadly.   Courts in this circuit have approved attorneys' fees of one-third of the total fund in civil rights class actions.   *See, e.g.*, *Horton v. Love's Travel Stops & Country Stores, Inc.*, No. 1:19-cv-1193-JLW, 2022 WL 2527824, at *5-6 (M.D.N.C. July 7, 2022) (awarding attorneys' fees of one-third of the fund in class action alleging gender-based wage discrimination; *Robinson v. Carolina First Bank NA*, No. 7:18-cv-02927-JDA, 2019 WL 2591153, at *14 (D.S.C. June 21, 2019) (awarding attorneys' fees of one-third of the fund in class action alleging racial discrimination in hiring practices); *Scott v. Fam. Dollar Stores, Inc.*, No. 3:08-cv00540-MOC, 2018 WL 1321048, at *5

(W.D.N.C. Mar. 14, 2018) (awarding attorneys' fees of one-third of the fund in class action alleging gender-based wage discrimination).

In light of the attorneys' fee awards granted in cases of similar settlement sizes and similar subject matter, Plaintiff's request for attorneys' fees of $900,000, or 30% of the common fund, is not unreasonable.

### vi.    Complexity and Duration of the Litigation

"In evaluating the complexity and duration of the litigation, courts consider not only the time between filing the complaint and reaching settlement, but also the amount of motions practice prior to settlement, and the amount and nature of discovery." *Graham*, 2022 WL 1758427, at *11 (quoting *Singleton*, 976 F.Supp.2d at 686). "Additionally, 'courts consider whether negotiations were hard fought, complex, or arduous.'" *Id.* (quoting *Singleton*, 976 F.Supp.2d at 686).

Counsel litigated this case for two years before reaching a settlement, engaged in hard-fought motions practice prior to settlement negotiations, and grappled with complex issues of statistics and environmental science. (ECF No. 163, at 6).  The settlement was only achieved after three full-day sessions with a mediator and revision efforts required by the court.  (ECF No. 158).  Class counsel had to fight to access documents, as evidenced by their filing of a motion to compel discovery.  (ECF

No. 67).  Although contract law is not necessarily fast-evolving, very few federal courts have certified classes in housing conditions cases, so the law is not highly developed.  Moreover, Plaintiffs would have faced an uphill battle in satisfying all elements of breach of contract and breach of implied warranty of habitability.  As Plaintiffs note, this court's decisions that "the Prince George's County Code provided a cause of action for breach of implied warranty of habitability under general negligence principles, and that this applied to both landlords and property managers" and that the complaint "did not warrant dismissal before the Plaintiffs even move for class certification . . . were not guaranteed at the inception of this litigation[.]"  (ECF No. 163, at 7) (citing ECF Nos. 76, at 54; 138, at 3).  Given the complexity and duration of the litigation, there is no reason to reduce the fee award.

### vii.    Public Policy

"[P]ublic policy generally favors attorneys' fees that will induce attorneys to act and protect individuals who may not be able to act for themselves but also will not create an incentive to bring unmeritorious actions."  *Graham*, 2022 WL 17584274, at *11 (quoting *Jones*, 601 F.Supp.2d at 765).  As Plaintiffs note, tenants experiencing habitability issues "often find it difficult to secure representation for reasonable redress through the judicial process[]"  and  "[l]awyers,  including  contingency-fee-based

24

lawyers, often cannot see a viable economic method to pursue litigation" in housing conditions cases.  (ECF No. 163, at 6-7). It furthers public policy to induce attorneys to uphold tenants' rights to live in safe conditions.  Moreover, given the difficulty in proving breach of contract and implied warranty of habitability in housing conditions cases, awarding attorneys' fees of 30% of the common fund will likely not incentivize attorneys to bring unmeritorious actions.  In light of the aforementioned considerations, this fee award strikes the appropriate balance.

b.  **Lodestar Cross-Check**

> The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d [294, 306 (3d Cir. 2005), *as amended* (Feb. 25, 2005)] ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002)("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award.").  Importantly, "where the lodestar fee is used 'as a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized by the district court.'"  *In re Royal Ahold N.V. Securities*, 461 F.Supp.2d at 385 (quoting *Goldberger* [*v. Integrated Res., Inc.*], 209 F.3d [43, 50 (2d Cir. 2000)]).

*Singleton,* 976 F. Supp. 2d at 688.

A lodestar cross-check confirms that 30% of the $3 million Settlement Fund is a reasonable fee award for counsel here. When performing a lodestar cross-check, courts may "accept as reasonable counsel's estimate of the hours they have spent working on the case." *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 482-83 (D.Md. 2014). Here, class counsel represent that they expended a total of 1,192.89 hours on this case. (ECF No. 163, at 8). They employ the Adjusted Laffey Matrix, which provides for $852,125.53 in attorneys' fees without any multiplier. (*Id.*). As an alternative, they employ the Guidelines promulgated by this court in Appendix B to the Local Rules, which provides for attorneys' fees of $358,594. (*Id.*). Under the Guidelines, they request a multiplier of 2.51 to support a fee award of $900,000. (*Id.*) (first citing *Kelly v. Johns Hopkins Univ.*, Civ. No. 16-2835-GLR, 2020 WL 434473, at *7 (D.Md. Jan. 28, 2020) (approving 2.45 multiplier of lodestar); then citing *Kruger v. Novant Health, Inc.*, No. 14-cv-208-WLO, 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) (colleting cases approving lodestar multipliers of 2.5 to 8.9)). They assert that using the average of the Adjusted Laffey rates and the Guideline rates, a multiplier of 1.49 supports an award of $900,000. (*Id.* at 9). Finally, class counsel argue that the sale of BVS to new ownership and management may result in improved housing conditions—a benefit not captured by the monetary fund. (*Id.*).

At the hearing, class counsel confirmed that their estimate of hours devoted to the litigation did not include duplication of tasks by more than one attorney.  When asked about time spent on the unsuccessful Fair Housing Act ("FHA") claims, class counsel indicated that it would be well nigh impossible to segregate time spent on that theory from other aspects of the case.  In a supplemental memorandum, they argue that all claims arose from a common core of facts such that there should be no reduction in the lodestar to account for unsuccessful claims.  (ECF No. 167, at 1-4).  While time devoted to researching the legal landscape for the FHA claims might be ascertainable, the court agrees that the lodestar cross-check does not require that assessment.  It may be that the presence of those claims and the process of litigating them influenced the ultimate settlement that was reached.  From the perspective of the tenants, the results obtained did not turn on legal theories.  Accordingly, there will be no reduction in the lodestar number of hours.

"Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee."  *Boyd*, 299 F.R.D. at 467 (citing *Goldenberg v. Marriott PLP Corp.,* 33 F.Supp.2d 434, 439 n.6; *In re Microstrategy, Inc.,* 172 F.Supp.2d 778, 789; *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3ᵈ Cir. 2001)).  The multiplier of 2.51 falls within this range.

Accordingly, the lodestar cross-check does not suggest that attorneys' fees of 30% of the fund is unreasonable.

### 2.   Reimbursement for Litigation Expenses

"It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award." *Boyd*, 299 F.R.D. at 468 (quoting *Kabore v. Anchor Staffing, Inc.,* No. L-10-cv-3204-BEL, 2012 WL 5077636, at *10 (D.Md. Oct. 17, 2012)). "The Fourth Circuit has stated that such costs may include 'those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services.'" *Id.* (quoting *Spell v. McDaniel,* 852 F.2d 762, 771 (4th Cir. 1988) (internal quotations omitted)). "Examples of costs that have been charged include necessary travel, depositions and transcripts, computer research, postage, court costs, and photocopying." *Id.* (citing *Almendarez v. J.T.T. Enters. Corp.,* No. 06-cv-68-JKS, 2010 WL 3385362, at *7 (D.Md. Aug. 25, 2010)).

Class counsel seek reimbursement for the following litigation expenses: (1) expert witness fees ($64,091.94); (2) mediators ($8,562.73); research costs (legal or factual) ($4,112.75); and postage/delivery services ($398.96).   (ECF No. 165-1, at 18-19). This appears reasonable and consistent with other litigation expenses in similar cases. *See, e.g.*, *Horton*, 2022 WL 2527824, at

*5 (approving litigation expenses of $34,857.12); *Robinson*, 2019 WL 2591153, at *17 (approving litigation expenses of $19,329.76); *Scott*, 2018 WL 1321048, at *5 (approving litigation expenses of $1,000,000). Accordingly, the request for $78,965.18 in expenses will be approved.

### 3.   Settlement Administration Expenses

Class counsel also seek approval of payment to the claims administrator from the Settlement Fund of $27,701, to cover the cost of processing and mailing settlement payments to the class members. (ECF No. 165-2, at 2-4). This appears reasonable and consistent with other claims administration fees in other cases. *See, e.g.*, *Graham*, 2022 WL 17584274, at *12 (approving a claims administration fee of $18,722); *Singleton*, 976 F.Supp.2d at 690 (approving a claims administration fee of $89,208.63). Accordingly, the request for a $27,701 payment to the claims administrator will be approved.

### 4.   Reasonableness of the Incentive Payments

Finally, the court considers the reasonableness of a $7,500 incentive payment to each Named Plaintiff: Norma Guadalupe Beltran, Maria Arely Bonilla, Jesus Gonzalez, Maria Lara, Ramiro Lopez, Anita Ramirez, and Ervin Obdulio Rodas. Incentive payments are "often awarded in Rule 23 class actions." *Graham*, 2022 WL 17584274, at *12. "In determining whether an incentive payment is warranted, courts consider 'the actions the plaintiff has taken to

protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Id.* (quoting *Singleton*, 976 F.Supp.2d at 690).

Here, the Agreement provides that the Named Plaintiffs may apply for a service payment no greater than $7,500, (ECF No. 160-2, at 13), which they have done, (ECF No. 163, at 4-5).  An incentive payment of $7,500 to each Named Plaintiff is comparable to incentive payments approved in other cases in this circuit. *See, e.g.*, *Feinberg v. T. Rowe Price Grp., Inc.*, 610 F.Supp.3d 758, 774 (D.Md. 2022) (approving incentive payments of $15,000 to one named plaintiff, $12,500 to five named plaintiffs, and $10,000 to five named plaintiffs); *Scott*, 2018 WL 1321048, at *5 (approving incentive payments of $10,000 to the nine named class representatives and $5,000 to each of the other named plaintiffs); *Halcom v. Genworth Life Ins. Co.*, No. 3:21-cv-19-REP, 2022 WL 2317435, at *19 (E.D.Va. June 28, 2022) (approving $7,500 in incentive payments to each named plaintiff); *Robinson*, 2019 WL 2591153, at *18 (approving $15,000 incentive payment to sole named plaintiff); *Decohen*, 299 F.R.D. at 483 (approving $10,000 incentive payment to sole named plaintiff); *Kirkpatrick v. Cardinal Innovations Healthcare Sols.*, 352 F.Supp.3d 499, 508 (M.D.N.C. 2018) (approving $10,000 incentive payment to sole named plaintiff); *Horton*, 2022 WL 2527824, at *6 (approving $7,500

incentive payment to sole named plaintiff); *Boyd*, 299 F.R.D. at
469 (approving $5,000 incentive payment to each named plaintiff).
The total of the requested incentive payments is $52,500, which
represents 1.75% of the total fund.  This figure is well within
the range approved by other courts.  *See, e.g.*, *DeWitt v.
Darlington Cnty., S.C.*, No. 4:11-cv-00740-RBH, 2013 WL 6408371, at
*15 (D.S.C. Dec. 6, 2013) (approving total incentive payment
representing 3.33% of the gross amount of the settlement).

As counsel argue, this incentive payment is warranted
because:

> Each of the Named Plaintiffs received written
> discovery requests in the form of
> interrogatories and requests for documents to
> which they responded.  Additionally, the Class
> Representatives prepared for and engaged in
> three day-long mediations, each of which
> required these working-class individuals to
> seek time off from work.  Finally, the Class
> Representatives were consistently and
> conscientiously involved in both aggregating
> information for their counsel and in
> identifying other tenants at BVS who could
> support the matter both for class
> certification and on the merits of the claims.

(ECF No. 163, at 4).  In light of the Named Plaintiffs' role in
initiating this lawsuit and devoting the time and effort necessary
to achieve a favorable resolution, the court finds the requested
incentive payments reasonable and approves the payment of $7,500
to each Named Plaintiff.

## III. Conclusion

For the foregoing reasons, Plaintiff's motion for attorneys' fees, plaintiff incentive awards, and reimbursement of expenses, (ECF No. 163), and motion for final approval of class settlement, (ECF No. 165), will be granted.  A separate order will follow.


                                            /s/
                                  _____
                                  DEBORAH K. CHASANOW
                                  United States District Judge